# EXHIBIT A



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL

ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108

MARTHA COAKLEY
ATTORNEY GENERAL

(617) 727-2200
www.mass.gov/ago

December 2, 2013

**BY HAND**

Maura S. Doyle, Clerk
Supreme Judicial Court
    for Suffolk County
John Adams Courthouse
One Pemberton Square, Suite 1-300
Boston, MA 02108-1707

> Re:   Commonwealth of Massachusetts v. The Wampanoag Tribe of Gay Head
> (Aquinnah), the Wampanoag Tribal Council of Gay Head, Inc., and The
> Aquinnah Wampanoag Gaming Corporation, No. SJ-2013-

Dear Ms. Doyle:

Enclosed for filing in the above-referenced matter please find the Complaint and Motion
for Appointment of Special Process Server.   Because the plaintiff is the Commonwealth, I
understand that the filing fee will be waived.

Thank you for your attention to this matter.

Yours truly,

Juliana deHaan Rice
Assistant Attorney General
(617) 727-2200, ext. 2583

JDR/sc

S:\Adlaw\JRice\Wampanoag Aquinnah\Filing Ltr 12-2-13.docx

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY
No. 2013- 0479

THE COMMONWEALTH OF
MASSACHUSETTS,

　　　　　　　Plaintiff,

v.

THE WAMPANOAG TRIBE OF GAY HEAD
(AQUINNAH), THE WAMPANOAG TRIBAL
COUNCIL OF GAY HEAD, INC., and THE
AQUINNAH WAMPANOAG GAMING
CORPORATION,

　　　　　　　Defendants.



RECEIVED

DEC 0 2 2013

MAURA S. DOYLE CLERK
OF THE SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY

## MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER

Pursuant to MASS. R. CIV. P. 4(c), the undersigned hereby moves for the appointment of

Kevin McCarthy, Director of Investigations for the Office of the Attorney General, or his

designee, as special process server in the above-captioned action. Mr. McCarthy and the

individuals in his Division are over 18 years of age and are not parties to this action.

　　　　　　　　　　　COMMONWEALTH OF MASSACHUSETTS,
　　　　　　　　　　　By its attorneys,

　　　　　　　　　　　MARTHA COAKLEY
　　　　　　　　　　　ATTORNEY GENERAL

　　　　　　　　　　　Juliana deHaan Rice (BBO #564918)
　　　　　　　　　　　Carrie Benedon (BBO # 625058)
　　　　　　　　　　　Bryan F. Bertram (BBO # 667102)
　　　　　　　　　　　Assistant Attorneys General
　　　　　　　　　　　One Ashburton Place
　　　　　　　　　　　Boston, MA 02108
　　　　　　　　　　　617-727-2200
　　　　　　　　　　　Juliana.Rice@state.ma.us
　　　　　　　　　　　Carrie.Benedon@state.ma.us
　　　　　　　　　　　Bryan.Bertram@state.ma.us

Dated:　December 2, 2013

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT IN AND FOR SUFFOLK COUNTY

No. SJ-2013-0479

THE COMMONWEALTH OF
MASSACHUSETTS,

Plaintiff,

v.

THE WAMPANOAG TRIBE OF GAY HEAD
(AQUINNAH), THE WAMPANOAG TRIBAL
COUNCIL OF GAY HEAD, INC., and THE
AQUINNAH WAMPANOAG GAMING
CORPORATION,

Defendants.



RECEIVED

DEC 0 2 2013

MAURA S. DOYLE CLERK
OF THE SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY

## COMPLAINT

1.      The Wampanoag Tribe of Gay Head (Aquinnah) is a federally recognized

Indian Tribe located on lands at the western tip of Martha's Vineyard.[1]  On its lands, the

Aquinnah Tribe may do as it wishes, so long as it acts consistently with State and local

law.  The Aquinnah Tribe is entitled to, and receives, the respect and deference of the

Commonwealth of Massachusetts with regard to its lawful actions.

2.      What the Aquinnah Tribe may not do, however, is operate a gaming (i.e.,

gambling) establishment on its lands, unless that establishment is licensed and permitted

under both State and local law.

3.      This matter has been settled since November 1983, when the

---

[1]  As used herein, the terms "Aquinnah Tribe" and "Tribe" shall refer to the defendants
Wampanoag Tribe of Gay Head (Aquinnah) and the Wampanoag Tribal Council of Gay
Head, Inc.

Commonwealth, the Aquinnah Tribe, the Town of Aquinnah (the "Town"), and the Taxpayers' Association of Gay Head, Inc. (the "Taxpayers' Association") negotiated and entered into an agreement (the "Settlement Agreement") (attached as **Exhibit A**) to resolve a lawsuit brought by the Aquinnah Tribe claiming aboriginal property rights to certain tracts of land in the Town.

4. In the Settlement Agreement, the Town and its Taxpayers' Association conveyed title to over 400 acres of land on Martha's Vineyard to the Aquinnah Tribe. In return, the Aquinnah Tribe agreed that those lands would remain subject to the Commonwealth's (and local) laws and jurisdiction, and that the Tribe had no authority or jurisdiction to act in contravention of those laws.

5. The Commonwealth's laws prohibit any person or entity from operating a gaming establishment without a gaming license issued under State law. Under the terms of the Settlement Agreement, that prohibition applies to the Aquinnah Tribe, just as it would to any other entity that sought to open a gaming establishment in the Commonwealth. In addition, Massachusetts law grants only one entity (i.e., the Massachusetts Gaming Commission) authority to issue the requisite gaming license.

6. Because the Aquinnah Tribe does not have a gaming license issued by the Massachusetts Gaming Commission, the Tribe may not operate a gaming establishment on its lands.

7. Nonetheless, the Aquinnah Tribe recently adopted a Tribal ordinance purporting to permit the Tribe to: license, open, and operate gaming establishments on its lands, all in contravention of Massachusetts law. Moreover, the Tribe has expressed its intent to open a gaming establishment "as soon as possible," and has acted on that intent

as described in this complaint.  Those actions have violated the Settlement Agreement.

8.      Accordingly, the Commonwealth brings this action based upon breach of contract and G.L. c. 231A.  The Commonwealth seeks judgment declaring that the Aquinnah Tribe must follow the terms of the Settlement Agreement by, among other things, abiding by all laws of the Commonwealth, including those laws that prohibit gaming without a State-issued license.

## PARTIES

9.      The Commonwealth of Massachusetts is a sovereign state of the United States.

10.     Defendant the Wampanoag Tribe of Gay Head (Aquinnah) is a federally recognized Native American Tribe.  25 U.S.C. § 1771(7).

11.     The Wampanoag Tribe of Gay Head (Aquinnah) includes the Defendant Wampanoag Tribal Council of Gay Head, Inc., an entity formerly organized as a Massachusetts non-profit corporation whose incorporation was deemed revoked under the laws of the Commonwealth effective June 18, 2012.

12.     The Wampanoag Tribe of Gay Head (Aquinnah) and the Wampanoag Tribal Council of Gay Head, Inc. maintain their principal and usual places of business at 20 Black Brook Road, Aquinnah, Massachusetts.

13.     Defendant the Aquinnah Wampanoag Gaming Corporation is, on information and belief, a wholly-owned subsidiary of either or both the Wampanoag Tribe of Gay Head (Aquinnah) and the Wampanoag Tribal Council of Gay Head, Inc.

14.     Upon information and belief, the Aquinnah Wampanoag Gaming Corporation maintains its principal and usual place of business at 20 Black Brook Road, Aquinnah, Massachusetts.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action in accordance with G.L. c. 214, §§ 1, 2, 8.

16.     This Court has personal jurisdiction over the Wampanoag Tribe of Gay Head (Aquinnah) pursuant to G.L. c. 223A, § 2, because the Tribe maintains its principal and usual place of business in the Commonwealth.

17.     This Court has personal jurisdiction over the Wampanoag Tribal Council of Gay Head, Inc. pursuant to G.L. c. 223A, § 2, because the Tribe maintains its principal and usual place of business in the Commonwealth.

18.     This Court has personal jurisdiction over the Aquinnah Wampanoag Gaming Corporation pursuant to G.L. c. 223A, § 2, because that entity, on information and belief, maintains its principal and usual place of business in the Commonwealth.

19.     Venue is proper in this Court pursuant to G.L. c. 223, § 5, because this action is brought by the Commonwealth.

## FACTS

### The Aquinnah Tribe Received Title to Settlement Lands in Return for Its Agreement to Abide by the Laws of the Commonwealth

20.     The Town of Aquinnah is located on the western tip of Martha's Vineyard, Massachusetts.

21.     Incorporated in 1870 as Gay Head, Massachusetts, the Town formally changed its name to Aquinnah in 1997.

22.     Throughout its history, the Town has been home to a community of Wampanoag Native Americans named the Aquinnah.

23.     In February 1987, the United States Secretary of the Interior formally recognized the Aquinnah as an Indian Tribe.

24.     Previously, in 1974, the Aquinnah Tribe sued the Town claiming aboriginal title to certain tracts of land in Martha's Vineyard. *Wampanoag Tribal Council of Gay Head, Inc. v. Town of Gay Head*, No. 74-5826-G (D. Mass.).

25.     On September 28, 1983, the Commonwealth, the Aquinnah Tribe, the Town, and the Town Taxpayers' Association entered into a "Joint Memorandum of Understanding Concerning Settlement of the Gay Head, Massachusetts Indian Land Claims" (the Settlement Agreement) to resolve the *Wampanoag* lawsuit.

26.     The Settlement Agreement was the capstone to nine years of litigation and was a carefully struck, negotiated contract among sophisticated parties represented by legal counsel.

27.     The Settlement Agreement conferred benefits and placed obligations on all parties to that agreement.

28.     The Town and the Taxpayers Association agreed to convey title to more than 400 acres of public and private lands (the "Settlement Lands") to a specially created, state-formed corporation created by the Aquinnah Tribe "for the purpose of acquiring, managing, and permanently holding lands, including the lands defined in this settlement as the Settlement Lands." Settlement Agreement ¶ 3. On information and belief, the United States Department of the Interior took the Settlement Lands at issue in this action into trust for the Tribe's benefit in December 1988 and March 1993.

29.     In return, the Aquinnah Tribe agreed to relinquish all claims of any kind to lands and waters in the Commonwealth. Settlement Agreement ¶ 8(d).

30.     In numerous provisions of the Settlement Agreement, the Aquinnah Tribe also agreed that the Settlement Lands would remain under the Commonwealth's jurisdiction and be subject to all State and local laws. In short, the Aquinnah Tribe expressly agreed that it had no authority whatsoever to act in contravention of State and local laws, and conceded that it would be subject to State enforcement power if it did so.

A.      Paragraph 3 of the Settlement Agreement states:

> The Tribal Land Corporation shall hold the Settlement Lands, and any other land it may acquire, *in the same manner, and subject to the same laws, as any other Massachusetts corporation*, except to the extent specifically modified by this agreement and the accompanying proposed legislation. *Under no circumstances*, including any future recognition of the existence of an Indian tribe in the Town of Gay Head, *shall the civil or criminal jurisdiction of the Commonwealth of Massachusetts, or any of its political subdivisions, over the settlement lands, or any land owned by the Tribal Land Corporation in the Town of Gay Head, or the Commonwealth of Massachusetts, or any other Indian land in Gay Head, be impaired or otherwise altered*, except to the extent modified in this agreement and in the accompanying proposed legislation.

(emphasis added).

B.      Paragraph 11 of the Settlement Agreement states:

> The Settlement Land shall be subject to an express federal statutory restriction against alienation.   This statutory provision against alienation shall state explicitly that (a) *no Indian tribe or band shall ever exercise sovereign jurisdiction as an Indian tribe other than to the extent agreed herein, over all or part of the*

-6-

> *Settlement lands, or over any other land that may now or in the future be owned by or held in trust for, any Indian entity*, but (b) the absence of such sovereignty shall not in any way prejudice Gay Head Indians in their efforts to obtain federal benefits available to Indians or the achieve recognition as a tribe.

(emphasis added).

C.   Paragraph 13 of the Settlement Agreement states: "All Federal, State and Town laws shall apply to the Settlement Lands" subject only to certain narrow restrictions not relevant here.

D.   Paragraph 16 of the Settlement Agreement subjects the Settlement Lands to the Town's Land Use Plan and to the Town's zoning laws.

31.   The Settlement Agreement was duly executed by authorized individuals on behalf of the Commonwealth, the Aquinnah Tribe, the Town, and the Town Taxpayers' Association.

32.   Both the Massachusetts Legislature and the United States Congress subsequently enacted legislation ratifying the Settlement Agreement.

33.   In 1985, the Massachusetts Legislature enacted Chapter 277 of the Acts of 1985, entitled "An Act to Implement the Settlement of the Gay Head Indian Land Claims" ("the Commonwealth Act"). The Commonwealth Act implemented the terms of the Settlement Agreement and incorporated the Settlement Agreement into State law.

34.   The Commonwealth Act also reaffirmed the parties' contractual agreement that the Settlement Lands would be under the Commonwealth's jurisdiction and subject to the laws of both the Commonwealth and Town. Section 4 of the

Commonwealth Act states that "All federal, state, and town laws shall apply to the settlement lands" subject to certain exceptions not applicable in this action.  Section 5 of the Commonwealth Act provides:

> Except as provided in this act, all laws, statutes and bylaws of the commonwealth, the town of Gay Head, and any other properly constituted legal body, shall apply to all settlement lands and any other lands owned now or at any time in the future by the Tribal council or any successor organization.

35.    On August 18, 1987, the United States Congress enacted the Massachusetts Indian Land Claims Settlement Act (the "Federal Settlement Act") to implement the Settlement Agreement.

36.    As with the Commonwealth Act, the Federal Settlement Act reaffirmed the parties' contractual agreement that the Settlement Lands would remain subject to the Commonwealth's (and local) laws and jurisdiction—including those laws governing gaming—and that the Aquinnah Tribe would not exercise jurisdiction over those lands.

> [S]ettlement lands and any other land that may now or hereafter be owned or held in trust for any Indian tribe or entity in the town of Gay Head, Massachusetts shall be subject to the civil and criminal laws, ordinances, and jurisdiction of the Commonwealth of Massachusetts and the town of Gay Head, Massachusetts (including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance).

25 U.S.C. § 1771g.

37.    The Federal Settlement Act further reaffirmed the parties' contractual agreement that the Aquinnah Tribe may not exercise any jurisdiction inconsistent with Massachusetts law governing the Settlement Lands:  the Tribe "*shall not exercise any jurisdiction* over any part of the settlement lands *in contravention* of this subchapter, the civil regulatory and criminal laws of the Commonwealth of Massachusetts, the town of

Gay Head, Massachusetts, and applicable Federal laws." 25 U.S.C. § 1771e(a) (emphasis added).

## The Aquinnah Tribe Has Not Obtained a License to Open a Gaming Establishment Pursuant to Massachusetts Law

38.    Massachusetts law prohibits any person or entity from opening or operating a gaming establishment without a gaming license issued by the Massachusetts Gaming Commission pursuant to the statutory process set forth in Chapter 23K of the General Laws and regulations promulgated thereunder.

39.    The Settlement Agreement subjects the Aquinnah Tribe and the Settlement Lands to the jurisdiction of the Commonwealth and to the Commonwealth's criminal and civil laws.

40.    Accordingly, the Aquinnah Tribe—like any other entity subject to Massachusetts law—cannot operate a gaming establishment without first obtaining a gaming license issued by the Massachusetts Gaming Commission pursuant to Chapter 23K and regulations promulgated thereunder.

41.    The Aquinnah Tribe does not presently hold and has never held a gaming license issued by the Massachusetts Gaming Commission.

42.    Nor would the Aquinnah Tribe be currently eligible to receive a gaming license.

43.    The Chapter 23K licensing process requires an entity to apply for a gaming license, and the application process involves an extensive determination whether an applicant is suitable to operate a gaming establishment. *E.g.*, G.L. c. 23K, §§ 9-18.

44.     Among other requirements, an applicant must have reached an agreement with its host community and "received a certified binding vote on a ballot question at an election in the host community in favor of such license."  G.L. c. 23K, § 15.

45.     The Aquinnah Tribe has not reached any agreement with the Town, nor has it received the approval of the Town's voters to open a gaming establishment.

46.     The Aquinnah Tribe is therefore currently prohibited from opening a gaming establishment because it does not possess a gaming license issued by the Massachusetts Gaming Commission.

47.     Accordingly, any actions taken by the Aquinnah Tribe to open or operate a gaming establishment would violate Massachusetts law.

### The Aquinnah Tribe Adopted a Tribal Gaming Ordinance in Violation of Massachusetts Law

48.     The Aquinnah Tribe has taken actions to license, open, and operate gaming establishments on Settlement Lands in violation of Massachusetts and local law and in breach of the Settlement Agreement's provisions requiring the Aquinnah Tribe to abide by that law.

49.     On February 4, 2012, the Aquinnah Tribe passed Resolution 2012-04 ("Resolution Adopting Wampanoag Tribe of Gay Head (Aquinnah) Gaming Ordinance No. 2011-01") adopting a Tribal gaming ordinance, Gaming Ordinance No. 2011-01 (attached as **Exhibit B**).

50.     Among other things, Gaming Ordinance No. 2011-01 purportedly:

    A.     Authorizes gaming to be conducted on Settlement Lands;[2]

    B.     Establishes an Aquinnah Tribal Gaming Commission;[3] and

---

[2]   Gaming Ordinance No. 2011-01, §§ 1.5 and 1.6.

C.      Authorizes that Commission to issue gaming licenses and Tribal

work permits in furtherance of gaming activities.[4]

51.      In other words, Gaming Ordinance No. 2011-01 purportedly authorizes

the Aquinnah Tribe to license, open, and operate gaming establishments *without* first

obtaining a Chapter 23K license from the Massachusetts Gaming Commission.  Gaming

Ordinance No. 2011-01 also purportedly establishes a governing body for such unlawful

gaming separate from and outside of the very same laws the Aquinnah Tribe agreed to

follow in the Settlement Agreement:  the laws of the Commonwealth.

52.      The Aquinnah Tribe's adoption of Gaming Ordinance No. 2011-01

violates Massachusetts law, is void, and breaches the Aquinnah Tribe's contractual

obligation to abide by Massachusetts law as set forth in the Settlement Agreement.

### The Aquinnah Tribe Has Taken Further Actions Aimed at Opening a Gaming Establishment in Violation of Massachusetts Law

53.      After adopting Gaming Ordinance No. 2011-01, the Aquinnah Tribe has

taken additional actions violating the Commonwealth's gaming laws.

54.      The Aquinnah Tribe submitted its Gaming Ordinance No. 2011-01 to the

National Indian Gaming Commission ("NIGC") for review and approval.  By letter

dated February 21, 2012, the NIGC approved Gaming Ordinance No. 2011-01 for

gaming on Indian Lands as defined by the Federal Indian Gaming Regulatory Act

("IGRA").

---

[3]   *Id.* at § 2.

[4]   *Id.* at § 3.

55.    The Aquinnah Tribe subsequently re-submitted Gaming Ordinance No. 2011-01 to the NIGC accompanied by a new Tribal resolution making the ordinance specific to the Settlement Lands.[5]

56.    On August 29, 2013, NIGC wrote to the Aquinnah Tribe that the NIGC once again considered Gaming Ordinance No. 2011-01—now site-specific to the Settlement Lands—"to be approved to the extent that it is consistent with the provisions of IGRA."

57.    The Aquinnah Tribe requested a legal opinion from NIGC stating that the Tribe may conduct gaming on Settlement Lands.  On October 25, 2013, NIGC informed the Tribe by letter of its legal opinion that the Settlement Lands are Indian Lands under IGRA and that those lands are eligible for gaming under Gaming Ordinance No. 2011-01.

58.    Neither the Aquinnah Tribe nor the NIGC informed the Commonwealth that the Tribe had submitted gaming ordinances for NIGC's approval or that the Tribe had requested legal opinions from the NIGC concerning eligibility for gaming on Settlement Lands.

59.    The Commonwealth only first learned of these matters in a letter from the Aquinnah Tribe dated November 12, 2013—after NIGC approved the Aquinnah Tribe's gaming ordinance and after NIGC issued its legal opinion.

60.    The Aquinnah Tribe has publicly and repeatedly expressed its intent to license, open, and operate one or more gaming establishments under Gaming Ordinance No. 2011-01 "as soon as possible."[6]

---

[5]    Resolution 2012-23, "Identification of Indian Lands for the Purposes of the Wampanoag Tribe of Gay Head (Aquinnah) Gaming Ordinance 2011-11," Apr. 7, 2012.

61.    Consistent with its expressed intent, the Aquinnah Tribe has, on information and belief, submitted notice to the NIGC that it will license a gaming facility on its Settlement Lands.  On information and belief, the NIGC received the Aquinnah Tribe's notice—together with a proposed license—on or about August 5, 2013.

## COUNT I:
## BREACH OF CONTRACT

62.    The allegations set forth in paragraphs 1 through 61 are incorporated by reference as if set forth herein.

63.    The Settlement Agreement is a valid and enforceable contract that created obligations on the part of the Aquinnah Tribe to observe and comply with the Commonwealth's laws, including those regulating gaming establishments.

64.    The Aquinnah Tribe may not license, open, or operate gaming establishments on Settlement Lands without a gaming license issued by the Commonwealth.

65.    The Aquinnah Tribe's actions, as alleged in this complaint, have breached the terms of the Settlement Agreement.

66.    The Commonwealth has suffered and will continue to suffer injury resulting from the Aquinnah Tribe's breach of the Settlement Agreement.

67.    The Aquinnah Tribe's actions, as alleged in this complaint, are so considerable that they go to the very essence of the parties' contractual bargain in the Settlement Agreement.

---

[6]    *See, e.g.,* Mark Arsenault, "Tribe Says it Will Open Small Casino on Vineyard," *The Boston Globe* A1 (Nov. 12, 2013).

68.     The Aquinnah Tribe's actions, as alleged in this Complaint, are anticipatory breaches of the Tribe's contractual obligations to the Commonwealth.

69.     The Commonwealth has suffered and will continue to suffer injury resulting from the Aquinnah Tribe's anticipatory breaches of the Settlement Agreement.

70.     Relief in the form of damages or restitution is not adequate to remedy the injury the Aquinnah Tribe has inflicted upon the Commonwealth through its actual and anticipatory breaches of the Settlement Agreement.

## COUNT II:
## DECLARATORY JUDGMENT (G.L. c. 231A)

71.     The allegations set forth in paragraphs 1 through 70 are incorporated by reference as if set forth herein.

72.     Under General Laws c. 231A, § 2, this Court is authorized to determine the rights, duties, status, or other legal relations of parties under written contracts, such as the Settlement Agreement, and under the laws of the Commonwealth.

73.     The Aquinnah Tribe's actions, as alleged in this Complaint, are actual or anticipatory breaches of the Settlement Agreement and actual violations or contemplated and impending violations of Massachusetts law.

74.     As a party to the Settlement Agreement, the Commonwealth may seek to enforce the terms of the Settlement Agreement.

75.     The Commonwealth is also responsible for the enforcement of laws prohibiting gaming without a gaming license.

76.     An actual controversy has therefore arisen between the Aquinnah Tribe and the Commonwealth concerning the Tribe's actual or anticipatory breaches of the

Settlement Agreement and actual violations or contemplated and impending violations of Massachusetts law.

77.     No administrative remedies exist to terminate this controversy.

78.     A judgment of this Court concerning those actions would terminate the uncertainty giving rise to this controversy.

[*Reminder of page intentionally blank*]

## PRAYER FOR RELIEF

WHEREFORE, the Commonwealth respectfully asks this Court enter judgment:

a.  In favor of the Commonwealth and against the Aquinnah Tribe on all Counts;

b.  Declaring that the Aquinnah Tribe has no right to license, open, or operate a gaming establishment on the Settlement Lands without complying with all laws of the Commonwealth pursuant to the terms of the Settlement Agreement;

c.  Declaring that Gaming Ordinance No. 2011-01, and any action taken by the Aquinnah Tribe pursuant to Gaming Ordinance No. 2011-01, are illegal and void because the Ordinance and any actions taken pursuant to the Ordinance are in irreconcilable conflict with the Settlement Agreement and with Massachusetts law; and

d.  Awarding the Commonwealth such other and further relief as the Court deems just and proper.

Respectfully submitted,

THE COMMONWEALTH OF MASSACHUSETTS,

By and through its attorney,

MARTHA COAKLEY
ATTORNEY GENERAL

Juliana deHaan Rice (BBO # 564918)
Carrie Benedon (BBO # 625058)
Bryan Bertram (BBO # 667102)
Assistant Attorneys General
Government Bureau
Office of Attorney General Martha Coakley
One Ashburton Place
Boston, MA 02108-1698
(617) 963-2107
Juliana.Rice@state.ma.us
Carrie.Benedon@state.ma.us
Bryan.Bertram@state.ma.us

Dated: December 2, 2013

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT IN AND FOR SUFFOLK COUNTY

No.  SJ-_____

THE COMMONWEALTH OF
MASSACHUSETTS,

                         Plaintiff,

           v.

THE WAMPANOAG TRIBE OF GAY HEAD
(AQUINNAH), THE WAMPANOAG TRIBAL
COUNCIL OF GAY HEAD, INC., and  THE
AQUINNAH WAMPANOAG GAMING
CORPORATION,

                         Defendants.

## EXHIBITS TO COMPLAINT

**Exhibit A:**  Joint Memorandum of Understanding Concerning Settlement
of the Gay Head Massachusetts Indian Land Claims (Sept. 28, 1983)...............................1

**Exhibit B:**  Wampanoag Tribe of Gay Head (Aquinnah) Ordinance No.
2011-01, Tribal Gaming Ordinance .................................................................................66

# EXHIBIT A

JOINT MEMORANDUM OF UNDERSTANDING

CONCERNING SETTLEMENT OF THE GAY HEAD,

MASSACHUSETTS INDIAN LAND CLAIMS

WAMPANOAG TRIBAL COUNCIL
OF GAY HEAD, INC.

September 28, 1983

1.  The Parties to the Settlement are the parties in the
litigation before the United States District Court for the
District of Massachusetts known as Wampanoag Tribal Council of
Gay Head, Inc., et al. v. Town of Gay Head, et al., Civil
Action No. 74-5826-G (including intervenors).

The Parties shall seek to have all others who may be
interested in the Settlement act so as to assure that the
Settlement becomes effective.

2.  The Parties agree to the following settlement, all
provisions of which are to be considered as inseparable and
interdependent, except as otherwise specifically provided
herein, and which are all conditioned upon requisite favorable
action within 18 months of the execution of this settlement by
other entities, including appropriate executive and
legislative branches of the governments of the Town of Gay
Head, the Commonwealth of Massachusetts, and the United States
of America.

3.  A state-chartered corporation (hereinafter called the
Tribal Land Corporation) will be created by the Wampanoag
Tribal Council of Gay Head, Inc. (hereinafter the Tribal
Council) for the purpose of acquiring, managing, and
permanently holding lands, including the lands defined in this
settlement as the Settlement Lands.  The Tribal Land
Corporation shall hold the Settlement Lands, and any other
land it may acquire, in the same manner, and subject to the
same laws, as any other Massachusetts corporation, except to

the extent specifically modified by this agreement and the accompanying proposed legislation. Under no circumstances, including any future recognition of the existence of an Indian tribe in the Town of Gay Head, shall the civil or criminal jurisdiction of the Commonwealth of Massachusetts, or any of its political subdivisions, over the settlement lands, or any land owned by the Tribal Land Corporation in the Town of Gay Head, or the Commonwealth of Massachusetts, or any other Indian land in Gay Head, or the Commonwealth of Massachusetts, be impaired or otherwise altered, except to the extent modified in this agreement and in the accompanying proposed legislation.

4. The Town of Gay Head will convey all its rights, title and interest in the Town Common Lands (except for the shoreline as defined in Paragraph 10) to the Tribal Land Corporation. These lands comprise about 238 acres (which include the Cranberry Lands, the Face of the Cliffs, and the Herring Creek), and are described roughly on the map attached hereto and made part of this agreement. A survey shall be made in order to determine the precise acreage and boundaries of the Common Lands. The cost of the survey shall be regarded as part of the cost of the Tribal Land Corporation's acquisition of lands under this settlement and shall be financed out of the Federal funds appropriated pursuant to Paragraph 8. Existing surfaced roads across the Common Lands will continue to be owned and maintained by the Town of Gay Head or the Commonwealth of Massachusetts, as the case may be,

-2-

and shall be open to the public.  Present unsurfaced roads
providing access across the Common Lands to private lands
beyond shall continue to be available for access to such
private lands.

5.   The Town of Gay Head shall convey the so-called Cook
Lands (L. No. 395) to the Tribal Land Corporation.  Such
property, however, shall not be part of the Settlement Lands,
and shall remain subject to taxation and foreclosure in the
same manner as any other privately owned property in Gay
Head.  Any structure placed on this property shall be subject
to all Federal, State and local laws, including Town zoning
laws, State and Federal conservation laws, and the regulations
of the Martha's Vineyard Commission, and in no event shall any
structure or structures erected on this land comprise more
than 3,000 square feet or exceed a height of twelve feet with
a maximum peak of 16 feet.  Changes in Town zoning laws made
subsequent to the date of this Memorandum may be made
applicable to such Cook lands only in the manner provided for
changes to the Land Use Plan as described in Paragraph 16 of
this Memorandum.  If the said property is used for any purpose
not permitted by the Land Use Plan, or is sold, leased or
otherwise alienated by the Tribal Land Corporation to any
entity other than one which is Indian controlled, all right,
title and interest in the property shall revert to the Town of
Gay Head, provided however, that nothing herein shall prevent
the granting of a valid mortgage on the said property.  All
residents and property owners of Gay Head, their guests and

-3-

assigns, shall have an easement to use the pond beach on the
Cook Lands for such recreational activities as are now carried
out on such beach, including, but not limited to, fishing,
swimming, outdoor recreation, or the beaching or achorage of
small boats, and shall have guaranteed access to such beach by
land as provided in the Land Use Plan.

6.  The Owners of the former Strock Estate will convey
their ownership interest in certain lands formerly known as
the Strock Estate in Gay Head to the Tribal Land Corporation.
These lands consist of three parcels separate from each
other--one parcel of about 57 acres, one of about 33 acres and
one of about 85 acres, or a total of about 175 acres.  (The
precise lot numbers falling within these three parcels are
listed in Appendix A.)  These lands are to be sold to the
Tribal Land Corporation at fair market value established
without regard to Indian claims extinguished in accordance
with Paragraph 8(d).

7.  If the owners of the land located between the
so-called Cranberry Lands portion of the Common Lands and
Menemsha Creek (hereinafter called the Menemsha Neck Lands)
are willing to sell their land, the parties will support the
principle that the Federal Government should provide funds in
order to acquire these lands so that they may become part of
and be treated as Common Lands for purposes of this
settlement.  Such sales shall be at fair market value
established without regard to Indian claims extinguished in

accordance with Paragraph 8(d).  If any owner refuses to sell

or if the Federal Government refuses to provide funds for these lands, the other provisions of this settlement will nevertheless remain in effect.

8.   The parties to the settlement support the principle that:

(a)  The Federal Government will appropriate funds to finance the survey of the Common Lands and the Cook property described in Paragraphs 4 and 5;

(b)  The Federal Government will appropriate funds, in a sufficient amount to pay for the lands of the former Strock Estate described in Paragaph 6, based upon fair appraisal;

(c)  The Parties will also seek Federal funds to pay for the Menemsha Neck Lands described in Paragraph 7, if any owners desire to sell, but if such funds are not obtained, the other provisions of this settlement will nevertheless remain in effect;

(d)  Congress will enact legislation that eliminates all Indian claims of any kind, whether possessory, monetary, or otherwise, whether aboriginal or under recognized title involving lands and waters in the Town of Gay Head, and that effectively clears the titles to all land in Gay Head of any such claims, whether asserted in the past, present or future.  That legislation will also extinguish all claims of any kind by the alleged Gay Head Tribe, whether possessory, monetary or otherwise, whether aboriginal or under recognized title involving any other

-5-

lands and waters within the Commonwealth of Massachusetts and that effectively clears the titles to all land in the Commonwealth of any such claims, whether asserted in the past, present or future. The alleged Gay Head Tribe and the Tribal Council on behalf of all persons of Indian descent hereby agree that this settlement is in full compensation for the claims so extinguished. This legislation shall not eliminate or affect the claim of any individual Indian which is pursued under any law generally applicable to non-Indians as well as Indians.

9. Neither the provisions of Paragraph 8 nor this Joint Memorandum of Understanding as a whole shall be deemed an admission of the existence of a tribe and are instead intended simply to extinguish claims made by any Indians, whether advanced by individuals, groups or tribes.

10. The Settlement Lands shall comprise the following:

(a)  The Common Lands described in Paragraph 4, excluding the shoreline abutting on ocean, sound, or pond. Such shoreline, consisting of a strip of land extending 50 feet inland of mean high water along the ocean and sound and 30 feet inland of mean high water along Menemsha Pond, Menemsha Creek and any other body of water, shall continue to be owned by the Town of Gay Head and shall be available to all Gay Head residents and property owners, their guests and assigns, for recreational and other uses now commonly made of such shoreline, and shall be subject to a conservation trust

-6-

with the Town of Gay Head as Trustee that shall insure the continued right of such uses by such persons. Access to the shoreline across the common lands shall be preserved and the roads and paths established in accordance with the Land Use Plan mentioned in paragraph 16 for such access shall be maintained by the Town of Gay Head.

(b)  The three parcels of the former Strock Estate described in paragraph 6.

(c)  The Menemsha Neck Lands described in Paragraph 7 which, so far as they are acquired pursuant to this Settlement, shall be treated as though they were part of the Common Lands.

11.  The Settlement Land shall be subject to an express federal statutory restriction against alienation.  This statutory provision against alienation shall state explicitly that (a) no Indian tribe or band shall ever exercise sovereign jurisdiction as an Indian tribe other than to the extent agreed herein, over all or any part of the Settlement lands, or over any other land that may now or in the future be owned by or held in trust for, any Indian entity, but (b) the absence of such sovereignty shall not in any way prejudice Gay Head Indians in their efforts to obtain federal benefits available to Indians or to achieve recognition as a tribe. Notwithstanding the foregoing, the federal restriction against alienation shall permit the Tribal Land Corporation to convey a strip of land up to 70 feet wide beginning 30 feet inland from mean high water and 500 feet long, starting from the

-7-

terminus of the West Basin Road and running in an easterly direction along an area of West Basin now used for mooring boats, so that the Town may construct a bulkhead and related structures at this site, subject to the limitations set forth in the Land Use Plan.

12. Subject to the conditions expressly provided in this Agreement, the Settlement Lands are to be held in trust by the Tribal Land Corporation for the benefit of Gay Head Indians, defined as all descendants of the Indians listed in the census taken in 1869. A copy of the said census is included as Appendix B of this Agreement.

13. All Federal, State and Town laws shall apply to the Settlement Lands subject only to the following special provisions, regardless of any federal recognition the alleged Gay Head Tribe may acquire:

(a) The Settlement Lands will not be treated as real property subject to taxation pursuant to Massachusetts General Laws Chapter 59, or any successor State Law, but the Tribal Land Corporation will make payments in lieu of property taxes to the Town of Gay Head or other appropriate entity on the former Strock Estate, if and when improvements are placed on those lands. The fraction of land subject to such payments shall be determined in accordance with the density requirements of Town zoning ordinances. For example, if a house is placed on land which is zoned for two-acre homesites, then two acres of the land shall be subject to payments in lieu of

-8-

taxes. The amount of such payment shall be determined by assessing the value of the improvements and the value of the land attributable to such improvement, as determined in accordance with this section, and applying the town property tax rate or any other applicable tax rates just as though the improvements and attributable land were held by any private person. With respect to in-lieu payments that remain unpaid, neither the Town nor any other person will have the right of foreclosure against the Settlement Lands. Instead of its right of foreclosure, the Town or any other person otherwise entitled to foreclosure may enforce a lien against other assets of the Tribal Land Corporation or any subsidiary thereof, or any other entity controlled by the Tribal Council. If the in-lieu payments are not fully paid three years after they are due, the Town may seize the land and improvement on which the in-lieu payments are in arrears and lease such land and improvements on reasonable terms for periods of time not to exceed five years, the sums realized from such leases to be applied, after costs, to the payment of the amount in arrears. Seizure by the Town under this provision shall in no way affect title to the land, which shall remain with the Tribal Land Corporation, and at the expiration of any lease period during which all arrearages have been paid in full, control of the land and improvements shall be returned to the Tribal Land Corporation.

-9-

(b)   The Tribal Land Corporation will have the right
(after consultation with appropriate State and local
officials) to establish its own regulations concerning
hunting (but not trapping or fishing) by Indians on the
Settlement Lands by means other than firearms or
crossbow.   These regulations by the Tribal Land
Corporation shall impose reasonable standards of safety
for persons and protection of wild life and the absence of
such regulations imposing such standards of safety shall
be deemed unreasonable.   These safety and protection
standards shall be subject to judicial review for
reasonableness and may be enforced by State and local law
enforcement officers.   Hunting by firearm or crossbow
shall remain subject to the State law.

14.   The Gay Head Indians will not receive Federal
recognition as a Tribe as a result of Congressional
legislation to carry out the provisions of this Settlement,
but they shall have the same right to petition for such
recognition as other groups.

15.   Plaintiffs in the lawsuit against the Town of Gay
Head, known as Wampanoag Tribal Council of Gay Head, Inc., et
al. v. Town of Gay Head, et al., agree to cause the lawsuit to
be dismissed with prejudice at the time that the Federal
legislation referred to in Paragraph 8 becomes effective.

16.   The Settlement Lands will be subject to the Land Use
Plan attached hereto and made a part hereof.   The Land Use
Plan shall be enacted as part of the zoning law of the Town of

-10-

Gay Head. Future amendments of the Land Use Plan as
applicable to the Settlement Lands and embodied in the Town
Zoning Law will require approval by the Tribal Land
Corporation, by the Town of Gay Head (by whatever majority is
usually required for such amendments) at two town meetings not
less than one month apart, at least one of which shall be held
during the month of July or August, and by such officials, if
any, of the Commonwealth whose approval is required for
amendments to zoning laws.

ACCEPTED:

For the Wampanoag Tribal Council of Gay Head, Inc.
By: _____ Date: 11/19/83  Witness: _____

For the Town of Gay Head:
By: _____ Date: 11/19/83  Witness: _____

For the Taxpayers' Association of Gay Head, Inc.
By: Hannah R. Mackin Date: 11/19/83  Witness: _____

For the Commonwealth of Massachusetts:
By: _____ Date: 11/22/83  Witness: _____

True Copy & Attest.

WAMPANOAG TRIBAL COUNCIL
OF GAY HEAD, INC.

(A)

October 3, 1983

LAND USE PLAN

I.  The Cranberry Lands and the Gay Head Cliffs

A.  Access to the shoreline across the Common Lands shall be preserved, and the established roads and paths for such access shall be maintained by the Town of Gay Head or with respect to any State roads, by the Commonwealth of Massachusetts.  Such rights of way, as shown on the attached map, shall include:

(1)  By foot and by vehicle along the Lobsterville and West Basin Road, inclusive of the parking areas at their ends; from the end of these roads to the West Basin anchorage and to the Menemsha Pond; and by two existing roads leading from Lobsterville Road to the properties above the clay pits, the one proceeding from Menemsha Sound, the other from the terminus of the Lobsterville Road at Menemsha Pond;

(2)  By foot from the Lobsterville Road to the Sound, wherever the center line of that Road is within 125 feet of mean high water;

(3)  By foot along an easement 10 feet wide, extending from the West Basin parking area to the Sound, along a line approximately 80 feet west of, and parallel to, the top of the stone revetment along the west bank of Menemsha Creek, and by foot along existing paths from West Basin Road, as shown on the attached map.  The Town of Gay Head shall retain the right to enter on these shores and rights of way in order to clean and repair them, and to regulate behavior on them, as

necessary to maintain the natural condition of the land, or to keep its use within the capacity of anchorages, roads, or parking areas.

B.  The Common Lands will not be subdivided, but will be held in their entirety by the Tribal Land Corporation and will be subject to normal health and building regulations of Gay Head and of the Commonwealth as they are in force at the time in question.

C.  Except as noted below, all the Common Lands will be left in their existing natural condition, and used only for recreation, food gathering, ceremony, environmental research and education, or nature reserve.  There will be no clearance or planting of vegetation, no extension of paving or erecting of structures, no parking of vehicles beyond the existing paved roads and parking areas, no storage of equipment and no installation of utilities. All with the following exceptions:

1.  Work may be done which is necessary to preserve the present natural condition (such as planting, anchoring, the re-establishment of dunes, or works to prevent erosion), or to improve conditions for wildlife or for natural crops such as berries, fish, and shellfish (for example:  planting, draining, irrigating, shaping of the pond bottom, or the installation of traps or shellfish rafts).

2.  Existing walks, road and parking areas may be repaired and improved.  No road may be built or widened to give a travel surface wider than 15 feet.  Additional parking spaces may be provided between the West Basin Road and the

-2-

proposed bulkhead at West Basin, and at Menemsha Pond, and the unpaved parking areas along Lobsterville Road may be improved as necessary to protect the beach and vegetation.

3. New walkways, roads, and parking areas may be constructed, but only if they serve the purposes of this section, and do not disturb the nesting grounds on the peninsula.

4. Signs and symbolic objects may be erected to explain the meaning of the site, or to regulate behavior on it. They shall not be illuminated, nor be over six feet high or six square feet in area.

5. A bulkhead and related structures may be constructed on the strip of land 100 feet inland from mean high water and 500 feet long, starting from the terminus of West Basin Road and running in an easterly direction along the area of West Basin now used for mooring boats. Such structures may be installed at this site for the gathering or processing of fi: or shellfish, or the harboring, servicing, launching or repa. of small boats but shall be subject to Town zoning and may n' be over twelve feet high from mean ground level nor may thei aggregate floor area exceed 2000 square feet. As far as possible, these structures should be of traditional form, an be sited and finished so as to be visually unobstrusive and blend with the land. Utilities must be placed underground. The Tribal Land Corporation will grant an easement across settlement land to ensure that necessary utilities may be brought to this site. Any bulkhead and related facilities

-3-

built on this site shall be available on the same terms,
without distinction, to all residents of Gay Head, their
heirs, guests and assigns.

6.   Temporary utilities may be provided and related
activities undertaken to facilitate such traditional
activities as the Gay Head Pageant.

7.   Any facility built with Town funds on the Cranberry
Lands such as a bulkhead or a parking lot shall remain in the
ownership of the Town, provided, however, that no such
facility may be built by the Town without the consent of the
Tribal Land Corporation.

II.   The Cook Lands.

A.   These lands will not be subdivided, but will be held in
entirety by the Tribal Land Corporation.

B.   This land will be subject to normal health and building
regulations of Gay Head and the Commonwealth, as they are in force
at the time in question, and to state and federal conservation
laws and the regulations of the Martha's Vineyard Commission.
Town zoning laws applicable to these lands may be changed only in
the manner provided in the Settlement Agreement.

C.   In addition, the aggregate floor area of all structures on
the land may not exceed 3,000 square feet and such structures may
not exceed a height of twelve feet with a maximum peak of sixteen
feet.   All structures must be set back at least 100 feet from the
State Road, and at least 100 feet from the recreational beach, and

-4-

should as far as possible be traditional in form, and sited and finished to be unobtrusive and to blend with the land. All utilities must be placed underground, and any fishery development at the shore shall be kept easterly and separate from the pond beach to which residents have access, and no obstruction of any kind may be placed in the water that would interfere with the recreational use of the beach and adjacent waters.

D.  Residents and property owners of Gay Head, their guests and assigns, will have a right of access on foot along the shore of Menemsha Pond, to a point 30 feet inland of mean high water, and from the western boundary of the property to a point 300 feet to the east along the shore. They may use these shores for fishing, swimming, outdoor recreation, or the beaching and anchorage of small boats. They will also have a right of access by foot and by car to this shore along an easement 30 feet wide beginning at the present entrance from State Road, and running approximately 100 feet east of and parallel to the western boundary of the property, including a parking area 40 x 60 feet at the beach as shown on the attached map. The Town retains the right to enter on this shore and this right of way, in order to clean or repair them, or to regulate behavior on them, as necessary to maintain the natural condition of the land, or to keep its use within its capacity.

III.  The Strock Lands

A.  These lands will not be subdivided, but will be held in entirety by the Tribal Land Corporation.

-5-

B.  This land will be subject to normal health and building regulations of Gay Head and the Commonwealth, as they are in force at the time in question, and to the zoning regulations and the substantive standards of the subdivision regulations of the Town of Gay Head as they exist at the time of this agreement, as included herein as appendix "C". No special permit or approval by the Planning Board, the Board of Appeals, the Conservation Commission or the Martha's Vineyard Commission shall be required for any use which complies in all respects with the substantive requirements of the said zoning and subdivision regulations. Such permits and approvals may be requested and issued in the same manner as for other land in Gay Head with respect to any exception to, or other variation from such requirements, which is authorized by the said regulations.

*Mcol* 11/19/87
*HLm*
*l.c.d.*

*TRK* 11/22/83

-6-

GAY HEAD

ZONING BY-LAW

## SECTION I:     PURPOSE

The purpose of this By-Law is to promote the health, safety, con-
venience and welfare of the inhabitants of the Town of Gay Head,
to prevent flood damage, maintain water quality, assure adequate
water supply, prevent pollution, promote wildlife habitats,
assure and maintenance of cultural and historic sites and values,
preserve and enhance the character of views, prevent damage to
structures, land and water as a result of erosion, promote
economic development of fisheries and related industries, maintain
and enhance the overall economy of the Town of Gay Head, and to
provide them with the benefits and protection authorized by
Chapter 808 of the Acts of the Commonwealth of 1975.

## SECTION II:     USE REGULATIONS

A.    DISTRICTS

The Town of Gay Head is divided into the following districts.

1.    Rural-Residential Districts
2.    Marine Commercial Districts
3.    Special Overlay Districts (a district whose regulations
      are in used in addition to the regulations of the under-
      lying districts). These districts include the Island
      Pond District, the Coastal District, the Moshup Trail
      District, and the Special Places District of Critical
      Planning Concern.

These districts are located on a map entitled "Zoning Map of Gay Head", on file in the office of the Town Clerk. This map, with all explanatory matter concerning the special overlay districts, is hereby made part of the By-Law.

B.  HAZARDOUS USE

In any district, no use of any building of parcel of land may be established which is hazardous to health, or dangerous due to the possibility of fire, explosion, or other cause.

C.  PERMITTED USES IN A RURAL-RESIDENTIAL DISTRICT

The following uses are permitted in a Rural-Residential District:

1.  detached one-family dwellings, not including temporary or mobile structures except as provided below:

2.  religious, educational, or municipal uses;

3.  farm, forest, plant nursery, or other agricultural or horticultural use;

4.  the harvesting and processing of fish and shellfish;

5.  any use customarily accessory to and clearly incidental to a permitted principal use on the lot including:

    a.  a home occupation employing no more than five persons not members of the resident family;

    b.  the display and sale of natural products raised or prepared in the Town;

    c.  the renting of rooms or boarding of not more than eight persons not members of the resident family;

    d.  the use of no more than two tents for the sleeping of members of the resident family or their guests;

    e.  the storage of unoccupied vehicles, boats, boat and

equipment trailers and tents for the use of the
resident family, if screened from view of the public
road;

f. The keeping of horses, ponies, small animals and
poultry for the enjoyment of the resident family.

D.   USES BY SPECIAL PERMIT IN A RURAL-RESIDENTIAL DISTRICT
Any uses not specifically permitted above and not prohibited
by other provisions of the By-Law are permitted in a Rural-
Residential District, but only if the Planning Board grants
a special permit for an exception. Such special permits
shall be granted if all other provisions of this By-Law are
met, and if the following criteria are also met:

1.   The use is not likely to generate more auto trips but
to and from the premises at the busiest hour of a normal
operating day than is given by the number 10 multiplied
by the number of acres contained in the lot. The esti-
mation of likely auto traffic will be based on current
available experience with the type and size of the use
in question.

2.   Space for off street parking will be provided which is
at least twice the floor area of all structures on the
lot, and this parking arrangement will require no back-
ing out onto the public right-of-way.

3.   All outdoor parking, storage, loading, and service area
will be screened from the view of the public road from
adjacent premises.

4.   There will be no odor, dust, fumes, glare, or flashing
light which is perceptible without instruments more
than ... feet of the lot in question,

4

except for warning devices, construction or maintenance
work, or other special circumstances.

5. The use will not cause continued erosion of the land
or increased surface drainage from the lot.

6. The use will not cause pollution of the surface or
groundwater; salt-water intrusion into water supply
wells; or an inadequate water supply to meet the anti-
cipated demands of the proposed activity or of those
existing or permissible on adjacent properties.

7. No temporary or mobile structures not otherwise per-
mitted under this By-Law will be used or stored except
if incidental to a fair, a special event, or a public
construction project, and then only if for no more than
60 days.

8. Where possible, the site design will preserve and en-
hance existing trees over 12 inch caliber, water courses,
hills, and other natural features, as well as vistas,
ocean views, and historic locations, and will minimize
the intrusion into the character of existing development.

9. The use will not cause the destruction of wildlife habi-
tats, damage to wetlands or littoral ecology, damage
to marine fisheries and shellfish, or any unnecessary
decrease in agricultural use or potential productivity
of the land.

H. PERMITTED USES IN A MARINE COMMERCIAL DISTRICT

The following uses are permitted in a Marine Commercial Dis-
trict:

1. the harvesting and processing of fish and shellfish;

storage of boats, provided

that no more than four boats will be stored or assembled
there;

3.    religious, educational, or municipal uses;

4.    farm, forest, plant nursery, or other agricultural
aquacultural, or horticultural use;

5.    any use customarily accessory to and clearly incidental
to a permitted use on the lot, but not including the
use or storage of tents, trailers, mobile homes, camper
vehicles, and other temporary or portable dwelling or
structures.

F.    USES BY SPECIAL PERMIT IN A MARINE COMMERCIAL DISTRICT.
Any commercial or industrial use not specifically permitted
above, inclusive of marinas and boat repair yards of larger
size, which are not prohibited by other provisions of this
By-Law, and which are dependent on marine transportation, or
marine products or which service marine transportation, are
permitted in a Marine Commercial District, but only if the
Planning Board grants a special permit for an exception.
Such permits shall be granted if all other provisions of this
By-Law are met, and if the criteria listed in Section II-F
are also met.

SIGNS
There shall be no more than one sign per lot, and that sign
may only be used to identify the premises or to refer to prod-
ucts or services available there. All signs shall be under
square feet in size, with no moving or flashing elements
and shall be unlighted unless by a steady white reflected
light.    There shall be no signs in the Special Overlay

Moshup Trail District of Critical Planning Concern unless
by special permit from the Planning Board Plan Review Com-
mittee.

H.    REQUIREMENTS FOR DEVELOPMENT IN SPECIAL OVERLAY DISTRICTS
WHICH ARE IMPOSED IN ADDITION TO THE REQUIREMENTS OF THE
UNDERLYING DISTRICTS.

1.    Construction:

There shall be no construction of buildings or struc-
tures within 200 feet of wetlands, waterbodies, beaches,
dunes, or the crests of bluffs over 15 feet high until
a special permit is obtained from the Planning Board
Plan Review Committee, providing that within 100 feet of
said wetlands, waterbodies, beaches, dunes or bluffs,
a special permit may only be granted for a fishing
related marine commercial structures. Additions to
existing structures may be allowed by special permit
from the Planning Board Plan Review Committee provided
that any such addition is less than 500 square feet in
area.  In order to minimize visual prominence of man-
made features, avoid erosion or other land instabilities
and otherwise preserve the cultural, historic and
visual integrity of the Moshup Trail Cultural and His-
toric District of Critical Planning Concern, the fol-
lowing shall exist:

1.    A special permit shall be required from the Plan-
ning Board Plan Review Committee for the siting
of a building on its lot.  Buildings should be
sited on or at least near the side slope of a

valley and never into the center of a valley.

Buildings should not be sited at the top of a slope where their entire mass will be starkly silhouetted against the sky. Buildings should be sited down the grade so that the slope contains the building(s) and serves as a partial backdrop for them.

2. Buildings shall be constructed of natural wood shingles with neutral trim color (refer to SECTIO VIII: DEFINITIONS).

3. Roofing materials shall be black asphalt, wood or cedar shingles.

4. Building . . . tions shall be no more than 1 inches in height from the median natural grade without a special permit from the Planning Board Plan Review Committee.

5. Accessory structures and additions to pre-existin. Structures shall conform in materials, scale and proportion to the principal structure. In cases where pre-existing structures are not compatible with the requirements for new construction, accessory structures shall conform to the requirements for new construction (Numbers one (1) through four (4) of the above).

2. Vehicular and Pedestrian Ways

Vehicular accesses shall be located no closer than 1,000 feet from existing vehicular accesses on the same side of the road, and such accesses shall not be greater than 12 feet in width, except that lots in existence as of December 22, 1975 which have a right of access to

a public road shall continue to have such right of access. Variations from this requirement may be allowed by special permit from the Planning Board Plan Review Committee, provided safety and the visual character of the road are assured.

Old Lobsterville Road and additional sections of Old South Road, except for that part which connects Church Street with Moshup Trail, shall not be paved with impervious material. There shall be no new vehicular access to Old Lobsterville Road, Old Church, and Old South Roads, except when no other access is available, and it shall require a special permit from the Planning Board Plan Review Committee. Said roads shall continue to be kept open for non-vehicular public access.

No new vehicular way may be constructed in a Special Overlay District whose traveling surface exceeds 15 feet in width, except by special permit from the Planning Board Plan Review Committee.

In order to maintain the visual integrity and to promote public health and safety, no driveway (i.e. curbcut) shall be permitted within the Moshup Trail Cultural and Historic District of Critical Planning Concern without a special permit from the Planning Board Plan Review Committee. The Planning Board Plan Review Committee shall consider but is not limited to the following criteria in granting a special permit:

1. Road frontage of lot(s);

2. Frequency and duration of use;

      alignment on the lot(s);

4.   Safety (line of unobstructed vision to the public road');

5.   Ability to share joint access with adjacent property owner(s); and

C.   The use of pervious paving materials such as gravel, bluestone, crushed shell, or wood chips shall be employed.

3.   Stone Walls and Fences

No stone wall shall be removed, moved or otherwise altered, except for repair or except by special permit from the Planning Board Plan Review Committee. In order to minimize the visual prominence of manmade features and otherwise protect the cultural, historical and visual integrity of the Moshup Trail Cultural and Historic District of Critical Planning Concern, a special permit will be required by the Planning Board Plan Review Committee for new fences.

4.   Utilities

All new utilities shall be placed underground. However, above ground utilities may be allowed by permit from the Planning Board Plan Review Committee provided that it finds that (a) it is technically infeasible to install underground utilities, or (b) the cost of such underground utilities will be more than $1,500.00 greater than the cost of overhead utilities per lot served.

5.   Historic and Cultural Places

Construction within 100 feet of Historic and Cultural Places shall only be by special permit from the Planning

Board Plan

Review Committee shall issue a special permit only if it finds that the proposed construction is in harmony with the cultural and historic aspects of the site. The Cultural and Historic Places in the Town of Gay Head are: Toad Rock, The Clay Pits, Occoch Pond, Mittark's Grave, Silas Paul's Grave, Gay Head Pound, Cook's Spring, Gay Head Baptist Church and Parsonage, Old Indian Cemetary, Indian Burial Grounds Lot #1, Indian Burial Ground - Old Lobsterville Road, Gay Head School, Deacon Simon Johnson House.

6.  Private Parking Areas

Within the Special Overlay Moshup Trail Cultural and Historic District of Critical Planning Concern, a special permit shall be required by the Planning Board Plan Review Committee for a private parking area on a lot (Refer to SECTION VIII:  DEFINITIONS).  The Planning Board Plan Review Committee shall consider but is not limited to the following criteria in granting a special permit:

1.   Access to the parking area;

2.   Siting or placement of a parking area on a lot;

3.   The number of cars allowable on a lot;

4.   Frequency and duration of the use of a parking area;

5.   Pervious paving materials such as gravel, wood chips, bluestone, or crushed shell shall be employed; and

6.   Adequate screening with plants and shrubs as recommended by the Site Review Committee.

No commercial parking area will be permitted except those which benefit the Town's people, such as Philbin Beach.

In order to preserve the visual integrity of the Moshup

11.

Trail, Cultural and Historic District of Critical Plan-
ning Concern, no person(s) shall place, store or main-

tain on unregistered motor vehicle or more lot(s).

## SECTION III.   DIMENSIONAL AND DENSITY REGULATIONS

### A.   MINIMUM LOT SIZES

No existing lot shall be changed in any size or shape so as
to result, if developed, in a violation of any of the dimen-
sional regulations set forth below.  No structures may be
erected on any lot which is less than 2 acres in extent,
except as provided by the rules for compact siting in Sec-
tion V below, or unless that lot is a pre-existing lot as
provided in Section VI.

### B.   STRUCTURAL DENSITY

On any lot, the total enclosed floor area of all structures
may not exceed 3,500 square feet for every 2 acres contained
in that lot, except as provided in Section VI, and providing
also that this limitation shall not restrict the interior
area of any single family residential building; the interior
area of any single family residential building on a lot
shall be included in determining the limitation imposed by
this section on all other structures on such lot.

### C.   USE DENSITY

On any lot, there may be no more than one dwelling for every
2 acres contained in the lot.  No commercial enterprise may
occupy the same lot as a dwelling unit, unless it is a home
occupation accessory to that dwelling unit.

### D.   SETBACK

least 30 feet from any

lot line, and at least 40 feet from Old Lobsterville, Olde
Church and Old South Roads, except as provided in Section V
and VI.

E.  BUILDING HEIGHT

The highest point in any structure may not be more than 28
feet above the mean finished grade within 20 feet of the struc-
ture or two (2) stories, whichever is less. However, the
highest point may be no more than 18 feet high for a gable
or hip roof and 13 feet high for a flat or shed roof in open
areas within a Special Overlay District except by special
permit from the Planning Board Plan Review Committee. But
slender and unoccupied projections customarily carried above
the roof, such as chimneys, spires, flagpoles and windmills
may rise 40 feet above that grade, or higher by special per-
mit from the Planning Board where they will not block or
damage the view from the public road or from adjacent proper-
ty. Roof types other than gables or hip, flat or shed,
added roof walks and/or second story porches on new or pre-
existing structures shall require a special permit from the
Planning Board Plan Review Committee within the Moshup Trail
Cultural and Historic District of Critical Planning Concern.
(Refer to SECTION VIII: DEFINITIONS)

F.  WELLS AND SANITARY DISPOSAL SYSTEMS

All wells and sanitary disposal systems shall comply with the
following regulations:

1.  no sanitary disposal system may be located closer than
    200 feet from any water body or existing well or sani-
    tary disposal system. No well may be located closer

13

than 200 feet from any saltwater body or existing sani-
tary disposal system except for wells used in connection
with fish or shellfish hatcheries where a lesser dis-
tance may be allowed by special permit from the Planning
Board Plan Review Committee.

2.  There shall be a minimum of 5 feet separation between
the lowest point of the leaching field and the high
seasonal water table for all sanitary disposal systems.

3.  No sanitary disposal system shall be located within 30
feet of any adjacent lot in separate ownership.

## SECTION IV:   CONSERVATION REGULATIONS

### A.   CONSERVATION AREAS

No structure may occupy, nor may any regrading, excavation,
or filling be done in any wetland, land subject to flood,
cliff, beach, or dune immediately behind a beach except by
special permit from the Planning Board and subsequent review
and approval by the Conservation Commission. These conserva-
tion areas are intended to include those areas regulated by
Chapter 131, Section 40 of the General Laws, and also to in-
clude all land which is less than 10 feet above mean high
water. In granting a special permit the Board must be satis-
fied there will be no irreparable damage to the natural re-
sources of the Town, and no hazard to the health or safety
such as might arise from pollution, the backing up of sewage,
increased flooding, structural damage, lack of safe egress,
or a rupture of utility systems

B.  EXCAVATION

No gravel, loam, sand, clay, or stone may be removed from any
site without a special permit from the Board of Selectmen.

C.  USE OF WATER AREAS

There may be no shellfishing in any body of water or disturb-
ance of its bed or bank without a permit from the Board of
Selectmen, in accordance with General Laws Chapter 130, Sec-
tion 52.

D.  CLEARINGS AND VEGETATION

There shall be no clear-cutting of trees in any area over
1/2 acre, without a special permit from the Planning Board.
Within the Special Overlay Moshup Trail Cultural and His-
toric District of Critical Planning Concern, there shall be
no removal of ground cover, shrubs, or trees in any area
without a special permit from the Planning Board Plan Review
Committee. Within the District, plantings shall be indige-
nous or easily naturalized plant types and materials, (refer
to SECTION VIII: DEFINITIONS and to Suggestions for Planting
Materials on file with the Site Review Committee in the Town
Clerk's office). No special permit shall be requ_red for a
vegetable, herb or plant garden not exceeding 100 square feet.

SECTION V.  REVIEW OF DEVELOPMENTS

A.  COMPACT SITING

The Planning Board may, by special permit, allow that no more
than 20 dwellings with their normal accessory uses may be
placed on a contiguous group of lots of no less than 5,000
square feet each, and with side and rear but not street

15

setbacks reduced to no less than 10 feet from the lot lines;
provided the integrity of lots in immediately adjacent to an
open area whose extent, together with the house lots equals
at least 2 acres multiplied by the number of dwellings. The
Board must also find:

1.   the open area is legally established to remain perma-
     nently unbuilt-upon, permanently associated with these
     dwelling lots, and owned and maintained by their owners;

2.   satisfactory and permanent provision is made for water
     supply and sewage disposal without cost or responsibility
     to the Town;

3.   and the resulting compact development will be superior
     to conventional development in preserving open space,
     utilizing natural features, and allowing more efficient
     services while not being inferior to conventional de-
     velopment in any other respect.

B.  DEVELOPMENTS OF REGIONAL IMPACT

    Developments which meet the qualifications as Developments
    of Regional Impact will be referred to the Martha's Vineyard
    Commission for review under the provisions of Chapter 637,
    Acts of 1974 and Chapter 808 of the Acts of 1975. No permits
    or special permits may be issued for such developments which
    have been so referred until the Martha's Vineyard Commission
    has approved, or approved with conditions, and referred the
    proposal back to the Town for action.

## SECTION VI: NON-CONFORMING USES AND PRE-EXISTING LOTS

### A. PRE-EXISTING LOTS.

Any pre-existing lot containing an area of at least 5,000 square feet and held in separate ownership from any adjoining land may have erected on it any structure otherwise permitted on a lot of the minimum allowable area, even if the pre-existing lot does not comply with the minimum area requirements.

### B. NON-CONFORMING USE

Any pre-existing structure or use of structure or land which does not conform to the provisions of this By-Law or any amendment thereto may nevertheless continue in that use. It may also be changed to conform to the provisions of the By-Law at any time. Any such non-conforming use or structure may be extended or altered by a special permit from the Planning Board provided that the alteration bears a reasonable relationship to the original size and nature of the non-conforming use, and that the Planning Board finds that the change, extension or alteration shall not be substantially more detrimental than the existing non-conforming use to the neighborhood. Construction or operations under a building or special permit shall conform to any subsequent amendment of this By-Law unless the use or construction authorized thereby is commenced within a period of not more than six months after the issuance of the permit, and in cases involving construction, unless such construction is continued through to completion as continuously and expeditiously as is re Exhibits To Complaint f Page 35 on-conforming use or

17

structure is damaged or destroyed it may be restored to its
previous non-conforming status. Non-conforming uses or
structure abandoned or not used for a period of not less
than five years shall not thereafter be revived.


## SECTION VII:   ADMINISTRATION

### A.   BOARD OF SELECTMEN

This By-Law shall be enforced by the Building Inspector,
acting under the Board of Selectmen.  No building shall be
built or altered and no use of land or building shall be
begun or changed without a permit having been issued by the
Building Inspector, acting under the Board of Selectmen.
Permits not used within a year's time shall become void.
Each application for a permit shall be accompanied by such
plans, surveys, and other data as may be necessary in the
opinion of the Building Inspector to insure full compliance
with this By-Law.

If the Building Inspector is requested in writing to enforce
this By-Law against any person allegedly in violation of
the same and declines to act, he shall notify in writing the
party who requested such enforcement of any action or refusal
to act and the reasons therefore within 14 days of receipt
of such request.

### B.   BOARD OF APPEALS

There is hereby established a Board of Appeals consisting
of five members and two associate members to be appointed
by the Board of Selectmen as provided in Chapter 808 of the
General Laws.  The Board of Appeals shall have the power:

the conduct of

18

1. to hear and decide appeals; an appeal hereunder may be taken by any person aggrieved by reason of his inability to obtain a permit or enforcement action from any administrative officer under the provisions of Chapter 40A of the General Laws, by the Martha's Vineyard Commission, or by any person, including an officer or board of the Town, or of the abutting town, aggrieved by an order or decision of the Inspector of Buildings, or other administrative official, in violation of any provision of said chapter or this By-Law.

2. and to authorize variances according to requirements of Chapter 808 of the General Laws.

C. PLANNING BOARD PLAN REVIEW COMMITTEE

In addition to its customary responsibilities, the Planning Board shall hear and decide on applications for special permits for exceptions as provided in this By-Law; and as authorized by Chapters 637 and 808 of the General Laws.

When reviewing applications for special permits in Special Overlay Districts, the Planning Board shall be joined by a member appointed by and from the Conservation Commission and a member appointed by and from the Board of Selectmen and shall function as both a Plan Review Committee and Special Permit Granting Board.

In granting any special permit, the Planning Board must be satisfied that the general criteria in Section II-D are met as well as any special criteria for that type of special permit, and it may impose such conditions and safe-

It shall adopt rules for

the conduct of its business and procedures for the sub-
mission of applications, including required maps, plans,
views, reports and other information.

D.

A special permit under this By-Law shall only be issued
following a public hearing held within 65 days after the
filing of an application with the special permit granting
authority, a copy of which shall forthwith be given to the
Town Clerk by the applicant.  A special permit granted
under this By-Law shall lapse one year from the granting
thereof, including the time required to pursue or await the
determination of an appeal under General Laws Chapter 40A,
Section 17, if a substantial use thereof has not sooner
commenced except for good cause or, in the case of a permit
for construction, if construction has not begun by such
date except for good cause.  Uses accessory to activities
permitted as a matter of right, whether or not on the same
parcel as activities permitted as a matter of right, which
activities are necessary in connection with scientific
research or scientific development or related production
may be permitted upon the issuance of a special permit pro-
vided the granting authority finds that the proposed acces-
sory use does not substantially derogate from the public
good.

SITE REVIEW COMMITTEE

There shall be a Site Review Committee acting in an advisory
capacity to the Planning Board and the Planning Board Plan
Review Committee.  The Site Review Committee may adopt Site

Design Guidelines which may be revised from time to time,
and take into consideration the special characteristics of
the Moshup Trail Cultural and Historic District of Critical
Planning Concern.  The Site Design Guidelines shall be kept
on file in the Town Clerk's office and copies shall be made
available for inspection to applicants for special per-
mits.

The Site Review Committee shall consist of the Building
Inspector, one member appointed by and from the Conservation
Commission, Planning Board, Board of Health and Board of
Selectmen.

The Planning Board Plan Review Committee will receive
applications for special permits within the Moshup Trail
Cultural and Historic District of Critical Planning Concern,
and will refer the applicant to the Site Review Committee.
The Site Review Committee shall review the application and
may make a site visit to determine if the application con-
forms to the District regulations and to suggest guidelines
for development.  The guidelines will be assisted by the
Site Design Guidelines and are non-binding but intended to
assist and advise.  The Planning Board Plan Review Committee
will be guided by the comments, suggestions and recommenda-
tions of the Site Review Committee when granting special
permits.

Special permits within the Moshup Trail Cultural and His-
toric District of Critical Planning Concern will be granted
only for proposals determined by the Site Review Committee
to be consistent with of the By-Law as stated

in SECTION I and taking into consideration the special characteristics of the District.

The Board of Appeals may appoint a zoning administrator, subject to confirmation by the Board of Selectmen, to serve at its pleasure pursuant to such qualifications as may be established by the Board of Selectmen. The Board of Appeals may delegate to said Zoning Administrator some of its powers and duties. Any person aggrieved by a decision or order of the Zoning Administrator, whether or not previously a party to a proceeding, or any municipal officer or board, may appeal to the Board of Appeals, as provided in Section 14 of Chapter 40A of the General Laws, within 30 days after the decision of the Zoning Administrator has been filed in the office of the Town Clerk. Any appeal, application or petition filed with the Zoning Administrator as to which no decision has been issued within 35 days from the date of filing shall be deemed denied and shall be subject to appeal to the Board of Appeals as provided in Section 8 of Chapter 40A of the General Law.

## SECTION VIII:   DEFINITIONS

A.    ACCESSORY:          A building structure or use which is subordinate to, and the use of which is incidental to, that of the main building, structure or use of the lot.

B.    BLUFF:              For purposes of this By-Law, bluffs shall mean a coastal elevation lying within 200