COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT IN AND FOR SUFFOLK COUNTY

No. SJ-2013-0479

|  |  |
|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS, | **RECEIVED**<br>DEC 0 2 2013<br>MAURA S. DOYLE CLERK<br>OF THE SUPREME JUDICIAL COURT<br>FOR SUFFOLK COUNTY |

THE COMMONWEALTH OF
MASSACHUSETTS,

               Plaintiff,

    v.

THE WAMPANOAG TRIBE OF GAY HEAD
(AQUINNAH), THE WAMPANOAG TRIBAL
COUNCIL OF GAY HEAD, INC., and THE
AQUINNAH WAMPANOAG GAMING
CORPORATION,

               Defendants.

## **COMPLAINT**

    1.     The Wampanoag Tribe of Gay Head (Aquinnah) is a federally recognized Indian Tribe located on lands at the western tip of Martha's Vineyard.[1] On its lands, the Aquinnah Tribe may do as it wishes, so long as it acts consistently with State and local law. The Aquinnah Tribe is entitled to, and receives, the respect and deference of the Commonwealth of Massachusetts with regard to its lawful actions.

    2.     What the Aquinnah Tribe may not do, however, is operate a gaming (i.e., gambling) establishment on its lands, unless that establishment is licensed and permitted under both State and local law.

    3.     This matter has been settled since November 1983, when the

---

[1]   As used herein, the terms "Aquinnah Tribe" and "Tribe" shall refer to the defendants Wampanoag Tribe of Gay Head (Aquinnah) and the Wampanoag Tribal Council of Gay Head, Inc.

Commonwealth, the Aquinnah Tribe, the Town of Aquinnah (the "Town"), and the Taxpayers' Association of Gay Head, Inc. (the "Taxpayers' Association") negotiated and entered into an agreement (the "Settlement Agreement") (attached as **Exhibit A**) to resolve a lawsuit brought by the Aquinnah Tribe claiming aboriginal property rights to certain tracts of land in the Town.

4.      In the Settlement Agreement, the Town and its Taxpayers' Association conveyed title to over 400 acres of land on Martha's Vineyard to the Aquinnah Tribe. In return, the Aquinnah Tribe agreed that those lands would remain subject to the Commonwealth's (and local) laws and jurisdiction, and that the Tribe had no authority or jurisdiction to act in contravention of those laws.

5.      The Commonwealth's laws prohibit any person or entity from operating a gaming establishment without a gaming license issued under State law.  Under the terms of the Settlement Agreement, that prohibition applies to the Aquinnah Tribe, just as it would to any other entity that sought to open a gaming establishment in the Commonwealth.  In addition, Massachusetts law grants only one entity (i.e., the Massachusetts Gaming Commission) authority to issue the requisite gaming license.

6.      Because the Aquinnah Tribe does not have a gaming license issued by the Massachusetts Gaming Commission, the Tribe may not operate a gaming establishment on its lands.

7.      Nonetheless, the Aquinnah Tribe recently adopted a Tribal ordinance purporting to permit the Tribe to:  license, open, and operate gaming establishments on its lands, all in contravention of Massachusetts law.  Moreover, the Tribe has expressed its intent to open a gaming establishment "as soon as possible," and has acted on that intent

as described in this complaint. Those actions have violated the Settlement Agreement.

8.     Accordingly, the Commonwealth brings this action based upon breach of contract and G.L. c. 231A. The Commonwealth seeks judgment declaring that the Aquinnah Tribe must follow the terms of the Settlement Agreement by, among other things, abiding by all laws of the Commonwealth, including those laws that prohibit gaming without a State-issued license.

## PARTIES

9.     The Commonwealth of Massachusetts is a sovereign state of the United States.

10.     Defendant the Wampanoag Tribe of Gay Head (Aquinnah) is a federally recognized Native American Tribe. 25 U.S.C. § 1771(7).

11.     The Wampanoag Tribe of Gay Head (Aquinnah) includes the Defendant Wampanoag Tribal Council of Gay Head, Inc., an entity formerly organized as a Massachusetts non-profit corporation whose incorporation was deemed revoked under the laws of the Commonwealth effective June 18, 2012.

12.     The Wampanoag Tribe of Gay Head (Aquinnah) and the Wampanoag Tribal Council of Gay Head, Inc. maintain their principal and usual places of business at 20 Black Brook Road, Aquinnah, Massachusetts.

13.     Defendant the Aquinnah Wampanoag Gaming Corporation is, on information and belief, a wholly-owned subsidiary of either or both the Wampanoag Tribe of Gay Head (Aquinnah) and the Wampanoag Tribal Council of Gay Head, Inc.

14.     Upon information and belief, the Aquinnah Wampanoag Gaming Corporation maintains its principal and usual place of business at 20 Black Brook Road, Aquinnah, Massachusetts.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action in accordance with G.L. c. 214, §§ 1, 2, 8.

16.     This Court has personal jurisdiction over the Wampanoag Tribe of Gay Head (Aquinnah) pursuant to G.L. c. 223A, § 2, because the Tribe maintains its principal and usual place of business in the Commonwealth.

17.     This Court has personal jurisdiction over the Wampanoag Tribal Council of Gay Head, Inc. pursuant to G.L. c. 223A, § 2, because the Tribe maintains its principal and usual place of business in the Commonwealth.

18.     This Court has personal jurisdiction over the Aquinnah Wampanoag Gaming Corporation pursuant to G.L. c. 223A, § 2, because that entity, on information and belief, maintains its principal and usual place of business in the Commonwealth.

19.     Venue is proper in this Court pursuant to G.L. c. 223, § 5, because this action is brought by the Commonwealth.

## FACTS

### The Aquinnah Tribe Received Title to Settlement Lands in Return for Its Agreement to Abide by the Laws of the Commonwealth

20.     The Town of Aquinnah is located on the western tip of Martha's Vineyard, Massachusetts.

21.     Incorporated in 1870 as Gay Head, Massachusetts, the Town formally changed its name to Aquinnah in 1997.

22.     Throughout its history, the Town has been home to a community of Wampanoag Native Americans named the Aquinnah.

23.     In February 1987, the United States Secretary of the Interior formally recognized the Aquinnah as an Indian Tribe.

24.     Previously, in 1974, the Aquinnah Tribe sued the Town claiming aboriginal title to certain tracts of land in Martha's Vineyard.  *Wampanoag Tribal Council of Gay Head, Inc. v. Town of Gay Head*, No. 74-5826-G (D. Mass.).

25.     On September 28, 1983, the Commonwealth, the Aquinnah Tribe, the Town, and the Town Taxpayers' Association entered into a "Joint Memorandum of Understanding Concerning Settlement of the Gay Head, Massachusetts Indian Land Claims" (the Settlement Agreement) to resolve the *Wampanoag* lawsuit.

26.     The Settlement Agreement was the capstone to nine years of litigation and was a carefully struck, negotiated contract among sophisticated parties represented by legal counsel.

27.     The Settlement Agreement conferred benefits and placed obligations on all parties to that agreement.

28.     The Town and the Taxpayers Association agreed to convey title to more than 400 acres of public and private lands (the "Settlement Lands") to a specially created, state-formed corporation created by the Aquinnah Tribe "for the purpose of acquiring, managing, and permanently holding lands, including the lands defined in this settlement as the Settlement Lands."  Settlement Agreement ¶ 3.  On information and belief, the United States Department of the Interior took the Settlement Lands at issue in this action into trust for the Tribe's benefit in December 1988 and March 1993.

29. In return, the Aquinnah Tribe agreed to relinquish all claims of any kind to lands and waters in the Commonwealth. Settlement Agreement ¶ 8(d).

30. In numerous provisions of the Settlement Agreement, the Aquinnah Tribe also agreed that the Settlement Lands would remain under the Commonwealth's jurisdiction and be subject to all State and local laws. In short, the Aquinnah Tribe expressly agreed that it had no authority whatsoever to act in contravention of State and local laws, and conceded that it would be subject to State enforcement power if it did so.

A. Paragraph 3 of the Settlement Agreement states:

> The Tribal Land Corporation shall hold the Settlement Lands, and any other land it may acquire, *in the same manner, and subject to the same laws, as any other Massachusetts corporation*, except to the extent specifically modified by this agreement and the accompanying proposed legislation. *Under no circumstances*, including any future recognition of the existence of an Indian tribe in the Town of Gay Head, *shall the civil or criminal jurisdiction of the Commonwealth of Massachusetts, or any of its political subdivisions, over the settlement lands, or any land owned by the Tribal Land Corporation in the Town of Gay Head, or the Commonwealth of Massachusetts, or any other Indian land in Gay Head, be impaired or otherwise altered*, except to the extent modified in this agreement and in the accompanying proposed legislation.

(emphasis added).

B. Paragraph 11 of the Settlement Agreement states:

> The Settlement Land shall be subject to an express federal statutory restriction against alienation. This statutory provision against alienation shall state explicitly that (a) *no Indian tribe or band shall ever exercise sovereign jurisdiction as an Indian tribe other than to the extent agreed herein, over all or part of the*

*Settlement lands, or over any other land that may now or in the future be owned by or held in trust for, any Indian entity,* but (b) the absence of such sovereignty shall not in any way prejudice Gay Head Indians in their efforts to obtain federal benefits available to Indians or the achieve recognition as a tribe.

(emphasis added).

C.    Paragraph 13 of the Settlement Agreement states:   "All Federal, State and Town laws shall apply to the Settlement Lands" subject only to certain narrow restrictions not relevant here.

D.    Paragraph 16 of the Settlement Agreement subjects the Settlement Lands to the Town's Land Use Plan and to the Town's zoning laws.

31.    The Settlement Agreement was duly executed by authorized individuals on behalf of the Commonwealth, the Aquinnah Tribe, the Town, and the Town Taxpayers' Association.

32.    Both the Massachusetts Legislature and the United States Congress subsequently enacted legislation ratifying the Settlement Agreement.

33.    In 1985, the Massachusetts Legislature enacted Chapter 277 of the Acts of 1985, entitled "An Act to Implement the Settlement of the Gay Head Indian Land Claims" ("the Commonwealth Act").  The Commonwealth Act implemented the terms of the Settlement Agreement and incorporated the Settlement Agreement into State law.

34.    The Commonwealth Act also reaffirmed the parties' contractual agreement that the Settlement Lands would be under the Commonwealth's jurisdiction and subject to the laws of both the Commonwealth and Town.  Section 4 of the

Commonwealth Act states that "All federal, state, and town laws shall apply to the settlement lands" subject to certain exceptions not applicable in this action. Section 5 of the Commonwealth Act provides:

> Except as provided in this act, all laws, statutes and bylaws of the commonwealth, the town of Gay Head, and any other properly constituted legal body, shall apply to all settlement lands and any other lands owned now or at any time in the future by the Tribal council or any successor organization.

35.     On August 18, 1987, the United States Congress enacted the Massachusetts Indian Land Claims Settlement Act (the "Federal Settlement Act") to implement the Settlement Agreement.

36.     As with the Commonwealth Act, the Federal Settlement Act reaffirmed the parties' contractual agreement that the Settlement Lands would remain subject to the Commonwealth's (and local) laws and jurisdiction—including those laws governing gaming—and that the Aquinnah Tribe would not exercise jurisdiction over those lands.

> [S]ettlement lands and any other land that may now or hereafter be owned or held in trust for any Indian tribe or entity in the town of Gay Head, Massachusetts shall be subject to the civil and criminal laws, ordinances, and jurisdiction of the Commonwealth of Massachusetts and the town of Gay Head, Massachusetts (including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance).

25 U.S.C. § 1771g.

37.     The Federal Settlement Act further reaffirmed the parties' contractual agreement that the Aquinnah Tribe may not exercise any jurisdiction inconsistent with Massachusetts law governing the Settlement Lands: the Tribe "*shall not exercise any jurisdiction* over any part of the settlement lands *in contravention* of this subchapter, the civil regulatory and criminal laws of the Commonwealth of Massachusetts, the town of

Gay Head, Massachusetts, and applicable Federal laws." 25 U.S.C. § 1771e(a) (emphasis added).

### The Aquinnah Tribe Has Not Obtained a License to Open a Gaming Establishment Pursuant to Massachusetts Law

38.     Massachusetts law prohibits any person or entity from opening or operating a gaming establishment without a gaming license issued by the Massachusetts Gaming Commission pursuant to the statutory process set forth in Chapter 23K of the General Laws and regulations promulgated thereunder.

39.     The Settlement Agreement subjects the Aquinnah Tribe and the Settlement Lands to the jurisdiction of the Commonwealth and to the Commonwealth's criminal and civil laws.

40.     Accordingly, the Aquinnah Tribe—like any other entity subject to Massachusetts law—cannot operate a gaming establishment without first obtaining a gaming license issued by the Massachusetts Gaming Commission pursuant to Chapter 23K and regulations promulgated thereunder.

41.     The Aquinnah Tribe does not presently hold and has never held a gaming license issued by the Massachusetts Gaming Commission.

42.     Nor would the Aquinnah Tribe be currently eligible to receive a gaming license.

43.     The Chapter 23K licensing process requires an entity to apply for a gaming license, and the application process involves an extensive determination whether an applicant is suitable to operate a gaming establishment. *E.g.*, G.L. c. 23K, §§ 9-18.

44.     Among other requirements, an applicant must have reached an agreement with its host community and "received a certified binding vote on a ballot question at an election in the host community in favor of such license." G.L. c. 23K, § 15.

45.     The Aquinnah Tribe has not reached any agreement with the Town, nor has it received the approval of the Town's voters to open a gaming establishment.

46.     The Aquinnah Tribe is therefore currently prohibited from opening a gaming establishment because it does not possess a gaming license issued by the Massachusetts Gaming Commission.

47.     Accordingly, any actions taken by the Aquinnah Tribe to open or operate a gaming establishment would violate Massachusetts law.

### The Aquinnah Tribe Adopted a Tribal Gaming Ordinance in Violation of Massachusetts Law

48.     The Aquinnah Tribe has taken actions to license, open, and operate gaming establishments on Settlement Lands in violation of Massachusetts and local law and in breach of the Settlement Agreement's provisions requiring the Aquinnah Tribe to abide by that law.

49.     On February 4, 2012, the Aquinnah Tribe passed Resolution 2012-04 ("Resolution Adopting Wampanoag Tribe of Gay Head (Aquinnah) Gaming Ordinance No. 2011-01") adopting a Tribal gaming ordinance, Gaming Ordinance No. 2011-01 (attached as **Exhibit B**).

50.     Among other things, Gaming Ordinance No. 2011-01 purportedly:

    A.      Authorizes gaming to be conducted on Settlement Lands;[2]

    B.      Establishes an Aquinnah Tribal Gaming Commission;[3] and

---

[2]   Gaming Ordinance No. 2011-01, §§ 1.5 and 1.6.

C.      Authorizes that Commission to issue gaming licenses and Tribal work permits in furtherance of gaming activities.[4]

51.      In other words, Gaming Ordinance No. 2011-01 purportedly authorizes the Aquinnah Tribe to license, open, and operate gaming establishments *without* first obtaining a Chapter 23K license from the Massachusetts Gaming Commission.  Gaming Ordinance No. 2011-01 also purportedly establishes a governing body for such unlawful gaming separate from and outside of the very same laws the Aquinnah Tribe agreed to follow in the Settlement Agreement:  the laws of the Commonwealth.

52.      The Aquinnah Tribe's adoption of Gaming Ordinance No. 2011-01 violates Massachusetts law, is void, and breaches the Aquinnah Tribe's contractual obligation to abide by Massachusetts law as set forth in the Settlement Agreement.

### The Aquinnah Tribe Has Taken Further Actions Aimed at Opening a Gaming Establishment in Violation of Massachusetts Law

53.      After adopting Gaming Ordinance No. 2011-01, the Aquinnah Tribe has taken additional actions violating the Commonwealth's gaming laws.

54.      The Aquinnah Tribe submitted its Gaming Ordinance No. 2011-01 to the National Indian Gaming Commission ("NIGC") for review and approval.  By letter dated February 21, 2012, the NIGC approved Gaming Ordinance No. 2011-01 for gaming on Indian Lands as defined by the Federal Indian Gaming Regulatory Act ("IGRA").

---

[3]   *Id.* at § 2.

[4]   *Id.* at § 3.

55. The Aquinnah Tribe subsequently re-submitted Gaming Ordinance No. 2011-01 to the NIGC accompanied by a new Tribal resolution making the ordinance specific to the Settlement Lands.[5]

56. On August 29, 2013, NIGC wrote to the Aquinnah Tribe that the NIGC once again considered Gaming Ordinance No. 2011-01—now site-specific to the Settlement Lands—"to be approved to the extent that it is consistent with the provisions of IGRA."

57. The Aquinnah Tribe requested a legal opinion from NIGC stating that the Tribe may conduct gaming on Settlement Lands. On October 25, 2013, NIGC informed the Tribe by letter of its legal opinion that the Settlement Lands are Indian Lands under IGRA and that those lands are eligible for gaming under Gaming Ordinance No. 2011-01.

58. Neither the Aquinnah Tribe nor the NIGC informed the Commonwealth that the Tribe had submitted gaming ordinances for NIGC's approval or that the Tribe had requested legal opinions from the NIGC concerning eligibility for gaming on Settlement Lands.

59. The Commonwealth only first learned of these matters in a letter from the Aquinnah Tribe dated November 12, 2013—after NIGC approved the Aquinnah Tribe's gaming ordinance and after NIGC issued its legal opinion.

60. The Aquinnah Tribe has publicly and repeatedly expressed its intent to license, open, and operate one or more gaming establishments under Gaming Ordinance No. 2011-01 "as soon as possible."[6]

---

[5] Resolution 2012-23, "Identification of Indian Lands for the Purposes of the Wampanoag Tribe of Gay Head (Aquinnah) Gaming Ordinance 2011-11," Apr. 7, 2012.

61.   Consistent with its expressed intent, the Aquinnah Tribe has, on information and belief, submitted notice to the NIGC that it will license a gaming facility on its Settlement Lands.   On information and belief, the NIGC received the Aquinnah Tribe's notice—together with a proposed license—on or about August 5, 2013.

## COUNT I:
## BREACH OF CONTRACT

62.   The allegations set forth in paragraphs 1 through 61 are incorporated by reference as if set forth herein.

63.   The Settlement Agreement is a valid and enforceable contract that created obligations on the part of the Aquinnah Tribe to observe and comply with the Commonwealth's laws, including those regulating gaming establishments.

64.   The Aquinnah Tribe may not license, open, or operate gaming establishments on Settlement Lands without a gaming license issued by the Commonwealth.

65.   The Aquinnah Tribe's actions, as alleged in this complaint, have breached the terms of the Settlement Agreement.

66.   The Commonwealth has suffered and will continue to suffer injury resulting from the Aquinnah Tribe's breach of the Settlement Agreement.

67.   The Aquinnah Tribe's actions, as alleged in this complaint, are so considerable that they go to the very essence of the parties' contractual bargain in the Settlement Agreement.

---

[6]   *See, e.g.,* Mark Arsenault, "Tribe Says it Will Open Small Casino on Vineyard," *The Boston Globe* A1 (Nov. 12, 2013).

68.     The Aquinnah Tribe's actions, as alleged in this Complaint, are anticipatory breaches of the Tribe's contractual obligations to the Commonwealth.

69.     The Commonwealth has suffered and will continue to suffer injury resulting from the Aquinnah Tribe's anticipatory breaches of the Settlement Agreement.

70.     Relief in the form of damages or restitution is not adequate to remedy the injury the Aquinnah Tribe has inflicted upon the Commonwealth through its actual and anticipatory breaches of the Settlement Agreement.

## COUNT II:
## DECLARATORY JUDGMENT (G.L. c. 231A)

71.     The allegations set forth in paragraphs 1 through 70 are incorporated by reference as if set forth herein.

72.     Under General Laws c. 231A, § 2, this Court is authorized to determine the rights, duties, status, or other legal relations of parties under written contracts, such as the Settlement Agreement, and under the laws of the Commonwealth.

73.     The Aquinnah Tribe's actions, as alleged in this Complaint, are actual or anticipatory breaches of the Settlement Agreement and actual violations or contemplated and impending violations of Massachusetts law.

74.     As a party to the Settlement Agreement, the Commonwealth may seek to enforce the terms of the Settlement Agreement.

75.     The Commonwealth is also responsible for the enforcement of laws prohibiting gaming without a gaming license.

76.     An actual controversy has therefore arisen between the Aquinnah Tribe and the Commonwealth concerning the Tribe's actual or anticipatory breaches of the

Settlement Agreement and actual violations or contemplated and impending violations of Massachusetts law.

77.     No administrative remedies exist to terminate this controversy.

78.     A judgment of this Court concerning those actions would terminate the uncertainty giving rise to this controversy.

*[Reminder of page intentionally blank]*

## PRAYER FOR RELIEF

WHEREFORE, the Commonwealth respectfully asks this Court enter judgment:

a.    In favor of the Commonwealth and against the Aquinnah Tribe on all Counts;

b.    Declaring that the Aquinnah Tribe has no right to license, open, or operate a gaming establishment on the Settlement Lands without complying with all laws of the Commonwealth pursuant to the terms of the Settlement Agreement;

c.    Declaring that Gaming Ordinance No. 2011-01, and any action taken by the Aquinnah Tribe pursuant to Gaming Ordinance No. 2011-01, are illegal and void because the Ordinance and any actions taken pursuant to the Ordinance are in irreconcilable conflict with the Settlement Agreement and with Massachusetts law; and

d.    Awarding the Commonwealth such other and further relief as the Court deems just and proper.

Respectfully submitted,

THE COMMONWEALTH OF MASSACHUSETTS,

By and through its attorney,

MARTHA COAKLEY
ATTORNEY GENERAL


Juliana deHaan Rice (BBO # 564918)
Carrie Benedon (BBO # 625058)
Bryan Bertram (BBO # 667102)
Assistant Attorneys General
Government Bureau
Office of Attorney General Martha Coakley
One Ashburton Place
Boston, MA 02108-1698
(617) 963-2107
Juliana.Rice@state.ma.us
Carrie.Benedon@state.ma.us
Bryan.Bertram@state.ma.us

A True Copy

Attest:

_____   _____
Date                          Clerk

1-24-14

Dated: December 2, 2013

-16-

COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT IN AND FOR SUFFOLK COUNTY

No. SJ-_____

THE COMMONWEALTH OF
MASSACHUSETTS,

> Plaintiff,

v.

THE WAMPANOAG TRIBE OF GAY HEAD
(AQUINNAH), THE WAMPANOAG TRIBAL
COUNCIL OF GAY HEAD, INC., and THE
AQUINNAH WAMPANOAG GAMING
CORPORATION,

> Defendants.

## **EXHIBITS TO COMPLAINT**

**Exhibit A:**  Joint Memorandum of Understanding Concerning Settlement
of the Gay Head Massachusetts Indian Land Claims (Sept. 28, 1983)................................1

**Exhibit B:**  Wampanoag Tribe of Gay Head (Aquinnah) Ordinance No.
2011-01, Tribal Gaming Ordinance .................................................................................66

# EXHIBIT A

# JOINT MEMORANDUM OF UNDERSTANDING

# CONCERNING SETTLEMENT OF THE GAY HEAD,

# MASSACHUSETTS INDIAN LAND CLAIMS

## WAMPANOAG TRIBAL COUNCIL
## OF GAY HEAD, INC.

September 28, 1983

1.  The Parties to the Settlement are the parties in the litigation before the United States District Court for the District of Massachusetts known as Wampanoag Tribal Council of Gay Head, Inc., et al. v. Town of Gay Head, et al., Civil Action No. 74-5826-G (including intervenors).

The Parties shall seek to have all others who may be interested in the Settlement act so as to assure that the Settlement becomes effective.

2.  The Parties agree to the following settlement, all provisions of which are to be considered as inseparable and interdependent, except as otherwise specifically provided herein, and which are all conditioned upon requisite favorable action within 18 months of the execution of this settlement by other entities, including appropriate executive and legislative branches of the governments of the Town of Gay Head, the Commonwealth of Massachusetts, and the United States of America.

3.  A state-chartered corporation (hereinafter called the Tribal Land Corporation) will be created by the Wampanoag Tribal Council of Gay Head, Inc. (hereinafter the Tribal Council) for the purpose of acquiring, managing, and permanently holding lands, including the lands defined in this settlement as the Settlement Lands.  The Tribal Land Corporation shall hold the Settlement Lands, and any other land it may acquire, in the same manner, and subject to the same laws, as any other Massachusetts corporation, except to

the extent specifically modified by this agreement and the
accompanying proposed legislation.  Under no circumstances,
including any future recognition of the existence of an Indian
tribe in the Town of Gay Head, shall the civil or criminal
jurisdiction of the Commonwealth of Massachusetts, or any of
its political subdivisions, over the settlement lands, or any
land owned by the Tribal Land Corporation in the Town of Gay
Head, or the Commonwealth of Massachusetts, or any other
Indian land in Gay Head, or the Commonwealth of Massachusetts,
be impaired or otherwise altered, except to the extent
modified in this agreement and in the accompanying proposed
legislation.

    4.  The Town of Gay Head will convey all its rights, title
and interest in the Town Common Lands (except for the
shoreline as defined in Paragraph 10) to the Tribal Land
Corporation.  These lands comprise about 238 acres (which
include the Cranberry Lands, the Face of the Cliffs, and the
Herring Creek), and are described roughly on the map attached
hereto and made part of this agreement.  A survey shall be
made in order to determine the precise acreage and boundaries
of the Common Lands.  The cost of the survey shall be regarded
as part of the cost of the Tribal Land Corporation's
acquisition of lands under this settlement and shall be
financed out of the Federal funds appropriated pursuant to
Paragraph 8. . Existing surfaced roads across the Common Lands
will continue to be owned and maintained by the Town of Gay
Head or the Commonwealth of Massachusetts, as the case may be,

-2-

and shall be open to the public.  Present unsurfaced roads
providing access across the Common Lands to private lands
beyond shall continue to be available for access to such
private lands.

5.   The Town of Gay Head shall convey the so-called Cook
Lands (L. No. 395) to the Tribal Land Corporation.  Such
property, however, shall not be part of the Settlement Lands,
and shall remain subject to taxation and foreclosure in the
same manner as any other privately owned property in Gay
Head.  Any structure placed on this property shall be subject
to all Federal, State and local laws, including Town zoning
laws, State and Federal conservation laws, and the regulations
of the Martha's Vineyard Commission, and in no event shall any
structure or structures erected on this land comprise more
than 3,000 square feet or exceed a height of twelve feet with
a maximum peak of 16 feet.  Changes in Town zoning laws made
subsequent to the date of this Memorandum may be made
applicable to such Cook lands only in the manner provided for
changes to the Land Use Plan as described in Paragraph 16 of
this Memorandum.  If the said property is used for any purpose
not permitted by the Land Use Plan, or is sold, leased or
otherwise alienated by the Tribal Land Corporation to any
entity other than one which is Indian controlled, all right,
title and interest in the property shall revert to the Town of
Gay Head, provided however, that nothing herein shall prevent
the granting of a valid mortgage on the said property.  All
residents and property owners of Gay Head, their guests and

-3-

assigns, shall have an easement to use the pond beach on the Cook Lands for such recreational activities as are now carried out on such beach, including, but not limited to, fishing, swimming, outdoor recreation, or the beaching or achorage of small boats, and shall have guaranteed access to such beach by land as provided in the Land Use Plan.

6. The Owners of the former Strock Estate will convey their ownership interest in certain lands formerly known as the Strock Estate in Gay Head to the Tribal Land Corporation. These lands consist of three parcels separate from each other--one parcel of about 57 acres, one of about 33 acres and one of about 85 acres, or a total of about 175 acres. (The precise lot numbers falling within these three parcels are listed in Appendix A.) These lands are to be sold to the Tribal Land Corporation at fair market value established without regard to Indian claims extinguished in accordance with Paragraph 8(d).

7. If the owners of the land located between the so-called Cranberry Lands portion of the Common Lands and Menemsha Creek (hereinafter called the Menemsha Neck Lands) are willing to sell their land, the parties will support the principle that the Federal Government should provide funds in order to acquire these lands so that they may become part of and be treated as Common Lands for purposes of this settlement. Such sales shall be at fair market value established without regard to Indian claims extinguished in accordance with Paragraph 8(d). If any owner refuses to sell

or if the Federal Government refuses to provide funds for
these lands, the other provisions of this settlement will
nevertheless remain in effect.

8.   The parties to the settlement support the principle
that:

(a)  The Federal Government will appropriate funds to
finance the survey of the Common Lands and the Cook
property described in Paragraphs 4 and 5;

(b)  The Federal Government will appropriate funds,
in a sufficient amount to pay for the lands of the former
Strock Estate described in Paragaph 6, based upon fair
appraisal;

(c)  The Parties will also seek Federal funds to pay
for the Menemsha Neck Lands described in Paragraph 7, if
any owners desire to sell, but if such funds are not
obtained, the other provisions of this settlement will
nevertheless remain in effect;

(d)  Congress will enact legislation that eliminates
all Indian claims of any kind, whether possessory,
monetary, or otherwise, whether aboriginal or under
recognized title involving lands and waters in the Town of
Gay Head, and that effectively clears the titles to all
land in Gay Head of any such claims, whether asserted in
the past, present or future.  That legislation will also
extinguish all claims of any kind by the alleged Gay Head
Tribe, whether possessory, monetary or otherwise, whether
aboriginal or under recognized title involving any other

-5-

lands and waters within the Commonwealth of Massachusetts and that effectively clears the titles to all land in the Commonwealth of any such claims, whether asserted in the past, present or future.  The alleged Gay Head Tribe and the Tribal Council on behalf of all persons of Indian descent hereby agree that this settlement is in full compensation for the claims so extinguished.  This legislation shall not eliminate or affect the claim of any individual Indian which is pursued under any law generally applicable to non-Indians as well as Indians.

9.  Neither the provisions of Paragraph 8 nor this Joint Memorandum of Understanding as a whole shall be deemed an admission of the existence of a tribe and are instead intended simply to extinguish claims made by any Indians, whether advanced by individuals, groups or tribes.

10.  The Settlement Lands shall comprise the following:

(a)  The Common Lands described in Paragraph 4, excluding the shoreline abutting on ocean, sound, or pond.  Such shoreline, consisting of a strip of land extending 50 feet inland of mean high water along the ocean and sound and 30 feet inland of mean high water along Menemsha Pond, Menemsha Creek and any other body of water, shall continue to be owned by the Town of Gay Head and shall be available to all Gay Head residents and property owners, their guests and assigns, for recreational and other uses now commonly made of such shoreline, and shall be subject to a conservation trust

-6-

with the Town of Gay Head as Trustee that shall insure the
continued right of such uses by such persons.  Access to
the shoreline across the common lands shall be preserved
and the roads and paths established in accordance with the
Land Use Plan mentioned in paragraph 16 for such access
shall be maintained by the Town of Gay Head.

(b)  The three parcels of the former Strock Estate
described in paragraph 6.

(c)  The Menemsha Neck Lands described in Paragraph 7
which, so far as they are acquired pursuant to this
Settlement, shall be treated as though they were part of
the Common Lands.

11.  The Settlement Land shall be subject to an express
federal statutory restriction against alienation.  This
statutory provision against alienation shall state explicitly
that (a) no Indian tribe or band shall ever exercise sovereign
jurisdiction as an Indian tribe other than to the extent
agreed herein, over all or any part of the Settlement lands,
or over any other land that may now or in the future be owned
by or held in trust for, any Indian entity, but (b) the
absence of such sovereignty shall not in any way prejudice Gay
Head Indians in their efforts to obtain federal benefits
available to Indians or to achieve recognition as a tribe.
Notwithstanding the foregoing, the federal restriction against
alienation shall permit the Tribal Land Corporation to convey
a strip of land up to 70 feet wide beginning 30 feet inland
from mean high water and 500 feet long, starting from the

-7-

terminus of the West Basin Road and running in an easterly direction along an area of West Basin now used for mooring boats, so that the Town may construct a bulkhead and related structures at this site, subject to the limitations set forth in the Land Use Plan.

12.   Subject to the conditions expressly provided in this Agreement, the Settlement Lands are to be held in trust by the Tribal Land Corporation for the benefit of Gay Head Indians, defined as all descendants of the Indians listed in the census taken in 1869. A copy of the said census is included as Appendix B of this Agreement.

13.   All Federal, State and Town laws shall apply to the Settlement Lands subject only to the following special provisions, regardless of any federal recognition the alleged Gay Head Tribe may acquire:

(a)   The Settlement Lands will not be treated as real property subject to taxation pursuant to Massachusetts General Laws Chapter 59, or any successor State Law, but the Tribal Land Corporation will make payments in lieu of property taxes to the Town of Gay Head or other appropriate entity on the former Strock Estate, if and when improvements are placed on those lands. The fraction of land subject to such payments shall be determined in accordance with the density requirements of Town zoning ordinances. For example, if a house is placed on land which is zoned for two-acre homesites, then two acres of the land shall be subject to payments in lieu of

-8-

taxes.  The amount of such payment shall be determined by assessing the value of the improvements and the value of the land attributable to such improvement, as determined in accordance with this section, and applying the town property tax rate or any other applicable tax rates just as though the improvements and attributable land were held by any private person.  With respect to in-lieu payments that remain unpaid, neither the Town nor any other person will have the right of foreclosure against the Settlement Lands.  Instead of its right of foreclosure, the Town or any other person otherwise entitled to foreclosure may enforce a lien against other assets of the Tribal Land Corporation or any subsidiary thereof, or any other entity controlled by the Tribal Council.  If the in-lieu payments are not fully paid three years after they are due, the Town may seize the land and improvement on which the in-lieu payments are in arrears and lease such land and improvements on reasonable terms for periods of time not to exceed five years, the sums realized from such leases to be applied, after costs, to the payment of the amount in arrears.  Seizure by the Town under this provision shall in no way affect title to the land, which shall remain with the Tribal Land Corporation, and at the expiration of any lease period during which all arrearages have been paid in full, control of the land and improvements shall be returned to the Tribal Land Corporation.

-9-

(b)   The Tribal Land Corporation will have the right (after consultation with appropriate State and local officials) to establish its own regulations concerning hunting (but not trapping or fishing) by Indians on the Settlement Lands by means other than firearms or crossbow.  These regulations by the Tribal Land Corporation shall impose reasonable standards of safety for persons and protection of wild life and the absence of such regulations imposing such standards of safety shall be deemed unreasonable.  These safety and protection standards shall be subject to judicial review for reasonableness and may be enforced by State and local law enforcement officers.  Hunting by firearm or crossbow shall remain subject to the State law.

14.   The Gay Head Indians will not receive Federal recognition as a Tribe as a result of Congressional legislation to carry out the provisions of this Settlement, but they shall have the same right to petition for such recognition as other groups.

15.   Plaintiffs in the lawsuit against the Town of Gay Head, known as Wampanoag Tribal Council of Gay Head, Inc., et al. v. Town of Gay Head, et al., agree to cause the lawsuit to be dismissed with prejudice at the time that the Federal legislation referred to in Paragraph 8 becomes effective.

16.   The Settlement Lands will be subject to the Land Use Plan attached hereto and made a part hereof.  The Land Use Plan shall be enacted as part of the zoning law of the Town of

-10-

Gay Head.  Future amendments of the Land Use Plan as
applicable to the Settlement Lands and embodied in the Town
Zoning Law will require approval by the Tribal Land
Corporation, by the Town of Gay Head (by whatever majority is
usually required for such amendments) at two town meetings not
less than one month apart, at least one of which shall be held
during the month of July or August, and by such officials, if
any, of the Commonwealth whose approval is required for
amendments to zoning laws.

ACCEPTED:

For the Wampanoag Tribal Council of Gay Head, Inc.

By: _____ Date: 11/19/83   Witness: _____

For the Town of Gay Head:

By: _____ Date: 11/19/83   Witness: _____

For the Taxpayers' Association of Gay Head, Inc.

By: _____ Date: 11/19/83   Witness: _____

For the Commonwealth of Massachusetts:

By: _____ Date: 11/22/83   Witness: _____

True Copy & Attest.

WAMPANOAG TRIBAL COUNCIL
OF GAY HEAD, INC.

October 3, 1983

LAND USE PLAN

## I. The Cranberry Lands and the Gay Head Cliffs

A.  Access to the shoreline across the Common Lands shall be preserved, and the established roads and paths for such access shall be maintained by the Town of Gay Head or with respect to any State roads, by the Commonwealth of Massachusetts.  Such rights of way, as shown on the attached map, shall include:

(1)  By foot and by vehicle along the Lobsterville and West Basin Road, inclusive of the parking areas at their ends; from the end of these roads to the West Basin anchorage and to the Menemsha Pond; and by two existing roads leading from Lobsterville Road to the properties above the clay pits, the one proceeding from Menemsha Sound, the other from the terminus of the Lobsterville Road at Menemsha Pond;

(2)  By foot from the Lobsterville Road to the Sound, wherever the center line of that Road is within 125 feet of mean high water;

(3)  By foot along an easement 10 feet wide, extending from the West Basin parking area to the Sound, along a line approximately 80 feet west of, and parallel to, the top of the stone revetment along the west bank of Menemsha Creek, and by foot along existing paths from West Basin Road, as shown on the attached map.  The Town of Gay Head shall retain the right to enter on these shores and rights of way in order to clean and repair them, and to regulate behavior on them, as

necessary to maintain the natural condition of the land, or to keep its use within the capacity of anchorages, roads, or parking areas.

B.   The Common Lands will not be subdivided, but will be held in their entirety by the Tribal Land Corporation and will be subject to normal health and building regulations of Gay Head and of the Commonwealth as they are in force at the time in question.

C.   Except as noted below, all the Common Lands will be left in their existing natural condition, and used only for recreation, food gathering, ceremony, environmental research and education, or nature reserve.   There will be no clearance or planting of vegetation, no extension of paving or erecting of structures, no parking of vehicles beyond the existing paved roads and parking areas, no storage of equipment and no installation of utilities. All with the following exceptions:

1.   Work may be done which is necessary to preserve the present natural condition (such as planting, anchoring, the re-establishment of dunes, or works to prevent erosion), or to improve conditions for wildlife or for natural crops such as berries, fish, and shellfish (for example: planting, draining, irrigating, shaping of the pond bottom, or the installation of traps or shellfish rafts).

2.   Existing walks, road and parking areas may be repaired and improved.   No road may be built or widened to give a travel surface wider than 15 feet.   Additional parking spaces may be provided between the West Basin Road and the

-2-

proposed bulkhead at West Basin, and at Menemsha Pond, and the unpaved parking areas along Lobsterville Road may be improved as necessary to protect the beach and vegetation.

3. New walkways, roads, and parking areas may be constructed, but only if they serve the purposes of this section, and do not disturb the nesting grounds on the peninsula.

4. Signs and symbolic objects may be erected to explain the meaning of the site, or to regulate behavior on it. They shall not be illuminated, nor be over six feet high or six square feet in area.

5. A bulkhead and related structures may be constructed on the strip of land 100 feet inland from mean high water and 500 feet long, starting from the terminus of West Basin Road and running in an easterly direction along the area of West Basin now used for mooring boats. Such structures may be installed at this site for the gathering or processing of fi: or shellfish, or the harboring, servicing, launching or repa. of small boats but shall be subject to Town zoning and may n° be over twelve feet high from mean ground level nor may thei aggregate floor area exceed 2000 square feet. As far as possible, these structures should be of traditional form, an be sited and finished so as to be visually unobstrusive and blend with the land. Utilities must be placed underground. The Tribal Land Corporation will grant an easement across settlement land to ensure that necessary utilities may be brought to this site. Any bulkhead and related facilities

-3-

built on this site shall be available on the same terms, without distinction, to all residents of Gay Head, their heirs, guests and assigns.

6. Temporary utilities may be provided and related activities undertaken to facilitate such traditional activities as the Gay Head Pageant.

7. Any facility built with Town funds on the Cranberry Lands such as a bulkhead or a parking lot shall remain in the ownership of the Town, provided, however, that no such facility may be built by the Town without the consent of the Tribal Land Corporation.

II. The Cook Lands.

A. These lands will not be subdivided, but will be held in entirety by the Tribal Land Corporation.

B. This land will be subject to normal health and building regulations of Gay Head and the Commonwealth, as they are in force at the time in question, and to state and federal conservation laws and the regulations of the Martha's Vineyard Commission. Town zoning laws applicable to these lands may be changed only in the manner provided in the Settlement Agreement.

C. In addition, the aggregate floor area of all structures on the land may not exceed 3,000 square feet and such structures may not exceed a height of twelve feet with a maximum peak of sixteen feet. All structures must be set back at least 100 feet from the State Road, and at least 100 feet from the recreational beach, and

-4-

should as far as possible be traditional in form, and sited and finished to be unobtrusive and to blend with the land. All utilities must be placed underground, and any fishery development at the shore shall be kept easterly and separate from the pond beach to which residents have access, and no obstruction of any kind may be placed in the water that would interfere with the recreational use of the beach and adjacent waters.

D. Residents and property owners of Gay Head, their guests and assigns, will have a right of access on foot along the shore of Menemsha Pond, to a point 30 feet inland of mean high water, and from the western boundary of the property to a point 300 feet to the east along the shore. They may use these shores for fishing, swimming, outdoor recreation, or the beaching and anchorage of small boats. They will also have a right of access by foot and by car to this shore along an easement 30 feet wide beginning at the present entrance from State Road, and running approximately 100 feet east of and parallel to the western boundary of the property, including a parking area 40 x 60 feet at the beach as shown on the attached map. The Town retains the right to enter on this shore and this right of way, in order to clean or repair them, or to regulate behavior on them, as necessary to maintain the natural condition of the land, or to keep its use within its capacity.

III. The Strock Lands

A. These lands will not be subdivided, but will be held in entirety by the Tribal Land Corporation.

-5-

B.   This land will be subject to normal health and building regulations of Gay Head and the Commonwealth, as they are in force at the time in question, and to the zoning regulations and the substantive standards of the subdivision regulations of the Town of Gay Head as they exist at the time of this agreement, as included herein as appendix "C". No special permit or approval by the Planning Board, the Board of Appeals, the Conservation Commission or the Martha's Vineyard Commission shall be required for any use which complies in all respects with the substantive requirements of the said zoning and subdivision regulations. Such permits and approvals may be requested and issued in the same manner as for other land in Gay Head with respect to any exception to, or other variation from such requirements, which is authorized by the said regulations.

-6-

GAY HEAD

ZONING BY-LAW

## SECTION I:     PURPOSE

The purpose of this By-Law is to promote the health, safety, convenience and welfare of the inhabitants of the Town of Gay Head, to prevent flood damage, maintain water quality, assure adequate water supply, prevent pollution, promote wildlife habitats, assure and maintenance of cultural and historic sites and values, preserve and enhance the character of views, prevent damage to structures  land, and water as a result of erosion, promote economic development of fisheries and related industries, maintain and enhance the overall economy of the Town of Gay Head, and to provide them with the benefits and protection authorized by Chapter 808 of the Acts of the Commonwealth of 1975.

## SECTION II:     THE DISTRICTS

###       DISTRICTS

The Town of Gay Head is divided into the following districts.

1.    Rural-Residential Districts

2.    Marine Commercial Districts

3.    Special Overlay Districts (a district whose regulations are in part in addition to the regulations of the underlying districts). These districts include the Island Road District, the Coastal Districts, the Moshup Trail District, and the Special Places District of Critical Planning Concern)

2

These districts are located on a map entitled "Zoning Map of Gay Head", on file in the office of the Town Clerk.  This map, with all explanatory matter concerning the special overlay districts, is hereby made part of the By-Law.

B.    HAZARDOUS USE

In any district, no use of any building of parcel of land may be established which is hazardous to health, or dangerous due to the possibility of fire, explosion, or other cause.

C.    PERMITTED USES IN A RURAL-RESIDENTIAL DISTRICT

The following uses are permitted in a Rural-Residential District:

1.    detached one-family dwellings, not including temporary or mobile structures except as provided below:

2.    religious, educational, or municipal uses;

3.    farm, forest, plant nursery, or other agricultural or horticultural use;

4.    the harvesting and processing of fish and shellfish;

5.    any use customarily accessory to and clearly incidental to a permitted principal use on the lot including:

   a.  a home occupation employing no more than five persons not members of the resident family;

   b.  the display and sale of natural products raised or prepared in the Town;

   c.  the renting of rooms or boarding of not more than eight persons not members of the resident family;

   d.  the use of no more than two tents for the sleeping of members of the resident family or their guests;

   e.  the storage of unoccupied vehicles, boats, boat and