# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, <br><br> Plaintiff/Counterclaim-Defendant, <br><br> and <br><br> THE AQUINNAH/GAY HEAD COMMUNITY ASSOCIATION, INC. (AGHCA) and TOWN OF AQUINNAH, <br><br> Intervenors/Plaintiffs, <br><br> v. <br><br> THE WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH), THE WAMPANOAG TRIBAL COUNCIL OF GAY HEAD, INC., and THE AQUINNAH WAMPANOAG GAMING CORPORATION, <br><br> Defendants/Counterclaim-Plaintiffs, <br><br> v. <br><br> CHARLIE BAKER, in his official capacity as GOVERNOR, COMMONWEALTH OF MASSACHUSETTS, et al., <br><br> Third-Party Defendants. | Civil Action No. 13-13286-FDS |

## MEMORANDUM AND ORDER ON MOTIONS TO DISMISS

**SAYLOR, J.**

This lawsuit involves a dispute between the Commonwealth of Massachusetts and a federally recognized Indian tribe concerning regulatory jurisdiction over civil gaming on Indian

lands on Martha's Vineyard. The Wampanoag Tribe of Gay Head (Aquinnah) and related entities have taken steps to commence commercial gaming operations on tribal lands without a license from the Commonwealth. The Commonwealth contends that operating gaming facilities without such a license would violate a 1983 settlement agreement that subjects the lands in question to state civil and criminal jurisdiction (and thus subjects them to state laws regulating gaming). Count 1 of the complaint alleges breach of contract, and Count 2 seeks a declaratory judgment.

The Commonwealth filed suit in state court on December 2, 2013. On December 30, 2013, the Tribe removed the action to this Court on the basis of federal-question and supplemental jurisdiction. *See* 28 U.S.C. §§ 1331, 1367.[1] On August 6, 2014, the Court granted motions to intervene by the Town of Aquinnah and the Aquinnah/Gay Head Community Association ("AGHCA"). The Tribe has moved to dismiss the AGHCA complaint on the basis of sovereign immunity and for failure to state a claim upon which relief can be granted; it has further moved to dismiss all three complaints (with leave to amend) for failure to join the United States as a required party.

On October 24, 2014, the Tribe filed an amended answer that included a counterclaim against the Commonwealth and counterclaims against three third-party defendants (all of whom are officials of the Commonwealth). Plaintiff and third-party defendants have moved to dismiss the counterclaims on the grounds of sovereign immunity (as to the counterclaims against the Commonwealth) and failure to state a claim upon which relief can be granted.

---

[1]  According to the Commonwealth, the Aquinnah Wampanoag Gaming Corporation is a wholly-owned subsidiary of the Tribe or the Wampanoag Tribal Council of Gay Head, Inc. According to defendants, the Wampanoag Tribal Council of Gay Head, Inc., no longer exists. (Notice of Removal at 1 n.1). For the sake of simplicity, the Court will refer to defendants collectively as "the Tribe."

For the reasons stated below, the motions of the Tribe will be denied and the motion of counterclaim-defendants will be granted in part and denied in part.

I. **Background**

A. **Factual Background**

Unless otherwise noted, the facts are presented as stated in the complaint.

Historically, the western tip of Martha's Vineyard has been home to the Wampanoag Tribe of Gay Head (or Aquinnah). In 1974, the Wampanoag Tribal Council of Gay Head, Inc., sued the Town of Gay Head, asserting aboriginal property rights to certain land within the town.[2] In November 1983, the Commonwealth; the Town of Gay Head; the Taxpayers' Association of Gay Head, Inc.; and the Wampanoag Tribal Council of Gay Head, Inc., entered into a settlement agreement that they termed a "Joint Memorandum of Understanding Concerning Settlement of the Gay Head, Massachusetts Indian Land Claims" (the "Settlement Agreement"). The Town and the Taxpayers' Association conveyed to the Wampanoag Tribal Council approximately 400 acres of land (the "Settlement Lands") to be held "in the same manner, and subject to the same laws, as any other Massachusetts corporation." (Compl., Ex. A). The Tribal Council relinquished all claims to other lands and waters in the Commonwealth. The Settlement Agreement provided that "[u]nder no circumstances, including any future recognition of the existence of an Indian tribe in the Town of Gay Head, shall the civil or criminal jurisdiction of the Commonwealth of Massachusetts . . . over the settlement lands . . . be impaired or otherwise altered" and "no Indian tribe or band shall ever exercise sovereign jurisdiction" over those lands. (*Id.*). The Bureau of Indian Affairs of the United States Department of the Interior later took the

---

[2] In 1997, the Town of Gay Head changed its name to Aquinnah.

Settlement Lands into trust.

In 1985, pursuant to the terms of the Joint Memorandum, the Massachusetts Legislature enacted a statute implementing the Settlement Agreement.[3]  The Settlement Agreement, however,  required the approval of Congress to take effect.

In 1987, before Congress passed the implementing statute, the Department of the Interior officially recognized the Wampanoag Tribe of Gay Head as an Indian tribe.  *See* 52 Fed. Reg. 4193 (Feb. 10, 1987).

On August 18, 1987, Congress passed the act implementing the Settlement Agreement. *See* Wampanoag Tribal Council of Gay Head, Inc., Indian Land Claims Settlement Act, Pub. L. No. 100-95, *codified at* 25 U.S.C § 1771 *et seq.* ("Wampanoag Settlement Act").  The federal act stated that the Settlement Lands are subject to the laws of the Commonwealth of Massachusetts "including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance."  25 U.S.C. § 1771g.

In 1988, Congress enacted the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*  In part, the IGRA established a regulatory structure for gaming on Indian lands and created the National Indian Gaming Commission ("NIGC").

Between 2011 and 2013, the Tribe passed and adopted tribal resolutions instituting a gaming ordinance pursuant to the IGRA.  On May 30, 2013, the Tribe submitted an amendment to its gaming ordinance to the NIGC.  On August 23, 2013, the Department of the Interior's Office of the Solicitor sent a letter to the NIGC opining that the Tribe had jurisdiction to operate a gaming facility on the Settlement Lands.  On August 29, 2013, the NIGC approved the Tribe's

---

[3] *See* An Act to Implement the Settlement of the Gay Head Indian Land Claims, Mass. Stat. 1985, c. 277.

gaming ordinance, "to the extent that it is consistent with the provisions of IGRA," by operation of law.[4] On October 25, 2013, the NIGC Office of General Counsel sent a letter to the Tribe expressing the opinion that the Settlement Lands were "eligible for gaming." Soon thereafter, the Tribe announced its intention to open a gaming facility in a community center on those lands.

Massachusetts law prohibits any entity from operating a gaming establishment without a license issued by the Massachusetts Gaming Commission. *See* Mass. Gen. Laws ch. 23K, §§ 2, 9, 25. The Tribe has not obtained such a license nor complied with the Massachusetts prerequisites for doing so.

### B.     Procedural History

On December 2, 2013, the Commonwealth filed a complaint with the Single Justice of the Supreme Judicial Court for Suffolk County against the Tribe, the Wampanoag Tribal Council of Gay Head, Inc., and the Aquinnah Wampanoag Gaming Corporation. The complaint asserted a claim for breach of contract and requested a declaratory judgment that the Settlement Agreement allowed the Commonwealth to prohibit the Tribe from conducting gaming on the Settlement Lands. On December 30, 2013, the Tribe removed the action to this Court on grounds of federal-question and supplemental jurisdiction. On January 29, 2014, the Commonwealth moved to remand the action to state court. The Court denied that motion on July 1, 2014.

On July 10, 2014, both AGHCA and the Town filed motions to intervene. The Court granted those motions on August 6, 2014. On August 27, 2014, the Tribe moved to dismiss the AGHCA complaint on the grounds of sovereign immunity and failure to state a claim upon

---

[4] A gaming ordinance is automatically approved by NIGC, by operation of law, if it does not act on the ordinance within 90 days. 25 U.S.C. § 2710(e).

which relief can be granted. On that same day, the Tribe separately moved to dismiss all three complaints, with leave to amend, for failure to join the United States, which it contends is a required party under Fed. R. Civ. P. 19.

On October 24, 2014, the Tribe filed an amended answer to the complaint filed by the Commonwealth. The amended answer included counterclaims against the Commonwealth and claims against three third-party defendants, all of whom are government officials of the Commonwealth sued in their official capacity.[5] (For the sake of simplicity, the Court will refer to those claims collectively as the "counterclaims," and those defendants as "counterclaim-defendants").[6] The counterclaims seek declaratory and injunctive relief concerning the Commonwealth's assertion of jurisdiction over gaming that occurs on the Tribe's trust lands. On November 19, 2014, the Commonwealth and the third-party defendants moved to dismiss the counterclaims.

## II.    Legal Standard

On a motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (*citing Rogan v. Menino*, 175 F.3d 75, 77 (1st

---

[5] The original counterclaims named Governor Deval Patrick, Attorney General Martha Coakley, and Chairman of the Massachusetts Gaming Commission Stephen Crosby as third-party defendants. Patrick and Coakley no longer serve in the capacities listed, having been replaced by Governor Charlie Baker and Attorney General Maura Healey. Accordingly, Governor Baker, Attorney General Healey, and Crosby are the third-party defendants as the case currently stands.

[6] The proper means of bringing third-party defendants into a civil case is through the use of a third-party complaint, not a counterclaim. *See* Fed. R. Civ. P. 14. Because third-party defendants are all officials of the Commonwealth, all parties have treated the Tribe's claims against them as counterclaims under Rule 13 (even though third-party defendants are not plaintiffs in this action). Regardless of whether the claims should technically be considered counterclaims under Rule 13 or part of a third-party complaint under Rule 14, the Court's ruling as to their viability at this stage would be the same.

Cir.1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the facts as alleged do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (alterations omitted) (internal quotation marks omitted).

## III. Analysis

### A. The Motion by the Tribe to Dismiss the AGHCA Complaint

The Tribe has moved to dismiss the complaint of intervenor AGHCA on jurisdictional grounds and for failure to state a claim upon which relief can be granted. More specifically, the Tribe contends that it possesses sovereign immunity from suit and that its immunity has not been waived or congressionally abrogated with respect to this action.[7] The Tribe further contends that, if it does not have immunity, the AGHCA complaint must be dismissed on the merits. Each of those contentions is discussed below.

#### 1. Sovereign Immunity

"Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority

---

[7] While the Tribe has not moved to dismiss the complaints filed by the Commonwealth or the Town, it clarified in its motion to dismiss that it is not yet conceding the issue of immunity with respect to those plaintiffs. (Defs' Mem. at 3).

over their members and territories. Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509 (1991) (citations omitted). "[A] tribe's waiver must be clear" in order to renounce tribal sovereign immunity. *C&L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411, 418 (2001) (internal quotation marks omitted). Similarly, in order to abrogate tribal immunity, "Congress must unequivocally express that purpose." *Id.* (internal quotation marks omitted). The Tribe contends that there has been no waiver or abrogation of its sovereign immunity and that the AGHCA complaint must therefore be dismissed.

AGHCA contends both that the Tribe has waived its immunity and that the doctrine of issue preclusion (or collateral estoppel) prevents it from arguing otherwise. Specifically, AGHCA contends that the Massachusetts Supreme Judicial Court has previously determined that the Tribe waived its sovereign immunity with respect to jurisdiction over its lands. *See Building Inspector and Zoning Officer of Aquinnah v. Wampanoag Aquinnah Shellfish Hatchery Corp.*, 443 Mass. 1, 12-13 (2004). According to AGHCA, that prior determination binds this Court.

"[O]nce an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979). The doctrine of issue preclusion prevents "parties from contesting matters that they have had a full and fair opportunity to litigate," and "protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Id.* at 153-54.

The federal full-faith-and-credit statute, 28 U.S.C. § 1738, provides in substance that "a judgment rendered in state court is entitled to the same preclusive effect in federal court as it would be given within the state in which it was rendered."  *In re Sonus Networks, Inc., Shareholder Derivative Litig.*, 499 F.3d 47, 56 (1st Cir. 2007) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); *see also* U.S. Const. Art. IV § 1.  Accordingly, the preclusive effect of the prior judgment in *Shellfish Hatchery* is determined according to Massachusetts law.

Under Massachusetts law, issue preclusion applies when:

(1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication.  Additionally the issue decided in the prior adjudication must have been essential to the earlier judgment.

*Kobrin v. Bd. of Registration in Med.*, 444 Mass. 837, 843 (2005).  The question is whether, under that standard, *Shellfish Hatchery* precludes further litigation of the waiver issue.

*Shellfish Hatchery* was an action to enforce town zoning laws on certain Tribe lands (known as the Cook Lands).  The SJC held that the Tribe had waived its sovereign immunity with respect to the use of those lands.  *Id.* at 2-3.  The source of the waiver, according to the court, was the 1983 Settlement Agreement.  *Id.* at 13.  The court specifically pointed to paragraph three of the Settlement Agreement, in which the Tribe agreed to hold its land "in the same manner, and subject to the same laws, as any other Massachusetts corporation," as "clearly establish[ing] a waiver of sovereign immunity."  *Id.* at 12, 13.

The first requirement for issue preclusion is whether the prior decision constitutes a "final judgment on the merits."  There is no question that it does.  The *Shellfish Hatchery*

decision was issued by the Massachusetts Supreme Judicial Court after it granted an application for direct appellate review of the lower court's ruling. *Id.* at 2; *see Sena v. Commonwealth*, 417 Mass. 250, 260 (1994) ("We have implied that for a decision to be final it must have been subject to appeal or actually reviewed on appeal."). Moreover, the Tribe has not contested the finality of the decision.

The second requirement for issue preclusion is that the party against whom preclusion is being asserted (here, the Tribe) must have been either a party to, or in privity with a party to, the prior adjudication. *Kobrin*, 444 Mass. at 843. Privity exists "(1) where the nonparty substantially controlled the previous litigation; (2) where the nonparty is a successor-in-interest to a prior party; or (3) under the doctrine of virtual representation." *Boston Scientific Corp. v. Schneider (Europe) AG*, 983 F. Supp. 245, 257 (D. Mass. 1997) (citations omitted). The question of privity "essentially reduces itself to an inquiry whether the party against whom preclusion is asserted participated in the prior proceeding, either himself or by a representative." *Bourque v. Cope Southport Assocs., LLC*, 60 Mass. App. Ct. 271, 275 (2004).

Officially, the two defendants in *Shellfish Hatchery* were the Wampanoag Shellfish Hatchery Corporation and the Wampanoag Tribal Council of Gay Head. In its initial answer in that litigation, defendants admitted "that the Hatchery is controlled by the [T]ribe," was "exercising delegated authority from the Tribe," and was "wholly owned and operated by the Wampanoag Tribe of Gay Head (Aquinnah)." (Answer and Counterclaim at 1 ¶ 2, 5 ¶ 2, No. 01-10924) (D. Mass. July 13, 2001) (Woodlock, J.).[8] That same document identified the Tribal Council as "a federally recognized Indian Tribe (now known as Wampanoag Tribe of Gay Head

---

[8] The *Shellfish Hatchery* litigation began in federal court before it was remanded to state court on jurisdictional grounds. (*See* Memorandum and Order of Sept. 30, 2002, No. 01-10924) (D. Mass.).

(Aquinnah)[)]." (*Id.* at 5 ¶ 1). AGHCA cited those prior admissions in its memorandum in opposition to the motion to dismiss; the Tribe did not contest them in its reply.

On this record, it therefore appears that the Tribe is a successor-in-interest to the Tribal Council and substantially controlled the Shellfish Hatchery Corporation at the time of the *Shellfish Hatchery* litigation.[9] Accordingly, the Tribe is in privity with the parties to the prior suit and would be bound by the prior judgment if the remaining requirements are met.

The third requirement for issue preclusion is that "the issue in the prior adjudication [must have been] identical to the issue in the current adjudication." *Kobrin*, 444 Mass. at 843. The precise holding of *Shellfish Hatchery* was that "the Tribe waived its sovereign immunity as to land use on the Cook Lands," not all the Settlement Lands. The land on which the Tribe intends to conduct gaming activities is not part of the Cook Lands. Nonetheless, AGHCA contends that the *Shellfish Hatchery* court determined the issue with respect to other Tribe lands as well. It notes that the language in the Settlement Agreement that the court cited as effectuating a waiver applies not only to the Cook Lands, but to "any other land [the Tribe] may acquire." (Settlement Agreement at ¶ 3). Indeed, the court expressed its finding of a waiver in broader terms than the holding would imply: "[T]he tribe expressly memorialized a waiver of its sovereign immunity, with respect to municipal zoning enforcement, by agreeing, in paragraph three of the settlement agreement, to hold its land, including the Cook Lands, 'in the same manner, and subject to the same laws, as any other Massachusetts corporation.'" *Shellfish Hatchery*, 443 Mass. at 13 (quoting the Settlement Agreement). Reading the court's opinion as a

---

[9] As noted, the Aquinnah Wampanoag Gaming Corporation is apparently a wholly-owned subsidiary of the Wampanoag Tribe. The Wampanoag Tribal Council apparently no longer exists; if it does, it may have been a party to both this litigation and the *Shellfish Hatchery* litigation.

whole, it is clear that the court found a waiver of immunity with respect to the use of not just the Cook Lands, but all of the Tribe's land. It is therefore fair to say that this issue is identical to that currently before the Court.[10]

The final requirement for issue preclusion is that "the issue decided in the prior adjudication must have been essential to the earlier judgment." *Kobrin*, 444 Mass. at 843. The issue need not be "strictly essential," but it must have been "treated as essential to the prior case by the court and the party to be bound. Stated another way, it is necessary that [the court's] finding[] be the product of full litigation and careful decision." *Comm. of Dep't of Employment & Training v. Dugan*, 428 Mass. 138, 144 (1998) (quoting *Home Owners Fed. Savings & Loan Ass'n v. Northwestern Fire & Marine Ins. Co.*, 354 Mass. 448, 455 (1968) (emphasis in original)).

Although the *Shellfish Hatchery* court clearly found that the Tribe had waived its immunity with respect to all of its lands, arguably the only finding that was "strictly essential" to its judgment was that of a waiver with respect to the Cook Lands. Its finding that the Tribe had waived its immunity with respect to other lands was perhaps not essential in a strict sense; if the court had held that the Tribe had waived its immunity with respect to only the Cook Lands, it still would have allowed the zoning enforcement action against the Cook Lands to go forward.

The applicability of issue preclusion thus appears to turn on whether the *Shellfish Hatchery* court "treated as essential" its determination that the Tribe had waived its sovereign immunity with respect to all of its lands—that is, whether that determination was "the product of

_____

[10] If this Court were to rule to the contrary—that the Tribe did not waive its sovereign immunity as to all of its lands—it would necessarily be ruling that the Tribe did not waive its sovereign immunity as to the Cook Lands, which would contradict the ruling of the SJC.

full litigation and careful decision." *See Northwestern Fire & Marine*, 354 Mass. at 455.

The finding of the SJC appears to have been the product of a "careful decision." The SJC did not begin by analyzing whether there was a waiver specifically as to the Cook Lands and then note in passing that the analysis would apply equally to other lands; instead, it first analyzed the Settlement Agreement and found a broad waiver, and then applied that finding to the specific subset of land at issue. The statement that the Tribe waived its sovereign immunity as to all of its lands represents the court's central conclusion (although not strictly its ultimate holding). *Shellfish Hatchery*, 443 Mass. at 13 ("More specifically, the Tribe expressly memorialized a waiver of its sovereign immunity . . . by agreeing . . . to hold its land, including the Cook Lands, 'in the same manner, and subject to the same laws, as any other Massachusetts corporation.'"). That finding was also the product of "full litigation"—that is, the Tribe had a "full and fair opportunity to litigate the issue[]." *See Alba v. Raytheon Co.*, 441 Mass. 836, 844 (2004).[11] The finding of the SJC was thus "essential" to the prior case, and treated as such by the court and the parties.

Thus, the requirements for issue preclusion have been met, and this Court must give full faith and credit to the decision of the Supreme Judicial Court.

The Court further notes that even if the broad finding of the *Shellfish Hatchery* court is for some reason not preclusive, some of its narrower findings undoubtedly are. For example, in order to reach its decision, the SJC necessarily must have determined that the Settlement Agreement was enforceable against the parties and that the Tribal Council was capable of

---

[11] Arguably, the tribal defendants in *Shellfish Hatchery* had no incentive to distinguish between the Cook Lands and the rest of their lands, because only the Cook Lands were at issue in that litigation. If a determination as to other lands had been "strictly essential" to the judgment, the Tribe conceivably might have advanced arguments more specifically tailored to those lands. It has not, however, identified any such arguments here, and it is certainly doubtful that any such arguments would have convinced the court, in light of its reasoning.

waiving the sovereign immunity of the Tribe even though it had not yet been federally recognized. Those kinds of "subsidiary" findings may give rise to issue preclusion. *See Alba*, 441 Mass. at 844; *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30-31 (1st Cir. 1994) ("An issue may be 'actually' decided even if it is not explicitly decided, for it may have constituted, logically or practically, a necessary component of the decision reached in the prior litigation."). This Court is therefore precluded from contravening those findings. Moreover, the *Shellfish Hatchery* court conclusively determined that the Tribe had waived its sovereign immunity with respect to the Cook Lands as a result of the "in the same manner" language in the Settlement Agreement. Thus, this Court is precluded from finding no waiver at all in the Settlement Agreement.

At a minimum, therefore, the preclusive effect of those three subsidiary findings—(1) that the settlement agreement is enforceable, (2) that the Tribal Council had the power to waive the Tribe's sovereign immunity, and (3) that the "in the same manner" language waived the Tribe's immunity with respect to at least the Cook Lands—compels the conclusion that the Tribe's waiver applied to all of its lands. The language in the Settlement Agreement applies equally to the remainder of the Tribe's lands as it does to the Cook Lands; there is no apparent basis on which to distinguish the Cook Lands from the lands targeted for gaming. By that reasoning, therefore, the Tribe waived its sovereign immunity with respect to all of its lands.[12]

The Tribe makes three additional arguments concerning sovereign immunity and issue

---

[12] The decision of the Massachusetts Appeals Court in *Kitras v. Town of Aquinnah*, 64 Mass. App. Ct. 285 (2005), cited by the AGHCA, provides additional support. In *Kitras*, the court relied on *Shellfish Hatchery* in finding that the Tribe could properly be joined to a suit aimed at resolving easement claims that could burden some of its lands. *Id.* at 296-98. It specifically stated: "Although *Shellfish Hatchery Corp.* dealt with the Cook Lands and involved a zoning dispute (rather than the easement rights here at issue) we see little reason to suppose the court's rationale would not control the present proceedings." *Id.*

preclusion that merit discussion. First, the Tribe contends that the usual rules of issue preclusion do not apply to sovereign governments in the same way as they do to private parties. It is true that "the Government may not be estopped on the same terms as any other litigant." *Heckler v. Comm'y Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 60. However, the rationale for that rule, as it applies to the United States government, is to protect "the public interest in ensuring that the Government can enforce the law free from estoppel." *Id.* at 60-61. There is no obvious reason to apply that principle to avoid the application of issue preclusion to an Indian tribe, which does not enforce laws in service of the general public. Indeed, the Tribe has not put forth a persuasive argument to the contrary.

Second, the Tribe contends that *Shellfish Hatchery* applies only to suits against the Tribe by governmental bodies, and not private parties like the AGHCA. But the AGHCA (and another private party, UMB Bank) had intervened in the *Shellfish Hatchery* litigation, just as it has intervened in this one. The SJC's opinion did not distinguish the claims of those parties in any way. Furthermore, its reasoning applies equally to private parties. The court specifically cited the language in the Settlement Agreement that the Tribe would hold land "in the same manner, and subject to the same laws, as any other Massachusetts corporation" and noted that that status is one "permitting the Tribe to sue or be sued." *Shellfish Hatchery*, 443 Mass. at 13 (quoting the Settlement Agreement); *see* Mass. Gen. Laws ch. 155 § 6 ("A corporation may . . . sue and be sued . . . ."). Massachusetts corporations can be sued by private parties as well as governmental entities; there is therefore no reason to conclude that the holding applies differently as to the claims of private parties than as to the claims of governmental bodies.

Finally, the Tribe relies heavily on an earlier decision of this Court that (it contends) directly contradicts the decision in *Shellfish Hatchery*. *See Wampanoag Tribe of Gay Head*

*(Aquinnah) v. Massachusetts Comm'n Against Discrimination*, 63 F. Supp. 2d 119 (D. Mass. 1999) (Lindsay, J.). In the *MCAD* case, the Massachusetts Commission Against Discrimination sought to enforce Massachusetts employment discrimination law against the Tribe. *Id.* at 122. The Court ruled that the Tribe was immune from such enforcement. *Id.* at 125.

However, *MCAD* has little bearing on this case, and it certainly does not contradict *Shellfish Hatchery*. First, it predates *Shellfish Hatchery*.[13] Second, the waiver found by the *Shellfish Hatchery* court had to do specifically with land use; *MCAD* involved alleged employment discrimination. Indeed, *MCAD* mentioned the Settlement Agreement only cursorily and did not even examine it for possible waiver. *Id.* at 121, 123. Here, the Commonwealth and intervenors seek to prevent the Tribe from operating an unlicensed gaming facility on its land. For that reason, the *Shellfish Hatchery* determination that the settlement agreement contains a waiver as to the judicial enforcement of land-use laws is far more relevant to this analysis than is the *MCAD* determination that the Tribe was immune from judicial enforcement of employment-discrimination law.

Accordingly, the Tribe's motion to dismiss on the basis of sovereign immunity will be denied.

## 2.      Failure to State a Claim

The Tribe further contends that the AGCHA complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. It contends that the Settlement Agreement, which serves as the basis for the AGHCA's breach of contract claim,

---

[13] Under the later-in-time rule of the Restatement (Second) of Judgments, the *Shellfish Hatchery* judgment (issued five years after *MCAD*) would control if it were inconsistent with the *MCAD* judgment. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 15 (1982) ("When in two actions inconsistent final judgments are rendered, it is the later, not the earlier, judgment that is accorded conclusive effect in a third action under the rules of res judicata.").

is not presently binding upon the Tribe, because (1) the agreement terminated in 1985 and (2) the Tribal Council did not have the power to bind the Tribe.

Both of those contentions are precluded by *Shellfish Hatchery*. In order to make its finding on waiver, the court in *Shellfish Hatchery* necessarily must have determined that the Settlement Agreement was both enforceable (that is, it did not expire in 1985) and binding upon the Tribe. Those subsidiary findings have preclusive effect on this proceeding. *See Alba*, 441 Mass. 836, 844; *Grella*, 42 F.3d 26, 30-31. The Court therefore cannot conclude that the AGHCA complaint fails to state a claim upon which relief can be granted.

Accordingly, the Tribe's motion to dismiss for failure to state a claim will be denied.

**B.      The Tribe's Motion to Dismiss for Failure to Join a Required Party**

The Tribe has further moved to dismiss the claims of all three plaintiffs, with leave to amend, for failure to join a required party under Rule 19 of the Federal Rules of Civil Procedure. Rule 19 establishes a two-step inquiry for determining whether an action should be dismissed for failure to join a required party. First, the Court must determine whether an absent party is a person "to be joined if feasible" under Rule 19(a)—in other words, whether the absent party is "required." Fed. R. Civ. P. 19(a)(1). A party is "required" under Rule 19(a)(1) if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may
>
> > (i) as a practical matter impair or impede the person's ability to protect the interest; or
> >
> > (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

If the Court concludes that the absent party is "required" and that joinder is not feasible, then it must determine "whether, in equity and good conscience, the action should proceed among the existing parties, or[, alternatively, whether the action] should be dismissed." Fed. R. Civ. P. 19(b).[14] *See also Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118-19 (1968) ("The decision whether to dismiss (i.e., the decision whether the person missing is 'indispensable') must be based on factors varying with the different cases, some such factors being substantive, some procedural, some compelling by themselves, and some subject to balancing against opposing interests.").

Here, the Tribe has invoked Rule 19 based on the absence of the United States from this litigation. It contends that (1) the United States, as the trustee of the tribal lands in question, has a jurisdictional claim over the lands and thus a legal interest in asserting its jurisdiction to the exclusion of other sovereigns (such as the Commonwealth and the Town); and (2) that the NIGC (an arm of the United States government) has an interest in enforcing its approval of the Tribe's gaming ordinance against any restrictions that plaintiffs may try to impose on the Tribe's gaming activities. The Tribe contends that the United States is a required party that can feasibly be joined by plaintiffs. It therefore seeks dismissal of all three complaints, with leave to amend to join the United States.[15]

---

[14] Prior to 2007, Rule 19(b) used the term "indispensable" to describe a party whose absence required a dismissal. The 2007 amendment to the rule explained that the term had simply been used "to express a conclusion reached by applying the tests of Rule 19(b)" and that it was being "discarded as redundant." Fed. R. Civ. P. 19 advisory committee's note.

[15] The Tribe's memorandum in support of its motion equivocates as to which of the plaintiffs should be required to join the United States as a defendant. It first asks the Court to "dismiss each [c]omplaint and grant each party leave to amend in order to join the United States." (Defs' Mem. at 2). At another point, however, it appears to indicate that only the government plaintiffs should be required to join the United States. (*See id.* at 3 ("[T]he Court should grant the Tribe's Motion under Rule 19 with leave to amend the Commonwealth's and Town's Complaint(s) to join the NIGC as a party-defendant.")). Because the Court finds that joinder is not required, it does not resolve this ambiguity.

As detailed above, Rule 19(a) provides that a party is "required" if any of three circumstances is met. The Court will consider each of the three in turn.

### 1.    Whether the Court Can Accord Complete Relief Among the Parties

The Tribe contends that neither it nor plaintiffs can be accorded complete relief without joinder of the United States. *See* Fed. R. Civ. P. 19(a)(1)(A). More specifically, it contends that a decision by this Court in its favor would not accord it complete relief, because plaintiffs could "avail themselves of a second bite at the apple by filing an APA action against NIGC challenging its approval of the Tribe's site-specific gaming ordinance." (Defs' Mem. at 7). And it contends that a decision in favor of plaintiffs would not accord them complete relief, as such a decision could subject the Commonwealth or the Town to litigation brought by the United States for encroachment upon its jurisdiction. (*Id.*).

Rule 19(a)(1)(A), however, "is concerned only with those who are already parties." *MasterCard Intern. Inc. v. Visa Intern. Serv. Ass'n, Inc.*, 471 F.3d 377, 385 (2d Cir. 2006); *see Angst v. Royal Maccabees Life Ins. Co.*, 77 F.3d 701, 705 (3d Cir. 1996) ("Completeness is determined on the basis of those persons who are already parties, and not as between a party and the absent person whose joinder is sought.") That is true even where "further litigation . . . is inevitable." *MasterCard Intern.*, 471 F.3d at 385; *see Angst*, 77 F.3d at 705 ("The possibility that the successful party to the original litigation might have to defend against a subsequent suit by the receiver does not make the receiver a necessary party to the action.").

The Court can accord complete relief among the parties currently involved in this case with respect to the claims at issue. The four parties (counting the Tribe as one) represent the four signatories to the Settlement Agreement. A judgment as to the rights of the parties under the agreement will bind all four parties and resolve the current dispute. Accordingly, no

additional parties are required on the basis of Rule 19(a)(1)(A).

### 2. Whether the United States Claims an Interest That May Be Impaired or Impeded by a Judgment in Its Absence

All parties appear to agree that the United States claims at least some level of interest in this litigation. As the Tribe notes, the United States holds legal title to the Settlement Lands as trustee for the Tribe. More generally, the very existence of legislation such as the IGRA and bodies such as the NIGC make clear that the federal government maintains a strong interest in overseeing Indian gaming activities. Further, the specific involvement of the NIGC and the Department of the Interior in this dispute, if not this case, confirms that the United States "claims an interest" in the matter.

The key question is whether disposing of this action in the absence of the United States is likely to "impair or impede [its] ability to protect [whatever] interest" that it does claim. Fed. R. Civ. P. 19(a)(1)(B)(i). Plaintiffs contend that the risk of unduly impairing the interest of the United States is low, because its interest is (1) apparently not strong enough to induce it to intervene and (2) substantially similar to that of the Tribe, such that the Tribe will be an adequate representative.

A party's decision not to intervene in litigation can be relevant to a determination as to whether that litigation will "impair or impede" the party's ability to protect its own interests. *See United States v. Sabine Shell, Inc.*, 674 F.2d 480, 483 (5th Cir. 1982) ("Furthermore, the property owners themselves, patently aware of this litigation, never intervened either at the district or appellate court level. Presumably the property owners do not believe that the disposition of this suit will 'impair or impede' their ability to protect their interests."); *Burger King Corp. v. Am. Nat. Bank & Trust Co. of Chicago*, 119 F.R.D. 672, 678 (N.D. Ill. 1988)

("Courts frequently consider the refusal of an absent party to seek intervention as a factor mitigating against the necessity of joining him pursuant to Rule 19(a)"). However, at least one court has held that "where intervention would require the absent party to waive sovereign immunity," a failure to intervene is irrelevant to a determination as to the prejudice caused by a judgment to that absent party. *Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*, 43 F.3d 1491, 1498 (D.C. Cir. 1995).[16]

Plaintiffs contend that the apparent decision of the United States not to intervene in this litigation should be considered strong evidence that its interests would not be substantially impeded as a result of its absence. They contend that the United States is a sophisticated party that exercises "discretion as to where and how it litigates" and that if it "believes that its interests are in danger, it can move to intervene." (Pl. Opp. at 14, 15).

That factor, while entitled to substantial weight, is not conclusive. As the Tribe notes, the reason behind the failure to intervene on the part of the United States is not known. The Court cannot conclude that the United States has knowingly chosen not to intervene, after a determination that its interests will not be impeded in its absence, without some degree of speculation. Moreover, the United States may enjoy sovereign immunity with respect to suits relating to trust lands. *See, e.g.*, *United States v. Mitchell*, 445 U.S. 535, 537-38 (1980). In order to intervene, it presumably would need to waive its immunity. Where intervention would require an absent party to waive sovereign immunity, the inference that it does not have a substantial interest in the litigation may not be well-founded. *See Kickapoo Tribe*, 43 F.3d at 1498.

---

[16] Although an assessment of prejudice (under Rule 19(b)) is not identical to an assessment as to whether a party's interest would be "impaired or impeded" by a judgment (under Rule 19(a)), the two analyses are sufficiently analogous for the cited proposition to be relevant to both.

"If an absent party's interests are the same as those of an existing party, and the existing party will adequately protect those interests, this bears on whether the absent party's interest will be impaired by its absence from the litigation." *Tell v. Trustees of Dartmouth College*, 145 F.3d 417, 419 (1998). However, "without a perfect identi[t]y of interests, a court must be very cautious in concluding that a litigant will serve as a proxy for an absent party." *Id.* (citing 4 R.D. FREER, MOORE'S FEDERAL PRACTICE § 19.03[3][f], at 19–56 to 19–57 (3d ed.1998)).

The Tribe's interests do appear to align closely with those of the United States. The United States would presumably support the Tribe's position in all respects. To the extent that the United States has interests in protecting tribal lands, in preserving tribal sovereignty and tribal rights, and in upholding the jurisdiction of the NIGC and the integrity of its decision, those interests appear to be essentially identical to those of the Tribe. It is difficult to see how those interests might be likely to diverge, at least in the present context.

Nonetheless, the interests of the two parties may not be perfectly identical. In particular, the United States might take a broader viewpoint than that of the Tribe, which presumably will be focused solely on what it perceives are the protection of its own rights and prevailing in the case at hand. Thus, the United States may have an interest in upholding the federal regulatory scheme concerning Indian gaming, or ensuring that the law is properly interpreted.[17]

The critical question, though, is the extent to which those interests of the United States that are *not* represented by the Tribe may be "impaired or impeded" as a result of its absence from the litigation. Presumably, the United States always has an interest in ensuring that federal

---

[17] The Indian Gaming Regulatory Act "does not unambiguously impose upon the United States the duty to ensure that Indian gaming continue under any circumstances." *Pueblo of Santa Ana v. Kelly*, 932 F. Supp. 1284, 1298 (D.N.M. 1996). By contrast, the goal of the Tribe in this litigation might be to ensure exactly that.

law is properly interpreted and enforced.  While that interest is important, and certainly could be impacted by the decision in this case, such an interest may exist in every dispute involving an Indian tribe (or, for that matter, federal law).  The federal government cannot be a required party in all such suits.  Moreover, the effect of a judgment must be "direct and immediate" in order to impede an absent party's ability to protect its rights sufficiently to trigger Rule 19.  *See Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 407 (3d Cir. 1993).  If such an effect is likely here, it is not obvious, at least based on present record.  The more "direct and immediate" governmental interest at stake in this litigation—protection of the Tribe's land-use rights—is an interest that the United States appears to share with the Tribe.  The Tribe is clearly an adequate representative with respect to this interest.  Therefore, the ability of the United States to protect its interests is not likely to be "impaired or impeded" by a judgment in its absence.

3.  **Whether Disposing of the Action in the Absence of the United States May Subject a Party to a Substantial Risk of Inconsistent Obligations**

Pursuant to Rule 19(a)(1)(B)(ii), an absent party is a "required" party if it "claims an interest relating to the subject of the action and is so situated that disposing of the action in the [party's] absence may . . . leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."  Fed. R. Civ. P. 19(a)(1)(B)(ii).  The Tribe contends that a decision in plaintiffs' favor in the absence of the United States would yield such a result.  Such a decision would subject the Tribe to regulation under Massachusetts state law, but it would not bind the NIGC; consequently, the Tribe would remain subject to federal law as well.  According to the Tribe, it would be placed in an "untenable" "Catch-22" in which "[p]roceeding under State law would require that the Tribe

violate federal law; proceeding under federal law would require that the Tribe violate State law." (Defs' Mem. at 10).

It is unclear how the Tribe would be "required" to violate either state or federal law by a ruling in favor of the Commonwealth. Applying for a state gaming license would not necessarily violate federal law; in our federal system, parties must often comply with the regulations of multiple sovereigns in order to engage in certain activities.[18] While it is conceivable that the Tribe's obligations under federal and state law could conflict, the Tribe has not shown that there is a real possibility, much less a "substantial risk," that that would occur. Moreover, the Tribe is under no obligation to operate a gaming facility; if applying for a state gaming license would somehow violate federal law, the Tribe has the option to engage in no gaming at all.[19]

In sum, the absence of the United States will not prevent this Court from according complete relief among the parties, and the United States is not situated such that its absence would either (1) substantially impair its ability to protect its interests or (2) create a substantial risk that an existing party will be subject to inconsistent obligations in the future.

Accordingly, the United States is not a required party under Rule 19, and the Tribe's motion to dismiss for failure to join a necessary party will be denied.

### C.   Motion to Dismiss the Counterclaims

The Tribe has filed counterclaims against the Commonwealth and three third-party defendants—the Governor and Attorney General of the Commonwealth and the Chairman of the

---

[18] For example, a particular land development activity might require both federal and state environmental permits. If the federal government issues such a permit, but the state government does not, the landowner is not faced with "inconsistent" obligations; he simply cannot undertake the activity unless and until he receives the required state permit.

[19] Even if compliance with state law somehow creates a conflict with a federal obligation, it is unlikely that the NIGC would bring an enforcement action against the Tribe for complying with a decision of this Court.

Massachusetts Gaming Commission.  The counterclaims consist of two claims for a declaratory judgment and one for injunctive relief.

The counterclaim-defendants contend that the counterclaims should be dismissed, in whole or in part, on three grounds:  (1) sovereign immunity bars all claims against the Commonwealth; (2) the counterclaims against the individual third-party defendants are not cognizable under *Ex Parte Young*; and (3) the claim for injunctive relief fails to state a claim against all defendants.

## 1. Sovereign Immunity of the Commonwealth

The Eleventh Amendment to the United States Constitution bars lawsuits in federal courts against nonconsenting states.  *Rosie D. ex rel. John D. v. Swift*, 310 F.3d 230, 234 (1st Cir. 2002); *see Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court.").  A waiver by a state of sovereign immunity in its own courts does not constitute a waiver of immunity in federal courts.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 n.9 (1984).

A state that files a federal complaint or removes a case to federal court has likely waived its immunity, at least in part.  *See Lapides v. Bd. of Regents of Univ. System of Georgia*, 535 U.S. 613, 620 (2002) (removal); *Skelton v. Henry*, 390 F.3d 614, 618 (8th Cir. 2004) (filing a federal complaint).  By contrast, "a State which is sued in federal court does not waive the Eleventh Amendment simply by appearing and defending on the merits."  *Wisconsin Dept. of Corrections v. Schacht*, 524 U.S. 381, 393 (1998) (Kennedy, J., concurring); *United States v. Metropolitan St. Louis Sewer Dist.*, 578 F.3d 722, 725 (8th Cir. 2009) ("[A] state does not waive its immunity by entering a general appearance or by defending a case in federal court so long as it asserts its

Eleventh Amendment sovereign immunity defense in a timely manner.").

Where a state plaintiff voluntarily submits to federal-court jurisdiction—for example, by filing a federal complaint—the state has "made itself a party to the litigation to the full extent required for its complete determination." *Clark v. Barnard*, 108 U.S. 436, 448 (1883). However, "federal courts have consistently held that a state plaintiff does not waive its sovereign immunity with respect to all plausible counterclaims." *Woelffer v. Happy States of Am., Inc.*, 626 F. Supp. 499, 502 (N.D. Ill. 1985). Such a counterclaim is cognizable only if it "arises from the same event underlying the state's cause of action, and only if the claimant asserts his or her claim defensively by way of recoupment to defeat or diminish the state's recovery." *In re Dep't of Energy Stripper Well Exemption Litig.*, 956 F.2d 282, 285 (Temp. Emer. Ct. App. 1992). The counterclaim is not cognizable if it is "for the purpose of obtaining an affirmative judgment against the State." *Woelffer*, 626 F. Supp. at 502.

Here, the Commonwealth contends that it has not waived its sovereign immunity to suit in federal court. It initially filed this action in Massachusetts state court; only after the Tribe removed the action did the Commonwealth appear in federal court. Moreover, the Commonwealth did not consent to the jurisdiction of this Court, instead moving to remand the case back to state court. Although it is the plaintiff in this action, its posture with respect to the forum is similar to that of a defendant; it is not in federal court of its own volition. If a state that appears and defends in federal court has not waived its immunity, it stands to reason that a state in the Commonwealth's current position has also not waived its immunity. *See Metropolitan St. Louis Sewer Dist.*, 578 F.3d at 725.

Even if the Commonwealth were to be treated as having voluntarily invoked the jurisdiction of this Court, at least one of the Tribe's counterclaims would not be cognizable. The

Tribe's request for injunctive relief—seeking to enjoin counterclaim-defendants from interfering with gaming activities that occur on the Tribe's lands—represents an effort to "obtain[] an affirmative judgement against the [Commonwealth]." *Woelffer*, 626 F. Supp. at 502. It is therefore "not sufficiently equivalent to a recoupment or set-off to fall within the narrow exception to sovereign immunity recognized by the courts." *Id.* at 503 (finding that a counterclaim for injunctive relief was not cognizable against a state plaintiff that had requested only declaratory relief).

The Tribe's requests for a declaratory judgment arguably rest on a different footing. The Tribe has asked this Court to declare (1) that Congress abrogated the Commonwealth's jurisdiction over the Tribe's lands in enacting the IGRA and (2) that the NIGC's approval of the gaming ordinance preempted state law. The operative questions are whether those counterclaims "arise[] from the same event underlying the state's cause of action" and whether they are asserted "defensively by way of recoupment to defeat or diminish the state's recovery." *See Energy Stripper Well*, 956 F.2d at 285.

The Commonwealth contends that the Tribe's requests for a declaratory judgment go far beyond the relief sought by the Commonwealth, in that they "request that this Court rule on the validity and intent of federal action" and "arise[] out of an entirely separate federal process in which the Commonwealth had no involvement." (Counterclaim-Defendants' Mem. at 5). While a state plaintiff may impliedly consent to some defensive counterclaims, it "does not thereby consent to an affirmative judgment on a counterclaim." *In re Greenstreet, Inc.*, 209 F.2d 660, 664 (7th Cir. 1954). A declaration as to the abrogation effect of the IGRA or the preemption effect of the gaming ordinance might qualify as an "affirmative judgment," at least as compared to a narrow declaration that the Tribe is not subject to the jurisdiction of the Commonwealth.

However, in deciding whether plaintiff has jurisdiction over the Tribe's lands under the Settlement Agreement, this Court must necessarily determine whether any federal law has abrogated or preempted that jurisdiction. For that reason, adjudication of plaintiff's declaratory-judgment request will necessarily require analysis and application of federal Indian gaming law, including the IGRA and the NIGC process. In that respect, the Tribe's requests for declaratory relief are no broader than those of the Commonwealth. They might, therefore, qualify as defensive counterclaims that would ordinarily be cognizable against a state plaintiff.

Again, however, the Commonwealth is not in the position of an ordinary state plaintiff. It has not made a "voluntary submission" to the jurisdiction of this Court. *See Woelffer*, 626 F. Supp. at 502 (quoting *Clark*, 108 U.S. at 447). It brought this action in state court and sought remand once the action was removed to federal court. It has not taken any action that could be construed as a waiver of sovereign immunity, either express or implied. Therefore, the Tribe's declaratory-judgment counterclaims are not cognizable.

The Tribe contends that if it is held to have waived its sovereign immunity in the Settlement Agreement, then the Commonwealth must also have waived its sovereign immunity in that same document. But the Tribe's potential waiver of immunity is tied to specific language within the Settlement Agreement that conditioned its receipt of the Settlement Lands. The Settlement Agreement does not contain any similar language relating to the Commonwealth. Moreover, this Court's determination that the Tribe waived its sovereign immunity is partially based on the issue-preclusive effect of the Massachusetts Supreme Judicial Court's decision in *Shellfish Hatchery*. No such consideration applies to an analysis of the Commonwealth's sovereign immunity.

Finally, it is important to note that no inequity is likely to result should the Tribe's

counterclaims be dismissed.  As a general rule, defendants are required to state as a counterclaim

any claim that "arises out of the same transaction or occurrence that is the subject matter of the

[plaintiff's] claim."  Fed. R. Civ. P. 13(a).  A defendant who neglects to follow this "compulsory

counterclaim" rule could be barred from bringing the claim in a later proceeding.  *Baker v. Gold*

*Seal Liquors, Inc.*, 417 U.S. 467, 469 n.1 (1974) ("A counterclaim which is compulsory but is

not brought is thereafter barred.").  Here, however, the Court will necessarily rule on the issues

raised by the Tribe's counterclaims—the effect of both the IGRA and the issuance of the gaming

ordinance by the NIGC will be considered in conjunction with plaintiff's claims.  Thus, the Tribe

can obtain the essential relief it seeks even without a direct ruling on its declaratory-judgment

claims.  *See Williams v. Secretary of Exec. Office of Human Servs.*, 414 Mass. 551, 570 (1993)

("In declaratory judgment actions, even where relief is denied, the rights of the parties must be

declared.").

Accordingly, the Tribe's counterclaims against the Commonwealth will be dismissed on

the basis of sovereign immunity.

### 2.        Sovereign Immunity of Third-Party Defendants

The Tribe has also asserted its counterclaims against three individual third-party

defendants:  the Governor, the Attorney General of the Commonwealth, and the Chairman of the

Massachusetts Gaming Commission.  All three were sued in their official capacity.

State officials enjoy limited sovereign immunity to suit in federal court, but can be sued

in their official capacity in federal court under some circumstances.  *See Ex Parte Young*, 209

U.S. 123 (1908).  Under the *Ex Parte Young* doctrine, individuals can sue state officials only for

"prospective injunctive relief."  *Rosie D.*, 310 F.3d at 234.  The doctrine "does not permit

judgments against state officers declaring that they violated federal law in the past" or any other

29

"claims for retrospective relief." *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993); *Green v. Mansour*, 474 U.S. 64, 68 (1985). "In determining whether the doctrine of *Ex Parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Virginia Office for Protection & Advocacy v. Stewart*, 131 S. Ct. 1632, 1639 (2011).

Here, counterclaim-defendants do not dispute that the counterclaims request relief that is "properly characterized as prospective." *See id.* Instead, they contend that the Tribe has not "allege[d] an ongoing violation of federal law." *See id.*

The Tribe's amended answer specifically alleges that each of the individual defendants "intends to use [his/her] office and authority under the laws of the Commonwealth of Massachusetts to stop [the Tribe] from proceeding with [its] plans to open and operate a Class II gaming facility under IGRA and tribal law." (Amended Answer at ¶¶ 100-02). According to counterclaim-defendants, that is not sufficient to allege an ongoing violation of federal law, because "[t]he Tribe does not allege that such conduct, even if undertaken, constitutes a violation of IGRA or other federal law." (Counterclaim-Defendants' Mem. at 7). But a state official need not be violating a federal statute to be subject to suit under *Ex Parte Young*; all that is required is an allegation that the official is interfering, or is about to interfere, with a federally protected right. *See Timpanogos Tribe v. Conway*, 286 F.3d 1195 (10th Cir. 2002) (finding that *Ex Parte Young* doctrine applied where plaintiff tribe sought injunctive relief to stop officials from interfering with the tribe's right to hunt and fish on Indian land). Taking the allegations in the counterclaims to be true, that requirement is satisfied here.

Accordingly, the counterclaims against third-party defendants are cognizable under the

*Ex Parte Young* doctrine.

### 3. Claim for Injunctive Relief

Counterclaim-defendants further contend that the counterclaim for injunctive relief must be dismissed as against all parties because the Tribe has not alleged a sufficient threat of future injury and thus lacks standing. Because the Court has decided that all counterclaims against the Commonwealth will be dismissed on sovereign immunity grounds, this section will analyze the claim for injunctive relief only as it relates to the individual third-party defendants.

In order to establish constitutional standing, a plaintiff seeking injunctive relief "must allege a real and immediate threat of future injury." *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 152 (D. Mass. 2011) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983). Counterclaim-defendants contend that the allegations in the counterclaim are overly vague, as they allege only that counterclaim-defendants "intend[] to stop [the Tribe] from proceeding with [its] plans to open and operate a Class II gaming facility under IGRA and tribal law" and do not provide any further factual context. (Amended Answer at ¶¶ 100-02).

It is true that "the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context." *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Here, however, the factual context is clear: the very existence of this lawsuit provides ample proof that the Commonwealth and its officials intend to block the Tribe from operating a gaming facility. Under the circumstances, it would defy common sense to conclude that the Tribe's allegations do not establish "plausible grounds" for its right to relief. *See Twombly*, 550 U.S. at 545.

31

Counterclaim-defendants further contend that the Tribe's claim for injunctive relief is overly broad. They contend that enjoining them "from interfering with gaming activities that occur on the Tribe's trust lands," as the Tribe requests, could conceivably prevent the officials from (among other things) making public statements about the Tribe's gaming activities; managing environmental disasters that impact Tribal lands; or approving gaming licenses for non-Tribal entities that might compete with the Tribe's operation. (Amended Answer at 16; Counterclaim-Defendants' Mem. at 10).

Putting aside counterclaim-defendants' interpretation of the scope of the injunctive relief requested, their objection is at best premature. At this stage, the precise form of the injunctive relief need not be considered. *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 353 (E.D.N.Y. 2007) ("[A] motion for failure to state a claim properly addresses the cause of action alleged, not the remedy sought. It is the court that will craft any remedy."); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 286 ("Objections that particular provisions of the injunctive relief requested place an impermissible burden on interstate commerce can be considered on a case-by-case basis in a subsequent phase of this litigation if it becomes necessary to do so."); *United States by Clark v. Georgia Power Co.*, 301 F. Supp. 538, 543 (N.D. Ga. 1969) ("Rule 65(d) [of the Federal Rules of Civil Procedure] refers to the form of an injunction or a restraining order, and is silent as to the specificity required in the complaint's request for injunction."). If the Court does grant any injunctive relief, it can limit or shape that remedy as principles of equity and proper respect for federal-state relations may require.

Accordingly, the motion to dismiss the counterclaim for injunctive relief against the individual defendants will be denied.

**IV.**     <u>**Conclusion**</u>

For the foregoing reasons,

1.      Defendants' motions to dismiss are DENIED; and

2.      Counterclaim-defendants' motion to dismiss is GRANTED to the extent it seeks

dismissal of the counterclaims against the Commonwealth, and is otherwise

DENIED.

**So Ordered.**


                                                    /s/ F. Dennis Saylor
                                                    F. Dennis Saylor IV
Dated:  February 27, 2015                           United States District Judge