UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

The COMMONWEALTH OF
MASSACHUSETTS,

       *Plaintiff*,

    and

The AQUINNAH/GAY HEAD COMMUNITY
ASSOCIATION, INC. (AGHCA) and
TOWN OF AQUINNAH,

       *Intervenor/Plaintiffs*,

    v.

The WAMPANOAG TRIBE OF GAY
HEAD (AQUINNAH), et al.,

       *Defendants*

    and

CHARLES D. BAKER, in his official capacity as
GOVERNOR, COMMONWEALTH OF
MASSACHUSETTS, et al.

       *Third-Party Defendants.*
_____

No: 1:13-cv-13286-FDS

**COMMONWEALTH OF MASSACHUSETTS' MEMORANDUM OF REASONS IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................................1

STATEMENT OF FACTS ...............................................................................................1

    A.    Settlement Agreement...........................................................................1

    B.    Tribal Gaming Ordinance. ...................................................................3

PROCEDURAL HISTORY..............................................................................................4

ARGUMENT ...................................................................................................................4

The Terms of the Settlement Agreement Remain Enforceable Against the Tribe,
Notwithstanding Congress' Subsequent Enactment of IGRA. ........................................4

    A.    In the Massachusetts Settlement Act, Congress Implemented the
    Shared Intent of the Parties:  The Tribe Would Not Game on Its
    Lands Without First Complying with the Commonwealth's and
    Town's Laws.........................................................................................5

        1.    The Tribe Entered the Settlement Agreement with Terms
        that Unambiguously Submitted Tribal Gaming to the Civil
        Jurisdiction of the Commonwealth and the Town. .....................5

        2.    Congress Specifically Acted on the Parties'
        Representations to Ensure that the Tribe Would Not Game
        on Its Lands.................................................................................7

    B.    IGRA Did Not Supersede the Massachusetts Settlement Act or the
    Terms of the Settlement Agreement. ....................................................8

        1.    IGRA Expressly Exempts the Settlement Act From Its
        Reach Due to Congress' Insertion of Gaming-Specific
        Language Into the Settlement Act..............................................10

        2.    The Language of the Massachusetts Settlement Act and Its
        Legislative History Demonstrate that Congress Did Not
        Intend IGRA to Supersede the Settlement Act. ........................11

        3.    Congress' Decision to Legislatively Overrule *Narragansett
        I* Further Demonstrates that It Did Not Intend IGRA to
        Supersede the Massachusetts Settlement Act. ...........................14

CONCLUSION.................................................................................................................16

## TABLE OF AUTHORITIES

### Cases

*Bldg. Inspector & Zoning Officer of Aquinnah v. Wampanoag Aquinnah*
*Shellfish Hatchery Corp.*,
443 Mass. 1 (2004) ......................................................................................................1, 5

*Barana Group of Capitan Grande Band of Mission Indians v. Duffy*,
694 F.2d 1185 (9th Cir. 1982) .........................................................................6

*Bryan v. Itasca County*,
426 U.S. 373 (1976) ..........................................................................................6

*Connecticut Nat'l Bank v. Germain*,
503 U.S. 249 (1992) ........................................................................................11

*Crawford Fitting Co. v. J.T. Gibbons, Inc.*,
482 U.S. 437 (1987) ........................................................................................13

*Johnson v. M'Intosh*,
21 U.S. 543 (1823) ............................................................................................6

*Kittery Motorcycle, Inc. v. Rowe*,
320 F.3d 42 (1st Cir. 2003) ............................................................................11

*Narragansett Indian Tribe v. National Indian Gaming Comm'n*,
158 F.3d 1335 (D.C. Cir. 1998) ....................................................................15

*Oneida Tribe v. Wisconsin*,
518 F. Supp. 712 (W.D. Wis. 1981) ...............................................................6

*Passamaquoddy Tribe v. State of Maine*,
75 F.3d 784 (1st Cir. 1996) ............................................................................13

*POM Wonderful LLC v. Coca-Cola Co.*,
134 S. Ct. 2228 (2014) ..............................................................................11, 14

*Pullen v. Morgenthau*,
73 F.2d 281 (2d Cir. 1934) .............................................................................12

*Seminole Tribe of Fla. v. Butterworth*,
658 F.2d 310 (5th Cir. 1981) ...........................................................................6

*State of Rhode Island v. Narragansett Indian Tribe*,
19 F.3d 685 (1st Cir. 1994) .................................................................... *passim*

i

*Traynor v. Turnage,*
    485 U.S. 535 (1988) ................................................................................12

*United States v. Turkette,*
    452 U.S. 576 (1981) ................................................................................13

*United States v. Tynen,*
    78 U.S. 88 (1870) ............................................................................11, 12

*United States v. Wilson,*
    503 U.S. 329 (1992) ................................................................................13

*Ysleta del Sur Pueblo v. State of Texas,*
    36 F.3d 1325 (5th Cir. 1994) ............................................................10, 12

## **Statutes**

25 U.S.C. § 1708(b) ..........................................................................................15

25 U.S.C. §§ 1741 ..............................................................................................5

25 U.S.C. §§ 1742 ..............................................................................................5

25 U.S.C. § 1771 ...........................................................................................3, 12

25 U.S.C. § 1771(7) ............................................................................................1

25 U.S.C. § 1771e ...................................................................................10, 11, 12

25 U.S.C. § 1771g ...............................................................................3, 8, 10, 11

25 U.S.C. § 1772 ................................................................................................5

25 U.S.C. § 1772a ..............................................................................................5

25 U.S.C. § 1773a ..............................................................................................5

25 U.S.C. § 1773j ...............................................................................................5

25 U.S.C. § 2701 ..............................................................................................12

25 U.S.C. § 2701(5) ....................................................................................10, 11

25 U.S.C. § 2710(b)(1) .....................................................................................10

Mass. Gen. Laws ch. 23K, § 37, ch. 271, § 3 ..................................................3

Mass. Stat. 1985, c. 277 ....................................................................................3

Pub. L. 95-395 (Sept. 30, 1978) ........................................................................................11, 13

Pub. L. 100-95 (Aug. 18, 1978) ...............................................................................................12

Pub. L. 100-497 (Oct. 17, 1988) ..............................................................................................12

Pub. L. 104–208 (Sept. 30, 1996) ............................................................................................15

**Tribal Resolutions and Ordinances**

Tribal Gaming Ordinance No. 2011-01 ....................................................................................3, 4

Tribal Resolution 2012-04 .........................................................................................................3

Tribal Resolution 2012-23 .........................................................................................................4

**Other**

52 Fed. Reg. 4193 (1987) ..........................................................................................................1

Cohen's Handbook of Federal Indian Law § 12.01, at 874-75 (Nell Jessup
    Newton ed., 2012) ..............................................................................................................6

H.R. 1920, 99th Cong., 2d Sess. (1986) ..................................................................................8

H.R. 4566, 98th Congress, 1st Sess. (1983) ........................................................................14

Santoni, Roland J., *The Indian Gaming Regulatory Act:*
    *How Did We Get Here?  Where are We Going?*, 26
    Creighton L. Rev. 387 (1993) ...............................................................................7, 8, 14

S. Hrg. 99-688, Hearing Before the United States Senate
    Committee on Indian Affairs on Senate Bill 1452
    (Apr. 9, 1986) ..........................................................................................................6, 7

**INTRODUCTION**

In 1983, the Wampanoag Tribe of Gay Head, the Commonwealth of Massachusetts, the Town of Gay Head (now Aquinnah), and its Taxpayers' Association settled nine years of litigation over ownership of certain land located in and around Gay Head on Martha's Vineyard. By this settlement, the Wampanoag Tribe ("Tribe") received over 400 acres of public and private land in exchange for its commitment to adhere to state and local laws governing use of the settlement lands. Federal legislation codifying the settlement agreement expressly applied "those laws and regulations which prohibit or regulate the conduct of bingo or other games of chance" to the settlement lands. Notwithstanding the clear statutory prohibition against unlicensed gaming operations in the Commonwealth of Massachusetts, the Tribe has taken steps toward the commencement of such gaming in Aquinnah, prompting this breach-of-contract suit by the other three parties to the settlement agreement.[1]

**STATEMENT OF FACTS**

**A.     Settlement Agreement.**

The Town of Aquinnah, formerly known as Gay Head, is located on the western peninsula of Martha's Vineyard and is home to a community of Wampanoag Native Americans. (Stipulated Facts Not in Dispute, Dkt. #107 ("SF") ¶¶ 1-3). The Wampanoag Tribal Council of Gay Head, Inc. ("Tribal Council"), a Massachusetts non-profit corporate entity, founded in 1972, is the predecessor to the Wampanoag Tribe of Gay Head (Aquinnah) ("Tribe"). (SF ¶ 4; 52 Fed. Reg. 4193 (1987); 25 U.S.C. § 1771(7)); *see also Bldg. Inspector & Zoning Officer of Aquinnah v. Wampanoag Aquinnah Shellfish Hatchery Corp.*, 443 Mass. 1, 8, n.8 (2004). Although the Tribe had previously been recognized by the Commonwealth of Massachusetts, the Tribe did not acquire federal recognition as an Indian Tribe until 1987. (SF ¶¶ 6, 16).

---

[1] The Commonwealth sets out its reasoning and authorities in support of its Motion for Summary Judgment herein, but also notes its support for and agreement with the reasoning and authorities set forth in the motions and memoranda filed concurrently by the AGHCA and the Town.

In 1974, the Tribe sued the Town of Aquinnah, claiming aboriginal title to certain lands on Martha's Vineyard.  (SF ¶ 7).  The Commonwealth and the Aquinnah/Gay Head Community Association, Inc. ("AGHCA"), then the Taxpayers' Association of Gay Head, intervened in that action.  (SF ¶ 8).  In 1983, the Commonwealth, the Tribe, the Town of Aquinnah, and the AGHCA entered into the Joint Memorandum of Understanding Concerning Settlement of the Gay Head, Massachusetts Indian Land Claims ("Settlement Agreement") to resolve the suit.  (SF ¶¶ 10-11).  As part of the Settlement Agreement, the Town and the AGHCA agreed to convey title to approximately 485 acres of public and private lands ("the Settlement Lands") to the Tribe. (SF ¶ 19; SF ¶ 12, Ex. B (Settlement Agreement) ¶¶ 4-7, 10).  In exchange for the Settlement Lands, the Tribe relinquished all claims to other lands and waters in the Commonwealth. (Settlement Agreement ¶ 8(d)).  In addition, the Tribe agreed that the Settlement Lands would remain under the Commonwealth's jurisdiction and be subject to all state and local laws and that the Tribe had no authority to act in contravention of those laws.  (*Id.* ¶¶ 3, 11, 13).

The Settlement Agreement states, in relevant part:

> The Tribal Land Corporation shall hold the Settlement Lands, and any other Land it may acquire, in the same manner, and subject to the same laws, as any other Massachusetts corporation . . . . Under no circumstances, including any future recognition of the existence of an Indian tribe in the Town of Gay Head, shall the civil or criminal jurisdiction of the Commonwealth of Massachusetts, or any of its political subdivisions, over the settlement lands, or any land owned by the Tribal Land Corporation in the Town of Gay Head, or the Commonwealth of Massachusetts, or any other Indian land in Gay Head, or the Commonwealth of Massachusetts, be impaired or otherwise altered . . . .

(Settlement Agreement ¶ 3).  Further, the Tribe agreed not to exercise sovereign jurisdiction over any part of the Settlement Lands.  (*Id*. ¶ 11).

The Settlement Agreement expressly required local, state, and federal governmental ratification.  (Settlement Agreement ¶¶ 2, 8(d)).  To that end, in 1985 the Massachusetts Legislature enacted "An Act to Implement the Settlement of the Gay Head Indian Land Claims"

Mass. Stat. 1985, c. 277.  (SF ¶ 13).  In February 1987, the United States Department of the Interior's Bureau of Indian Affairs, issued a Final Determination for the Federal Acknowledgement of the Wampanoag Tribal Council of Gay Head, Inc., achieving federal recognition for the Tribe.  (SF ¶¶ 14-17).  In August 1987, the United States Congress enacted the Massachusetts Indian Land Claims Settlement Act ("Massachusetts Settlement Act"), 25 U.S.C. § 1771, *et seq.*  (SF ¶ 18).  Congress expressly acknowledged that the Settlement Lands would remain subject to the civil and criminal laws, ordinances, and the jurisdiction of the Commonwealth, "including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance."  25 U.S.C. § 1771g.  Thereafter, title to approximately 485 acres of private and public lands, including lands purchased from private parties, were deeded to the United States to hold in trust for the benefit of the Tribe.  (SF ¶¶ 19, 20).

      **B.**      **Tribal Gaming Ordinance.**

In November 2011, then-Governor Patrick signed into law "An Act Establishing Expanded Gaming in the Commonwealth."  (SF ¶ 28).  This law prohibits any person or entity— including the Tribe—from opening or operating a gaming establishment without a gaming license.  Mass. Gen. Laws ch. 23K, § 37, ch. 271, § 3.  The Tribe has never applied to the Massachusetts Gaming Commission for a license to operate a gaming establishment of any kind, and does not currently possess such a license.  (SF ¶ 36).

Nonetheless, on February 4, 2012, the Tribe passed Resolution 2012-04, adopting Gaming Ordinance No. 2011-01, a 33-page document purporting to authorize and regulate Class I and Class II gaming on the Tribe's lands.  (SF ¶¶ 37-39, Ex. P).  In April 2012, the Tribe passed Resolution 2012-23, amending Gaming Ordinance No. 2011-01 by revising its definition of "Indian Lands," and submitted the new resolution and amended ordinance to NIGC for review and approval.  (SF ¶¶ 44-47).  By letter dated August 29, 2013, the NIGC notified the Tribe that its Gaming Ordinance was approved by operation of law "to the extent that it is consistent with [the Indian Gaming Regulatory Act]."  (SF ¶¶ 54-55).

## PROCEDURAL HISTORY

In December 2013, the Commonwealth filed suit in state court seeking a declaration that the Settlement Agreement bars the Tribe's commencement of unlicensed gaming operations on the Settlement Lands.  *See generally* Dkt. #15.  The Tribe then removed the case to this Court and defeated the Commonwealth's motion to remand.  *See* Dkt. ## 15, 17, 31.  Over the Tribe's objection, the Town of Aquinnah and the AGHCA were permitted to intervene as plaintiffs.  *See* Dkt. ## 36, 38, 51.  The Tribe then moved to dismiss the complaints of all three plaintiffs on varied grounds, which motions were denied.  *See* Dkt. ## 59, 61, 95.  Of particular relevance at this stage, in denying the Tribe's motion to dismiss the AGHCA's complaint on the basis of sovereign immunity, this Court recognized that the Settlement Agreement is enforceable against the Tribe.  *See* Dkt. # 95, at 14.  In accordance with Scheduling Order entered by this Court on August 7, 2014, and subsequently amended, *see* Dkt. # 54, the parties filed stipulated facts on April 24, 2015, *see* Dkt. # 107, and are now cross-moving for summary judgment.

## ARGUMENT

### The Terms of the Settlement Agreement Remain Enforceable Against the Tribe, Notwithstanding Congress' Subsequent Enactment of IGRA.

Although Congress has plenary authority over relations with Indian tribes, States can and do deal with tribes regarding ownership of and jurisdiction over lands with the approval of Congress.  In the specific field of land claims settlements, tribes and states often enter into agreements that they later present to Congress for federal approval.[2]  In this case, the Commonwealth, Town, and AGHCA entered into such an agreement with a state-chartered, non-profit corporation (the Tribal Council) acting as the representative and with the authority of the

---

[2] *E.g.*, 25 U.S.C. §§ 1741, 1742 (recognizing and implementing negotiated Florida and Miccosukee Indian tribe settlement agreement); §§ 1772, 1772a (recognizing and implementing negotiated Florida and Seminole Indian tribe settlement agreement); §§1773a, 1773j (recognizing and implementing negotiated Washington State and Puyallup Indian tribe settlement agreement).

Tribe.  The Commonwealth now seeks to enforce one of the agreed-upon terms of the Settlement

Agreement:  that the Tribe must comply with the Commonwealth's laws in order to conduct

gaming on Tribal lands.[3]   As explained below, all parties to the Settlement Agreement agreed

that the Tribe was relinquishing present and future rights to regulate gaming through the

Settlement Agreement.  *See* Section I.A.  And Congress' enactment of IGRA—only one year

after the Massachusetts Settlement Act—did not alter the terms of the Settlement Agreement and

that shared understanding.  *See* Section I.B.

> **A.    In the Massachusetts Settlement Act, Congress Implemented the Shared
> Intent of the Parties:  The Tribe Would Not Game on Its Lands Without
> First Complying with the Commonwealth's and Town's Laws.**
>
> > **1.    The Tribe Entered the Settlement Agreement with Terms that
> > Unambiguously Submitted Tribal Gaming to the Civil Jurisdiction of
> > the Commonwealth and the Town.**

By entering into the Settlement Agreement, the Tribe subjected its lands to the criminal

and civil jurisdiction of the Commonwealth and the Town.  *See* Settlement Agreement, ¶ 3.  No

provision in the Settlement Agreement creates an exception to the Commonwealth's or the

Town's jurisdiction with respect to Tribal gaming (including bingo).  *See generally id.*  Legal

analysis of the Settlement Agreement and its meaning is therefore straightforward:  by entering

into the Settlement Agreement, the Tribe agreed that it would not game on its lands, absent

compliance with the laws of both the Commonwealth and the Town.  *See id.*

Furthermore, the Tribe knew when it entered into the Settlement Agreement that it was

forgoing a potentially lucrative use for those lands.  Indian gaming developed as a source of

commercial revenue for Indian tribes in the 1970s and began flourishing in 1976, after the

Supreme Court held in *Bryan v. Itasca County,* 426 U.S. 373 (1976), that States generally lack

---

[3] Upon federal recognition of the Tribe, the Tribe succeeded to all obligations of the Tribal
Council, including the Settlement Agreement.  *See* Memo and Order on Mots. to Dismiss at 13-
14 (Dkt. # 95) (recognizing "preclusive effect" of subsidiary finding in *Shellfish Hatchery*, 443
Mass. at 12-13, that settlement agreement is enforceable against the Tribe).

regulatory authority over Indian people on Indian reservations.  Cohen's Handbook of Federal Indian Law § 12.01, at 874-75 (Nell Jessup Newton ed., 2012) (hereinafter "Cohen's Handbook").  By 1981 and 1982, prior to execution of the Settlement Agreement, several States had taken legal action to restrain tribal gaming.  *Id.*[4]  Thus, when the Tribe entered into the Settlement Agreement in 1983, it could not have failed to realize that Indian gaming was an issue of enormous economic importance to Indian tribes.  The Tribe knew what it was relinquishing by signing the Settlement Agreement.

Indeed, that is precisely what the Tribe would tell Congress only a few short years later. After all parties executed the Settlement Agreement, Congressional approval was required to implement certain of its terms.[5]  While seeking Congressional approval, all parties to the Settlement Agreement (and many others) testified before the United State Senate Committee on Indian Affairs.  *See generally* S. Hrg. 99-688, Hearing Before the United States Senate Committee on Indian Affairs on Senate Bill 1452 (Apr. 9, 1986).[6]  During that hearing, the Tribal Corporation's President—Gladys A. Widdiss—represented to those Senators and others present that the Settlement Agreement and proposed federal legislation would not authorize Tribal gaming:

> Lastly, Mr. Chairman we are aware of the growing concern in Congress regarding the issue of gaming on reservations.  *This bill would not permit such activity on Gay Head.*  Although the private settlement land will be taken into trust the tribe will not exercise the necessary civil regulatory control on those trust lands which the courts have deemed necessary.  We recognize and accept that no gaming on our lands is now or will in the future be possible.

---

[4] *See Barana Group of Capitan Grande Band of Mission Indians v. Duffy*, 694 F.2d 1185 (9th Cir. 1982); *Seminole Tribe of Fla. v. Butterworth*, 658 F.2d 310 (5th Cir. 1981); *Oneida Tribe v. Wisconsin*, 518 F. Supp. 712 (W.D. Wis. 1981).

[5] For example, only Congress has authority to extinguish Tribal aboriginal title.  *See Johnson v. M'Intosh*, 21 U.S. 543, 574 (1823).

[6] Excerpts of pages in these hearing materials are attached to the Declaration of Bryan Bertram in Support of Plaintiff Commonwealth of Massachusetts' Motion for Summary Judgment as Exhibit A.

*Id.* at 99 (emphasis added) (written testimony); *see also id.* at 24 (stating substantially the same in oral testimony). Leaving no doubt as to the parties' shared understanding, the Community Association's representative reiterated this fundamental point in both written comments and oral testimony. *Id.* at 34 ("Section 10 [of the proposed federal settlement legislation] assures that none of the lands in our town will be exempt from generally applicable State regulation against gambling or other presently prohibited activities which would ruin our town."), 160-61 (substantially the same). Both the Tribe and the AGHCA could not have been plainer: the Tribe consciously agreed that, in order to game on its lands it would first have to comply with the Commonwealth's and the Town's laws.

> **2.     Congress Specifically Acted on the Parties' Representations to Ensure that the Tribe Would Not Game on Its Lands.**

Congress took the parties' representations seriously. At the time the parties testified to the Committee on Indian Affairs, the proposed federal settlement legislation then pending did not contain any language concerning Tribal gaming. *See id.* at 2-16 (text of Senate bill 1452). But Congress understood that the absence of such language might create a future problem; since 1983, Congress had been considering and debating various iterations of legislation designed to address Indian gaming. *See* Roland J. Santoni, *The Indian Gaming Regulatory Act: How Did We Get Here? Where are We Going?*, 26 Creighton L. Rev. 387, 395 (1993).

Congress therefore acted to ensure that the parties' intent with respect to gaming would be preserved. After the Tribe and Community Association testified to the Committee on Indian Affairs, Congress inserted into its settlement legislation language specific to gaming. The finally enacted Massachusetts Settlement Act expressly subjects the Tribe's lands to the Commonwealth's and Town's laws and regulations that "prohibit or regulate the conduct of bingo or any other game of chance." 25 U.S.C. § 1771g. By inserting that specific language into the Massachusetts Settlement Act, Congress implemented the represented will of the parties to the Settlement Agreement: the Tribe would not game on its newly acquired lands without first securing approval from the Commonwealth and the Town. *See id.*

Congress' insertion of this language is even more significant in light of its contemporaneous consideration of federal legislation to regulate Indian gaming.  One month prior to the parties' Committee testimony, Congress began considering amendments to its legislation entitled the "Indian Gaming Regulatory Act" that, for the first time, introduced the three-tiered class structure for regulation now embodied in IGRA.  *See* Santoni, *supra*, at 399 (citing H.R. 1920, 99th Cong., 2d Sess. (1986)).  Congress, therefore, knew that future federal legislation governing Indian gaming was on the horizon and that such legislation could confer upon Indian tribes authority to self-regulate bingo without State involvement.  *See id.*  Of course, without some harmonization, such legislation could stand at odds with the Settlement Agreement and the parties' express representations that the Tribe would be subject to the Commonwealth's and the Town's laws.  Congress thus took specific action to make sure that future legislation, in whatever form, would not disturb the parties' agreement with respect to gaming on the Tribe's lands by adding to the Massachusetts Settlement Act specific language concerning gaming, including "bingo or any other game of chance."

Indeed, Congress' specific reference to bingo was no accident.  Having begun first considering a three-tiered structure for regulating gaming only one month prior—with bingo to be Class II gaming subject to Tribal self-regulation—Congress' decision to reference bingo in the Massachusetts Settlement Act makes plain that Congress was specifically contemplating the Settlement Act's interplay with the pending federal legislation that would become IGRA.  There is simply no other explanation for Congress' unilateral decision to insert into the Massachusetts Settlement Act language specific to gaming: Congress intended to preserve the parties' shared intent, notwithstanding any future federal enactment.

**B.    IGRA Did Not Supersede the Massachusetts Settlement Act or the Terms of the Settlement Agreement.**

As explained above, Congress was cognizant of Indian gaming when enacting the Massachusetts Settlement Act in 1987.  Congress' intent at the time was to preserve the parties' agreement:  to game on its lands, the Tribe would first need to comply with the Commonwealth's

and the Town's laws.  Although the very same Congress (the 100th) passed both the Massachusetts Settlement Act and IGRA, the Tribe nonetheless asserts that Congress radically changed its position in that intervening year.  *See* First Amended Answer to Complaint, Affirmative Defenses, Counterclaim to Complaint of the Commonwealth of Massachusetts and Counter-Claims Against Third-Party Defendants ("Tribe's Counter-Claims"), Dkt. #74, ¶ 96. And the Tribe will no doubt argue that the First Circuit's decision in *State of Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685 (1st Cir. 1994) ("*Narragansett I*") bolsters that assertion.

But the Tribe is mistaken:  Congress' intent did not change with the passage of IGRA in 1988.  This constancy is demonstrated in at least three ways.  ***First***, IGRA specifically exempts from its sweep any lands on which federal law otherwise prohibits gaming.  Here, the Massachusetts Settlement Act's language subjecting the Settlement Lands to the Commonwealth's and the Town's civil jurisdiction constitutes such a federal prohibition.  Such explicit language was absent from the Rhode Island Settlement Act, at issue in *Narragansett I*. ***Second***, Congress' deliberate insertion of gaming related language into the Settlement Act conclusively evinces Congress' intent that IGRA —enacted only a year later and by the same Congress—would not impliedly repeal the Commonwealth's and the Town's authority to regulate gaming on the Tribe's lands.  That history is far different than in *Narragansett I*, where Congress included no gaming-specific language in the Rhode Island Settlement Act, which was enacted a decade prior to IGRA.  And, ***third***, Congress' subsequent legislative override of the First Circuit's decision in *Narragansett I* demonstrates that Congress did not intend IGRA to supersede state-specific Indian land claims settlement acts.

1.      **IGRA Expressly Exempts the Settlement Act From Its Reach Due to Congress' Insertion of Gaming-Specific Language Into the Settlement Act.**

IGRA contains an important and explicit exemption.  In its findings supporting enactment of IGRA, Congress observed:  "Indian tribes have the exclusive right to regulate gaming activity on Indian lands *if the gaming activity is not specifically prohibited by Federal law* ...."  25 U.S.C. § 2701(5).  Accordingly, as to Class II gaming, IGRA does not apply to lands where federal law otherwise prohibits gaming.  *See* 25 U.S.C. § 2710(b)(1) ("An Indian tribe may engage in, or license and regulate, class II gaming on Indian lands within such tribe's jurisdiction, if--(A) such Indian gaming is located within a State that permits such gaming for any purpose by any person, organization or entity (*and such gaming is not otherwise specifically prohibited on Indian lands by Federal law*) …") (emphasis added).[7]  State-specific settlements acts, such as the Massachusetts Settlement Act, may "otherwise specifically prohibit" gaming on Indian lands. *See Ysleta del Sur Pueblo v. State of Texas*, 36 F.3d 1325, 1335 (5th Cir. 1994) (noting that IGRA is to be considered in light of pre-existing state-specific settlement acts).

By enacting the Massachusetts Settlement Act, Congress established "federal law" that specifically prohibits gaming on the Tribe's lands absent compliance with the Commonwealth's and the Town's laws.  25 U.S.C. § 1771g (subjecting the Settlement Lands to the Commonwealth's and the Town's civil and criminal laws and jurisdiction "including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance"); *see also id.* § 1771e(a) (stating that the Tribe "shall not exercise any jurisdiction over any part of the settlement lands in contravention of this subchapter").  Both the Massachusetts Settlement Act and IGRA must be read in conjunction and, here, that is easily accomplished.  *See POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2283 (2014) ("When two statues complement

---

[7] The Tribe has stated its intention to commence Class II gaming operations on the lands in question.  *See* Tribe's Counter-Claims, Dkt. #74, ¶ 96.  The Tribe has not asserted that such Class II gaming would fall outside the Massachusetts Settlement Act's injunction against "bingo or any other game of chance."

each other, it would show disregard for the congressional design to hold that Congress intended one federal statute to preclude the operation of the other."); *United States v. Tynen*, 78 U.S. 88, 92 (1870) ("When there are two acts on the same subject the rule is to give effect to both if possible"); *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 51 (1st Cir. 2003) ([I]f we can reasonably read … two statutes consonantly, we will."). By inserting its specific gaming-related language into the Massachusetts Settlement Act, Congress avoided creating a conflict between that Act and IGRA— and, under IGRA's express terms, it is the Massachusetts Settlement Act that controls. *See* 25 U.S.C. § 1771g; *Id.* § 2701(5).

The gaming related language also distinguishes this case from *Narragansett I*. Unlike the Massachusetts Settlement Act, the "Rhode Island Settlement Act" at issue in *Narragansett I*, did not contain any language specific to gaming. *Compare* Pub. L. 95-395, § 9 (Sept. 30, 1978), *with* 25 U.S.C. § 1771g. That difference is critical. Congress's explicit words in a statute have always been a cornerstone to divine legislative intent. *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). Lacking such specific language, the Rhode Island Act did not trigger IGRA's express exemption to its coverage. Inclusion of that language in the Massachusetts Settlement Act yields the opposite result and thus serves to distinguish *Narragansett I* on the basis of Congress' express language in Section 1771e of the Massachusetts Settlement Act.

> **2.** **The Language of the Massachusetts Settlement Act and Its Legislative History Demonstrate that Congress Did Not Intend IGRA to Supersede the Settlement Act.**

Even assuming that  Congress' insertion of gaming-specific language into the Massachusetts Settlement Act does not rise to the level of "federal law" specifically prohibiting gaming within IGRA's meaning, that insertion would  nonetheless be strong evidence of Congressional intent that the two statutes were to co-exist harmoniously. Implied repeal of federal statutes is strongly disfavored. *See Traynor v. Turnage*, 485 U.S. 535, 547-48 (1988)

(holding that Congress did not impliedly repeal a statute when it failed to "affirmatively evince any intent" to do so); *Tynen*, 78 U.S. at 92 ("[I]t is a familiar doctrine that repeals by implication are not favored.").  The presumption against implied repeal is even stronger where the very same Congress enacted both statutes in question—here, the 100th Congress enacted the Massachusetts Settlement Act in 1987 and IGRA in 1988.[8]   *See Traynor*, 485 U.S. at 547 (rejecting implied repeal when "the same Congress" had "not affirmatively evince[d] any intent to repeal or amend" the original statute, and enacted another statute "one year later"); *Pullen v. Morgenthau*, 73 F.2d 281, 283 (2d Cir. 1934) ("Where both laws are passed at the same session, the presumption against implied repeal is all the stronger."); *see also Ysleta del Sur Pueblo*, 36 F.3d at 1335 (giving effect to state-specific federal gaming prohibition enacted by same Congress that enacted IGRA).

Here, Congress spoke to the issue of Tribal gaming in the Massachusetts Settlement Act. In doing so, Congress crafted a federal statute that not only generally governed jurisdiction over the Tribe's lands but specifically addressed one activity: gaming.  *See* 25 U.S.C. § 1771e. Congress did not carve out any other activity, thus indicating its view of gaming as a particularly important part of the Act and of the parties' Settlement Agreement.  *See id.*[9] Congress' intent could not have been to cavalierly wipe away this language only a year later when enacting IGRA.  Such a result would make little sense.  It makes far more sense, and is entirely consonant with both the Massachusetts Settlement Act and IGRA, to conclude that Congress intended in the Massachusetts Settlement Act to treat the Tribe's lands differently than other Indian lands that would later be subject to IGRA.   In accord with the general rule stated above that related

---

[8] *See* 25 U.S.C. § 1771, *et seq.* (Massachusetts Settlement Act enacted on Aug. 18, 1987 by Pub. L. 100-95); 25 U.S.C. § 2701, *et seq.* (IGRA enacted on Oct. 17, 1988 by Pub. L. 100-497).

[9]  With regard to gaming, the Massachusetts Settlement Act – governing only the Tribe's lands – is the more specific statute and therefore the one that should control.  *See Ysleta del Sur Pueblo*, 36 F.3d at 1335 (federal act implementing state-tribal settlement agreement is more specific than IGRA); *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987) ("[W]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.").

statutes should be read to give effect to both wherever possible, this conclusion preserves both the Massachusetts Settlement Act and IGRA, which will not be rendered meaningless if it does not apply to the Tribe's Settlement Lands. *See Passamaquoddy Tribe v. State of Maine*, 75 F.3d 784, 792 (1st Cir. 1996) (IGRA not exclusive of any other potentially applicable legislation).

Congress' intent in this regard is underscored by legislative history. The history of the Massachusetts Settlement Act, examined above, *see* pages 2 to 3, shows that the Tribe agreed to relinquish any jurisdiction over gaming on its lands when entering into the Settlement Agreement. And, that history further shows that the AGHCA placed special significance on that commitment. *See id.* As a result, Congress deliberately included gaming-specific language in the Massachusetts Settlement Act. To accept the Tribe's argument would mean that Congress found the parties' representations important and meaningful enough that it *sua sponte* added particular language to the Massachusetts Settlement Act but, only one year later, wholly reversed its position and overrode that language when enacting IGRA. That cannot have been Congress' intent. *See United States v. Wilson*, 503 U.S. 329, 334 (1992) (when construing statutes, absurd results are to be avoided); *United States v. Turkette,* 452 U.S. 576, 580 (1981) (same). The only reasonable conclusion is that Congress intended both statutes to operate in harmony.

Congress' evident plan for both statutes to operate together further distinguishes this case from *Narragansett I.* Congress enacted the Rhode Island Settlement Act in 1978, *see* Pub. L. 95-395 (Sept. 30, 1978), a decade before IGRA and a full five years before it would even consider its first bill to regulate Indian gaming, *see* Santoni, *supra*, at 396 (citing H.R. 4566, 98th Congress, 1st Sess. (1983)). Thus, no evidence before the *Narragansett I* court showed that Congress had devoted any thought to gaming when codifying the Rhode Island settlement agreement and thus no basis to conclude that Congress would be acting arbitrarily to later authorize gaming on Rhode Island's settlement lands through IGRA. Not so here, where the very same Congress explicitly inserted language restricting gaming in the Massachusetts Settlement Act and later enacted IGRA. *See, e.g.*, *POM Wonderful LLC*, 134 S. Ct. at 2283 ("When two statues complement each other, it would show disregard for the congressional

design to hold that Congress intended one federal statute to preclude the operation of the other."). This Court should not, therefore, disregard this clear intent to conclude that Congress intended IGRA to impliedly repeal those portions of the Massachusetts Settlement Act pertaining to gaming.

**3.      Congress' Decision to Legislatively Overrule *Narragansett I* Further Demonstrates that It Did Not Intend IGRA to Supersede the Massachusetts Settlement Act.**

Legislative history subsequent to Congress' enactment of IGRA also sheds significant light on Congress' intent in this case. In *Narragansett I*, the First Circuit determined that, when enacting IGRA, Congress intended to impliedly repeal so much of the Rhode Island Settlement Act as permits Rhode Island to regulate gaming on the Narragansett's lands. *See* 19 F.3d at 697-700. It was a difficult call. *See id.* at 706 (Coffin, J., dissenting) (observing the "closeness" of the case). Indeed, the closeness of that case and the significant additional evidence of Congressional intent here that was not present in *Narragansett I—i.e.* specific gaming language in the Massachusetts Settlement Act and the short time between enactment of Massachusetts Settlement Act and IGRA— make *Narragansett I*'s result wholly inapplicable here.

Subsequent to the First Circuit's decision, Congress acted decisively to clarify its intent with respect to Indian land claim settlements. In 1996, Congress amended the Rhode Island Settlement Act to state expressly that the lands subject to that Act were not "Indian lands" within IGRA's meaning, thereby removing those lands from IGRA's sweep. *See* Omnibus Consolidated Appropriations Act, 1997, Pub. L. 104–208, September 30, 1996, 110 Stat 3009, § 330 (amending the Rhode Island Settlement Act (25 U.S.C. § 1708(b)) by specifying that, for the purposes of IGRA, "settlement lands shall not be treated as Indian lands") (hereinafter "the Chafee Amendment").[10] As stated by Senator Lincoln Chafee: "It is our determined view that a

---

[10] *See also* 25 U.S.C. § 1708(b) ("For the purposes of the Indian Gaming Regulatory Act, [Rhode Island] settlement lands shall not be treated as Indian lands"); *id.* § 2703(4) (defining "Indian lands" as "(A) all lands within the limits of any Indian reservation; and (B) any lands … over which an Indian tribe exercises governmental power.")

deal is a deal." *Narragansett Indian Tribe v. National Indian Gaming Comm'n*, 158 F.3d 1335, 1341 (D.C. Cir. 1998) *("Narragansett II")* (quoting *Narragansett Indian Tribe: Oversight Hearing Before the House Comm. on Resources*, 105th Cong. 14 (1997) (statement of Sen. Chafee)). "Congress promptly enacted the Chafee Amendment to, in the words of its sponsor, 'restore[ ] the integrity of the Rhode Island Claims Settlement Act and uph[o]ld the primacy of State jurisdiction over the Tribe's settlement lands.'" *Id.* Congress thus made plain that it understands and will implement settlement agreements negotiated between States and Indian tribes to resolve Indian land claims by, in part, restricting gaming availability. *See id.*[11]

There is no principled reason the Massachusetts Settlement Act should yield a different result than ultimately occurred in Rhode Island. Like Rhode Island, Massachusetts affirmatively negotiated an end to land claims litigation that Congress meant to approve through federal legislation. Moreover -- unlike with Rhode Island -- Congress expressly inserted gaming-specific language into the Massachusetts Settlement Act to ensure that the parties' mutual understanding remained intact. And, the very same Congress passed *both* the Massachusetts Settlement Act and IGRA, whereas Congress had enacted the Rhode Island Settlement Act a decade before it enacted IGRA. Congress' now-clear intent to restrict tribal gaming in the Rhode Island Settlement Act is only stronger here, where just one year separated adoption of the Massachusetts Settlement Act and IGRA.

---

[11] As the D.C. Circuit Court observed, Congress has not infrequently removed tribal lands from the reach of IGRA through state settlement acts, including the Massachusetts Settlement Act. *See Narragansett II*, 158 F.3d at 1341 (giving as examples the Narragansett, the Catawba Indians, the Passamaquoddy Tribe and Penobscot Nation, and the Wampanoag Tribal Council and noting that the settlement acts of the Catawba Indians and the Wampanoag Tribal Council "specifically provide for exclusive state [rather than IGRA] control over gambling.").

## CONCLUSION

For the reasons set forth above and in the contemporaneous filings of the other plaintiffs, the Commonwealth of Massachusetts respectfully requests that this Court GRANT its Motion for Summary Judgment on all counts of the Complaint.

Respectfully submitted,

THE COMMONWEALTH OF MASSACHUSETTS,

By its attorney,

MAURA HEALEY
ATTORNEY GENERAL

*/s/ Juliana deHaan Rice*
Juliana deHaan Rice (BBO # 564918)
Carrie Benedon (BBO # 625058)
Bryan Bertram (BBO # 667102)
Assistant Attorneys General
One Ashburton Place
Boston, MA 02108-1698
(617) 963-2583
Juliana.Rice@state.ma.us
Carrie.Benedon@state.ma.us
Bryan.Bertram@state.ma.us

On the brief:

Anthony Masero

Law Student Intern

Dated: May 28, 2015

## CERTIFICATE OF SERVICE

I, Carrie Benedon, hereby certify that on this 28th day of May, 2015, I filed the foregoing document through the Electronic Case Filing (ECF) system and thus copies of the foregoing will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); paper copies will be sent, via first-class mail, to those indicated as non-registered participants.

*/s/ Carrie Benedon*

16