UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS, <br><br> *Plaintiff,* <br><br> and <br><br> AQUINNAH/GAY HEAD COMMUNITY ASSOCIATION, INC.  and TOWN OF AQUINNAH, <br><br> *Intervenor-Plaintiffs/Counterclaim-Defendants,* <br><br> **vs.** <br><br> THE WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH), THE WAMPANOAG TRIBAL COUNCIL OF GAY HEAD, INC., and THE AQUINNAH WAMPANOAG GAMING CORPORATION, <br><br> *Defendants/Counterclaim-Plaintiffs,* <br><br> and <br><br> CHARLIE BAKER, in his official capacity as GOVERNOR, COMMONWEALTH OF MASSACHUSETTS, et al., <br><br> *Third-Party Defendants.* | **CASE NO: 1:13-cv-13286-FDS** <br><br><br><br> [Formerly Supreme Judicial Court for Suffolk County, Massachusetts, CIVIL ACTION NO. 2013-0479 ] |

**WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH) and AQUINNAH
WAMPANOAG GAMING CORPORATION'S
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................i

TABLE OF AUTHORITIES.........................................................................ii

I.    INTRODUCTION................................................................................1

II.   CONCISE STATEMENT OF MATERIAL FACTS............................................3

III.  STANDARD OF REVIEW.....................................................................7

IV.   ANALYSIS AND ARGUMENT................................................................9

    A.    The First Circuit Established the Two-Step Analysis to Determine Whether IGRA or the Federal Act Governs Aquinnah's Gaming Activities....................................9

    B.    Step One: The Tribe Possesses Sufficient Jurisdiction Over the Settlement Lands to Make IGRA Applicable..........................10

    C.    Step Two: IGRA Impliedly Repeals Those Portions of the Federal Act that Otherwise Granted Jurisdiction to the Commonwealth, and its Political Subdivisions, Regarding Gaming............................16

    D.    The Tribe's Position in this Litigation is Supported by the Interpretations of the Two Federal Agencies Designated by Congress to Interpret and Implement the Federal Act and IGRA............................20

CONCLUSION...................................................................................23

LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS............................25

CERTIFICATE OF SERVICE...............................................................26

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 S.Ct. 2505 (1986) ........................................................................... 8

*Barnhart v. Walton*,
  535 U.S. 212 S.Ct. 1265 (2002) ........................................................................... 22

*Bryan v. Itasca County*,
  426 U.S. 373 (l976) ............................................................................................... 12

*California v. Band of Mission Indians*,
  480 U.S. 202 (1987) ............................................................................................... 12

*Celotex Corp. v. Catrett*,
  477 U.S. 317 S.Ct. 2548 (1986) ........................................................................... 8

*Chevron U.S.A., Inc. v. NRDC*,
  467 U.S. 837 (1984) ................................................................................... 21, 22, 23

*Coll v. PB Diagnostic Sys.*,
  50 F.3d 1115 (1st Cir. 1995) ................................................................................. 8

*County of Oneida v. Oneida Indian Nation*,
  470 U.S. 226 (1985) ............................................................................................... 8

*Deppenbrook v. Pension Benefit Guar. Corp.*,
  778 F.3d 166 (D.C. Cir. 2015) .............................................................................. 21

*Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*,
  769 F.3d 1127 (D.C. Cir. 2014) ............................................................................ 22

*Garcia-Gonzalez v. Puig-Morales*,
  761 F.3d 81 (1st Cir. 2014) ................................................................................... 7

*K.G. Urban Enterprises v. Patrick*,
  693 F.3d 1 (1st Cir. 2012) ..................................................................................... 16

*Kansas v. United States*,
249 F.3d 1213 (10th Cir. 2001) .................................................................................... 11

*KG Urban Enterprises, LLC v. Patrick*,
Civil No. 11-12070·NMG ...................................................................................... 7, 11

*Lone Wolf v. Hitchcock*,
187 U.S. 553 (1903) ....................................................................................................... 16

*Medina-Munoz v. R.J. Reynolds Tobacco Co.*,
896 F.2d 5 (1st Cir. 1990) .............................................................................................. 7

*Medina-Rivera v. MVM, Inc.*,
713 F.3d 132 (1st Cir. 2013) ........................................................................................... 8

*Merrimon v. Unum Life Ins. Co. of America*,
758 F.3d 46 (1st Cir. 2014) ........................................................................................... 23

*Merrion v. Jicarilla Apache Tribe*,
455 U.S. 130 (1982) ......................................................................................................... 9

*Mesnick v. General Electric Co*,
950 F.2d 816 (1st Cir. 1991) ........................................................................................... 7

*Miami Tribe of Oklahoma v. United States*,
5 F. Supp. 2d 1213 (D. Kan. 1998) .............................................................................. 11

*Miami Tribe of Oklahoma v. United States*,
927 F. Supp. 1419 (D. Kan. 1996) ............................................................................... 11

*Montana v. Blackfeet Tribe*,
471 U.S. 759 (1985) ......................................................................................................... 8

*O'Conner v. Steeves*,
994 F.2d 905 (1st Cir. 1993) ........................................................................................... 8

*Oklahoma Tax Commission v. United States*,
63 S.Ct. 1284 (1943) ..................................................................................................... 16

*Passamaquoddy Tribe v. Maine*,
75 F.3d 784 (1st. Cir. 1996) .................................................................................... 19, 22

*Perry v. Roy*,
782 F.3d 73 (1st Cir. 2015) ............................................................................................. 7

*Pipefitters Local 562 v. United States,*
    407 U.S. 385, 92 S.Ct. 2247 (1972)...................................................................... 16

*Rhode Island v. Narragansett,*
    19 F.3d 685 (lst Cir.1994)........................................................................ passim

*Russello v. United States,*
    464 U.S. 16 (1983).......................................................................................... 15

*Showtime Entertainment, LLC v. Town of Mendon,*
    769 F.3d 61 (1st Cir. 2014)............................................................................. 8

*Skidmore v. Swift Co.,*
    323 U.S.134, 65 S.Ct. 161 (1944)...................................................... 21, 22, 23

*Sycuan Band v. Roache,*
    54 F.3d 535 (9th Cir.1995) ........................................................................... 18

*Traynor v. Turnage,*
    485 U.S. 535, 108 S.Ct. 1372 (1988)................................................................. 16

*United States* v. *Cook,*
    922 F.2d 1026 (2d Cir. 1991)......................................................................... 14

*United States v. Lara,*
    124 S.Ct. 1628 (2004).................................................................................... 16

*United States* v. *Mazurie,*
    419 U.S. 544 (1975)........................................................................................ 12

*United States* v. *Mead Corp.,*
    533 U.S. 218 (2001)....................................................................................... 22

*United States* v. *Tynen,*
    78 U.S. (11 Wall) 88 (1871) ..................................................................... 16, 17

*United States* v. *Wheeler,*
    435 U.S. 313 (1978)....................................................................................... 12

*Watt v. Alaska,*
    451 U.S. 259, 101 S.Ct. 1673 (1981)................................................................ 17

*Wightman v. Springfield Terminal Ry.,*
    100 F.3d 228 (1st Cir. 1996) ............................................................................. 8

*Ysleta del Sur Pueblo v. Texas*,
   36 F.3d 1325 (5th Cir. 1994) ...................................................................................... 19


**STATUTES**


25 U.S.C. § 9 .................................................................................................................. 22

25 U.S.C. 1300g-6 ..........................................................................................................19

25 U.S.C. §§ 1701–1716 .................................................................................................. 9

25 U.S.C. 1725(b)..........................................................................................................19

25 U.S.C. § 1708 ............................................................................................................. 9

25 U.S.C. § 1771e(a) ........................................................................................... 1, 14, 20

25 U.S.C. § 1771g ................................................................................................... passim

25 U.S.C. §§ 2701 ........................................................................................................... 1

25 U.S.C. § 2703(4) ...................................................................................................... 11

25 U.S.C. §§ 2703(6-8) ................................................................................................ 19

25 U.S.C. § 2706(b)(10) ............................................................................................... 22

25 U.S.C. § 2710(a) ...................................................................................................... 18

25 U.S.C. § 2710(b)(1) ................................................................................................. 10

25 U.S.C. § 2710(d) ...................................................................................................... 18

25 U.S.C. §§ 2710(d)(1)(a)(I) ...................................................................................... 10

25 U.S.C. §§ 2710(d)(3)(A) .......................................................................................... 10

California Rancheria Termination Act of 1958, Public Law 85-671, August 18, 1958, [H.R.
   2824] 72 Stat. 619 at § 10(b) ..................................................................................... 13

Maine Indian Claims Act of 1980 ........................................................................... 19

Western Oregon Indian Termination Act, Public Law 588. Chapter 733, August 13, 1954, [S. 2746] 68 Stat. 724 at § 13(a) ................................................................. 13

Ysleta del Sur Pueblo Restoration Act ....................................................................19

**RULES**

Fed.R.Civ.P. 56 ..................................................................................................... 1, 8

Fed.R.Civ.P. 56(a) ......................................................................................................7

Fed.R.Civ.P 56(e) ...................................................................................................... 8

**CONGRESSIONAL AND LEGISLATIVE AUTHORITIES**

H.R. 2868, 99th Cong.  § 107(a) (1986) ..................................................................15

H. R. REP. No. 100-238, at 6 (1987) ...................................................................... 15

H. REP. NO. 99-918, AT 5 (1986) .......................................................................... 15

S.Rep. No. 446, 100th Cong.2d Sess., *reprinted in* 1988 U.S.C.C.A.N. 3071, 3075-76 ............. 18

**OTHER AUTHORITIES**

2B (NORMAN J) SINGER, SUTHERLAND ON STAT. CONST., § 51.02, AT 121 (5TH ED. 1993). ...................................................................................................... 17

Defendants[1] Counterclaimants Wampanoag Tribe of Gay Head (Aquinnah) and the Aquinnah Wampanoag Gaming Corporation (collectively "Defendants" or "Tribe"), move this Court for Summary Judgment pursuant to Fed.R.Civ.P. 56 on their Counterclaims against Third-Party Defendants Governor Charlie Baker, Attorney General Maura Healey, and Massachusetts Gaming Commission Chairman Stephen Crosby, and Intervenor-Plaintiffs/Counterclaim-Defendants the Town of Aquinnah ("Town") and the Aquinnah/Gay Head Community Association, Inc. ("AGHCA"), granting the relief requested, and seek summary judgment against all claims brought against Defendants by the Commonwealth of Massachusetts ("Commonwealth" or "State"), the Town and AGHCA.

## I.    INTRODUCTION

The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 et seq. ("IGRA") applies to gaming conducted by a tribe on its Indian lands unless Congress, in the exercise of its plenary authority over Indian Tribes, divested the tribe of jurisdiction through an exclusive grant of jurisdiction to a state or through an explicit divesture of tribal jurisdiction. Section 1771g of the Massachusetts Indian Land Claims Settlement Act (the "Federal Act") does not grant exclusive jurisdiction to the State, and Section 177le(a) of the Federal Act does not divest the Tribe of jurisdiction over its land.   For this reason, IGRA applies to those lands now held by the United

---

[1] Although Plaintiffs named the Wampanoag Tribal Council of Gay Head, Inc. as a party defendant, alleging that Defendant Wampanoag Tribe of Gay Head (Aquinnah) "includes" Wampanoag Tribal Council of Gay Head, Inc., which no longer exists, Defendants deny that allegation, but if such allegation is true, and Defendant Wampanoag Tribe of Gay Head (Aquinnah) has the capacity for pleading on behalf of Wampanoag Tribal Council of Gay Head, Inc., then this Motion for Summary Judgment shall also be considered to be filed on behalf of Wampanoag Tribal Council of Gay Head, Inc.

1

States of America in trust for the benefit of the Tribe (the "Settlement Lands").  The Federal Act and IGRA are repugnant to each other regarding their respective provisions related to state jurisdiction over gaming, and for this reason, cannot be read in harmony.  Because (i) IGRA post-dates the Federal Act, (ii) the Federal Act does not contain a savings clause, and (iii) IGRA's applicability furthers Congressional intent, IGRA impliedly repeals those portions of the Federal Act pertaining to the State's jurisdiction over Indian gaming. Therefore, the Federal Act does not prohibit the Tribe from conducting gaming on its Settlement Lands.

The First Circuit Court of Appeals, in *Rhode Island v. Narragansett*, 19 F.3d 685 (lst Cir.1994), created a two-step analysis that applies to the issues presented to this Court: first, does the Tribe possess the requisite jurisdiction for IGRA to apply to its Settlement Lands, and second, can the Federal Act and IGRA be read together without conflict, and if not, does IGRA impliedly repeal those portions of the Federal Act regarding gaming? Applying that two-step analysis to the instant litigation, this Court should conclude that the Federal Act did not divest the Tribe of jurisdiction over the Settlement Lands, and therefore, IGRA applies to such lands. Further, this Court should conclude that IGRA impliedly repealed those portions of the Federal Act related to Indian gaming. The Court should also afford substantial deference to the thorough and well-reasoned opinions of the United States Department of the Interior and the National Indian Gaming Commission ("NIGC") that reach these same conclusions. Accordingly, this Court should enter summary judgment in favor of the Tribe on its counterclaims. In deciding whether the Commonwealth has jurisdiction over Indian gaming on the Tribe's lands under the Settlement Agreement, this Court must necessarily determine that IGRA has impliedly repealed, abrogated or preempted any such jurisdiction.  This Court cannot properly conclude that the Commonwealth has jurisdiction over the Settlement Lands, and accordingly, this Court should

also enter summary judgment in favor of the Tribe on the Commonwealth's and Intervenors' claims.

## II.     CONCISE STATEMENT OF MATERIAL FACTS

All parties in this litigation jointly filed "Stipulated Facts Not in Dispute" (doc. 107). Those facts are incorporated by reference as if fully set forth herein. On September 28, 1983, Wampanoag Tribal Council of Gay Head, Inc. entered into a Memorandum of Understanding Concerning Settlement of Gay Head, Massachusetts Indian Land Claims with the Town of Aquinnah (formally Town of Gay Head) and the Taxpayers' Association of Gay Head, Inc., resolving a multi-year litigation over aboriginal title to lands located on Martha's Vineyard. (doc. 107 at ¶¶11 & 12). The Memorandum of Understanding notably was intended to set the groundwork for federal recognition of the Tribe, and upon such recognition, to establish the Tribe's right to permanently possess certain "Settlement Lands" on Martha's Vineyard. (doc. 107 at ¶12). The Memorandum of Understanding was later codified into Commonwealth state law, and Chapter 277 of the Acts of 1985 (the "Commonwealth Act") was passed by the Massachusetts legislature in 1985 (doc. 107 at ¶13). In 1987, before the United States Congress enacted the Settlement Act, the Tribe received federal recognition status through the Department of the Interior (doc. 107 at ¶¶ 14-17). Many aspects of the Memorandum of Understanding were imposed upon the newly federally-recognized Tribe in the Federal Act, 25 U.S.C. 1771g, passed by the United States Congress in 1987 (doc. 107 at ¶18).

In 1988, approximately one year after enactment of the Federal  Act, Congress enacted IGRA, establishing a regulatory scheme for Indian gaming in the United States, and creating the NIGC, an independent federal regulatory agency within the Department of Interior, to oversee IGRA's administration.  In compliance with IGRA, the Tribe passed Gaming Ordinance 2011-

01, adopted in 2012, which authorized gaming activities on the Settlement Lands, as conducted in accordance with IGRA and its implementing regulations (doc. 107 at ¶37-39).  The Tribe thereafter received two legal opinions confirming the Tribe's authority to conduct gaming on the Settlement Lands.  First, on August 23, 2013, the Tribe received an opinion letter from the Department of Interior's Office of the Solicitor concluding that the Memorandum of Understanding,  effectuated in part as the Federal  Act in 1987, does not prohibit the Tribe from conducting Indian gaming on its Settlement Lands (doc. 107 at ¶¶ 52 & 53).  Subsequently, on October 25, 2013, the Tribe received an additional opinion letter from the NIGC's Office of General Counsel concluding that the Settlement Lands are eligible for Indian gaming under IGRA (doc. 107 at ¶¶58 & 59).

For clarification purposes, it is important to note that the Tribe achieved its federally-recognized status on April 11, 1987 through the formal administrative process administered by the Department of the Interior (doc. 107, at ¶¶ 14-17), and not through the Federal Act, which was enacted by Congress six months later on August 18, 1987 (doc. 107, at ¶¶ 18–20). The Federal Act did not confer federal recognition upon the Tribe, but rather, resulted in the Settlement Lands being set aside for the benefit of the Tribe, while extinguishing the Tribe's aboriginal title to lands on Martha's Vineyard.

In addition to the joint filing of Stipulated Facts Not in Dispute (doc. 107), the Tribe submits these additional concise statements of material fact:

    A.    The Tribe regularly asserts its jurisdiction over its Settlement Lands. The tribal government is responsible for stewarding the Settlement Lands, including providing a full range of services to the Tribe's members, including education, health and recreation, public safety, law enforcement, public utilities, natural

4

resources management, economic development and community assistance. Furthermore, the Tribe polices the Settlement Lands and applies tribal laws to its members on the Settlement Lands. *See* May 28, 2015 Declaration of Chairman Tobias J. Vanderhoop at ¶ 3.

B.  The exercise of the Tribe's jurisdiction is manifested by the Tribe's enactment and implementation of a range of tribal laws, *see* May 28, 2015 Declaration of Chairman Tobias J. Vanderhoop at ¶¶ 4-14 , including but not limited to:

1.  A Tribal Ordinance regarding building, health, fire and safety, attached to May 28, 2015 Declaration of Chairman Tobias J. Vanderhoop as Exhibit A.

2.  A Tribal Ordinance regarding the establishment of an Historic Preservation Office, attached to May 28, 2015 Declaration of Chairman Tobias J. Vanderhoop as Exhibit B.

3.  A Tribal Ordinance regarding fish, wildlife and natural resources, attached to May 28, 2015 Declaration of Chairman Tobias J. Vanderhoop as Exhibit C.

4.  A Tribal Ordinance regarding housing, attached to May 28, 2015 Declaration of Chairman Tobias J. Vanderhoop as Exhibit D.

5.  A Tribal Ordinance regarding lead paint, attached to May 28, 2015 Declaration of Chairman Tobias J. Vanderhoop as Exhibit E.

6.  A Tribal Ordinance regarding enrollment, attached to May 28, 2015 Declaration of Chairman Tobias J. Vanderhoop as Exhibit F.

7.  A Tribal Ordinance regarding elections, attached to May 28, 2015 Declaration of Chairman Tobias J. Vanderhoop as Exhibit G.

8.  A Tribal Ordinance regarding the judiciary, attached to May 28, 2015

Declaration of Chairman Tobias J. Vanderhoop as Exhibit H.

9.   A Tribal Ordinance regarding criminal background checks, attached to May
     28, 2015 Declaration of Chairman Tobias J. Vanderhoop as Exhibit I.

10.  A Tribal Ordinance regarding notice and reporting of child abuse and neglect,
     attached to May 28, 2015 Declaration of Chairman Tobias J. Vanderhoop as
     Exhibit J.

C.   The exercise of the Tribe's jurisdiction is further manifested by the Tribe's
execution and implementation of various inter-governmental agreements, *see* May
28, 2015 Declaration of Chairman Tobias J. Vanderhoop at ¶¶ 15–21, including but
not limited to:

1.   A Tribal Environmental Agreement between the Tribe and the United States
     Environmental Protection Agency, attached to May 28, 2015 Declaration of
     Chairman Tobias J. Vanderhoop as Exhibit K.

2.   An Agreement between the National Park Service, U.S. Department of the
     Interior and the Tribe for the assumption by the Tribe of certain
     responsibilities pursuant to the National Historic Preservation Act, attached to
     May 28, 2015 Declaration of Chairman Tobias J. Vanderhoop as Exhibit L.

3.   A Fire Cooperative Agreement, No. CTS50T03041, between the Tribe  and
     the Eastern Region Bureau of Indian Affairs, attached to May 28, 2015
     Declaration of Chairman Tobias J. Vanderhoop as Exhibit M.

4.   An Intergovernmental Agreement between the Tribe  and the Commonwealth
     Agreement Authority, regarding Indian child welfare matters, attached to
     May 28, 2015 Declaration of Chairman Tobias J. Vanderhoop as Exhibit N.

6

5.    An Intergovernmental Agreement on Cooperative Land Use and Planning between the  Tribe  and the Town, attached to May 28, 2015 Declaration of Chairman Tobias J. Vanderhoop as Exhibit O.

6.    An Operational Plan, pursuant to an Agreement between the Tribe  and the Town, attached to May 28, 2015 Declaration of Chairman Tobias J. Vanderhoop as Exhibit P.

D.    In denying the Tribe's Motion to Intervene, the U.S. District Court for the District of Massachusetts, in *KG Urban Enterprises, LLC v. Patrick,* Civil No.  1 1 - 12070·NMG, found that  the Tribe exercises jurisdiction over its Settlement Lands. *See,* June 6, 2013 Memorandum & Order, at p.7 (D. Mass. June 6, 2013), attached to May 28, 2015 Declaration of Chairman Tobias J. Vanderhoop as Exhibit Q.

## III.    STANDARD OF REVIEW

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Electric Co*, 950 F.2d 816, 822 (1st Cir. 1991). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any declarations show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the non-movant ... would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990). A genuine issue of material fact must be built on a solid foundation—a foundation constructed from materials of evidentiary quality. *Perry v. Roy,* 782 F.3d 73 (1st Cir. 2015); *Garcia-Gonzalez v. Puig-Morales*, 761 F.3d 81, 87 (1st Cir. 2014). A Court should give no heed to speculative, unsupported, or unreasonable conclusions, but should favor factual presentation

insofar as it finds support in the record. *Showtime Entertainment, LLC v. Town of Mendon*, 769 F.3d 61, 69 (1st Cir. 2014); *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 134 (1st Cir. 2013). In evaluating a summary judgment motion, a court indulges all reasonable inferences in favor of the non-moving party. *O'Conner v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505 (1986) (quoting Fed.R.Civ.P 56(e)). Essentially, Federal Rule 56 mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986); *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se*. Cross motions simply require a court to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. *Showtime Entertainment*, 769 F3d at 69-70*; Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 230 (1st Cir. 1996).

The crux of the cross-motions for summary judgment in the present litigation is the interpretation of the Federal Act and IGRA, both statutes intended to benefit Indian tribes. Accordingly, the Indian canons of construction should be applied. *Montana* v. *Blackfeet Tribe*, 471 U.S. 759, 766 (1985) ("Statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."); *County of Oneida v. Oneida Indian Nation*,

470 U.S. 226, 247 (1985) ("The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians. Thus, it is well established that treaties should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit. . . . The Court has applied similar canons of construction in nontreaty matters."); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 152 (1982) ("If there [is] ambiguity . . . the doubt would benefit the tribe, for ambiguities in federal law have been construed generously in order to comport with traditional notions of sovereignty and with the federal policy of encouraging tribal independence").

## IV.   ANALYSIS AND ARGUMENT

### A.  The First Circuit Established the Two-Step Analysis to Determine Whether IGRA or the Federal Act Governs Aquinnah's Gaming Activities.

In *Narragansett,* the land the United States held in trust for the Narragansett Indian Tribe had been received through the Rhode Island Indian Claims Settlement Act ("RIICSA"), 25 U.S.C. §§ 1701–1716. The RIICSA mandated that the settlement lands "shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island."   25 U.S.C. § 1708[2]. The litigation began when the Narragansett Indian Tribe requested that Rhode Island enter into a tribal-state compact pursuant to IGRA. Rhode Island filed suit in federal district court asking the court to rule that IGRA did not apply to the Narragansett Indian Tribe's settlement lands, and therefore, the lands were subject to Rhode Island law. The district court found that IGRA controlled because the Narragansett Indian Tribe had jurisdiction sufficient to trigger IGRA, 816 F.Supp. 796 (D. R.I. 1993), and Rhode Island appealed.

---

[2] In 1996, the RIICSA at Section 1708 was amended to expressly preclude Narragansett's Indian lands from qualifying under IGRA. That amendment was a direct result of the First Circuit issuing its opinion in *Rhode Island v. Narragansett*. No similar amendment has been made to the Federal Act at issue here. The 1996 Narragansett Amendment underscores the Commonwealth's and Intervenors' appropriate venue for seeking their desired result, the United States Congress.

The First Circuit in *Narragansett* began by asking whether the RIICSA left the Narragansett Indian Tribe with sufficient jurisdiction over the land, and whether it exercised governmental power over the land, thereby triggering IGRA. After concluding that IGRA was triggered, the court examined the interface between the two laws, first asking whether IGRA and the RIICSA could be read to give full effect to each, and finding that they could not, secondarily determining that IGRA performed an implied partial repeal of portions of the RIICSA.

**B.  Step One: The Tribe Possesses Sufficient Jurisdiction Over the Settlement Lands to Make IGRA Applicable.**

With respect to Class II gaming[3], IGRA states that "[a]n Indian tribe may engage in, or license and regulate, Class II gaming on Indian lands within such tribe's jurisdiction." 25 U.S.C. § 2710(b)(1).  IGRA's Class III gaming provisions, although only tangentially relevant to the instant litigation, also limit a tribe's ability to engage in Class III gaming to lands over which it has jurisdiction. 25 U.S.C. §§ 2710(d)(1)(a)(I) and § 2710(d)(3)(A).  The provisions of IGRA related to Class I and Class II gaming mandate that a tribe must have jurisdiction over the land.  The provision defining the elements of "Indian lands" mandates that a tribe must exercise governmental power over the land. 25 U.S.C. §§ 2703(4), 2710(b)(1) and 2710(d)(3)(A). Hence, in the instant litigation, the first step of *Narragansett's* two-step analysis is to determine whether the Tribe has jurisdiction over the Settlement Lands. *See*

---

[3] IGRA divides gaming into three classes. Class I involves traditional tribal gaming and is governed and regulated exclusively by the tribe. Class II involves bingo and non-banked card games and is governed and regulated by the tribe and the federal government to the exclusion of the state. Class III involves gambling not covered in Class I or Class II (such as casino- style gaming, including slot machines and banked card games), and except for specific circumstances, is governed by a tribal/state compact between the tribe and the state. 25 U.S.C. § 2703.

*Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001) ("[B]efore a sovereign may exercise governmental power over land, the sovereign, in its sovereign capacity. must have jurisdiction over that land."); *Miami Tribe of Oklahoma v. United States*, 5 F. Supp. 2d 1213, 1217-18 (D. Kan. 1998) (stating that a tribe must have jurisdiction in order to exercise governmental power); *Miami Tribe of Oklahoma v. United States*, 927 F. Supp. 1419, 1423 (D. Kan. 1996) ("[T]he NIGC implicitly decided that in order to exercise governmental power for purposes of 25 U.S.C. § 2703(4), a tribe must first have jurisdiction over the land.").

All parties in this litigation stipulated that "[t]he Commonwealth, the Town, and the Tribe have each exercised jurisdiction over the Settlement Lands pursuant to the provisions of the Federal Act" (doc. 107 at ¶ 22). As discussed below, that stipulated fact is alone sufficient to meet the first step of the *Narragansett* two-step analysis.   Additionally, when denying the Tribe's Motion to Intervene, this U.S. District Court for the District of Massachusetts in *KG Urban Enterprises, LLC v. Patrick*, Civil No. ll-12070·NMG found that that the Tribe exercises jurisdiction over the Settlement Lands. *See* June 6 Memorandum & Order, at p.7 (D. Mass. June 6, 2013) (attached to May 28, 2015 Declaration of Chairman Tobias J. Vanderhoop as Exhibit Q). ("The Aquinnah  is a federally recognized tribe with jurisdiction  over land on the western half of Martha's Vineyard, a part of Region C, . . .").

The Tribe's actual exercise of its jurisdiction over the Settlement lands, however, far exceeds the threshold requirements.   The Tribe regularly asserts its jurisdiction over its Settlement Lands. The tribal government is responsible for stewarding the Settlement Lands, including providing a full range of services to the Tribe's members, including education, health and recreation, public safety and law enforcement, public utilities, natural resources management, economic development, and community assistance. Furthermore, the Tribe

polices the Settlement Lands and applies tribal laws to its members on the Settlement Lands. The Concise Statement of Material Facts, above, provides examples of several ordinances enacted and implemented by the Tribe, including ordinances dealing with such diverse topics as building codes, health, fire, safety, historic preservation, fish, wildlife, natural resources, housing, lead paint, enrollment, elections, judiciary, criminal background checks, and reporting of child abuse and neglect. The Concise Statement of Material Facts, above, also provides examples of several intergovernmental agreements between the Tribe and the U.S. Environmental Protection Agency, the National Park Service, the Bureau of Indian Affairs, the Commonwealth and the Town. The Tribe's exercise of its jurisdiction over its Settlement lands is robust and extensive, far in excess of the minimal threshold required to satisfy the first step in the two-step analysis.

Federal courts consistently recognize that Indian tribes retain attributes of sovereignty over both their members and their territories. *California* v. *Band of Mission Indians*, 480 U.S. 202, 207 (1987); *United States* v. *Wheeler*, 435 U.S. 313, 322-323 (1978); *United States* v. *Mazurie*, 419 U.S. 544, 557 (1975). Jurisdiction is an integral part of a tribe's retained sovereignty. *Narragansett*, 19 F.3d at 701. It is well-settled that tribes possess aspects of sovereignty not withdrawn by treaty or statute or by implication as a necessary result of their dependent status. *United States v. Wheeler*, 435 U.S. 313, 323 (1978); *Narragansett*, 19 F.3d at 701. Congressional intent to delegate exclusive jurisdiction to a state must be clearly and specifically expressed. *Bryan v. Itasca County*, 426 U.S. 373, 392 (l976). The First Circuit in *Narragansett* found that the tribe's retained jurisdiction, even if concurrent with the jurisdiction of the State of Rhode Island, was "substantial enough" for the tribe's lands to qualify for gaming under IGRA. 19 F. 3d at 701.

To defeat IGRA's low threshold for a tribe's exercise of jurisdiction over its Indian lands, the Commonwealth must first prove that the Federal Act completely divested the Tribe of jurisdiction over the Settlement Lands. Congress knew well how to employ language to achieve such a result. *See e.g.,* California Rancheria Termination Act of 1958, Public Law 85-671, August 18, 1958, [H.R. 2824] 72 Stat. 619 at § 10(b) ("After the assets of a rancheria or reservation have been distributed pursuant to this Act, the Indians who receive any part of such assets, and the dependent members of their immediate families, shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians, all statutes of the United States which affect Indians *because of their status as Indians shall be inapplicable to them*, and the laws of the several States shall apply to them in the same manner as they apply to other citizens or persons within their jurisdiction.")(emphasis added); Western Oregon Indian Termination Act, Public Law 588. Chapter 733, August 13, 1954, [S. 2746] 68 Stat. 724 at § 13(a)("the Secretary shall publish in the Federal Register a proclamation declaring that the Federal trust relationship to the affairs of the tribe and its members has terminated. Thereafter individual members of the tribe shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians, all statutes of the United States which affect Indians because of their status as Indians, excluding statutes that specifically refer to the tribe and its members, shall no longer be applicable to the members of the tribe, and the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction.")

The Commonwealth and the Intervenors have stipulated that the Tribe possesses the requisite jurisdiction (doc. 107 at ¶ 22). The Federal Act's grant of jurisdiction to the Commonwealth provides:

> Except as otherwise expressly provided in this Act or the State Implementing Act, the settlement lands and any other land that may now or hereafter be owned by or held in trust for any Indian tribe or entity in the town of Gay Head, Massachusetts, shall be subject to the civil and criminal laws, ordinances, and jurisdiction of the Commonwealth of Massachusetts and the town of Gay Head, Massachusetts (including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance).

25 U.S.C. § 1771g. Nothing in the statute's language suggests that the Commonwealth's jurisdiction was intended to be complete to the exclusion of the Tribe. See *Narragansett*, 19 F.3d at 701; *United States* v. *Cook*, 922 F.2d 1026, 1032 -33 (2d Cir. 1991) (Congress knew how to include language to provide for exclusive jurisdiction and the omission of such language evidences its intent that state jurisdiction not be to the exclusion of tribal jurisdiction). The Federal Act explicitly limits the exercise of the Tribe's jurisdiction over the Settlement Lands, but in doing so, it acknowledges rather than completely divest the Tribe's jurisdiction:

> The Wampanoag Tribal Council of Gay Head, Inc., shall not have any jurisdiction over nontribal members and shall not exercise any jurisdiction over any part of the settlement lands in contravention of this Act, the civil regulatory and criminal laws of the Commonwealth of Massachusetts, the town of Gay Head, Massachusetts, and applicable Federal laws.

25 U.S.C. § 1771e(a). The Tribe's jurisdiction over the land is apparent when compared with the language divesting the Tribe of jurisdiction over nontribal members. The statute states that the Tribe "shall not have any jurisdiction" over nontribal members, but preserves the Tribe's jurisdiction over the land by stating that any jurisdiction exercised must not contravene State or federal law.

Importantly, H.R. 2868, an older version of the legislation that culminated in the Federal Act, would have barred the Tribe from exercising any form of jurisdiction over the land, but Congress ultimately changed the text before it became law:

> No Indian tribe or band may exercise any form of jurisdiction (whether or not such tribe or band is a federally recognized Indian Tribe or band) over any part

14

of the settlement lands, or any other land that may now or in the future be owned by or held in trust for such Indian entity in the town of Gay Head, Massachusetts, except to the extent provided in this Act, the State Implementing Act, or the Settlement Agreement.

H.R. 2868, 99th Cong.  § 107(a) (1986).  *See also,* H. REP. No. 99-918, at 5 (1986) (explaining the Bill "provide[d] that no Indian tribe may exercise any form of jurisdiction over the settlement lands or any other lands owned by such Indian entity within the town of Gay Head except to the extent provided in this Act, the State Implementing Act or the Settlement Agreement"). Based on this discarded and more stringent language, it is clear that Congress contemplated divesting the Tribe of jurisdiction but ultimately chose not to do so[4]. Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended. *Russello v. United States,* 464 U.S. 16, 23-24 (1983); *Narragansett* 19 F.3d at 700. The House Report on the Federal Act further supports the Tribe:

> [W]hile the civil and criminal laws of Massachusetts will be applicable on the settlement lands, the [T]ribe will be able to assume concurrent jurisdiction over its own members with the State and the [T]own as long as such jurisdiction is consistent with the civil and criminal laws of the State and the Town."

H. R. REP. No. 100-238, at 6 (1987).

Of course, the Commonwealth cannot establish that the Federal Act divested the Tribe of jurisdiction. Indeed, The legal and factual reality is that the Tribe exercises  jurisdiction over its Settlement Lands as a robust, functioning tribal government.

---

[4] This same change in language also defeats the argument repeatedly raised in this litigation by the Commonwealth and the Intervenors that the Federal Act ratified the 1983 MOU. It did not.

**C.  Step Two: IGRA Impliedly Repeals Those Portions of the Federal Act that Otherwise Granted  Jurisdiction to the Commonwealth, and its Political Subdivisions, Regarding Gaming.**

The United States Congress maintains plenary power over the rights and authority of federally-recognized Indian tribes to the exclusion of the states. The United States Supreme Court bluntly summarized 200 years of jurisprudence:

> This course of legislation and adjudication may be fairly summarized as recognizing the special relation of Indians toward the United States and the exclusion of state power with relation to them, except in so far as the federal government has actually released to the state governments its constitutional supremacy over this special field.

*Oklahoma Tax Commission v. United States*, 63 S.Ct. 1284, 1291 (1943). See also, *United States v. Lara*, 124 S.Ct. 1628, 1633 (2004); *Lone Wolf v. Hitchcock*, 187 U.S. 553 (1903); *K.G. Urban Enterprises v. Patrick*, 693 F.3d 1, 18 (1st Cir. 2012).

Because the Tribe possesses sufficient jurisdiction to trigger the application of IGRA, the First Circuit instructs this Court to initiate the second step of the analysis and determine whether an implied repeal of any portion of the Federal Act has taken place. In the absence of a contrary legislative command, when two acts of Congress touch upon the same subject matter, the courts should give effect to both, if that is feasible. See, *Narragansett*, 19 F.3d at 703; *Pipefitters Local 562 v. United States*, 407 U.S. 385, 432 n.43, 92 S.Ct. 2247, 2272 n.43 (1972); *United States v. Tynen*, 78 U.S. (11 Wall) 88, 92 (1871). In other words, so long as the two statutes, fairly construed, are capable of coexistence, courts should regard each as effective. See *Narragansett*, 19 F.3d at 703; *Traynor v. Turnage*, 485 U.S. 535, 547-48, 108 S.Ct. 1372, 1381-82 (1988*)*. However, "if the two [acts] are repugnant in any of their provisions, the latter act, without any repealing clause, operates to the extent of the repugnancy as a repeal of the first." *Narragansett*, 19 F.3d at 703; *Tynen*, 78 U.S. (11 Wall) at 92.  Even absent outright repugnancy, a repeal may be implied in cases where the later statute covers the entire subject "and embraces new

16

provisions, plainly showing that it was intended as a substitute for the first act." *Narragansett*,

19 F.3d at 703-704; *Tynen*, 78 U.S. (11 Wall) at 92.

Applying these standards, the First Circuit concluded that IGRA impliedly repealed the

RIICSA as to gaming activities on Narragansett's Indian lands:

> It is evident that the Settlement Act and the Gaming Act are partially but not wholly repugnant. The Settlement Act assigned the state a number of rights. Among those rights—and by no means one of the rights at the epicenter of the negotiations leading up to the Act—was the non-exclusive right to exercise jurisdiction, in all customary respects save two, (citation omitted), over the settlement lands. The Gaming Act leaves undisturbed the key elements of the compromise embodied in the Settlement Act. It also leaves largely intact the grant of jurisdiction—but it demands an adjustment of that portion of jurisdiction touching on gaming. Even in respect to jurisdiction over gaming, the two laws do not collide head-on. Thus, in connection with class III gaming, the Gaming Act does not in itself negate the state's jurisdiction, but, instead, channels the state's jurisdiction through the tribal-state compact process. It is only with regard to class I and class II gaming that the Gaming Act *ex proprio vigore* bestows exclusive jurisdiction on qualifying tribes. And it is only to these small degrees that the Gaming Act properly may be said to have worked a partial repeal by implication of the preexisting statute. In the area in which the two laws clash, the Gaming Act trumps the Settlement Act for two reasons. First, the general rule is that where two acts are in irreconcilable conflict, the later act prevails to the extent of the impasse. See *Watt v. Alaska*, 451 U.S. 259, 266, 101 S.Ct. 1673, 1677 (1981); *Tynen*, 78 U.S. (11. Wall.) at 92; see also 2B (Norman J) Singer, Sutherland on Stat. Const., § 51.02, at 121 (5th ed. 1993). Second, in keeping with the spirit of the standards governing implied repeals, courts should endeavor to read antagonistic statutes together in the manner that will minimize the aggregate disruption of congressional intent. Here, reading the two statutes to restrict state jurisdiction over gaming honors the Gaming Act and, at the same time, leaves the heart of the Settlement Act untouched. Taking the opposite tack—reading the two statutes in such a way as to defeat tribal jurisdiction over gaming on the settlement lands—would honor the Settlement Act, but would do great violence to the essential structure and purpose of the Gaming Act. Because the former course keeps disruption of congressional intent to a bare minimum, that reading is to be preferred. Based on our understanding of the statutory interface, we hold that the provisions of the Indian Gaming Regulatory Act apply with full force to the lands in Rhode Island now held in trust by the United States for the Narragansett Indian Tribe.

17

19 F.3d at 704-705. The same analysis leads to the same result when attempting to apply the Federal Act at issue here, with IGRA.

IGRA and the Federal Act cannot be read in harmony and are therefore repugnant. The Federal Act clearly applies Commonwealth law, including gaming law, to the Settlement Lands. 25 U.S.C. § 1771g. This application grants the State "the non-exclusive right to exercise jurisdiction" over the Settlement Lands. The Federal Act also limits the exercise of the Tribe's jurisdiction to that which conforms to Commonwealth law. *Id.* Regardless of what the Commonwealth's gaming laws actually require, the Federal Act dictates that the Tribe must act in conformance with the Commonwealth's laws when conducting gaming.

IGRA provides an entirely different framework for the Tribe's gaming activities. IGRA mandates exclusive tribal jurisdiction over the Tribe's Class I and Class II gaming. 25 U.S.C. § 2710(a). Although IGRA may permit the Commonwealth to exercise its jurisdiction over Class III gaming as prescribed and negotiated under the terms of an approved tribal-state compact, 25 U.S.C. § 2710(d), such exercise is still dependent on the Tribe entering into such an agreement in accordance with IGRA's terms[5].   Indeed, Congress expressly provided that the only mechanism by which state law may govern tribal gaming activities is by means of a negotiated tribal-state compact approved by the Department of the Interior. See, *Sycuan Band v. Roache*, 54 F.3d 535, 538 (9th Cir.1995); S.Rep. No. 446, 100th Cong.2d Sess., *reprinted in* 1988 U.S.C.C.A.N. 3071, 3075-76 ("[U]nless a tribe affirmatively elects to have State laws and State jurisdiction extend to

---

[5] The Tribe has pursued a tribal/state compact with the Patrick Administration, (doc. 107 at ¶¶ 29 – 35, which compact would provide an opportunity for the Commonwealth to exercise jurisdiction over Class III gaming on the Tribe's Indian lands. However, the Patrick Administration rejected the Tribe's requests. Accordingly, the Tribe has restricted its gaming activities in its Gaming Ordinance to Class II gaming activities, which are governed and regulated by the Tribe and the federal government, to the exclusion of the State.

tribal lands, the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities."). Further, IGRA categorizes Indian gaming into three classes and imposes different regulatory frameworks for each  class. 25 U.S.C. §§ 2703(6-8).

There are two circumstances in which the Commonwealth could defeat the conclusion of an implied repeal of portions of the Federal Act, but these circumstances are not present with respect to the Federal Act. First, the Commonwealth cannot demonstrate that the Federal Act expressly limits the circumstances in which subsequent acts of Congress apply to the Settlement Lands. For example, the Maine Indian Claims Act of 1980 states:

> The provisions of any federal law enacted after October 10, 1980 [the effective date of the Settlement Act], for the benefit of Indians, Indian nations, or tribes or bands of Indians, which would affect or preempt the application of the laws of the State of Maine, ... shall not apply within the State of Maine, *unless such provision of such subsequently enacted Federal law is specifically made applicable within the State of Maine.*

25 U.S.C. 1725(b)(emphasis added). The First Circuit rejected the Passamaquoddy Tribe's request to negotiate a compact under IGRA because Congress did not expressly make IGRA applicable to the Maine tribes as required by the Maine Indian Claims Act of 1980. *Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 790-91 (1st. Cir. 1996). As another example, the Ysleta del Sur Pueblo Restoration Act: states:

> The provisions of this subsection are enacted in accordance with the tribe's request in Tribal Resolution No. T.C.-02-86 which was approved and certified on March 12, l986.

25 U.S.C. 1300g-6. The referenced Tribal Resolution expressly states the Ysleta del Sur Pueblo's intent to forego gaming under any laws, tribal, state or federal. *Ysleta del Sur Pueblo v. Texas*, 36 F.3d 1325, 1328 n.2 (5th Cir. 1994). The Fifth Circuit found that the Ysleta del Sur Pueblo's Restoration Act was intended to codify the Pueblo's Tribal Resolution regardless of

19

subsequent changes in the law. *Id.* at 1334-35. The dispositive language in the Passamaquoddy

Settlement and Ysleta del Sur Pueblo's Restoration Act is noticeably absent in the Federal Act

at issue here. Congress was aware of the tools needed to defeat an implied repeal and used them

in the drafting of language regarding Passamaquoddy and Ysleta del Sur, but did not use them

in the Federal Act.

Second, the Commonwealth cannot demonstrate that subsequent to the passage of IGRA,

Congress enacted legislation to limit  IGRA's reach to the Tribe, e.g. the Chafee Amendment to

RIICSA after the First Circuit ruled in *Narragansett*, discussed in footnote 1, above. The

Commonwealth are welcome to advocate to Congress that while allowing for four large

commercial casinos and compacting with the Wampanoag Mashpee Tribe, Congress should ban

gaming on Aquinnah Indian lands. Congress is the proper forum for the Commonwealth to

pursue the result it seeks in this Court.

**D. The Tribe's Position in this Litigation is Supported by the Interpretations of the Two Federal Agencies Designated by Congress to Interpret and Implement the Federal Act and IGRA.**

The NIGC's approval of the Tribe's Gaming Ordinance was supported by the Department

of the Interior's and NIGC's issuance of two formal legal opinions confirming that the Tribe may

conduct gaming activities on its existing trust lands. In rejecting the position maintained by the

Deval Patrick Administration, the Department of the Interior opinion reasoned:

> IGRA applies if a tribe has not been divested of jurisdiction through an exclusive
> grant of jurisdiction to the state or through an explicit divesture of tribal
> jurisdiction. Section 1771g of the Settlement Act does not grant exclusive
> jurisdiction to the State, and Section 177le(a) of the Settlement Act does not
> divest the Tribe of jurisdiction. For this reason, IGRA applies on the Settlement
> Lands. The Settlement Act and IGRA are repugnant regarding provisions related
> to State jurisdiction over gaming and for this reason cannot be read in harmony.
> Because IGRA post-dates the Settlement Act, the Settlement Act does not contain
> a savings clause, and lGRA's applicability furthers congressional intent, IGRA

impliedly repeals those portions of the Settlement Act pertaining to State jurisdiction over gaming. ***Therefore, the Settlement Act does not prohibit the Tribe from gaming on the Settlement Lands.***

(doc. 107, Exhibit W)(emphasis added).   Additionally, on October 25, 2013, the NIGC opined that its approval of a site-specific Gaming Ordinance authorizes the Tribe to offer Class II gaming activities on its existing trust lands (doc. 107, Exhibit X).   The analysis set forth in Subsections B and C of this pleading reflect the analysis embraced by the two federal agency legal opinions.

At a minimum, these two opinions provide persuasive authority and analysis, of which this Court should give serious consideration. The Tribe acknowledges that this Court has forecast that it likely will not give deference to the agency actions regarding the questions on summary judgment (doc. 31 at 7, n.6). The Tribe is fully confident that the analysis set forth above is correct, such that this Court need not consider whether it should give deference to the agency actions. However, the Tribe believes that the agency actions warrant *Chevron* deference and at a minimum, warrant *Skidmore* deference.

The Court should apply the framework established in *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). Under such a framework, a court first asks whether Congress has directly spoken to the precise question at issue, in which case the court must give effect to the unambiguously expressed intent of Congress. *Deppenbrook v. Pension Benefit Guar. Corp*, 778 F.3d 166, 172 (D.C. Cir. 2015) (citation omitted). If the statute is silent or ambiguous with respect to the specific issue, however, the court moves to the second step, and defers to the agency's interpretation as long as it is based on a permissible construction of the statute. *Id.* To trigger deference, Congress must have delegated authority to the agency to make rules carrying the force of law, and  the agency interpretations for which deference is claimed must have been

promulgated in the exercise of that authority. *United States v. Mead Corp.*, 533 U.S. 218, 226-27

(2001); *Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1136

(D.C. Cir. 2014). As such, "the related expertise of the Agency, the importance of the question to

administration of the statute, the complexity of that administration, and the careful consideration

the Agency has given the question over a long period of time all indicate that *Chevron* provides

the appropriate legal lens through which to view the legality of the Agency interpretation here at

issue." *Barnhart v. Walton*, 535 U.S. 212, 222, 122 S.Ct. 1265, 1272 (2002).

The two legal opinions referenced above both fall within the scope of *Chevron*. They

were prepared as part of the NIGC's Final Agency Action allowing the Tribe's Gaming

Ordinance to go into effect. Congress delegated to the NIGC the responsibility to interpret and

implement IGRA. 25 U.S.C. § 2706(b)(10). Congress delegated to the Department of the Interior

the responsibility to interpret and implement the Federal Act. 25 U.S.C. § 9. The two agencies

with the requisite authority for interpretation and implementation of the two federal statutes at

issue cooperated and appropriately applied the expertise of both agencies. Thus, the instant case

is critically distinguishable from *Passamaquoddy*, 75 F.3d at 793, cited by this Court in its Order

of July 1, 2014. Applying *Chevron,* because the Department of the Interior's and NIGC's

collective interpretation is reasonable, such interpretation should not be overturned by this Court.

Even if this Court does not give the two legal opinions *Chevron* deference, it should still

afford *Skidmore* deference. The Supreme Court has reasoned that even if the agency

interpretation is part of a formal interpretive agency action, if that interpretation is "made in

pursuance of official duty, based upon more specialized experience and broader investigations

and information than is likely to come to a judge in a particular case," the Court should give it

"considerable and in some cases, decisive weight." *Skidmore v. Swift Co.*, 323 U.S.134, 139, 65

S.Ct. 161, 164 (1944). The First Circuit has recently reasoned that the degree of *Skidmore* deference is based on a mix of factors, including the thoroughness evident in the agency's consideration, the validity of its reasoning, and the consistency of its interpretation with earlier and later pronouncements. *Merrimon v. Unum Life Ins. Co. of America*, 758 F.3d 46, 54-55 (1st Cir. 2014). All of those factors weigh heavily in favor of substantial deference here. Two agencies were cooperative and thorough, providing very detailed research and sourced reasoning that is consistent with similar pronouncements. Further, the opinions were issued in the context of necessary analysis for a final agency action. If *Chevron* deference is not warranted here, substantial *Skidmore* deference is warranted, and this Court should uphold the agency interpretations.

### CONCLUSION

In this Court's July 1, 2014 Order denying the Commonwealth's Motion to Remand this litigation  to state court, this Court properly framed the dispositive question regarding these cross-motions for summary judgment:

> Resolution of the gaming jurisdiction issue is unquestionably "necessary" to the Commonwealth's case. The Commonwealth would not be responsible for the enforcement of gaming laws—and the Tribe would not violate Massachusetts law—if the Tribe, rather than the Commonwealth, had jurisdiction over the Settlement Lands.

(doc. 31 at p.7).  Because the Tribe possesses and exercises the requisite jurisdiction over the Settlement Lands for such lands to qualify for gaming under IGRA, and because the Federal Act's provisions regarding gaming jurisdiction are repugnant to IGRA, this Court should issue an opinion consistent with the Department of the Interior's thorough and well-reasoned opinion that IGRA impliedly repealed the Commonwealth's gaming jurisdiction. Accordingly, it should grant summary judgment affirming the Tribe's claims and negating the claims of the Commonwealth

and the Intervenors.

DATED: May 28, 2015                    Respectfully Submitted,

                                       /s/ Scott Crowell
                                       SCOTT CROWELL *(pro hac vice)*
                                       TRIBAL ADVOCACY GROUP LLP
                                       1487 W. State Route 89A, Suite 8
                                       Sedona, Arizona, 86336
                                       Telephone: 425-802-5369
                                       Facsimile: 509-290-6953

                                       BRUCE SINGAL   (BBO #464420)
                                       ELIZABETH MCEVOY   (BB) # 683191)
                                       DONOGHUE, BARRETT & SINGAL
                                       One Beacon Street, Suite 1320
                                       Boston, MA 02108-3106
                                       Telephone: 617-720-5090
                                       Facsimile 617-720-5092

                                       LAEL R. ECHO-HAWK (*pro hac vice*)
                                       GARVEY SHUBERT BARER
                                       1191 Second Ave. 18th Floor
                                       Seattle, Washington 98101
                                       Telephone: 206-816-1355
                                       Facsimile: 206-414-0125

                                       *Attorneys for Defendants/Counterclaim-
                                       Plaintiffs*

## **LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Fed.R. Civ. P. 56 and Local Rule 56.1, Wampanoag Tribe of Gay Head (Aquinnah) and the Aquinnah Wampanoag Gaming Corporation, respectfully incorporates as its statement of undisputed facts the parties' Stipulated Facts Not in Dispute, filed as Dkt. #107.

*/s/ Scott Crowell*
SCOTT CROWELL

## CERTIFICATE OF SERVICE

I, Scott Crowell, hereby certify that the WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH) and AQUINNAH WAMPANOAG GAMING CORPORATION'S MOTION FOR SUMMARY JUDGMENT, TOBIAS J. VANDERHOOP'S DECLARATION IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, and SUPPORTING EXHIBITS TO TOBIAS J. VANDERHOOP'S DECLARATION were filed through the ECF System and therefore copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); paper copies will be sent, via first-class mail, to those indicated as non-registered participants.

Dated: May 28, 2015

                                    */s/ Scott Crowell*
                                    SCOTT CROWELL