# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF MASSACHUSETTS,

    *Plaintiff,*

AQUINNAH/GAY HEAD COMMUNITY
ASSOCIATION, INC., and TOWN OF AQUINNAH,

    *Intervenor-Plaintiffs/Counterclaim-Defendants,*

v.

THE WAMPANOAG TRIBE OF GAY HEAD
(AQUINNAH), THE WAMPANOAG TRIBAL
COUNCIL OF GAY HEAD, INC., and THE
AQUINNAH WAMPANOAG GAMING
CORPORATION,

    *Defendants/Counterclaim-Plaintiffs,*

v.

CHARLES D. BAKER, in his official capacity as
GOVERNOR, COMMONWEALTH OF
MASSACHUSETTS, et al.,

    *Third-Party Defendants.*

Civil Action
No. 13-13286-FDS

\* Oral Argument Requested \*

## MEMORANDUM OF LAW IN SUPPORT OF INTERVENOR-PLAINTIFF/COUNTERCLAIM-DEFENDANT AQUINNAH/GAY HEAD COMMUNITY ASSOCIATION, INC.'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................iii

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 4

I.  THE TRIBE HAS VIOLATED THE SETTLEMENT AGREEMENT BY FAILING TO
    COMPLY WITH STATE AND LOCAL REQUIREMENTS PRIOR TO ENGAGING IN
    GAMING ................................................................................................................ 4

    A.  The Settlement Agreement Is An Enforceable Contract........................................ 4

    B.  The Tribe Cannot Engage In Gaming On The Lands At Issue
        Without First Obtaining State And Local Approval ................................................ 5

    C.  The Tribe Is Seeking To Open A Gaming Establishment Without
        Obtaining The Requisite State And Local Approvals, In Breach Of
        The Settlement Agreement ................................................................................... 7

II. THE INDIAN GAMING REGULATORY ACT DOES NOT SUPERSEDE THE
    SETTLEMENT AGREEMENT OR IMPLEMENTING LEGISLATION ............................... 9

    A.  IGRA Does Not Apply To The Lands At Issue ................................................... 10

        1.  The Tribe cannot show sufficient jurisdiction over the lands
            in question to trigger the application of IGRA ......................................... 10

        2.  The Tribe cannot show that the lands at issue qualify as
            "Indian lands" as defined in IGRA .......................................................... 13

    B.  Even If IGRA Did Apply To The Lands At Issue, The Tribe
        Cannot Show That IGRA Impliedly Repealed The Federal Act's
        Gaming Limitations ........................................................................................... 14

        1.  IGRA's plain language permits both acts to coexist................................. 15

        2.  Even if there were a conflict between IGRA and the
            Federal Act, the more specific Federal Act would control ...................... 16

        3.  Congress did not intend IGRA to impliedly repeal the
            Federal Act............................................................................................. 17

**4.**     Refusing to find an implied repeal of the Federal Act is
consistent with the purposes behind IGRA ............................................. 19

CONCLUSION ............................................................................................................... 20

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Artichoke Joe's California Grand Casino v. Norton*,
  353 F.3d 712 (9th Cir. 2003) ...............................................................................................20

*Building Inspector & Zoning Officer of Aquinnah v. Wampanoag Aquinnah
  Shellfish Hatchery Corp.*, 443 Mass. 1 (2004)..........................................................................4

*California v. Cabazon Band of Mission Indians*,
  480 U.S. 202 (1987)...............................................................................................................19

*Cheyenne River Sioux Tribe v. South Dakota*,
  830 F. Supp. 523 (D.S.D.), *aff'd*, 3 F.3d 273 (8th Cir. 1993)..................................................14

*Crawford Fitting Co. v. J.T. Gibbons, Inc.*,
  482 U.S. 437 (1987)...............................................................................................................16

*Ellis v. United States*,
  313 F.3d 636 (1st Cir. 2002)....................................................................................................4

*KG Urban Enterprises, LLC v. Patrick*,
  693 F.3d 1 (1st Cir. 2012).......................................................................................................10

*Lease-It, Inc. v. Massachusetts Port Authority*,
  33 Mass. App. Ct. 391 (1992)..................................................................................................8

*Massachusetts v. Wampanoag Tribe of Gay Head*,
  No. 13-cv-13286, __ F. Supp. 3d. __, 2015 WL 854850 (D. Mass. Feb. 27,
  2015) .......................................................................................................................................4

*Michigan v. Bay Mills Indian Community*,
  134 S. Ct. 2024 (2014)...........................................................................................................19

*Narragansett Indian Tribe v. National Indian Gaming Commission*,
  158 F.3d 1335 (D.C. Cir. 1998) ...............................................................................12, 13, 16

*Passamaquoddy Tribe v. Maine*,
  75 F.3d 784 (1st Cir. 1996).....................................................................................................17

*POM Wonderful LLC v. Coca-Cola Co.*,
  134 S. Ct. 2228 (2014).......................................................................................................14, 16

*Posadas v. National Bank of New York*,
  296 U.S. 497 (1936)...............................................................................................................16

*Pullen v. Morgenthau,*
  73 F.2d 281 (2d Cir. 1934)...................................................................................17

*Saybrook Tax Exempt Investors LLC v. Lake of Torches Economic Development*
  *Corp.*, 929 F. Supp. 2d 859 (W.D. Wis. 2013), *clarified on other grounds by*
  2013 WL 3508378 (W.D. Wis. May 30, 2013) ........................................................9

*Rhode Island v. Narragansett Indian Tribe,*
  19 F.3d 685 (1st Cir. 1994).......................................................................... passim

*Traynor v. Turnage,*
  485 U.S. 535 (1988)...............................................................................15, 16, 17, 18

*United States Liability Insurance Co. v. Selman,*
  70 F.3d 684 (1st Cir. 1995).......................................................................................9

*Washington County v. Gunther,*
  452 U.S. 161 (1981)................................................................................................18

*Watt v. Alaska,*
  451 U.S. 259 (1981)................................................................................................15

*Ysleta del Sur Pueblo v. Texas,*
  36 F.3d 1325 (5th Cir. 1994) ...............................................................15, 16, 17, 20

## STATUTES AND REGULATIONS

25 U.S.C.
  § 1771d(c) ..............................................................................................................7
  § 1771d(g)..............................................................................................................6
  § 1771e(a) ............................................................................................................12
  § 1771g.......................................................................................................... passim
  §§ 2701 *et seq.* ........................................................................................14, 16, 20
  § 2701(5)........................................................................................................10, 15
  § 2702....................................................................................................................10
  § 2703(4)...............................................................................................................13
  § 2710(b)(1) ..........................................................................................................10

*An Act to Implement The Settlement of Gay Head Indian Land Claims*, Mass. Stat.
  1985, c. 277 .................................................................................................. passim

*Indian Gaming Regulatory Act*, Pub. L. 100-497, 102 Stat. 2467 ...............................17

*Wampanoag Tribal Council of Gay Head, Inc., Indian Land Claims Settlement*
  *Act of 1987*, Pub. L. 100-95, 101 Stat. 704, codified at 25 U.S.C. §§ 1771-
  1771i ...............................................................................................................2, 17

25 C.F.R.
   § 502.12................................................................................................................13

46 Fed. Reg. 50614-01 (Oct. 14, 1981) ........................................................................4

## INTRODUCTION

In 1983, the Wampanoag Tribe of Gay Head (Aquinnah) ("the Tribe"), the

Commonwealth of Massachusetts, the Town of Aquinnah, and the Aquinnah/Gay Head

Community Association, Inc. ("the AGHCA") entered into a Joint Memorandum Of

Understanding Concerning Settlement Of The Gay Head, Massachusetts Indian Land Claims (the

"Settlement Agreement").  Under the Settlement Agreement, the Tribe obtained the use of

valuable lands, in exchange for which it explicitly subjected itself to State and local authority in

connection with its use of those lands, including State and local limitations on gaming.  The

Settlement Agreement was codified and implemented in state and federal legislation, and has

formed the basis of the Tribe's land use on Martha's Vineyard for the past thirty years.  Having

reaped the benefit of this bargain for over three decades, the Tribe now seeks to avoid its

obligations under the Settlement Agreement by engaging in gaming in the Town without first

obtaining State and local approvals, despite unequivocally agreeing in 1983 that it could not

conduct gaming on those lands absent such approvals.  The Tribe's efforts to escape the

restrictions it agreed to in the Settlement Agreement should be rejected, and summary judgment

should enter in the AGHCA's favor.[1]

## BACKGROUND

In 1974, on behalf of the Tribe, the Wampanoag Tribal Council of Gay Head, Inc. ("the

Tribal Council") sued the Town in federal court, asserting aboriginal title to certain lands on

Martha's Vineyard.  *Wampanoag Tribal Council of Gay Head, Inc. v. Town of Gay Head*, No.

74-cv-5826 (D. Mass.); *see* Stipulated Facts Not in Dispute, Dkt. 107 ("Stip. Facts") at ¶ 7.  The

Commonwealth and the AGHCA (then, the Taxpayers' Association of Gay Head) intervened in

---

[1] The AGHCA also supports the reasoning and authorities set forth in the motions and
memoranda filed concurrently by the Commonwealth and the Town.

that litigation, and, in 1983, the parties entered into the Settlement Agreement.  Stip. Facts at ¶¶ 7, 10-11.  The Settlement Agreement's terms were subsequently codified in state and federal implementing legislation that referenced and incorporated the Settlement Agreement and its provisions, *An Act to Implement The Settlement of Gay Head Indian Land Claims*, Mass. Stat. 1985, c. 277 ("the State Act"); *Wampanoag Tribal Council of Gay Head, Inc., Indian Land Claims Settlement Act of 1987*, Pub. L. 100-95, codified at 25 U.S.C. §§ 1771-1771i ("the Federal Act"), and title to approximately 485 acres of public and private land was deeded to the United States to be held in trust for the benefit of the Tribe, Stip. Facts at ¶¶ 18-19.

The Settlement Agreement provides, in relevant part, that the Tribe's lands will be held "in the same manner, and subject to the same laws, as any other Massachusetts corporation," and "under no circumstances" will the "civil or criminal jurisdiction of the Commonwealth of Massachusetts, or any of its political subdivisions, over" the Tribe's lands "be impaired or otherwise altered[.]"  Settlement Agreement, Dkt. 107-2 at ¶ 3.  The Settlement Agreement also provides that "[a]ll Federal, State and Town laws shall apply to the Settlement Lands" regardless of the Tribe's future federal recognition, *id.* at ¶ 13, and that the transferred lands are subject to the Town's zoning laws as set forth in the Land Use Plan.  *Id.* at ¶¶ 5, 16.  The State and Federal implementing Acts codified these limitations, and the Federal Act expressly provides that lands in the Town are governed by the Commonwealth's and the Town's laws and regulations related to gaming.  *See* 25 U.S.C. § 1771g ("[T]he settlement lands and any other land that may now or hereafter be owned by or held in trust for any Indian tribe or entity in the town of Gay Head, Massachusetts, shall be subject to the civil and criminal laws, ordinances, and jurisdiction of the Commonwealth of Massachusetts and the town of Gay Head, Massachusetts (*including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of*

- 2 -

*chance*).” (emphasis added)); Stat. 1985, c. 277, § 4 (“All federal, state, and town laws shall

apply to the settlement lands[.]”); *id.* § 5 (“[A]ll laws, statutes and bylaws of the commonwealth,

[and] the town of Gay Head, … shall apply to all settlement lands and any other lands owned

now or at any time in the future by the Tribal council or any successor organization.”).

    Notwithstanding its clear relinquishment of any unfettered right to conduct gaming in the

Settlement Agreement, in recent years the Tribe has taken steps to conduct gaming on lands in

the Town, including through Defendant Aquinnah Wampanoag Gaming Corporation (“the

Gaming Corporation”).  On February 4, 2012, the Tribe adopted Gaming Ordinance No.

2011-01, authorizing gaming on its tribal lands generally and establishing a Tribal Gaming

Commission with the power to issue gaming licenses.  Stip. Facts at ¶ 37; Stip. Facts, Dkt.

107-16 at §§ 1.5, 1.6, 2.1, 3.1.  And on April 7, 2012, the Tribe amended Gaming Ordinance No.

2011-01 to specify that the Settlement Lands, as defined in the Settlement Agreement, are

subject to the commission’s gaming regulations.  Stip. Facts at ¶ 44; Stip. Facts, Dkt. 107-19 at

1-2; *see generally* Stip. Facts, Dkt. 107-22 at 7-40 (amended Gaming Ordinance No. 2011-01).

The Tribe also created the Gaming Corporation under tribal law to manage the operation of

commercial gaming on the Tribe’s lands.  Dkt. 100 at ¶ 50.[2]  The Tribe has consistently

articulated its intent to license, open, and operate a gaming establishment on the Settlement

Lands, but it has never obtained a license to operate a gaming establishment from the

Commonwealth, and has failed to seek or obtain Town zoning approvals to operate a gaming

establishment.  Stip. Facts at ¶ 36; *see also* Dkt. 57 at ¶ 7; Dkt. 100 at ¶ 26 (admitting that the

Tribe “inten[ds] [to] conduct[] gaming, with a plan to have a gaming facility ‘open within a

year’”); *id.* at ¶ 49.

---

[2] The Gaming Corporation is a wholly-owned entity established by the Tribe, with certain
authority explicitly delegated to it by the Tribe.  Dkt. 100 at ¶ 11.

**ARGUMENT**

I. **THE TRIBE HAS VIOLATED THE SETTLEMENT AGREEMENT BY FAILING TO COMPLY WITH STATE AND LOCAL REQUIREMENTS PRIOR TO ENGAGING IN GAMING**

A. **The Settlement Agreement Is An Enforceable Contract**

As this Court has already held, the Settlement Agreement represents a binding contract, enforceable through an action against the Tribe in this Court.  Dkt. 95 at 17, *Massachusetts v. Wampanoag Tribe of Gay Head*, No. 13-cv-13286, __ F. Supp. 3d. __, 2015 WL 854850, at *9 (D. Mass. Feb. 27, 2015) (Settlement Agreement is "both enforceable … and binding upon the Tribe").  That conclusion is now the law of this case.  *See Ellis v. United States*, 313 F.3d 636, 646 (1st Cir. 2002) ("'[A] legal decision made at one stage of a civil or criminal case constitutes the law of the case throughout the pendency of the litigation.'").  And this Court's ruling followed a parallel holding by the Supreme Judicial Court of Massachusetts, which held in 2004 that the Tribe waived its sovereign immunity as to land use in the Settlement Agreement, and was therefore subject to a zoning enforcement action relating to activities on the Tribe's lands in the Town.  *See Building Inspector & Zoning Officer of Aquinnah v. Wampanoag Aquinnah Shellfish Hatchery Corp.*, 443 Mass. 1, 13 (2004).

The substantive correctness of this finding is confirmed by the undisputed facts, which establish that:  (1) the Tribe bound itself to the terms of the Settlement Agreement through its then duly-appointed representative body (the Tribal Council), through which the Tribe carried out its affairs prior to federal recognition, including filing its land claim action in 1974 and filing for federal recognition in 1981, s*ee, e.g.*, 46 Fed. Reg. 50614-01 (Oct. 14, 1981); Stip. Facts at ¶¶ 7, 9, 11; (2) in signing the Settlement Agreement through its official representative, the Tribe promised to accept land in the future pursuant to certain conditions while acknowledging the possibility of federal recognition, and the Tribe then gained federal recognition through the

Tribal Council (the entity actually recognized by the United States as "exist[ing] as an Indian tribe within the meaning of Federal Law"), Stip. Facts, Dkt. 107-4 at 2; *see also* Stip. Facts at ¶¶ 14-16; Settlement Agreement, Dkt. 107-2 at ¶ 3; and (3) the Tribe took post-recognition actions to affirm the binding nature of the Settlement Agreement, including by succeeding to all of the Tribal Council's obligations and by accepting beneficial use of lands transferred through deeds specifying that the lands were to be held subject to the Settlement Agreement and implementing acts.  *See, e.g.*, Stip. Facts, Dkt. 107-6 at 1 (Preamble) ("All authority previously exercised by [the Tribal Council] *on behalf of the tribe* shall cease as of the effective date of this constitution and any responsibility undertaken by the [Tribal Council] *shall hereinafter be the sole responsibility of the tribe as organized pursuant to this constitution*." (emphases added)); Stip. Facts, Dkt. 107-5 at 15 (deed referencing Settlement Agreement and implementing legislation).

###### B.   The Tribe Cannot Engage In Gaming On The Lands At Issue Without First Obtaining State And Local Approval

In the Settlement Agreement, the Tribe agreed that the Commonwealth and the Town would retain jurisdiction over any lands obtained by the Tribe, and that the Tribe's use of those lands would comply with regulatory, permitting, and licensing requirements (including local zoning ordinances).  *See* Settlement Agreement, Dkt. 107-2 at ¶ 3 ("The Tribal Land Corporation shall hold the Settlement Lands, and any other land it may acquire, in the same manner, and subject to the same laws, as any other Massachusetts corporation[.]"); *id.* ("Under no circumstances … shall the civil or criminal jurisdiction of the Commonwealth of Massachusetts, or any of its political subdivisions, over the settlement lands, or any land owned by the Tribal Land Corporation in the Town of Gay Head, or the Commonwealth of Massachusetts, or any other Indian land in Gay Head, or the Commonwealth of Massachusetts, be impaired or

otherwise altered[.]"); *id.* at ¶ 5 (structures placed on the Cook lands "shall be subject to all Federal, State and local laws, including Town zoning laws[.]"); *id.* at ¶ 13 ("All Federal, State and Town laws shall apply to the Settlement Lands[.]"); *id.* at ¶ 16 ("The Settlement Lands will be subject to the Land Use Plan attached hereto and made a part hereof.").[3]

The State and Federal implementing Acts reflect these promises, using equally unequivocal language to confirm that the lands are subject to the criminal and civil jurisdiction and the laws of the Commonwealth and the Town, including those laws and regulations related to gaming. *See* 25 U.S.C. § 1771d(g) ("Any land acquired by the Wampanoag Tribal Council of Gay Head, Inc., that is located outside the town of Gay Head shall be subject to all the civil and criminal laws, ordinances, and jurisdiction of the Commonwealth of Massachusetts."); *id.* § 1771g ("[T]he settlement lands and any other land that may now or hereafter be owned by or held in trust for any Indian tribe or entity in the town of Gay Head, Massachusetts, shall be subject to the civil and criminal laws, ordinances, and jurisdiction of the Commonwealth of Massachusetts and the town of Gay Head, Massachusetts (including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance)."); Stat. 1985, c. 277, § 4 ("All federal, state, and town laws shall apply to the settlement lands[.]"); *id.* § 5 ("[A]ll laws, statutes and bylaws of the commonwealth, the town of Gay Head, and any other properly constituted legal body, shall apply to all settlement lands and any other lands owned now or at any time in the future by the Tribal council or any successor organization.").

In addition to the plain language of the Settlement Agreement, the legislative history of the Federal Act confirms that, in the Settlement Agreement, the Tribe knowingly relinquished

---

[3] The Settlement Agreement creates two exceptions to the Commonwealth's and the Town's jurisdiction and laws, not material to this litigation, relating to hunting by tribal members and taxation of real property. *See* Settlement Agreement, Dkt. 107-2 at ¶ 13(a)-(b).

any rights to engage in gaming activities unfettered by State or local regulation.  In testimony

before Congress in connection with the enactment of the Federal Act, the President of the Tribal

Council testified: "The last thing, Mr. Chairman, we recognize and accept that this bill will not

empower our tribe to conduct high-stakes gaming on the public or private settlement lands

provided for in this bill."  Ex. A at 24; *id.* at 99 ("This bill would not permit such [gaming]

activity on Gay Head. … We recognize and accept that no gaming on our lands is now or will in

the future be possible." (testimony of Gladys A. Widdiss, President, Wampanoag Tribal Council

of Gay Head, Inc.)).[4]  This testimony echoes the clear meaning of the Settlement Agreement, and

underscores the Tribe's understanding and agreement at the time that the Settlement

Agreement—and the Federal Act—restricts the Tribe's ability to game on the Settlement Lands.[5]

     Thus, the Settlement Agreement and implementing legislation make clear that the

Settlement Lands are subject to the jurisdiction, laws, and regulations of the Commonwealth and

the Town, including those concerning gaming, and that the Tribe must comply with all

applicable State and local laws before engaging in gaming on any lands it has or may acquire.[6]

### C.    The Tribe Is Seeking To Open A Gaming Establishment Without Obtaining The Requisite State And Local Approvals, In Breach Of The Settlement Agreement

     Under the Settlement Agreement and implementing legislation, the Tribe has forfeited

any sovereign right to engage in gaming activity, and must comply with all applicable State and

---

[4] Exhibit citations herein refer to Exhibits to the concurrently filed Declaration of Felicia H. Ellsworth.

[5] This was so even though, at the time of the Tribe's testimony in support of the bill, the proposed federal implementing legislation did not draw explicit attention to the Tribe's relinquishment of the right to conduct gaming on the Settlement Lands in the Settlement Agreement.  *See* Ex. A at 15.

[6] The Settlement Agreement's mandate that State and local laws apply to the Tribe's lands on Martha's Vineyard applies with equal force to both the lands obtained in connection with the Settlement Agreement and to after-acquired lands.  *See* Settlement Agreement, Dkt. 107-2 at ¶ 3; *see also* 25 U.S.C. §§ 1771d(c), 1771g; Stat. 1985, c. 277, § 5.

local laws before engaging in such activity.  Instead, in breach of these obligations, the Tribe has taken steps to open a gaming establishment within the boundaries of the Town without obtaining the requisite approvals from the Commonwealth or the Town.

In particular, the Tribe enacted a Gaming Ordinance establishing a tribal regulatory framework for operating a gaming establishment in the Town, and formed a wholly-owned entity for purposes of conducting gaming on these lands.  *See* Dkt. 100 at ¶ 50 (the Gaming Corporation "is a political subdivision of the Tribe that has been directed by the Tribal Council to conduct, pursuant to the IGRA, Class II gaming on the Tribe's lands."); Stip. Facts at ¶¶ 37-39, 44-47 (detailing history of Tribal Gaming Ordinance); *see generally* Stip. Facts, Dkt. 107-22. The Tribe has repeatedly reaffirmed its intention to open a gaming establishment in the Town. *See* Dkt. 100 at ¶ 49 ("The Tribe intends to establish a Class II gaming facility on a portion of [its lands in the Town]."); *id.* at ¶ 26 (admitting that the Tribe "inten[ds] [to] conduct[] gaming, with a plan to have a gaming facility 'open within a year'"); *see also* Dkt. 57 at ¶ 7 ("[T]he Tribe adopted a Tribal Ordinance governing the licensing and operation of a gaming establishment, and [] the Tribe intends to open a gaming establishment in compliance with that Ordinance[.]"). Yet the Tribe does not now hold a license to operate a gaming establishment pursuant to State law, nor has the Tribe sought or obtained Town zoning approvals for its proposed gaming facility.  *See* Stip. Facts at ¶ 36.

These steps by the Tribe to open and operate a gaming facility in the Town without first obtaining the necessary State and local licenses and approvals breach the Settlement Agreement, represent an ongoing harm to the interests of the AGHCA, and directly imperil the AGHCA's contractually bargained-for rights.  *See Lease-It, Inc. v. Massachusetts Port Auth.*, 33 Mass. App.

Ct. 391, 396 (1992) ("A material breach of an agreement occurs when there is a breach of 'an essential and inducing feature of the contract[].'").

## II.   THE INDIAN GAMING REGULATORY ACT DOES NOT SUPERSEDE THE SETTLEMENT AGREEMENT OR IMPLEMENTING LEGISLATION

The Tribe does not meaningfully contest that the Settlement Agreement and implementing legislation contain express limitations on its ability to conduct Class II gaming in the Town.  Instead, the Tribe suggests that the Indian Gaming Regulatory Act ("IGRA") absolves the Tribe of its responsibility to comply with State and local law prior to engaging in gaming.  *See, e.g.*, Dkt. 87 at 6; Dkt. 71 at 3; Dkt. 62 at 5.  Where, as here, the Tribe relies on IGRA to avoid its contractual obligations under the Settlement Agreement, it bears the burden of proving that IGRA not only applies in this context, but also that IGRA excuses the breach of contract.  *See Saybrook Tax Exempt Investors LLC v. Lake of Torches Econ. Dev. Corp.*, 929 F. Supp. 2d 859, 862-863 (W.D. Wis. 2013) ("[R]ebutting IGRA is not part of the cause of action [for breach of contract] itself. … [I]t is by now well-settled federal law that contract invalidity is a defense, and that the defeat of potential invalidity defenses is not an element of an affirmative claim."), *clarified on other grounds by*, 2013 WL 3508378 (W.D. Wis. May 30, 2013); *see also U.S. Liability Ins. Co. v. Selman*, 70 F.3d 684, 691 (1st Cir. 1995) ("usual rule" is "to place the burden of proving affirmative defenses on the party asserting them").  IGRA does not absolve the Tribe of its obligation under the Settlement Agreement and implementing acts to obtain State and local approvals in order to conduct gaming for two independent reasons.  First, the Tribe cannot carry its burden of showing that IGRA is applicable to the Settlement Lands.  Second, the Tribe cannot meet its burden of showing that IGRA repealed the Federal Act's express gaming limitations.

## A.      IGRA Does Not Apply To The Lands At Issue

IGRA was intended to promote tribal economic development while shielding tribal gaming from organized crime through the establishment of an "independent Federal regulatory authority for gaming on Indian lands."  *See* 25 U.S.C. § 2702(1)-(3).  Under IGRA, "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity."  *Id.* § 2701(5).  But this right does not extend to every tribe and all lands with a tribal link.  Rather, IGRA "make[s] clear that tribal gaming may only be conducted by an 'Indian tribe' on 'Indian lands,' as both terms are defined in the IGRA."  *KG Urban Enters., LLC v. Patrick*, 693 F.3d 1, 8 (1st Cir. 2012).  Moreover, IGRA specifies that a tribe that seeks to conduct Class II gaming, as the Tribe does here, may only do so "on Indian lands *within such tribe's jurisdiction*."  25 U.S.C. § 2710(b)(1) (emphasis added).

Thus, the Tribe must show that IGRA is applicable to the lands at issue by establishing that:  (1) the Tribe exercises sufficient "jurisdiction" over these lands; and (2) the lands qualify as "Indian lands" as defined in IGRA.  *See, e.g.*, *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 700-701 (1st Cir. 1994) ("*Narragansett I*") (explaining IGRA's "dual limitations," which cabin its "key provisions" so they apply only where "Indian Tribes" have "jurisdiction" over "Indian lands").  The Tribe cannot carry this burden.

### 1.      The Tribe cannot show sufficient jurisdiction over the lands in question to trigger the application of IGRA

The Tribe's authority over the Settlement Lands is controlled by the Settlement Agreement and the implementing legislation.  And the Settlement Agreement and implementing legislation provide a detailed, comprehensive framework specifying the division of jurisdiction

between the Tribe on the one hand and the Commonwealth and the Town on the other.  The

Settlement Agreement and implementing legislation confirm that:  (1) subject to two non-

material exceptions, the Commonwealth and the Town retain exclusive civil regulatory and

criminal jurisdiction over the Tribe's lands and all State and Town laws apply to these lands; and

(2) the Tribe's jurisdiction is correspondingly limited.

      The Settlement Agreement establishes that the "civil and criminal jurisdiction" that the

Commonwealth and the Town exercised before the transfer of lands to be held in trust for the

Tribe would continue post-transfer; that "[a]ll Federal, State and Town laws shall apply to the

Settlement Lands"; and that the only limitations on this jurisdiction and the application of these

laws would be that the lands are not subject to property taxation and that the Tribe has the

authority to establish regulations as to certain hunting by "Indians."  Settlement Agreement, Dkt.

107-2 at ¶¶ 3, 13; *see also* 25 U.S.C. § 1771g ("Except as otherwise expressly provided in this

subchapter or in the State Implementing Act, the settlement lands and any other land that may

now or hereafter be owned by or held in trust for any Indian tribe or entity in the Town of Gay

Head, Massachusetts, shall be subject to the civil and criminal laws, ordinances, and jurisdiction

of the Commonwealth of Massachusetts and the town of Gay Head, Massachusetts (including

those laws and regulations which prohibit or regulate the conduct of bingo or any other game of

chance)."); Stat. 1985, c. 277, §§ 4(a)-(b), 5.

      As to the Tribe's jurisdiction, the Settlement Agreement makes plain that the Tribe does

not exercise full sovereign authority, but rather "hold[s] the Settlement Lands, and any other land

it may acquire, in the same manner, and subject to the same laws, as any other Massachusetts

corporation[.]"  Settlement Agreement, Dkt. 107-2 at ¶ 3; *see also id.* at ¶ 11.  Reflecting this, the

Federal Act includes a specific provision setting out a "Limitation on Indian jurisdiction," which

provides that "[the Tribe] shall not have any jurisdiction over nontribal members and shall not exercise any jurisdiction over any part of the settlement lands in contravention of this subchapter, the civil regulatory and criminal laws of the Commonwealth of Massachusetts, [and] the town of Gay Head, Massachusetts[.]"  25 U.S.C. § 1771e(a).[7]

These provisions are an insurmountable hurdle to the Tribe's ability to show jurisdiction sufficient to trigger IGRA.  The broad grant of jurisdictional authority to the Commonwealth and the Town, combined with the express limitation on the Tribe's jurisdictional authority, demonstrate that the Tribe does not have full concurrent jurisdiction with the Commonwealth and the Town.  *See Narragansett Indian Tribe v. National Indian Gaming Comm'n*, 158 F.3d 1335, 1341 (D.C. Cir. 1998) ("*Narragansett II*") (discussing the division of authority between the Tribe and the Commonwealth in the Federal Act and explaining that the Federal Act "specifically provide[s] for *exclusive* state control over gambling" (emphasis added)).  To the contrary, these provisions establish that the Commonwealth and the Town have exclusive jurisdiction over non-tribal members and over all activities and uses of lands within the Town, and most pertinently, exclusive jurisdiction and authority to regulate gaming on lands in the Town, to the exclusion of the Tribe.  *See* 25 U.S.C. § 1771e(a); *id.* § 1771g ("[T]he settlement lands … shall be subject to the civil and criminal laws, ordinances, and jurisdiction of the Commonwealth of Massachusetts and the town of Gay Head, Massachusetts (*including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance*)." (emphasis added)); *Narragansett II*, 158 F.3d at 1341.[7]

---

[7] This conclusion was readily apparent to, and contemporaneously acknowledged by, the Tribe. *See* Ex. A at 99 (testifying that the Tribe lacks "necessary civil regulatory control" over trust lands to conduct gaming).

Indeed, the jurisdictional framework here is exactly the arrangement that the First Circuit sought, but found lacking, in *Narragansett I*.  There the First Circuit addressed a similar settlement agreement and act between the Narragansett tribe and state and local authorities in Rhode Island.  The Rhode Island settlement agreement and act, however, awarded jurisdiction to Rhode Island, but included no corresponding limitation on tribal jurisdiction, much less an explicit limit on tribal authority over gaming.  *Narragansett I*, 19 F.3d at 694, 702.  In reviewing the Rhode Island settlement agreement and act, the *Narragansett I* court explained that the jurisdictional analysis begins with the tribe's otherwise inherent powers and jurisdiction over the lands at issue (whatever their scope), looks for any diminution or defeasance of this jurisdiction, and then weighs whether the remaining jurisdiction is "substantial enough" to trigger IGRA.  *Id.* at 701.  Here the Tribe's jurisdiction over the lands at issue in the Town has been highly circumscribed (using language specifically cited by the First Circuit in *Narragansett I* as limiting tribal jurisdiction), including with an express limitation on the Tribe's jurisdictional authority relating to gaming in the Town.  *See id.* at 702; *see also* 25 U.S.C. §§ 1771e(a), 1771g.  Therefore, under the analytical framework established by *Narragansett I*, the Tribe cannot show that its jurisdictional authority "is substantial enough to satisfy [IGRA's] 'having jurisdiction' prong[.]"  *Narragansett I*, 19 F.3d at 701; *see also Narragansett II*, 158 F.3d at 1341.

### 2.    The Tribe cannot show that the lands at issue qualify as "Indian lands" as defined in IGRA

In addition to having sufficient jurisdiction, "a tribe must exercise governmental power in order to trigger [IGRA]," *Narragansett I*, 19 F.3d at 702-703, because only trust lands over which an Indian Tribe "exercises governmental power" may qualify as "Indian lands" pursuant to IGRA, 25 U.S.C. § 2703(4); 25 C.F.R. § 502.12.  As the First Circuit has explained, "[m]eeting this requirement does not depend upon the Tribe's theoretical authority, but upon the

presence of concrete manifestations of that authority," as informed by the jurisdictional history

of the lands.  *Narragansett I*, 19 F.3d at 703.

The Tribe cannot demonstrate sufficient "concrete manifestations" of "governmental

power" over the lands at issue to meet its burden.  The Tribe's jurisdiction over lands in the

Town is in fact quite limited, including no ability to exercise any jurisdiction over non-tribal

members, and no ability to exercise jurisdiction in contravention of State or Town law (other

than over certain types of hunting by "Indians" and the collection of property taxes).  *See supra*

Section II.A.1.  Given this highly circumscribed jurisdiction, even if the Tribe were exercising

the full extent of its available jurisdictional authority, it could not demonstrate "concrete

manifestations" of "governmental power"—i.e., the provision of law enforcement or other

traditional governmental services—sufficient to trigger IGRA.  *See Cheyenne River Sioux Tribe

v. South Dakota*, 830 F. Supp. 523, 528 (D.S.D.) (listing criteria pertinent to "governmental

power" analysis, including "whether law enforcement on the lands in question is provided by the

Tribe or the State"), *aff'd*, 3 F.3d 273 (8th Cir. 1993).

> **B.      Even If IGRA Did Apply To The Lands At Issue, The Tribe Cannot Show
>             That IGRA Impliedly Repealed The Federal Act's Gaming Limitations**

Even if IGRA were to apply to the Settlement Lands (which it does not), the Tribe would

still have to show that IGRA repealed, either explicitly or by implication, the Federal Act's

gaming-related provisions.  The Tribe cannot make such a showing.  IGRA contains no explicit

repeal of the Federal Act.  *See* 25 U.S.C. §§ 2701 *et seq.*  And in the absence of a clear

congressional command, this Court must give effect to both statutes so long as they are not in

"irreconcilable conflict."  *See, e.g.*, *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228,

2238 (2014) ("When two statutes complement each other, it would show disregard for the

congressional design to hold that Congress nonetheless intended one federal statute to preclude

the operation of the other."); *Watt v. Alaska*, 451 U.S. 259, 267 (1981) ("We must read the statutes to give effect to each if we can do so while preserving their sense and purpose.").

IGRA plainly did not effect an implied repeal of the Federal Act because (1) IGRA and the Federal Act are not in irreconcilable conflict; (2) even if they were, the Federal Act regulates gaming as to a specific tribe, whereas IGRA regulates gaming related to tribes generally, and thus the Federal Act is the more specific act and controls; (3) the statutory histories of the Federal Act and IGRA make clear that Congress did not intend IGRA to supersede the Federal Act; and (4) the purposes underlying IGRA do not support finding implied repeal.

**1.      IGRA's plain language permits both acts to coexist**

IGRA's plain terms permit IGRA and the Federal Act to be given full effect. *See, e.g.*, *Traynor v. Turnage*, 485 U.S. 535, 548 (1988).  Although IGRA permits tribes to regulate gaming activity on lands that qualify as "Indian lands," that legislative grant is not unbounded. *See* 25 U.S.C. § 2701(5).  Instead, Congress specifically conferred that authority only where "the gaming activity is not specifically prohibited by Federal law."  *Id.*  Thus, Congress allowed for preexisting federal laws pertaining to gaming to continue in force even in light of IGRA.  *See id.*; *Ysleta del Sur Pueblo v. Texas*, 36 F.3d 1325, 1335 (5th Cir. 1994) ("Congress, when enacting IGRA … explicitly stated in two separate provisions of IGRA that IGRA should be considered in light of other federal law.").  And at the time of IGRA's enactment, the Settlement Agreement, as codified by and incorporated in the Federal Act, was extant federal law that prohibited gaming on the Tribe's lands in the Town unless the Tribe complied with State and local requirements. *See* 25 U.S.C. § 1771g.  There is no irreconcilable conflict between the Federal Act and IGRA: the Tribe has the authority to regulate gaming on "Indian lands" under IGRA, but the Tribe may not avail itself of IGRA's provisions on its lands on Martha's Vineyard because "Federal law" "specifically prohibit[s]" it from conducting gaming on those lands absent State and local

approval.  Each statute can be given full effect, and thus the disfavored remedy of implied repeal

is unwarranted and unnecessary.  *See, e.g.*, *Traynor*, 485 U.S. at 548 ("'The courts are not at

liberty to pick and choose among congressional enactments, and when two statutes are capable

of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to

the contrary, to regard each as effective.'"); *Posadas v. National City Bank of N.Y.*, 296 U.S.

497, 503 (1936) ("[R]epeals by implication are not favored.").

> **2.    Even if there were a conflict between IGRA and the Federal Act, the
> more specific Federal Act would control**

To the extent the Court were to find some conflict between IGRA and the Federal Act,

the Federal Act controls.  "'[W]here there is no *clear* intention otherwise, a specific statute will

not be controlled or nullified by a general one, regardless of the priority of enactment.'"

*Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987); *see also Ysleta*, 36 F.3d at

1335.  The Federal Act explicitly addresses gaming by the Tribe in the Town, whereas IGRA

addresses gaming involving all tribes across the country.[8]  And IGRA contains no express clause

repealing conflicting federal laws, nor does it contain any express language repealing the Federal

Act.  *Ysleta*, 36 F.3d at 1335; *see also* 25 U.S.C. §§ 2701 *et seq.*; *POM Wonderful*, 134 S. Ct. at

2237 (noting, in concluding that the FDCA did not bar Lanham Act claim, that neither act

contained direct language that "forbids or limits Lanham Act claims challenging labels that are

---

[8] The Federal Act's gaming-specific language distinguishes it from the settlement act considered
in *Narragansett I*, which had no such language.  *Compare* 19 F.3d at 694, 700-705  (analyzing
25 U.S.C. § 1708, which provides that "the settlement lands shall be subject to the civil and
criminal laws and jurisdiction of the State of Rhode Island"), *with* 25 U.S.C. § 1771g (providing
that Tribe's lands "in the town of Gay Head, Massachusetts, shall be subject to the civil and
criminal laws, ordinances, and jurisdiction of the Commonwealth of Massachusetts and the town
of Gay Head, Massachusetts (*including those laws and regulations which prohibit or regulate
the conduct of bingo or any other game of chance*)" (emphasis added)).  Indeed, as the D.C.
Circuit emphasized, the Federal Act is different from other legislation relating to land claim
settlements because it "specifically provide[s] for *exclusive* state control over gambling."
(emphasis added)).  *Narragansett II*, 158 F.3d at 1341.

regulated by the FDCA").  Accordingly, because there is no indication that Congress intended to repeal any portion of the Federal Act, the more specific Federal Act controls for purposes of analyzing the Tribe's ability to game on the lands at issue.  *See Ysleta*, 36 F.3d at 1335 (explaining that the Restoration Act, which applied to two Indian tribes in a particular state, was specific, whereas IGRA was general; holding "that the Restoration Act survives today" and "that it—and not IGRA—would govern the determination of whether gaming activities … are allowed under Texas law …").

### 3.    Congress did not intend IGRA to impliedly repeal the Federal Act

The statutory history of IGRA and the Federal Act also confirm that Congress did not intend to impliedly repeal the Federal Act through IGRA.  Both acts were enacted by the same Congress, and, after Congress introduced the bill that would ultimately be enacted as IGRA, it specifically added language to the Federal Act to address gaming, providing further evidence that Congress did not intend IGRA to repeal by implication the Federal Act's restrictions on the Tribe's ability to game.

The principle that Congress "does not legislate in a vacuum," *Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 789 (1st Cir. 1996); *see also Traynor*, 485 U.S. at 546, is especially applicable here, where Congress simultaneously considered the Federal Act and IGRA, and enacted the two only fourteen months apart.[9]  Absent an affirmative indication of congressional intent, it strains logic to conclude that the same Congress meant, through enactment of a later act, to eviscerate the language of an act that it had passed just months before, especially when the two acts were travelling through Congress simultaneously.  *See Pullen v. Morgenthau*, 73 F.2d 281, 283 (2d Cir. 1934) ("Where both laws are passed at the same session, the presumption

---

[9] The Federal Act was enacted on August 18, 1987, *see* Pub. L. 100-95, 101 Stat. 709, and IGRA was enacted on October 17, 1988, *see* Pub. L. 100-497, 102 Stat. 2467.

against implied repeal is all the stronger."); *see also Traynor*, 485 U.S. at 547-551 (absent affirmative congressional intent that later act repealed or amended earlier one passed by same Congress, later act effected no repeal and both should be read harmoniously); *Washington Cnty. v. Gunther*, 452 U.S. 161, 188 (1981) ("It defies common sense to believe that the same Congress … intended *sub silentio* … to abandon the limitations of the equal work approach just one year later, when it enacted Title VII." (Rehnquist, J., dissenting)).[10]

Likewise, the drafting history of IGRA and the Federal Act demonstrates that, soon after the bill that became IGRA was introduced, the Federal Act was amended to include gaming specific language mirroring language from the IGRA bill, further confirming that Congress did not intend IGRA to repeal the gaming-related provisions of the Federal Act.

Senate Bill 555 ("S. 555")—the bill which ultimately became IGRA—was introduced in the Senate on February 19, 1987.  *See* Ex. B at 1.  Approximately four months later, on June 30, 1987, House Bill 2855 ("H.R. 2855")—the bill which ultimately became the Federal Act—was introduced in the House of Representatives.  *See* Ex. C at 1.[11]  H.R. 2855 represents the first time that Congress included express gaming-focused language in the text of the Federal Act. *Compare* Ex. C at § 9 ("Except as otherwise expressly provided in this Act or in the State Implementing Act, the settlement lands and any other land that may now or hereafter be owned by or held in trust for any Indian tribe or entity in the town of Gay Head, Massachusetts, shall be subject to the civil and criminal laws, ordinances, and jurisdiction of the Commonwealth of Massachusetts and the town of Gay Head, Massachusetts (*including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance*)" (emphasis

---

[10] The contemporaneous nature of the Federal Act and IGRA further differentiate the Federal Act from the settlement act analyzed in *Narragansett I*, which was enacted a decade before IGRA.  *See* 19 F.3d at 689, 694.

[11] An identical bill was introduced in the Senate on June 30, 1987.  *See* Ex. D.

added)), *with* Ex. E at § 109 (identical but for the absence of "including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance").  And not only did this inclusion occur just after the introduction of the bill that became IGRA, but the gaming language parallels the language Congress used in IGRA:  S. 555, in defining Class II gaming, used the terms "games of chance commonly known as bingo or lotto" (Ex. B at § 4(8)), and H.R. 2855 paralleled this language, stating that the Tribe's lands would be subject to the laws, ordinances, and jurisdiction of the Commonwealth and the Town including those related to "bingo or any other game of chance."  Ex. C at § 9.

This reference to gaming in the Federal Act in the same terms used in IGRA, immediately after the introduction of the bill that became IGRA, signals that Congress considered the Federal Act's gaming-related limits with full understanding of the then-draft IGRA bill, and that the Federal Act's specific gaming provisions control the Tribe's ability to game on lands in the Town, and are not superseded by IGRA's more broadly applicable provisions.

**4.      Refusing to find an implied repeal of the Federal Act is consistent with the purposes behind IGRA**

A review of the context in which IGRA was passed further clarifies that IGRA was not intended to sweep away existing, specific federal legislation (like the Federal Act) relating to the ability of a specific tribe to conduct gaming on specific lands.  Congress adopted IGRA in response to *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 221-222 (1987), which held that States lacked regulatory authority over gaming on Indian lands, but left intact States' regulatory power over tribal gaming outside Indian territory.  *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2034 (2014).  IGRA did not sweep away existing statutory limitations on Indian tribes, but rather "devised a method to give back some of the regulatory

authority that the Supreme Court had held inapplicable to Indian lands in *Cabazon.*" *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 721 (9th Cir. 2003).  Given that IGRA was intended to provide a regulatory balance at the *state level* where the Supreme Court had swept one away—conferring no new jurisdiction, but permitting new uses of existing jurisdiction—and that IGRA contains no language expressly repealing prior, specific federal legislation governing tribal lands, *Ysleta*, 36 F.3d at 1335; *see also* 25 U.S.C. §§ 2701 *et seq.*, it follows that IGRA did not impliedly repeal pre-existing federal statutory authority as to specific issues of tribal gaming jurisdiction and effected no implied repeal of the Federal Act's gaming-related provisions.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of the AGHCA.

AQUINNAH/GAY HEAD COMMUNITY
ASSOCIATION, INC.

By its attorneys,

May 28, 2015     /s/ Felicia H. Ellsworth
Felicia H. Ellsworth (BBO# 665232)
Oramel H. Skinner (BBO# 680198)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000
Felicia.Ellsworth@wilmerhale.com
Oramel.Skinner@wilmerhale.com

James L. Quarles III (BBO# 408520)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 663-6000
James.Quarles@wilmerhale.com

- 20 -

**CERTIFICATE OF SERVICE**

In accordance with Local Rule 5.2(b), I hereby certify that this document filed through the ECF system on May 28, 2015, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

 /s/ Felicia H. Ellsworth
Felicia H. Ellsworth