UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 1:13-CV-13286-FDS

|  |  |
|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS, <br><br> Plaintiff, <br><br> and <br><br> AQUINNAH/GAY HEAD COMMUNITY ASSOCIATION, INC. (AGHCA) and TOWN OF AQUINNAH, <br><br> Intervenor-Plaintiffs, <br><br> vs. <br><br> THE WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH), THE WAMPANOAG TRIBAL COUNCIL OF GAY HEAD, INC., and THE AQUINNAH WAMPANOAG GAMING CORPORATION, <br><br> Defendants/Counterclaim-Plaintiffs <br><br> and <br><br> DEVAL PATRICK, in his official capacity as GOVERNOR, COMMONWEALTH OF OF MASSACHUSETTS, <br><br> Defendants. | **THE TOWN OF AQUINNAH'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR A PRELIMINARY INJUNCTION** |

The Town of Aquinnah (the "Town") submits this memorandum in support of its motion for a temporary restraining order and/or a preliminary injunction against the defendants Wampanoag Tribe of Gay Head (Aquinnah), the Wampanoag Tribal Council of Gay Head, Inc., and the Aquinnah Wampanoag Gaming Corporation (collectively, the "Tribe"), which have decided to proceed with constructing a gambling and gaming facility in the Town, notwithstanding this litigation and the impending argument on the parties' cross motions for summary judgment.

I.   INTRODUCTION

This Court described the background to the present dispute in its Memoranda and Orders issued on February 27, 2015 (in connection with rulings on various motions to dismiss), and on July 1, 2014 (in connection with Plaintiff's Motion to Remand).[1] All of the parties to this action have worked cooperatively to agree on stipulated facts and a briefing schedule, and all parties have filed cross motions for summary judgment, which are presently scheduled for argument on August 12, 2015.  Despite the fact that the legal issues regarding the Tribe's right to conduct gaming, or to operate a casino in Aquinnah (and

---

[1]     The Supreme Judicial Court of Massachusetts ("SJC"), in Building Inspector and Zoning Officer of Aquinnah v. Wampanoag Aquinnah Shellfish Hatchery Corp., Inc.,443 Mass. 1 (2004)(the "Shellfish Hatchery" case), also provides background on the historical relationship between the Tribe and the Town and, more specifically, their disputes concerning land use and local permitting on Tribal lands.

elsewhere), are framed and ripe for resolution by this Court, the Tribe recently disclosed, during a deposition of the Tribal Chairman Tobias Vanderhoop on July 1, 2015,[2] that it would be commencing construction on July 6, 2015, to convert a 6,500 square foot, partially completed community center located on Tribal lands – commonly known as the Wampanoag Community Center ("WCC") – to an operative casino.  Mr. Vanderhoop also testified that the Tribe would not seek Town permits and would not allow Town inspections of the project.  Mr. Vanderhoop's July 1 statement was the first time that the Tribe had notified the other parties to this action that construction of a casino was proceeding forward notwithstanding this pending litigation.[3]

II.  FACTS

In connection with the submission of a statement of undisputed facts, the parties agreed to preserve their rights to develop additional facts for use in the next round of briefing on the cross motions for summary judgment, which is due on July 23, 2015.  (Mr. Vanderhoop's deposition on July 1, 2015, was scheduled for that purpose.)  As noted, Mr. Vanderhoop testified that the partially completed WCC, which both the Town and the Martha's Vineyard Commission ("MVC"), a regional planning body,

---

[2]    The Tribe also announced its plans in an online advertisement appearing the same day in *The Vineyard Gazette*.

[3]    A copy of Mr. Vanderhoop's deposition is submitted as Exhibit "A" hereto.

3

had permitted and approved for use as a community center eight years ago, would be renovated and "re-purposed" to serve as the Tribe's commercial casino.

A.   Permitting History for the WCC.

1.   The Tribe began constructing the WCC without Town permits in approximately 2003.   The Tribe at that time refused to seek Town permits for that construction – despite the pendency of the Shellfish Hatchery case in the SJC.   Following the 2004 decision in Shellfish Hatchery, a lengthy negotiation produced a protocol between the Town and the Tribe for permitting, which the parties memorialized in an agreement entitled "Intergovernmental Agreement on Cooperative Land Use between the Tribe and the Town" ("Agreement"), and which the parties executed in 2007.   (A copy of this Agreement is submitted in conjunction with the Town's papers as Exhibit "B".)

2.   The purpose of the Agreement, according to Mr. Vanderhoop's deposition testimony, was to resolve the jurisdictional dispute between the Town and the Tribe over permitting for the WCC.   (Vanderhoop Dep. at 68-69, 198). Pursuant to that Agreement, the Tribe agreed to seek building permits from the Town and the MVC.

3.   On or about April 27, 2007, the Tribe submitted a permit application to the Town building inspector, Jerry Wiener, to build the approximately 6,500 square-foot WCC.   The Tribe's

4

plan (as explicitly stated in its application materials) was to construct a building for community and recreational use, outfitted with a gymnasium, a stage, locker rooms, and a kitchen.

4.   The building inspector referred the Tribe's permit application to the MVC as what is known as a "Development of Regional Impact ("DRI")" on or about June 12, 2007.  The MVC is an Island-wide planning body, created by a special act of the Massachusetts legislature (St. 1977, c. 831, as amended).  The MVC issues standards and criteria to be used to designate what development projects constitute DRIs on Martha's Vineyard.  The DRI criteria are reviewed and approved by the Massachusetts Secretary of Energy and Environmental Affairs.  DRIs are development projects that are of sufficient magnitude as to require MVC review under its statutory mandate:

> "to protect the health, safety, and general welfare of island residents and visitors by preserving and conserving for the enjoyment of present and future generations the unique natural, historical, ecological and cultural values of Martha's Vineyard which contribute to public enjoyment, inspiration and scientific study, by protecting these values from development and uses which would impair them, and by promoting the enhancement of local economies."

St. 1977, c. 831, § 1.

5.   The MVC conducted a series of public hearings on the WCC referral, and on December 13, 2007, issued a decision approving the WCC as a DRI, with conditions.  Among the

conditions was the requirement that the Tribe "apply to the
appropriate Aquinnah offices and boards, for any local
development permits which may be required by law."  The MVC also
conditioned the project as follows:

> "Should the [Tribe] substantially alter the use of the
> premises from the proposed uses, it shall return to the
> Martha's Vineyard Commission to request approval of said
> alterations."

6.    In 2011 and 2012, the Town issued a building permit,
and an amended building permit, for the repair, alteration and
building of the WCC.  The purpose of the building, as stated on
the Tribe's application for its permits, and as denoted on the
building permits themselves, was, again, for a community center.
The Tribe did not return to the MVC.  Both the Town permits and
the MVC decision limited the use of the WCC to a community
center, which is a permitted use under the Town's zoning (as in
effect in 1983 per the Settlement Agreement).

7.    Accordingly, the conditions imposed by the MVC and by
the Town on the building permit remain valid and effective.

8.    After the Tribe had obtained the Town and MVC permits
noted above – and after the commencement of this litigation –
the Tribe exercised its right to terminate the Agreement (as to

land use permitting) with the Town by letter dated February 11, 2013.[4]

9.    The Town and the Tribe are currently cooperating under what is known as the "Operational Plan (amended November 3, 2011)" on the provision of emergency services.  (A copy of which is submitted as Exhibit "C").  This Operational Plan, which remains in effect (Vanderhoop Dep. at 201-202 and 204, 205), provides that:

> "(i) The Tribe shall utilize permit and inspection services as governed by the Town Building Inspector's Office in new construction and renovation projects that would generally require a building permit under applicable Law. . . . [5]; and
>
> (ii) Building Inspectors are granted the power to enforce applicable laws and codes on Tribal Lands."[6]

10.    On July 1, 2015, Mr. Vanderhoop (who is also a member of the Tribal Gaming Corporation) stated in his deposition that the building permits issued by the Town for the WCC are no longer valid because the Tribe has transferred control of the

---

[4]    There is nothing in the 2007 Agreement which provides that, notwithstanding the 2013 termination of the Agreement, the conditions imposed by these permits issued during the time that the agreement was in effect do not remain valid and enforceable.  By accepting conditions of the permits, the Tribe agreed to be bound by the conditions, and those conditions have continued viability.

[5]    "Building Inspectors" are defined in the Operational Plan as "Town personnel responsible for preliminary, interim, and final inspections during construction and renovation of a structure." (Emphasis added.)

[6]    During the deposition Mr. Vanderhoop offered his view that this provision does not apply to gaming projects, but acknowledged that the Agreement draws no such distinction.  (Vanderhoop Dep. at 205.)

building to the Tribal Gaming Corporation and has "repurposed"
its use from a community center to a casino. (Vanderhoop Dep. at
70, 76.)  He further testified that the Tribe neither notified
the Town about this change of use nor sought new or amended
permits to reflect physical changes to the building to
accommodate a casino.  Mr. Vanderhoop testified that the Tribe
would not permit Town inspections and that the type of
commercial gaming which would be conducted on the premises was
permitted by the Indian Regulatory Gaming Act ("IGRA") and is to
be "electronic bingo, or, as referred to, Class 2 gaming
activities."  (Vanderhoop Dep. at 185.)

    11.  Mr. Vanderhoop further testified that the Tribe had
retained a contractor and an architect, although no
architectural plans or construction drawings have been submitted
to the Town.  He also acknowledged that, at this point, the
Tribe does not have its own building inspector or board of
health agent. (Vanderhoop Dep. at 219-220.)

    12.  Mr. Vanderhoop testified that work on the casino
building was to commence on July 6, 2015 and that no building
permits would be sought from the Town.  (Vanderhoop Dep. at
187.)

    13.  On July 6, 2015, the Town's Assistant Building
Inspector, Leonard Jason, Jr., issued a cease and desist order,
a copy of which is attached to his affidavit.  (Mr. Jason's

Affidavit is Exhibit "D".)  The Tribe has replied that they do not intend to comply with the order.  (A copy of the response is submitted as Exhibit "E".)

14.   The Tribe's response raises essentially four arguments.  First, that IGRA supersedes the need for the Tribe to procure Town permits.[7]  (The issue is, of course, the precise question before the Court on the cross motions for summary judgment.)  Second, that letter rulings from the National Indian Gaming Commission (NIGC), which essentially conclude that the Tribe may conduct gaming on its lands under IGRA, are controlling.  This Court has already stated in its July 1, 2014, Memorandum and Order and Plaintiff's Motion to Remand "[t]hat agency action likely will not be entitled to deference."  (Id. at 7, ¶ 6).  Third, the Tribe asserts that it wishes to discuss with Town officials steps that the "Tribe is taking steps to ensure that building improvements are in compliance with appropriate building codes. . . ."[8]  (Emphasis added.)  Finally,

---

[7]    The Town observes that the Tribe's recent actions and its response to the Town's cease and desist letter suggest an expanded view of the authority granted to it under IGRA.  Not only does the Tribe suggest that IGRA allows it to conduct gaming on a commercial level, but also that IGRA exempts it from all State and local health and safety laws and regulations.

[8]    However, it bears noting that the still binding Operational Plan provides that the Town, not the Tribe, is responsible for the issuance of building permits and conducting inspections.  Further, the Town has a statutory right, as well as and the right under Town zoning, to issue permits and to undertake inspections.

the Tribe argues that the Town should have sought injunctive relief when it was allowed to intervene in the case.[9]

15.    The use of the community center building as a casino, or for bingo, gambling, or games of chance, or for any commercial use, violates Town zoning[10], as Mr. Jason avers.

B.    Recent Statements by Tribal Representatives Confirm the Imminence of the Gaming Facility.

16.    Both the Chairman of the Tribe, Tobias J. Vanderhoop, and the Chair of the Aquinnah Wampanoag Gaming Corporation ("Gaming Corporation"), Cheryl Andrews-Maltais, recently stated that the Tribe intends to have the community center building open as a casino by the end of this year and hopefully sooner.

17.    Chair Andrews-Maltais stated that the Gaming Corporation intends to the casino open this fall.

18.    An advertisement appeared in the Vineyard Gazette on July 1, 2015, which sought licensed electricians for a "10+ week commercial Aquinnah Casino project starting July 6."

---

[9]    Since both the Operational Plan was in effect at that time and remains in effect today, and since the Tribe had not announced that it was proceeding with the WCC-casino conversion until now, there was no reason for the Town to seek temporary injunctive relief earlier.  The Town reasonably assumed that the Tribe was going to allow the Court to issue declarations as to the parties' rights and obligations before proceeding forward.

[10]    Not only does the Tribe's decision to proceed with conversion of the WCC to a commercial casino without permits and without Town inspections violate zoning, the use itself is prohibited on the parcel at issue under the 1983 Zoning By-law.

19.   Chairman Vanderhoop likewise confirmed at his deposition that the Tribe and the Gaming Corporation have recently taken steps to convert the community center building into a casino by this fall.  These include:  notifying the U.S. Housing and Urban Development Department in the past two weeks that the Tribe has changed the use of the community center building to that of a casino; transferring control of the community center building to the Gaming Corporation; hiring a project manager and general manager for the casino project; hiring Aquinnah Associates to perform the construction necessary to convert the community center into the casino; and confirming that Aquinnah Associates has employed Michael D'Amato as the general contractor for the project.

20.   Chair Andrews-Maltais likewise recently confirmed that Aquinnah Associates had been retained and that Aquinnah Associates has a relationship with D'Amato Builders and Advisors.

III. ARGUMENT

A. Standard for Temporary Restraining Order/Preliminary Injunctive Relief.

As a general matter, the purpose of a preliminary relief "is merely to preserve the relative positions of the parties until the trial on the merits can be held."  University of Tex.

v. Camenisch, 451 U.S. 390, 395 (1981).  As the First Circuit

has stated:

> "The court's interim injunctive decree attempts to prevent
> further injury by maintaining the status quo, cf.
> Narragannsett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1ˢᵗ
> Cir. 1991)(listing the "potential for irreparable injury"
> as a standard prerequisite for the granting of a
> preliminary injunction), thus enhancing the court's
> ability, if it ultimately finds for the movant, to minimize
> the harmful effects of the defendant's wrongful conduct."

CMM Cable REP., Inc. v. Ocean Coast Properties, Inc., 48 F.3d

618, 620 (1ˢᵗ Cir. 1995).

To obtain a preliminary injunction, a party must satisfy a

four-factor test by demonstrating:

> 1.)  a substantial likelihood of prevailing on the merits;
> 2.)  a significant risk of irreparable harm if the
> injunction is withheld; 3.) that the threatened injury
> outweighs the harm the preliminary injunction might pose to
> the offending party; and 4) that the preliminary
> injunction, if issued, will not adversely affect the public
> interest.

See, e.g., Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1ˢᵗ

Cir. 2003); Cohen v. Brown Univ., 991 F.2d 888, 902 (1ˢᵗ Cir.

1993); see also Praire Band of Potawatomi Indians v. Pierce, 253

F.3d 1234, 1246 (10ᵗʰ Cir. 2001)("Potawatomi Indians").  However,

"[i]f the party seeking the preliminary injunction can establish

the last three factors listed above, then the first factor

becomes less strict."  Id.  We address each of the factors in

turn, which, when taken together, show that preliminary relief

should issue.

B.   Likelihood of Success on the Merits.

The current status quo is that the Tribe must comply with Town laws – including its Zoning By-laws.  The prior decisions on this very issue – the SJC's decision in the Shellfish Hatchery case and this Court's ruling on the motions to dismiss – establish that the land on which the Tribe proposes to conduct gaming, the so-called "Strock Lands," is subject to Town and State laws.  Thus, the Tribe is required to obtain a building permit and is required to comply with Town laws before it can construct a casino on the Strock Lands.

The Tribe does not appear to suggest otherwise, but rather seeks to alter this status quo by relying on IGRA as a basis for arguing that it need not comply with Town laws.  The burden of establishing that IGRA applies is the Tribe's – an argument that the Tribe can (and is) making to this Court in connection with the ongoing summary judgment briefing.  In the face of the existing orders from other courts and this Court, however, the Tribe does not have a unilateral right to reject Town oversight of its conversion of the WCC to a casino absent an order to the contrary.  Until this Court declares otherwise, the status quo is that the Tribe must comply with Town zoning and land-use laws, and this status quo should be maintained.

The Potowatomi Indians case (noted above) held that, in lieu of showing a substantial likelihood of success on the

13

merits, a moving party need only show that there are "questions
going to the merits . . . so serious, substantial, difficult and
doubtful as to make the issue ripe for litigation and deserving
of more deliberate investigation" to secure a preliminary
injunction.  Id. at 1246-47.  However this Court may ultimately
rule on the merits, the prior submissions to this Court, at a
minimum, raise serious and substantial questions.  The Court
need look no further than the identities of the parties
themselves to make that judgment:  three separate governmental
entities are directly involved and their debate addresses the
meaning of legislation enacted by Congress.  While the Court
grapples with these questions, the Town respectfully suggests
that maintaining the status quo, as described at the outset of
this section, is warranted.[11]  See, e.g., Six Clinics Holding
Corp., II v. Cafcomp Sys., Inc. 119 F.3d 393, 402 (6th Cir.
1997); Northeast Ohio Coalition for Homeless v. Husted, 696 F.3d
580 (6th Cir. 2012); Citigroup Global Markets, Inc. v. BCG
Special Opportunities Master Fund Ltd., 598 F.3d. 30, 35 (2nd
Cir. 2010).

        C.    Irreparable Harm.

        The requirement of obtaining a building permit is part of a
comprehensive statutory scheme set forth in Chapter 143 of the

---

[11]    As the Town has noted, the "status quo" of the structure at issue
(the WCC) is that it is permitted and conditioned as a community
center for recreational use and for no other purpose.

Massachusetts General Laws.  Under § 3 of that chapter, the

selectmen of each town in Massachusetts are mandated to appoint

a building inspector, as well as other local inspectors as are

reasonably necessary to assist the building inspector in

administering and enforcing the state building code.  Section 3

requires that:

> "Each local inspector shall have at least five years of
> experience in the supervision of building construction or
> design or in the alternative a two-year associate degree in
> a field related building construction or design or any
> combination of education experience which would confer
> equivalent knowledge and ability, as determined by the
> board.  In addition, such persons shall have a general
> knowledge of the quality and strength of building
> materials, a general knowledge of accepted requirements for
> building construction, fire prevention, light, ventilation,
> safe exits, and a general knowledge of other equipment and
> materials essential for safety, comfort, and convenience of
> the occupants of a building or structure."

Section 3 further requires that every local building

inspector "shall be certified by the Board of Building

Regulations and Standards in accordance with regulations

promulgated by said Board."  Chapter 143 has one hundred (100)

different sections which outline the powers, authority, duties,

and responsibilities of building inspectors.  The assistant

building inspector for the Town, who also serves as the building

inspector for the Towns of Edgartown and Chilmark, has held

these positions for over 30 years.  The Tribe does not at the

present time have its own building inspector.  And, even if it

did, its inspector would not be a building inspector appointed under the provisions of M.G.L. c. 143.[12]

The Town has an interest in ensuring that no building is erected within its boundaries without the owner obtaining all necessary permits. The requirement of obtaining a building permit - mandated by both M.G.L. c. 143 and by the specific provisions of the Aquinnah Zoning By-law - is unquestionably designed to protect the public, and to ensure that buildings are constructed in a manner which complies with all safety regulations. The Tribe's effort to circumvent this fundamental requirement is, on its face, the cause of irreparable harm.

In brief summary, the Massachusetts General Laws require that a building permit issue prior to the alteration of the building; the MVC legislation requires that a permit from the MVC issue for a project of the magnitude of a casino; the Settlement Agreement, the State Act, and the Federal Act all require that the Tribe comply with State and Town laws; the Town zoning by-laws operate to prohibit commercial gaming and further provide that "no building shall be built or altered and no use of land or building shall be begun or changed without a permit having been issued by the building inspector acting under the Board of Selectmen" (Section 7A); and the Operational Plan

_____

[12]     The Town also notes that other Massachusetts laws require the appointment of a Town wiring inspector (M.G.L. c. 166, § 32) and a plumbing inspector (M.G.L. c. 142, § 11).

requires the issuance of a Town Building permit and provides for Town inspections.  The Tribe unilaterally chose to begin construction of a casino, a month before the summary judgment argument, without complying with <u>any</u> of the above applicable laws and without complying with the Operational Plan.

Given the Tribe's decision to flout specific laws intended to protect public safety, and given the Tribe's rejection of the Town's authority over its development project, the Town need not show any more to satisfy the requirement of irreparable harm.  A preliminary injunction should issue.[13]

D. <u>Stopping the construction of an unpermitted public building outweighs the harm that the preliminary injunction might cause the Tribe.</u>

As noted above, the Tribe waited until the eve of the summary judgment argument to begin construction of the casino. Preliminary relief will not cause harm to the Tribe, as a court decision adjudicating the merits is now in the foreseeable future.  Choosing to begin construction a month before the summary judgment argument is a choice the Tribe made; it cannot

---

[13]    Even if the Court should conclude that all of this is insufficient to constitute irreparable harm in and of itself under the traditional standard governing preliminary injunctions, "[a]llegations of statutory violations implicate a different calculus because such violations inherently offend the public interest.  The need to demonstrate irreparable harm, a condition precedent to the grant of injunctive relief in civil litigation, is not a prerequisite where plaintiff attempts to enforce a statute."  <u>United States v. D'Annolfo</u>, 474 F. Supp. 220, 222 (D. Mass. 1979). <u>See also</u> <u>Long Term Care Pharmacy Alliance v. Ferguson</u>, 260 F. Supp. 2d 282, 289 (D. Mass. 2003).

legitimately complain if the Court elects to preserve the status quo.  By its terms, any preliminary injunction issued by this Court will only last until its decision on the cross motions for summary judgment is rendered.  The threatened injury to the Town and the public if preliminary relief is not granted – interests which have their foundation in public safety – is, however, substantial.

E. <u>The preliminary injunction, if issued, will not adversely affect the public interest.</u>

The issuance of a preliminary injunction preserving the status quo pending a decision on the merits will protect, rather than adversely affect, the public interest.  The public, as well as the Town, has an interest in seeing that proper administrative procedures, in particular those addressing public safety issues, are followed.  Accordingly, the final prong of the preliminary injunction test has also been satisfied.

IV. <u>CONCLUSION.</u>

For all the reasons set out in this memorandum, the Town requests that the Court issue a temporary restraining order and, after hearing, a preliminary injunction enjoining the Tribe from proceeding with construction activities for a casino, pending an adjudication of the issues raised in the pleadings on the merits.

TOWN OF AQUINNAH

By its attorneys,

/s/  Ronald H. Rappaport
Ronald H. Rappaport
    BBO No. 412260
rrappaport@rrklaw.net
Michal A. Goldsmith
    BBO No. 558971
mgoldsmith@rrklaw.net
Reynolds, Rappaport, Kaplan
    & Hackney, LLC
106 Cooke Street, PO Box 2540
Edgartown, MA  02539
(508) 627-3711


Dated:     July 14, 2015


## CERTIFICATE OF SERVICE

        In accordance with Local Rule 5.2(b), I hereby certify that
this document filed through the ECF system on July 14, 2015 will
be sent electronically to the registered participants as
identified on the Notice of Electronic Filing.


                         /s/ Ronald H. Rappaport
                         Ronald H. Rappaport


4607-009/Memorandum in Support of Town's Motion for Preliminary Injunction Final 7 14 15.doc