**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **COMMONWEALTH OF MASSACHUSETTS,** | ) | |
| | ) | |
| Plaintiff/Counterclaim-Defendant, | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **THE AQUINNAH/GAY HEAD COMMUNITY ASSOCIATION, INC. (AGHCA) and TOWN OF AQUINNAH,** | ) | |
| | ) | |
| Intervenors/Plaintiffs, | ) | |
| | ) | Civil Action No. |
| v. | ) | 13-13286-FDS |
| | ) | |
| **THE WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH), THE WAMPANOAG TRIBAL COUNCIL OF GAY HEAD, INC., and THE AQUINNAH WAMPANOAG GAMING CORPORATION,** | ) | |
| | ) | |
| Defendants/Counterclaim-Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **CHARLIE BAKER, in his official capacity as GOVERNOR, COMMONWEALTH OF MASSACHUSETTS, et al.,** | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

**MEMORANDUM AND ORDER ON**
**MOTIONS FOR SUMMARY JUDGMENT**

SAYLOR, J.

This lawsuit involves a dispute over gaming on Indian lands on Martha's Vineyard.  The

Wampanoag Tribe of Gay Head (Aquinnah) and related entities have taken steps to commence

commercial gaming operations on tribal lands in the town of Aquinnah.[1]  The Tribe does not

have a state gaming license.  The Commonwealth of Massachusetts contends that operating

gaming facilities without such a license would violate a 1983 agreement, approved by Congress

in 1987, that subjects the lands in question to state civil and criminal jurisdiction (and

specifically to state laws regulating gaming).  Count 1 of the complaint alleges breach of

contract, and Count 2 seeks a declaratory judgment.

The Commonwealth, the Town of Aquinnah, the Aquinnah/Gay Head Community

Association, and the Tribe have all moved for summary judgment.  For the reasons stated below,

the Tribe's motion will be denied and the motions of the Commonwealth, the Town, and the

AGHCA will be granted.

This case presents two fairly narrow issues.  The first is whether a statute passed by

Congress in 1988 (the Indian Gaming Regulatory Act, or IGRA) applies to the lands in question,

which in turn raises the questions whether the Tribe exercises "jurisdiction" and "governmental

power" over the lands.  The second is whether IGRA repealed, by implication, the statute passed

by Congress in 1987 (the act that approved the 1983 agreement).  If the 1988 law (IGRA)

controls, the Tribe can build a gaming facility in Aquinnah.  If the 1987 law controls, it cannot.

Whether an Indian tribe should be permitted to operate a casino on Martha's Vineyard is

a matter of considerable public interest, and the question touches upon a variety of complex and

significant policy issues.  This lawsuit is not, however, about the advisability of legalized

gambling.  Nor is it about the proper course of land development on Martha's Vineyard, or how

---

[1] According to the Commonwealth, the Aquinnah Wampanoag Gaming Corporation is a wholly-owned subsidiary of the Tribe or the Wampanoag Tribal Council of Gay Head, Inc.  According to defendants, the Wampanoag Tribal Council of Gay Head, Inc., no longer exists.  (Defs.' Notice of Removal 1 n.1).  For the sake of convenience, the Court will refer to defendants collectively as "the Tribe."

best to preserve the unique environment and heritage of the island.  And it is not about the appropriate future path for the Wampanoag people.  If there are answers to those questions, they are properly left to the political branches in our system of government.  The role of the Court here is a narrow one, and it expresses no opinion of any kind about the broader issues underlying this dispute.  *See Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 690 (1st Cir. 1994) ("Under our tripartite system of government, Congress, not the courts, is empowered to make such policy choices. . . . Thus, the courts have not focused on the wisdom of the policies underlying [IGRA] . . . .").

I.   **Background**

A.   **Factual Background**

Unless otherwise stated, the following facts come from the parties' joint statement of material facts not in dispute ("SMF").

1.   **The Tribe**

At the time of the first contact with Europeans, the Wampanoag tribe lived in what is now southeastern New England, including Cape Cod, Nantucket, and Martha's Vineyard.  *See generally Wampanoag Indians*, The American Indian Heritage Foundation, www.indians.org/articles/wampanoag-indians.html; *History & Culture*, The Wampanoag Tribe of Gay Head (Aquinnah), www.wampanoagtribe.net/Pages/Wampanoag_WebDocs.  In the 1600's, the tribe was devastated by disease, warfare, and other forces.  *See id.*  By the mid-1800's, the tribe had been reduced to a few small groups, including the present-day Wampanoag Tribe of Gay Head, which occupied the western tip of Martha's Vineyard.  *See id.*

In 1869 and 1870, the Commonwealth of Massachusetts took a series of steps that were intended, among other things, to permit the alienation of Indian land and assimilate tribal

members as full citizens.  *See Mashpee Tribe v. Town of Mashpee*, 447 F. Supp. 940, 945-46 (D.

Mass. 1978).  As part of that process, the Commonwealth incorporated the Town of Gay Head in

1870.  (SMF ¶ 2).[2]

In 1972, the Wampanoag Tribal Council of Gay Head, Inc., was founded as a state-

chartered non-profit corporate entity.  (*Id.* at ¶ 4).  As of that time, the Tribe was not officially

recognized by the United States Government.  (*Id.* at ¶ 6).

In 1974, the Wampanoag Tribal Council, on behalf of the Tribe, sued the

Commonwealth, the Town of Gay Head, and the Taxpayers' Association of Gay Head, Inc.,

asserting aboriginal property rights to certain lands within the town.  *See Wampanoag Tribal

Council of Gay Head, Inc. v. Town of Gay Head*, 74-5826-G (D. Mass.).  The Tribe contended

that the various transfers of tribal lands in the nineteenth century violated the 1790 Non-

Intercourse Act, which required federal approval for any extinguishment of Indian title.  *Id.*

### 2.    The Settlement Acts

The land-rights lawsuit was not resolved for nearly a decade.  Finally, in November

1983, the Commonwealth; the Town of Gay Head; the Taxpayers' Association of Gay Head,

Inc.; and the Wampanoag Tribal Council of Gay Head, Inc., entered into a settlement agreement

that they termed a "Joint Memorandum of Understanding Concerning Settlement of the Gay

Head, Massachusetts Indian Land Claims" (the "Settlement Agreement").  (SMF ¶¶ 10-11).

As part of the settlement, the Town and the Taxpayers' Association conveyed to the

Wampanoag Tribal Council approximately 485 acres of land (the "Settlement Lands") to be held

"in the same manner, and subject to the same laws, as any other Massachusetts corporation."  (*Id.*

at Ex. B ¶ 3).  In return, the Tribal Council relinquished all claims to other lands and waters in

---

[2] In 1997, the Town of Gay Head changed its name to Aquinnah.

the Commonwealth. (*Id.* at Ex. B ¶ 8). The Settlement Agreement provided that "[u]nder no circumstances, including any future recognition of the existence of an Indian tribe in the Town of Gay Head, shall the civil or criminal jurisdiction of the Commonwealth . . . over the settlement lands . . . be impaired or otherwise altered" and "no Indian tribe or band shall ever exercise sovereign jurisdiction" over those lands. (*Id.* at Ex. B ¶ 3). The Tribe agreed that the Settlement Lands would be "subject to all Federal, State, and local laws, including Town zoning laws." (*Id.* at Ex. B ¶¶ 5, 13). The Settlement Agreement set forth two exceptions to that provision, specifying that the Settlement Lands would be exempt from state property taxes and hunting regulations. (*Id.* at Ex. B ¶ 13(a)-(b)).

In 1985, the Massachusetts Legislature enacted a statute implementing the Settlement Agreement. (*Id.* at ¶ 13).[3] For the Settlement Agreement to take effect, however, it required Congressional approval. *See Morton v. Mancari*, 417 U.S. 535, 551-52 (1974).

Meanwhile, in 1981, the Tribal Council had submitted a petition seeking the acknowledgement of the Tribe by the United States as an Indian tribe with a government-to-government relationship with the United States. (SMF ¶ 9). In 1987—after the execution of the Settlement Agreement, but before Congress passed the implementing statute—the Department of the Interior officially recognized the Wampanoag Tribe of Gay Head as an Indian tribe. *See* Final Determination for Federal Acknowledgment of the Wampanoag Tribal Council of Gay Head, Inc., 52 Fed. Reg. 4193 (Feb. 10, 1987).

On August 18, 1987, Congress passed the act implementing the Settlement Agreement. *See* Wampanoag Tribal Council of Gay Head, Inc., Indian Land Claims Settlement Act of 1987, Pub. L. No. 100-95, 101 Stat. 704 (codified at 25 U.S.C § 1771) ("Massachusetts Settlement

---

[3] *See* An Act to Implement the Settlement of the Gay Head Indian Land Claims, Mass. Stat. 1985, c. 277.

Act").  The Massachusetts Settlement Act contained the following language:  "Except as otherwise expressly provided in this subchapter or in the State Implementing Act, the settlement lands and any other land that may now or hereafter be owned by or held in trust for any Indian tribe or entity in the town of Gay Head, Massachusetts, shall be subject to the civil and criminal laws, ordinances, and jurisdiction of the Commonwealth of Massachusetts and the town of Gay Head, Massachusetts (including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance)."  25 U.S.C. § 1771g.

The Bureau of Indian Affairs of the United States Department of the Interior then took the Settlement Lands into trust.  (SMF ¶ 19).  Since the enactment of the Massachusetts Settlement Act, the Commonwealth, the Town, and the Tribe have all exercised concurrent jurisdiction over the Settlement Lands pursuant to its provisions.  (*Id.* at ¶ 22).

### 3.  *Cabazon Band* **and IGRA**

As noted, the Massachusetts Settlement Act was enacted by Congress on August 18, 1987.  *See* Pub. L. No. 100-95, 101 Stat. 704.  Only six months earlier, on February 25, 1987, the Supreme Court had issued an opinion that essentially prohibited states from enforcing gambling laws on Indian lands.  *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987). In *Cabazon Band*, two California Indian tribes were sponsoring unregulated gaming activities on their reservations.  *Id.* at 205.  When California attempted to enforce a state statute regulating bingo operations against the tribes, the tribes sued, asserting that California had no authority to enforce its gambling laws on tribal reservations because the United States had not authorized California to do so.  *Id.* at 205-06.  California argued that its bingo statute was a criminal law that could be enforced on Indian reservations pursuant to federal law.  *Id.* at 207.  The Court rejected

that argument, holding that the statute was not criminal in nature, and therefore the state could not prohibit the tribes from offering gaming activities on their reservations. *Id.* at 221-22.

"*Cabazon Band* led to an explosion in unregulated gaming on Indian reservations" in states that did not prohibit gaming. *Ysleta del Sur Pueblo v. Texas*, 36 F.3d 1325, 1330 (5th Cir. 1994). Congress quickly became concerned that unregulated growth in Indian gaming might, among other things, "invite criminal elements." *Id.* It passed the Massachusetts Settlement Act, with its specific reference to state regulation of gaming on Indian lands, in August 1987. And on October 17, 1988, it enacted the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721. *See Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2034 (2014) ("Congress adopted IGRA in response to this Court's decision in [*Cabazon*], which held that States lacked any regulatory authority over gaming on Indian lands.").

According to its legislative history, IGRA "was intended to balance the right of tribes to self-government with the need 'to protect both the tribes and the gaming public from unscrupulous persons.'" *Ysleta*, 36 F.3d at 1330 (quoting S. Rep. No. 100-446, at 1-2 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071). The Senate Report specifically noted that IGRA was born out of "fear that Indian bingo and other gambling enterprises may become targets for infiltration by criminal elements." S. Rep. No. 100-446, at 2 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071.

Among other things, IGRA established a regulatory structure for gaming on Indian lands and created the National Indian Gaming Commission ("NIGC"). That structure categorized gaming into three "classes":  class I included "social games solely for prizes of minimal value or traditional forms of Indian gaming"; class II encompassed, among other things, "the game of chance commonly known as bingo" and some card games (with "banking card games, including

baccarat, chemin de fer, [and] blackjack" specifically excepted from the class); class III was a catch-all category that included all forms of gaming not encompassed by classes I or II.  25 U.S.C. § 2703(6)-(8).

Under IGRA, a tribe's right to conduct and regulate gaming on its lands are subject to two relevant restrictions.  First, IGRA confers upon qualifying tribes the "exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law."  25 U.S.C. § 2701(5).  Second, a tribe may conduct class II gaming only "on Indian lands within such tribe's jurisdiction."  25 U.S.C. § 2710(b)(1).  Specifically, as to class II gaming, the statute provides:

> (1) An Indian tribe may engage in, or license and regulate, class II gaming on Indian lands within such tribe's jurisdiction, if—
>
> > (A) such Indian gaming is located within a State that permits such gaming for any purpose by any person, organization or entity (and such gaming is not otherwise specifically prohibited on Indian lands by Federal law), and
> >
> > (B) the governing body of the Indian tribe adopts an ordinance or resolution which is approved by the Chairman.

*Id.*

### 4.    Precursors to the Present Controversy

In 1997, the Acting Assistant Secretary of Indian Affairs for the Department of the Interior sent the Tribe a letter addressing whether the Tribe could conduct class II gaming activities on certain lands.  (SMF ¶¶ 26-27).  The letter expressed the opinion "that the Tribe would be eligible to conduct [c]lass II gaming activities" on land held in trust for it by the United States, as long as it "complie[d] with all applicable requirements of [ ] IGRA."  (*Id.* at Ex. G).

On November 22, 2011, then-Governor of Massachusetts Deval Patrick signed a law entitled "An Act Establishing Expanded Gaming in the Commonwealth."  *See* Mass. Gen. Laws

ch. 23K, § 37, ch. 271, § 3 ("Expanded Gaming Act").  Among other things, the law prohibited

any person or entity from opening or operating a gaming establishment in Massachusetts without

a gaming license.  *Id.*

On that same day, the Tribe submitted a Tribal Gaming Ordinance, numbered Ordinance

No. 2011-01, to the NIGC for review.  (SMF ¶ 40).  The statement of purpose contained within

the ordinance read:

> An ordinance to govern and regulate the operation, conduct and playing of (1)
> Class I Gaming, and (2) Class II Gaming, as defined by IGRA, so that revenue
> may be produced for the support of Tribal government programs, to promote
> economic development, and for the health, education and welfare of the Tribe and
> its members.  The Tribal Council of the Wampanoag Tribe of Gay Head
> (Aquinnah) enacts this Ordinance in order to regulate all forms of Gaming on the
> Tribe's Indian Lands.

Ordinance No. 2011-01, § 1.3.

On February 4, 2012, the Tribe passed Resolution 2012-04, which formally adopted

Ordinance No. 2011-01.  (SMF ¶¶ 37-39, Ex. P).

On February 21, 2012, the NIGC issued a letter approving Ordinance No. 2011-01 as it

related to class I and class II gaming.  (*Id.* at ¶ 42).  The letter specifically noted that the

ordinance was "approved for gaming only on Indian lands, as defined by the [IGRA], over which

the Tribe exercises jurisdiction."  (*Id.* at Ex. R).

On March 5, 2012, the Tribe delivered two letters to Governor Patrick requesting that the

Commonwealth enter into negotiations for a gaming compact that would allow the Tribe to

conduct class III gaming.  (*Id.* at ¶ 30).  One letter requested that the Commonwealth "enter into

formal gaming compact negotiations pursuant to the requirements set forth in [IGRA]," and the

other requested that the Commonwealth "enter gaming compact negotiations pursuant to the

requirements set forth in Section 91 of the Expanded Gaming Act."  (*Id.* at Exs. H, I).

On March 14, 2012, counsel for Governor Patrick requested that the Tribe provide certain additional information in connection with its requests for a compact.  (*Id.* at ¶ 31).  Specifically, the letter sent by counsel requested "documents which evidence that (1) the Tribe has purchased, or entered into an agreement to purchase, a parcel of land for the proposed tribal gaming development and (2) a vote has been scheduled in the host communities for approval of the proposed tribal gaming development."  (*Id.* at Ex. J).  The Tribe responded to that letter on March 27, 2012, with correspondence that provided the requested information.  (*Id.* at Ex. K).

On April 7, 2012, the Tribe passed Resolution 2012-23, amending Ordinance No. 2011-01 by altering the definition of "Indian Lands."  (*Id.* at ¶ 44, Ex. S).  As amended, "Indian Lands" was defined to include 238 acres of land defined in the Massachusetts Settlement Act as "Public Settlement Lands" and 175 acres of land defined in the Massachusetts Settlement Act as "Private Settlement Lands."  (*Id.*).

On April 12, 2012, the Tribe submitted Resolution 2012-23 and the amended version of Ordinance No. 2011-01 to the NIGC for review and approval.  (*Id.* at ¶ 46, Ex. T).

On April 20, 2012, counsel for Governor Patrick sent further correspondence to the Tribe in connection with its request for a gaming compact.  (*Id.* at ¶ 33, Ex. L).  The letter offered to set a meeting on April 24, 2012.  (*Id.*).

On July 10, 2012, the Tribe withdrew the request for review that it had made to the NIGC in its April 12, 2012 letter.  (*Id.* at ¶ 48, Ex. U).

On May 30, 2013, the Tribe re-submitted a site-specific Ordinance No. 2011-01, as amended by Resolution 2012-23, to the NIGC for review and approval.  (*Id.* at ¶ 50, Ex. V).  The cover letter attached to that request stated that the Tribe "ha[d] determined that it [wa]s in the

best interest of [its] community to proceed with its class II gaming endeavors" and requested an expedited review. (*Id.*).

On June 13, 2013, the NIGC sent a letter to the Department of the Interior's Office of the Solicitor, requesting an opinion as to whether the Massachusetts Settlement Act prohibited the Tribe from gaming on the Settlement Lands. (*Id.* at ¶ 52). The office's Division on Indian Affairs responded on August 23, 2013, with a letter providing the opinion that the Tribe was not prohibited from gaming on the Settlement Lands. (*Id.* at ¶ 53, Ex. W).

On August 29, 2013, the NIGC informed the Tribe by letter that Ordinance No. 2011-01, as amended by Resolution 2012-23, was approved by the NIGC by operation of law, "to the extent that it is consistent with IGRA." (*Id.* at ¶ 54, Ex. X).[4] On that same day, the Tribe responded and requested "a legal opinion . . . as to whether the Indian lands identified in the amendment [effectuated by Resolution 2012-23] are eligible for gaming under [IGRA]." (*Id.* at ¶ 56, Ex. Y).

On October 25, 2013, the NIGC responded to the Tribe's August 29 correspondence with a letter providing the opinion that the lands identified in the amendment were "eligible for gaming under [IGRA]." (*Id.* at ¶ 58, Ex. Z).

On November 12, 2013, the Tribe wrote a letter to Governor Patrick "restat[ing] and renew[ing] its March 5, 2012 request to enter into formal gaming compact negotiations with the Commonwealth of Massachusetts under the requirements of . . . IGRA." (*Id.* at ¶ 34, Ex. M). The Tribe attached its correspondence with the NIGC to its November 12, 2013 letter. (*Id.*).

On December 5, 2013, counsel for the Tribe met with Governor Patrick to discuss the Tribe's request for gaming-compact negotiations. (*Id.* at Ex. N). On December 18, 2013,

---

[4] A gaming ordinance is automatically approved by the NIGC, by operation of law, if it does not act on the ordinance within 90 days. *See* 25 U.S.C. § 2710(e).

counsel for Governor Patrick sent further correspondence to the Tribe, stating its position "that the Tribe, as part of the bargain it agreed to in exchange for its land settlement in the 1980s, waived its federal right to conduct Indian gaming except in conformity with state law." (*Id.*).

Massachusetts law prohibits any entity from operating a gaming establishment without a license issued by the Massachusetts Gaming Commission. *See* Mass. Gen. Laws ch. 23K, §§ 2, 9, 25. The Tribe has not obtained such a license nor complied with the Massachusetts prerequisites for doing so. (SMF ¶ 36).

### B.       Procedural Background

On December 2, 2013, the Commonwealth filed a complaint with the Single Justice of the Supreme Judicial Court for Suffolk County against the Tribe, the Wampanoag Tribal Council of Gay Head, Inc., and the Aquinnah Wampanoag Gaming Corporation. The complaint asserted a claim for breach of contract and requested a declaratory judgment that the Settlement Agreement allowed the Commonwealth to prohibit the Tribe from conducting gaming on the Settlement Lands.

On December 30, 2013, the Tribe removed the action to this Court on grounds of federal-question and supplemental jurisdiction. On January 29, 2014, the Commonwealth moved to remand the action to state court, which the Court denied.

On July 10, 2014, both the AGHCA and the Town filed motions to intervene. The Court granted those motions on August 6, 2014. On August 27, 2014, the Tribe moved to dismiss the AGHCA complaint on the grounds of sovereign immunity and failure to state a claim upon which relief can be granted. On that same day, the Tribe separately moved to dismiss all three complaints, with leave to amend, for failure to join the United States, which it asserted was a required party under Fed. R. Civ. P. 19.

On October 24, 2014, the Tribe filed an amended answer to the Commonwealth's complaint. The amended answer included counterclaims against the Commonwealth and claims against three third-party defendants, all of whom are government officials of the Commonwealth sued in their official capacity.[5] (For the sake of convenience, the Court will refer to those claims collectively as the "counterclaims," and those defendants as "counterclaim-defendants"). The counterclaims sought declaratory and injunctive relief concerning the Commonwealth's assertion of jurisdiction over gaming that occurs on the Tribe's trust lands. On November 19, 2014, the Commonwealth and the third-party defendants moved to dismiss the counterclaims.

On February 27, 2015, the Court denied the Tribe's motions to dismiss and granted the motion by the Commonwealth to dismiss the counterclaims against it. Remaining are the claims by the Commonwealth, the AGHCA, and the Town against the Tribe, and the Tribe's counterclaims against the government officials.

On May 28, 2015, the Commonwealth, the Town, the AGHCA, and the Tribe all moved for summary judgment.[6]

## II.   <u>Legal Standard</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816,

---

[5] The original counterclaims named then-Governor Deval Patrick, then-Attorney General Martha Coakley, and Chairman of the Massachusetts Gaming Commission Stephen Crosby as third-party defendants. Patrick and Coakley no longer serve in the capacities listed, having been replaced by Governor Charles D. Baker and Attorney General Maura Healey. Accordingly, Governor Baker, Attorney General Healey, and Crosby are the third-party defendants as the case currently stands.

[6] On July 14, 2015, the Town moved for a temporary restraining order and/or a preliminary injunction enjoining the Tribe from undertaking any further construction of a gaming facility at the site of its community center building. The AGHCA and the Commonwealth each filed memoranda in support of that motion, and the Tribe filed an opposition. On July 28, 2015, after a hearing, the Court entered a preliminary injunction enjoining and restraining the Tribe from commencing or continuing the construction of a gaming facility at or on the Wampanoag Community Center building site without first complying with the permit requirements of the Town of Aquinnah, pending further order of the Court.

822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when

the moving party shows that "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[ ]

mandates the entry of summary judgment 'against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir.

1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that

determination, the court must view "the record in the light most favorable to the nonmovant,

drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir.

2009).  When "a properly supported motion for summary judgment is made, the adverse party

'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party

may not simply "rest upon mere allegation or denials of his pleading," but instead must "present

affirmative evidence."  *Id*. at 256-57.

## III.  <u>Analysis</u>

This action essentially requires the Court to answer two questions:  (1) whether IGRA

applies to the Settlement Lands (which requires that the Tribe both (a) have "jurisdiction" and

(b) exercise "governmental power" over the lands); and (2) whether IGRA impliedly repealed

the Massachusetts Settlement Act, which expressly stated that any lands held in trust for the

Tribe would "be subject to the civil and criminal laws, ordinances, and jurisdiction of the

Commonwealth of Massachusetts and the town of Gay Head, Massachusetts (including those

laws and regulations which prohibit or regulate the conduct of bingo or any other game of

chance)."  25 U.S.C. § 1771g.

### A.      The Burden of Proof

The Commonwealth's complaint alleges a claim for breach of contract (that is, that the

Tribe has breached the Settlement Agreement).  The Tribe's principal response is an affirmative

defense of contract invalidity (that is, that IGRA applies to the lands and supersedes the

Massachusetts Settlement Act and the underlying Settlement Agreement).  Because it is an

affirmative defense, the Tribe has the burden of proving that the contract is invalid.  *See*

*Saybrook Tax Exempt Investors LLC v. Lake of Torches Econ. Dev. Corp.,* 929 F. Supp. 2d 859,

862-63 (W.D. Wis. 2013) ("[R]ebutting IGRA is not part of the cause of action [for breach of

contract] itself. . . . [I]t is by now well-settled federal law that contract invalidity is a defense,

and that the defeat of potential invalidity defenses is not an element of an affirmative claim."),

*clarified on other grounds by,* 2013 WL 3508378 (W.D. Wis. May 30, 2013); *see also U.S.*

*Liability Ins. Co. v. Selman*, 70 F.3d 684, 691 (1st Cir. 1995) (explaining that the "usual rule" is

to place the burden of proving affirmative defenses on the party asserting them).

### B.      The *Narragansett* and *Passamaquoddy* Cases

In resolving the questions presented in this case, the Court does not write on a completely

blank slate.  Although the specific issues as to the Massachusetts Settlement Act have not yet

been addressed by any court, similar issues relating to Indian tribes in both Rhode Island, *Rhode*

*Island v. Narragansett Indian Tribe*, 19 F.3d 685 (1994), and Maine, *Passamaquoddy Tribe v.*

*Maine*, 75 F.3d 784 (1996), have previously been raised and ruled upon by the First Circuit.

In *Narragansett*, the First Circuit analyzed the interaction between IGRA and the Rhode

Island Indian Claims Settlement Act of 1978, 25 U.S.C. §§ 1701-1716 ("Rhode Island

Settlement Act"), which codified a land settlement agreement between the state and the

Narragansett Indian Tribe.  *See* 19 F.3d at 688-89.  The Rhode Island Settlement Act provided

that, subject to two exceptions, "the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island." 25 U.S.C. § 1708.[7] There, as here, the state initiated a declaratory-judgment action after the Indian tribe (there, the Narragansett) had requested that the state enter into negotiations for a gaming compact. *See* 19 F.3d at 690. Rhode Island contended that IGRA did not apply to the settlement lands held in trust for the tribe and that those lands therefore remained subject to Rhode Island's general criminal and civil laws, including those civil regulations relating to gaming. *See id.* at 691.

After first confirming the validity and applicability of the Rhode Island Settlement Act, the *Narragansett* court set forth an analytical framework for evaluating whether IGRA applies to particular lands. It first quoted language from IGRA stating that it applies only to an "Indian tribe having jurisdiction over Indian lands" (or, as alternatively stated, "Indian lands within such tribe's jurisdiction"). *Id.* at 701 (quoting 25 U.S.C. §§ 2710(d)(3)(A), 2710(b)(1)). It then noted that the term "Indian lands" was defined in IGRA in part as land over which "an Indian tribe exercises governmental power," *id.* (quoting 25 U.S.C. § 2703(4)), and concluded that the statute therefore established "dual limitations" on the eligibility of particular lands. *Id.* In other words, the court held that IGRA applies only to lands over which an Indian tribe both "ha[s] jurisdiction" and "exercise[s] governmental power." *Id.*

The court then proceeded to evaluate whether the settlement lands held in trust for the Narragansetts could meet the "dual limitations" of IGRA. *See id.* at 701-03. In determining whether the Narragansetts had jurisdiction over the land, it focused on whether the Rhode Island Settlement Act had granted exclusive jurisdiction to the state. *See id.* at 701-02 ("[T]he mere

---

[7] The two exceptions are related to the Tribe's general exemption from state taxation, 25 U.S.C. § 1715(a), and its exemption from state regulations concerning fishing and hunting. 25 U.S.C. § 1706(a)(3). The Massachusetts Settlement Act also contains exceptions related to hunting by means other than firearms or crossbow (but not fishing) and taxation. *See* 25 U.S.C. §§ 1771c(a)(1)(B), 1771e(d).

fact that the Settlement Act cedes power to the state does not necessarily mean, as Rhode Island

suggests, that the Tribe lacks similar power and, thus, lacks 'jurisdiction' over the settlement

lands."). After concluding that the grant of jurisdiction was non-exclusive, the court found that

to be sufficient for the Narragansetts to "ma[k]e the necessary threshold showing" and held that

the "having jurisdiction" prong was satisfied. *See id.* at 702 ("Since the [Rhode Island]

Settlement Act does not unequivocally articulate an intent to deprive the Tribe of jurisdiction, we

hold that its grant of jurisdiction to the state is non-exclusive. The Narragansetts, therefore, have

made the necessary threshold showing.").[8]

Next, the court addressed whether the Narragansetts exercised sufficient governmental

power over their settlement lands to meet the statutory requirement. *See id.* at 702-03. It first

noted that "[m]eeting this requirement does not depend upon [a t]ribe's theoretical authority, but

upon the presence of concrete manifestations of that authority." *Id.* at 703. It then held that the

Narragansetts easily satisfied the requirement because of their "many strides in the direction of

self-government." *See id.* It stated:

> [The Tribe] has established a housing authority, recognized as eligible to
> participate in the Indian programs of the federal Department of Housing and
> Development. It has obtained status as the functional equivalent of a state for
> purposes of the Clean Water Act, after having been deemed by the Environmental
> Protection Agency as having "a governing body carrying out substantial
> governmental duties and powers," and as being capable of administering an
> effective program of water regulation. It has taken considerable advantage of the

---

[8] In reaching its conclusion that the grant of jurisdiction by the Rhode Island Settlement Act was non-exclusive, the court cited to language from the Massachusetts Settlement Act and from the Maine Indian Claims Settlement Act of 1980 that limited tribal jurisdiction. *See* 19 F.3d at 702 (citing 25 U.S.C. § 1771e(a) ("The Wampanoag Tribal Council of Gay Head, Inc., shall not have jurisdiction over nontribal members and shall not exercise any jurisdiction over any part of the settlement lands in contravention of this subchapter, the civil regulatory and criminal laws of the Commonwealth of Massachusetts, the town of Gay Head, Massachusetts, and applicable Federal Laws.") and 25 U.S.C. § 1725(f) ("The Passamaquoddy Tribe and the Penobscot Nation are hereby authorized to exercise jurisdiction, separate and distinct from the civil and criminal jurisdiction of the State of Maine, to the extent authorized by the Maine Implementing Act, and any subsequent amendments thereto.")).

The court stated: "By placing stated limits on the retained jurisdiction of the affected tribes, these newer acts imply that an unadorned grant of jurisdiction to a state—such as is embodied in the [Rhode Island] Settlement Act—does not in and of itself imply exclusivity." 19 F.3d at 702.

Indian Self-Determination and Education Assistance Act (ISDA), a statute specifically designed to help build "strong and stable tribal governments." The Tribe administers health care programs under an ISDA pact with the Indian Health Service, and, under ISDA contracts with the Bureau, administers programs encompassing job training, education, community services, social services, real estate protection, conservation, public safety, and the like. These activities adequately evince that the Tribe exercises more than enough governmental power to satisfy the second prong of the statutory test.

*Id.* (citations omitted).

After concluding that IGRA applied to the settlement lands held in trust for the Narragansett, the court endeavored "to determine how [IGRA] and the [Rhode Island] Settlement Act operate in tandem." *Id.* It first clarified that "[t]he proper mode of analysis for cases that involve a perceived conflict between two federal statutes is that of implied repeal," rather than preemption (which applies to conflicts between federal statutes and state or local provisions). *Id.* After reciting the basic principles of the implied-repeal doctrine (including that "implied repeals of federal statutes are disfavored"), the court held that it was "evident that the [Rhode Island] Settlement Act and [IGRA] are partially but not wholly repugnant." *Id.* at 704. It explained:

The [Rhode Island] Settlement Act assigned the state a number of rights. Among those rights . . . was the non-exclusive right to exercise jurisdiction . . . over the settlement lands. [IGRA] leaves undisturbed the key elements of the compromise embodied in the [Rhode Island] Settlement Act. It also leaves largely intact the grant of jurisdiction—*but it demands an adjustment of that portion of jurisdiction touching on gaming*.

*Id.* (emphasis added).

The court further held that IGRA "trump[ed]" the Rhode Island Settlement Act for two reasons—first, because it was enacted later in time, and second, because "in keeping with the spirit of the standards governing implied repeals, courts should endeavor to read antagonistic statutes together in the manner that will minimize the aggregate disruption of congressional intent." *Id.* Applying that second principle, the court stated:

> Here, reading the two statutes to restrict state jurisdiction over gaming honors
> [IGRA] and, at the same time, leaves the heart of the [Rhode Island] Settlement
> Act untouched.  Taking the opposite tack—reading the two statutes in such a way
> as to defeat tribal jurisdiction—would honor the [Rhode Island] Settlement Act,
> but would do great violence to the essential structure and purpose of [IGRA].
> Because the former course keeps disruption of congressional intent to a bare
> minimum, that reading is to be preferred.

*Id.* at 704-05.

In sum, the *Narragansett* court held both that IGRA applied to the Narragansett

settlement lands and that it impliedly repealed the Rhode Island Settlement Act.  *See id.* at 702-

03, 705.

Two years later, the First Circuit reached a different conclusion when considering the

interplay between IGRA and the Maine Indian Claims Settlement Act of 1980.  *Passamaquoddy*,

75 F.3d at 787.  In so doing, it did not overrule or question the validity of *Narragansett*.  *See id.*

at 791 ("Our opinion in *Narragansett Indian Tribe* is not to the contrary.").  Instead, the

*Passamaquoddy* court based its holding on a "savings clause" in the Maine Settlement Act that

expressly restricted the applicability to Maine of future statutes that applied to Indians.  *See id.* at

789-91.  That clause states:

> The provisions of any Federal law enacted after October 10, 1980, for the benefit
> of Indians, Indian nations, or tribes or bands of Indians, which would affect or
> preempt the application of the laws of the State of Maine, including application of
> the laws of the State to lands owned by or held in trust for Indians, or Indian
> nations, tribes, or bands of Indians, as provided in this subchapter and the Maine
> Implementing Act, shall not apply within the State of Maine, unless such
> provision of such subsequently enacted Federal law is specifically made
> applicable within the State of Maine.

25 U.S.C. § 1735(b).  Finding that IGRA was a statute enacted "for the benefit of Indians" and

that it was not "specifically made applicable within the State of Maine," the court held that the

savings clause prevented IGRA from impliedly repealing the Maine Settlement Act.

*Passamaquoddy*, 75 F.3d at 791.

Subsequent to *Passamaquoddy*, and approximately two and a half years after *Narragansett*, Congress amended the Rhode Island Settlement Act.  Among other changes, it added the following language:  "For purposes of [IGRA], settlement lands shall not be treated as Indian lands."  *See* Pub. L. No. 104-208, § 330, 110 Stat. 3009-227 (1996).  Thus, IGRA no longer applies to the Narragansett settlement lands, and Rhode Island retains civil regulatory jurisdiction over gaming on the tribe's land.

C.      <u>**Whether IGRA Applies to the Settlement Lands**</u>

The first question to be resolved is whether IGRA applies to the Settlement Lands.  As set forth by the *Narragansett* court, that question may only be answered in the affirmative if the Tribe meets the "dual limitations" of "having jurisdiction" over the lands and "exercis[ing] governmental power" over them.  19 F.3d at 701.

1.      <u>**"Having Jurisdiction"**</u>

In *Narragansett*, the First Circuit indicated that the "necessary threshold showing" with respect to the first prong is relatively low.  *See* 19 F.3d at 702.  The court held that the Narragansett Tribe satisfied the requirement simply because the Rhode Island Settlement Act did not grant exclusive jurisdiction to the state of Rhode Island—that which was not granted, the court reasoned, was retained by the Narragansetts.  *See id.* ("Since the [Rhode Island] Settlement Act does not unequivocally articulate an intent to deprive the [Narragansett] Tribe of jurisdiction, we hold that its grant of jurisdiction to the state is non-exclusive.  The Narragansetts, therefore, have made the necessary threshold showing.").

Here, it is undisputed that the Massachusetts Settlement Act did not grant exclusive jurisdiction to the Commonwealth and the Town; the parties have stipulated that "[t]he Commonwealth, the Town, and the Tribe have each exercised jurisdiction over the Settlement

Lands pursuant to the provisions of the [Massachusetts Settlement] Act." (SMF ¶ 22). Although the Massachusetts Settlement Act contains language limiting the Tribe's jurisdiction to some degree, *see* 25 U.S.C. § 1771e (providing that the Tribe "shall not have any jurisdiction over nontribal members" and mandating that its jurisdiction shall not contravene "the civil regulatory and criminal laws" of the Commonwealth, the Town, and the United States), such language simply confirms that the Tribe retains *some* jurisdiction. Therefore, because the Massachusetts Settlement Act "does not unequivocally articulate an intent to deprive" the Tribe of jurisdiction, *Narragansett*, 19 F.3d at 702, its grant of jurisdiction to the Commonwealth is non-exclusive. That non-exclusive grant of jurisdiction was sufficient to satisfy the "having jurisdiction" prong in *Narragansett*, and so too it is here.

The AGHCA contends that the "having jurisdiction" prong turns "not on whether the Commonwealth and the Town have exclusive jurisdiction over the lands," but on whether "the Tribe has sufficient (and substantial) jurisdiction over th[e] lands" after considering any diminution or defeasance of its jurisdiction. (AGHCA Mem. Opp. 3-4). That reading of the "having jurisdiction" prong, however, seems to run counter to the First Circuit's language suggesting that *any* level of tribal jurisdiction is sufficient. Indeed, the *Narragansett* court concluded the relevant section of its opinion as follows: "[W]e hold that [the Settlement Act's] grant of jurisdiction to the state is *non-exclusive*. The Narragansetts, *therefore*, have made the necessary threshold showing." 19 F.3d at 702 (emphasis added).

Here, it is undisputed that the Massachusetts Settlement Act's grant of jurisdiction to the Commonwealth is non-exclusive and that the Tribe exercises at least some level of jurisdiction over the Settlement Lands. Accordingly, the Tribe satisfies the "having jurisdiction" prong of IGRA.

### 2.        "Exercising Governmental Power"

The second question is whether the Tribe exercises sufficient "governmental power" over the Settlement lands.  The term is undefined in IGRA and "[t]he case law considering this phrase is sparse."  *Miami Tribe of Okla. v. United States*, 5 F. Supp. 2d 1213, 1217 (D. Kan. 1998).  Therefore, for guidance, the Court must look to not only other courts' relatively limited explanations of "governmental power," but also to the statutory purpose of IGRA.

In *Narragansett*, the First Circuit explained that whether the Tribe exercises sufficient governmental power over the Settlement Lands "does not depend upon the Tribe's theoretical authority, but upon the presence of concrete manifestations of that authority."  19 F.3d at 703.  Without explaining fully what constitutes sufficient "concrete manifestations" of authority under IGRA, the *Narragansett* court found myriad examples of such manifestations, including the Narragansetts' establishment of a housing authority; the fact that they had "obtained status as the functional equivalent of a state for purposes of the Clean Water Act;" and their administration of programs providing "health care . . ., job training, education, community services, social services, real estate protection, conservation, public safety, and the like."  *See id.*

The only other court to construe the phrase "exercising governmental power" looked to the following factors:

> (1) whether the areas are developed; (2) whether tribal members reside in those areas; (3) whether any governmental services are provided and by whom; (4) whether law enforcement on the lands in question is provided by the Tribe or the State; and (5) other indicia as to who exercises governmental power over those areas.

*Cheyenne River Sioux Tribe v. South Dakota*, 830 F. Supp. 523, 528 (D.S.D. 1993), *aff'd*, 3 F.3d 273 (8th Cir. 1993).  In that case, however, the court merely noted that there was "nothing in the record to determine" the issue, and denied summary judgment to both parties.  *Id.*

The Tribe contends that its governmental authority over the Settlement Lands "is robust and extensive, far in excess of the *minimal threshold*." (Defs.' Mem. 12) (emphasis added). The Tribe asserts that it is "responsible for" providing a full range of governmental services for tribal members, including education, health and recreation, public safety and law enforcement, public utilities, and community assistance. (Vanderhoop Decl. ¶ 3). The Tribe also points to several laws that it has enacted and implemented, including ordinances concerning "building codes, health, fire, safety, historic preservation, fish, wildlife, natural resources, housing, lead paint, enrollment, elections, judiciary, criminal background checks, and reporting of child abuse and neglect." (Defs.' Mem. 12; Vanderhoop Decl. ¶¶ 4-14). Finally, the Tribe contends that it has exercised governmental authority over the Settlement Lands by executing various inter-governmental agreements, including agreements with the Environmental Protection Agency, the National Park Service, and the Bureau of Indian Affairs. (Defs.' Mem. 12; Vanderhoop Decl. ¶¶ 15-21).

The underlying premise of the Tribe's argument appears to be that it need overcome only a "minimal threshold" to show that it exercises governmental power. That premise, however, does not accurately reflect the relevant legal standard. Under the plain language of *Narragansett*, the Tribe does not face a "minimal threshold;" rather, it has the burden of demonstrating "concrete manifestations" of its governmental authority. 19 F.3d at 703. Mere assertions of power or "theoretical authority" over the Settlement Lands are not sufficient. *Id.*

Furthermore, the Tribe's premise is inconsistent with the statutory construction of IGRA. If the Tribe's premise were true, the "governmental power" prong would effectively add no meaning to IGRA beyond the "having jurisdiction" prong, which itself imposed only a minimal threshold. But, as the *Narragansett* court noted, IGRA places "dual limitations" on its "key

provisions" so that they apply only where "Indian Tribes" have "jurisdiction" over "Indian lands." *Id.* at 700-01. In short, the Tribe's interpretation of its burden under the "exercising governmental power" prong violates the surplusage canon of statutory construction: if possible, every word and every provision of a statute is to be given effect, and none should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence. *See, e.g.*, *United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used.").

Finally, the premise overlooks the clear statutory purpose of IGRA. IGRA was born out of *Cabazon Band*, which "led to an explosion in unregulated gaming on Indian reservations," *Ysleta del Sur Pueblo*, 36 F.3d at 1330, and a "fear that Indian bingo and other gambling enterprises may become targets for infiltration by criminal elements." S. Rep. No. 100-446, at 2 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071. To deal with the proliferation of unregulated Indian gaming, Congress passed IGRA to install a regulatory framework, under which (depending on the class of gaming) either a state or tribe, or both, would exercise governmental authority that would be sufficient to manage the inherent challenges posed by gaming facilities. Indian gaming facilities, by their nature, attract persons who would not otherwise travel to reservations or settlement lands. And gaming facilities of any kind have always proved to be an attraction for organized crime. IGRA requires that some governmental authority, whether it be a tribe, a state, or a municipality, provide the law enforcement, public safety, and emergency services that are necessary to serve an influx in traffic and activity and to guard against criminal infiltration and corruption. Where a tribe can initiate gaming without prior state approval (that is, where a federal law does not specifically prohibit it), the tribe must demonstrate, through

existing "concrete manifestations" of governmental power, *Narragansett*, 19 F.3d at 703, that it is prepared to provide at least some substantial portion of those services itself.

Accordingly, the Tribe must make a showing of "concrete manifestations" of its governmental authority over the Settlement Lands to trigger the application of IGRA.  Under that standard, the Tribe has failed to carry its burden for at least two reasons.

First, it appears to be undisputed that the Town, and not the Tribe, provides the basic law enforcement and public safety services that are indicative of governmental authority.  *See id.* at 703 (noting that the Tribe "administer[ed] programs encompassing . . . public safety"); *see also Cheyenne River Sioux*, 830 F. Supp. at 528 ("whether law enforcement on the lands in question is provided by the Tribe or the State" is an important factor in the governmental power analysis).  The Town, not the Tribe, provides the essential police,[9] fire,[10] and emergency services[11] on the Settlement Lands.  The Tribe does not have its own "full-fledged police department."  (*See* Vanderhoop Dep. 175:9-15).  Furthermore, the only two law enforcement officers that the Tribe does employ—both conservation rangers—cannot enforce Commonwealth or Town laws without deputization by a non-tribal authority.[12]  (*See* Vanderhoop Dep. 206:3-5; 206:20-207:16; 207:23-208:13; 209:8-210:7).  Without deputization, the rangers may not arrest non-tribal

---

[9] *See* Vanderhoop Dep. 31:25-32:10 ("[P]olice, fire, [and] EMS services are provided from [the Town.]"); *id.* at 212:19-213:24 (Town police patrol the Settlement Lands, make traffic stops on the Settlement Lands, and have made arrests on the Settlement Lands); *id.* at 213:25-214:8, 214:25-215:3 (Tribe Chairman receives a report every few weeks detailing law enforcement incidents on the Settlement Lands); *id.* at 203:9-13 (Town police have primary responsibility in an emergency).

[10] *See id.* at 203:16-19 (Town has responsibility for fire duties on the Settlement Lands); *id.* at 215:11-13 (Tribe does not have a fire department).

[11] *See id.* at 203:20-23 (Tribe has no ambulance service; Tri-Town Ambulance, a consortium of the towns of Aquinnah, Chilmark, and West Tisbury, provides emergency services).

[12] When the conservation rangers are deputized by a non-tribal authority, they are necessarily acting as agents of another sovereign.

members for violations of law, even if those violations occur on the Settlement Lands.  *See* 25

U.S.C. § 1771e(a) (Tribe has no jurisdiction over non-tribal members).  In short, the Tribe has

not met its burden of demonstrating "concrete manifestations" of its governmental power

through law enforcement and public safety services.  Instead, it appears that the Town exercises

governmental power over the Settlement Lands by providing those services.[13]

Second, although the Tribe asserts that it is "responsible for" many other governmental

services unrelated to law enforcement and public safety, it does not provide concrete examples of

what the Tribe actually does.  *See Narragansett*, 19 F.3d at 703; *see also Cheyenne River Sioux*,

830 F. Supp. at 528 ("whether any governmental services are provided and by whom" is an

important factor in the governmental power analysis).  For example, the First Circuit noted that

the Narragansetts "administer[ed]" programs for health care, job training, education, community

services, social services, real estate protection, conservation, and public safety.  *See* 19 F.3d at

703.  The court's analysis suggests that the Narragansetts, in administering those programs,

actively managed, directed, and provided services to its members.

---

[13] The Tribe asserts that its passage of ordinances and execution of agreements with other organizations (attached as exhibits to the Vanderhoop Declaration) are sufficient to demonstrate that it exercises governmental authority over the Settlement Lands.  But the mere *passage* of ordinances in and of itself does not establish that the Tribe actually exercises governmental power over the lands.  Among other things, there is no evidence in the record of any actual tribal enforcement actions.

Moreover, as the AGHCA notes, many of the ordinances and agreements are either no longer in force or do not apply to the lands at issue.  Thus, those regulations are only barely relevant, if at all, to the issue of whether the Tribe presently exercises governmental authority over the land.  *See* Vanderhoop Dep. 104:15-17 (not all ordinances presently in effect); *id.* at 108:11-24 (ordinance on building, health, fire, and safety "on the books" but "there is no force and effect behind [the] ordinance"); *id.* at 133:7-18, 134:17-19 (program under Exhibit E "not a funded program any longer"; no action taken in 10 years); *id.* at 194:8-12 ("intergovernmental agreement" with town terminated and no longer in effect); *id.* at 163:3-10 (aspects of tribal judiciary have "not been fully implemented"); *id.* at 191:9-14 ("intergovernmental agreement" with Commonwealth regarding Indian child welfare "dissolved" "[b]y the Tribe"); *see also* Dkt. 119-10 (Exhibit I relates to background checks, with no reference to Settlement Lands); Dkt. 119-11 (Exhibit J relates to child abuse reporting, with no reference to Settlement Lands); Dkt. 119-12 (Exhibit K is agreement not specifically tied to Settlement Lands); Vanderhoop Dep. 122:14-25 (Exhibit D not limited to specific Settlement Lands); *id.* at 140:2-5, 141:21-142:2, 143:6-8, 143:18-21, 144:3-7 (tribal enrollment under Exhibit F does not require residency on particular lands or refer to the Settlement Lands).

Here, although the Tribe asserts that it is "responsible for" providing similar services, it provides little evidence of actually providing those services. *See id.* at 703 (noting that assertions of "theoretical authority" are not sufficient). The Tribe has no health board or health inspector.[14] And while the Tribe contends that it is responsible for providing health services on the Settlement Lands, its health clinic is staffed by only one part-time nurse and a doctor who visits only a few times a year.[15] The Tribe does not have a public school.[16] Nor does the Tribe provide any public housing beyond that which is funded by the U.S. Department of Housing and Urban Development.[17] There is no tribal criminal code, prosecutor, or jail.[18] The Tribe's judiciary, which was organized two years ago, offers only a limited judicial function. Its cases are heard by a judge who is hired on a case-by-case basis and who presides by teleconference from Washington State over proceedings that are conducted in a building off the Settlement Lands.[19] And, importantly, the Tribe has no tax system in place on the lands to fund any future governmental services.[20]

In short, the Tribe's demonstrations of governmental authority fall short of establishing sufficient *actual* manifestations of that authority. The analysis, of course, does not consider whether the Tribe *could* effectively exercise substantial governmental authority should the circumstances so require. Rather, the Court's duty is to determine whether the Tribe has met its

---

[14] *See* Vanderhoop Dep. 223:15-19.

[15] *See id.* at 224:18-22; 225:19-226:6; 229:14-230:4.

[16] *See id.* at 227:22-228:25.

[17] *See id.* at 126:14-16.

[18] *See id.* at 244:24-245:15.

[19] *See id.* at 150:4-12; 150:16-17; 150:22-23; 151:13-15; 154:10-20; 155:20-156:4; 156:14-21; 164:14-17.

[20] *See id.* at 258:9-14.

burden of demonstrating that there are currently sufficient concrete manifestations of governmental authority over the Settlement Lands.  On this record, the Court must conclude that it has not met that burden, and IGRA therefore does not apply to the Settlement Lands.

### D.      Whether IGRA Impliedly Repealed the Massachusetts Settlement Act

Although not technically necessary, the Court will proceed to the second step of the *Narragansett* analysis.  In determining the effect of IGRA on the Settlement Act, the clear starting point is a comparison of the facts of this case with those of *Narragansett*.

The Commonwealth and the intervenors principally point to the difference in language between the portions of the Massachusetts Settlement Act and the Rhode Island Settlement Act that address applicability of state law.[21]  Where the Rhode Island Settlement Act states simply that the settlement lands addressed therein will "be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island," the Massachusetts Settlement Act recites similar language and then adds, "(including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance)."  *Compare* 25 U.S.C. § 1708, *with* 25 U.S.C. § 1771g.  They contend that the inclusion of gaming-specific language in the Massachusetts Settlement Act triggers an exemption provision of IGRA that was not addressed by the *Narragansett* court.  Within the congressional findings section of the statute, subsection (5) reads:  "Indian tribes have the exclusive right to regulate gaming activity on Indian lands *if the gaming activity is not specifically prohibited by Federal law . . . .*"  25 U.S.C. § 2701 (emphasis added).  According to them, the Massachusetts Settlement Act, by virtue of the parenthetical, is a specific federal prohibition on gaming by the Tribe that triggers the IGRA exemption.

---

[21] The Commonwealth, the AGHCA, and the Town have each expressly incorporated the arguments made by the others in support of summary judgment against the Tribe.  For the sake of simplicity, the Court will refer only to the party who has explicitly raised an argument when addressing it.

The Commonwealth further contends that the statutory histories of IGRA and the Massachusetts Settlement Act demonstrate that Congress did not intend an implied repeal of the Settlement Agreement.  It notes that the Massachusetts Settlement Act was enacted by the very same Congress that was already considering a draft version of IGRA and that would ultimately enact IGRA only fourteen months later.  It contends that the 100th Congress deliberately included gaming-specific language in the Massachusetts Settlement Act in an effort to prevent it from being impliedly repealed by the imminent Indian gaming statute.  Further, it cites to the later congressional amendment to the Rhode Island Settlement Act—legislatively overruling *Narragansett* and specifying that the Narragansett settlement lands were not to be treated as Indian lands—as further evidence that Congress did not intend IGRA "to supersede state-specific Indian land claims settlement acts."  (Commonwealth Mem. 9).

The narrow issue before the Court, whether IGRA impliedly repealed the Massachusetts Settlement Act, is essentially one of statutory construction and interpretation.  "The chief objective of statutory interpretation is to give effect to the legislative will."  *Passamaquoddy*, 75 F.3d at 788.  To determine whether it was the legislative will of the 100th Congress for IGRA to impliedly repeal the Massachusetts Settlement Act, the Court must focus principally on the plain language of IGRA and the Massachusetts Settlement Act, and whether the two statutes conflict. *See Narragansett*, 19 F.3d at 699 ("In the game of statutory interpretation statutory language is the ultimate trump card.").  If the plain meaning of IGRA and the Massachusetts Settlement Act enables both statutes to be given full effect, the Court cannot read an implied repeal into IGRA. To the extent appropriate, the Court will also look to well-established canons of statutory interpretation and, to a limited extent, legislative history.

1.      **Plain Meaning:  Whether the Massachusetts Settlement Act Is a
Federal Law That Prohibits Gaming**

As the *Narragansett* court noted, "[i]n the absence of a contrary legislative command,

when two acts of Congress touch upon the same subject matter the courts should give effect to

both, if that is feasible."  19 F.3d at 703 (citing *Pipefitters Local 562 v. United States*, 407 U.S.

385, 432 n.43 (1972)).  Therefore, "so long as the two statutes, fairly construed, are *capable* of

coexistence, courts should regard each as effective." *Id.* (emphasis added); *see also POM*

*Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2238 (2014) ("When two statutes

complement each other, it would show disregard for the congressional design to hold that

Congress nonetheless intended one federal statute to preclude the operation of the other.");

*Traynor v. Turnage*, 485 U.S. 535, 548 (1988) ("[C]ourts are not at liberty to pick and choose

among congressional enactments, and when two statutes are capable of co-existence, it is the

duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard

each as effective."); *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 51 (1st Cir. 2003) ("Given

our reluctance to find an implied repeal, if we can reasonably read the two statutes consonantly,

we will.").

In 1988, the 100th Congress enacted IGRA.  Two separate provisions of IGRA explicitly

state that its provisions are limited by existing federal laws on gaming.  First, within the

congressional findings section of the statute, subsection (5) reads:  "Indian tribes have the

exclusive right to regulate gaming activity on Indian lands *if the gaming activity is not*

*specifically prohibited by Federal law . . . .*" 25 U.S.C. § 2701 (emphasis added).  Second,

within the section of the statute that details jurisdiction for class II gaming, subsection (b)(1)

reads:

An Indian tribe may engage in, or license and regulate, class II gaming on Indian

lands within such tribe's jurisdiction, if—such Indian gaming is located within a State that permits such gaming for any purpose by any person, organization or entity (*and such gaming is not otherwise specifically prohibited on Indian lands by Federal law*) . . . .

*Id.* at § 2710(b)(1) (emphasis added); *see also Ysleta del Sur Pueblo*, 36 F.3d at 1335

("Congress . . . explicitly stated in two separate provisions of IGRA that [it] should be

considered in light of other federal law.").

Therefore, the key issue is whether the Massachusetts Settlement Agreement is a federal

law that specifically prohibits the Tribe from initiating gaming activities on the Settlement

Lands.  Based on the statute's plain meaning, the Court concludes that it is.  A year before the

100th Congress enacted IGRA, the same Congress codified the Settlement Agreement into

federal law by passing the Massachusetts Settlement Act.  It reads:  "[T]he settlement

lands . . . shall be subject to the civil and criminal laws, ordinances, and jurisdiction of the

Commonwealth of Massachusetts and the town of Gay Head, Massachusetts (including those

laws and regulations which *prohibit or regulate the conduct of bingo or any other game of

chance*)."  25 U.S.C. § 1771g (emphasis added).  That parenthetical is critical.[22]  It

singlehandedly takes a law that, like the Rhode Island Settlement Act in *Narragansett*, is

otherwise a general grant of jurisdiction, and transforms it into a law that specifically prohibits

gaming on the Settlement Lands.  By its plain meaning, the Massachusetts Settlement Act is a

federal law that specifically prohibits gaming on the Settlement Lands.  It therefore triggers

IGRA's exemption in 25 U.S.C. § 2710(b)(1), which allows class II gaming on Indian Lands

---

[22] Indeed, as the District of Columbia Circuit emphasized in a follow-up case to *Narragansett*, the Massachusetts Settlement Act is different from other legislation, such as the Rhode Island Settlement Act, because it "specifically provide[s] for exclusive state control over gambling."  *Narragansett Indian Tribe v. National Indian Gaming Comm'n*, 158 F.3d 1335, 1341 (D.C. Cir. 1998) (citing 25 U.S.C. § 1771g).

within a tribe's jurisdiction as long as "such gaming is not otherwise specifically prohibited on

Indian lands by Federal law."

If IGRA and the Massachusetts Settlement Act are "capable of co-existence," the Court

must "regard each as effective" unless there is explicit Congressional guidance otherwise.  *See*

*Traynor*, 485 U.S. at 548.  The two statutes are not merely capable of co-existence; rather, both

can be given full effect.  IGRA permits tribes to engage in class II gaming on their land *unless* it

is specifically prohibited by federal law.  25 U.S.C. § 2710(b)(1).  When Congress passed IGRA,

the Settlement Act was an existing federal law that specifically prohibited gaming on the

Settlement Lands.  25 U.S.C. § 1771g.  The statutes are "capable of co-existence" because the

Settlement Act's parenthetical triggers IGRA's exemption.  Therefore, the Court can, and must,

"regard each as effective."

The Tribe, relying on *Narragansett*, contends that if IGRA and the Massachusetts

Settlement Act "are repugnant in any of their provisions, the latter act, without any repealing

clause, operates to the extent of the repugnancy as a repeal of the first."  19 F.3d at 703.  Because

IGRA and the Massachusetts Settlement Act "cannot be read in harmony and are therefore

repugnant," according to the Tribe, "the same [*Narragansett*] analysis leads to the same result

when attempting to apply the Federal Act at issue here, with IGRA."  (Defs.' Mem. 17).[23]

---

[23] The Tribe also attempts to bolster its argument that IGRA repealed the Massachusetts Settlement Act by pointing to two supportive agency letters from the Department of the Interior and the National Indian Gaming Commission.  The Tribe contends that those letters are entitled to deference.  (Defs.' Mem. 20-23).  But the Tribe is wrong for at least two reasons.  First, the letters are only advisory opinions on legal issues, not final agency action that carry the "force of law."  *See United States v. Mead Corp.*, 533 U.S. 218, 229 (2001).  Therefore, they are not entitled to deference.  *See id.; see also Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129, 140 (1st Cir. 2013) (noting that informal agency opinion letters are not entitled to deference).  Second, the letters focus predominantly on interpreting *Narragansett* and applying its two-step test to the Massachusetts Settlement Act.  The First Circuit addressed a similar situation in *Passamaquoddy*, and concluded that "deference is inappropriate when an agency's conclusion rests predominantly upon its reading of judicial decisions" because "courts, not agencies, have special expertise in interpreting case law."  75 F.3d at 794.  Accordingly, the Court will not give any deference to the agencies' conclusions.

But the Court's conclusion is not at odds with *Narragansett*.  Unlike the Massachusetts Settlement Act, the Rhode Island Settlement Act at issue in *Narragansett* did not contain any specific language about gaming; therefore, it did not specifically prohibit gaming on the tribe's land.  *See* Pub. L. No. 95-395, § 9 (Sept. 30, 1978) (codified at 25 U.S.C. § 1708).  Accordingly, the Rhode Island Settlement Act did not trigger IGRA's exemption to its coverage.  The *Narragansett* Court was correct to conclude that the Rhode Island Settlement Act and IGRA conflicted:  the Settlement Act granted Rhode Island the right to exercise jurisdiction over the settlement lands, while IGRA granted the tribe exclusive jurisdiction to regulate class I and class II gaming on the Settlement Lands.

Here, there is no such conflict.  The two statutes are not in "irreconcilable conflict;" rather, they both are capable of being given full effect, and the "disfavored" remedy of implied repeal is unnecessary.  *See Narragansett*, 19 F.3d at 703-04.  It would "show disregard for the congressional design to hold that Congress nonetheless intended [IGRA] to preclude the operation of the [Massachusetts Settlement Act]."  *See POM Wonderful*, 134 S. Ct. at 2238.

The Court need not proceed any further in its statutory interpretation because its conclusion is based on the plain meaning of the two statutes.  *See, e.g.*, *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. . . . When the words of a statute are unambiguous, then, this first canon is also the last:  judicial inquiry is complete." (citations omitted)).  Nonetheless, various well-established canons of construction and relevant legislative history reinforce the conclusion that Congress did not intend to repeal the Massachusetts Settlement Act by enacting IGRA.

2.      **Congressional Intent:  Canons of Construction**

"[C]anons of construction are no more than rules of thumb that help courts determine the

meaning of legislation . . . ."  *Connecticut Nat'l Bank*, 503 U.S. at 253.  Although they should

not be used to escape plain statutory meaning, canons of construction can be useful in

deciphering legislative intent.  *See Finley v. United States*, 490 U.S. 545, 556 (1989) (expressing

the view "that Congress [should] be able to legislate against a background of clear interpretive

rules, so that it may know the effect of the language it adopts").

The Tribe contends that a canon of construction applicable to Indian law should control

the present case.  That canon provides that ambiguous statutes concerning Indian tribes should be

construed to the tribes' benefit.  *See Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985)

("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions

interpreted to their benefit." (citations omitted)); *County of Oneida v. Oneida Indian Nation*, 470

U.S. 226, 247 (1985) ("The canons of construction applicable in Indian law are rooted in the

unique trust relationship between the United States and the Indians. Thus, it is well established

that treaties should be construed liberally in favor of the Indians, with ambiguous provisions

interpreted to their benefit. . . . The Court has applied similar canons of construction in nontreaty

matters." (citations omitted)).

That canon, however, is not applicable here; the statutes in question are not ambiguous.

*See Passamaquoddy*, 75 F.3d at 793 ("When, as now, Congress has unambiguously expressed its

intent through its choice of statutory language, courts must read the relevant laws according to

their unvarnished meaning, without any judicial embroidery. . . . [S]ince there is no statutory

ambiguity, the principle of preferential construction is not triggered.")  Furthermore, and in any

event, there are at least two additional canons of construction that must be considered when interpreting the statute.

The first canon is the strong presumption against implied repeals. *See Passamaquoddy*, 75 F.3d at 790 ("We are unequivocally committed to 'the bedrock principle that implied repeals of federal statutes are disfavored.'" (quoting *Narragansett*, 19 F.3d at 703)). That canon is based on the well-established assumption that "Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990); *see also Passamaquoddy*, 75 F.3d at 789 ("[C]ourts must recognize that Congress does not legislate in a vacuum" and "take into account the tacit assumptions that underlie a legislative enactment, including . . . preexisting statutory provisions.").

Implied repeals may occur in either of two very limited circumstances: "(1) [w]here provisions in the two acts are in irreconcilable conflict . . . ; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute . . . ." *Posadas v. National City Bank of N.Y.*, 296 U.S. 497, 503 (1936). Unless the statutes fall under one of those circumstances, courts must apply the presumption against reading an implied repeal into the second statute. *See id.* The presumption against implied repeals is even stronger when the two laws are passed during the same legislative session. *See Traynor*, 485 U.S. at 547 (rejecting an implied repeal where "the same Congress" had "not affirmatively evince[d] any intent to repeal or amend" the original statute, and enacted a second statute only one year later); *see also Washington Cnty. v. Gunther*, 452 U.S. 161, 188 (1981) ("It defies common sense to believe that the same Congress . . . intended *sub silentio* . . . to abandon the limitations of the equal work approach just one year later, when it enacted Title VII." (Rehnquist, J., dissenting)); *Pullen v.*

*Morgenthau*, 73 F.2d 281, 283 (2d Cir. 1934) ("Where both laws are passed at the same session, the presumption against implied repeal is all the stronger.").

Here, the two statutes are not in "irreconcilable conflict" because IGRA exempts federal laws that, like the Massachusetts Settlement Act, specifically prohibit gaming on Indian lands. Furthermore, IGRA, which regulates Indian gaming nationally, does not "cover[ ] the whole subject" of the Massachusetts Settlement Act, which codified agreements between the Commonwealth and the Tribe on many issues other than gaming. The presumption against finding an implied repeal accordingly applies. *Posadas*, 296 U.S. at 503. That presumption carries significant weight here, where the two statutes were moving through Congress simultaneously, and the same Congress that enacted the Massachusetts Settlement Act, passed IGRA fourteen months later.[24] Finally, the virtually concurrent enactment of the Massachusetts Settlement Act and IGRA further distinguishes the analysis here from the situation in *Narragansett*, where the Rhode Island settlement act was enacted ten years before IGRA.

The second canon of construction weighing against finding an implied repeal provides that if two statutes conflict, the more specific statute controls. *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987) ("[W]here there is no *clear* intention otherwise, a specific statute will not be controlled or nullified by a general one, *regardless of the priority of enactment*." (emphasis added) (citation omitted)). Here, the Massachusetts Settlement Act is a more specific law than IGRA. The former addresses gaming by one specifically named Indian tribe in one particular town, while the latter applies to gaming on all tribal lands nationwide. Again, the gaming-specific language of the Massachusetts Settlement Act distinguishes it from the Rhode Island Settlement Act, which had no such language. In *Narragansett*, because that

---

[24] The Massachusetts Settlement Act was enacted on August 18, 1987. *See* Pub. L. No. 100-95, 101 Stat. 704. IGRA was enacted on October 17, 1988. *See* Pub. L. No. 100-497, 102 Stat. 2467.

gaming-specific language was absent, the Court could not determine which statute was more specific, and instead applied a secondary canon:  "where two acts are in irreconcilable conflict, the later act prevails to the extent of the impasse."  19 F.3d at 704.  Here, where the Massachusetts Settlement Act is clearly more specific than IGRA, it must apply "regardless of the priority of enactment."  *See Crawford Fitting*, 482 U.S. at 445.

Accordingly, even if the Court could not rely on plain statutory meaning and had to resort to gleaning congressional intent, two canons of statutory construction weigh in favor of the Commonwealth.  Absent explicit Congressional intent, the Court should presume IGRA did not repeal the Massachusetts Settlement Act, and because the latter is more specific than the former, the Settlement Act should control.

### 3.      Congressional Intent:  Legislative History

The legislative histories of the two statutes strongly suggest that Congress did not intend to repeal the Massachusetts Settlement Act by enacting IGRA.  The Court is mindful of the dangers of relying on legislative history, and certainly acknowledges the principle that legislative history should never be used to contradict the plain meaning of a statute, to add provisions that the statute never contained, or to conflate the general purpose of a statute with its actual text.[25]  Here, however, the legislative history is entirely consistent with the statutory plain meaning.

On April 9, 1986, while testifying before Congress in support of the Settlement Agreement being codified as federal law, the President of the Wampanoag Tribal Council stated:

> Lastly, Mr. Chairman we are aware of the growing concern in Congress regarding the issue of gaming on reservations. This bill would not permit such activity on Gay Head. Although the private settlement land will be taken into trust the tribe will not exercise the necessary civil regulatory control on those trust lands which

---

[25] *See, e.g., Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) (describing the use of legislative history as "[t]he equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends"); *Connecticut Nat'l Bank*, 503 U.S. at 254 (1992) (criticizing the use of legislative history and citing the plain meaning rule as the "cardinal canon" in statutory interpretation).

the courts have deemed necessary. We recognize and accept that *no gaming on our lands is now or will in the future be possible*.

*Hearing on S. Res. 1452 Before the United States Senate Committee on Indian Affairs* (written testimony) (emphasis added).  But even at the time of that testimony, drafts of the Massachusetts Settlement Agreement did not yet include a specific prohibition on gaming.  (AGHCA Mem. 17).

On February 19, 1987, Senate Bill 555, which would ultimately be enacted as IGRA, was introduced.  (*Id.* at Ex. B).  Four months later, House Bill 2855, which was ultimately enacted as the Massachusetts Settlement Act, was introduced.  (*Id.* at Ex. C).  That bill was the first draft of the Massachusetts Settlement Agreement to include gaming-specific language.[26]  Therefore, Congress added the gaming-specific parenthetical in the Massachusetts Settlement Act just after the introduction of the bill that became IGRA, which had an exemption for federal laws otherwise specifically prohibiting gaming.  Further, the language used in the Settlement Act's gaming prohibition closely tracks the language Congress used in defining class II gaming in IGRA.  In IGRA, Congress defined class II gaming as "games of chance commonly known as bingo or lotto," (*id.* at Ex. B § 4(8)) and in the Settlement Act, Congress specified that the Settlement Lands would be subject to the laws, ordinances, and jurisdiction of the Commonwealth and the Town, including those related to "bingo or any other game of chance." (*Id.* at Ex. C § 9).

Congress's addition of a gaming prohibition in the Massachusetts Settlement Act, in the

---

[26] *Compare id.* at Ex. C § 9 ("Except as otherwise expressly provided in this Act or in the State Implementing Act, the settlement lands and any other land that may now or hereafter be owned by or held in trust for any Indian tribe or entity in the town of Gay Head, Massachusetts, shall be subject to the civil and criminal laws, ordinances, and jurisdiction of the Commonwealth of Massachusetts and the town of Gay Head, Massachusetts (*including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance.*)" (emphasis added)), *with id.* at Ex. E § 109 (same, but for absence of "including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance").

same terms used in IGRA, immediately after the introduction of the bill that became IGRA,

suggests that its intent was to exempt the Settlement Act from IGRA's broader provisions.

Therefore, the legislative history of the two statutes is consistent with the plain meaning of

IGRA's exemption and the Settlement Act's parenthetical:  the Massachusetts Settlement Act's

gaming-specific provision, not IGRA, controls the Tribe's ability to game on the Settlement

Lands.

Furthermore, the Court cannot ignore the fact that Congress enacted a statute overruling

the decision in *Narragansett*.  In 1996, Congress amended the Rhode Island Settlement Act to

state that the lands subject to the Act were not "Indian Lands" within IGRA's meaning, thereby

ensuring that IGRA would not supersede the settlement.  *See* Pub. L. No. 104-208, § 330, 110

Stat. 3009-227 (1996).  As the court later noted in *Narragansett II*, "Congress promptly enacted

the [ ] [a]mendment to . . . restore[ ] the integrity of the Rhode Island Claims Settlement Act and

uph[o]ld the primacy of State jurisdiction over the Tribe's settlement lands."  158 F.3d at 1341

(citations omitted).  The legislative overrule of *Narragansett* is further evidence that Congress

did not intend IGRA to supersede state-specific Indian land settlements like the Massachusetts

Settlement Act.

Accordingly, the Court finds that IGRA did not impliedly repeal the Massachusetts

Settlement Act.

**IV.**   **Conclusion**

In summary, the Tribe has not met its burden of demonstrating that it exercises sufficient

"governmental power" over the Settlement Lands, and therefore IGRA does not apply.

Furthermore, and in any event, it is clear that IGRA did not repeal by implication the

Massachusetts Settlement Act.  Accordingly, the Tribe cannot build a gaming facility on the

Settlement Lands without complying with the laws and regulations of the Commonwealth and the Town.

For the foregoing reasons:

1.     The motion for summary judgment of the Commonwealth of Massachusetts is GRANTED;

2.     The motion for summary judgment of the Town of Aquinnah is GRANTED;

3.     The motion for summary judgment of the Aquinnah/Gay Head Community Association, Inc. is GRANTED;

4.     The motion for summary judgment of the Wampanoag Tribe of Gay Head (Aquinnah), the Wampanoag Tribal Council of Gay Head, Inc., and the Aquinnah Wampanoag Gaming Corporation is DENIED.

**So Ordered.**


                                                      /s/ F. Dennis Saylor
                                                      F. Dennis Saylor IV
Dated:  November 13, 2015                              United States District Judge