# United States Court of Appeals
## For the First Circuit

No. 16-1137

COMMONWEALTH OF MASSACHUSETTS; AQUINNAH/GAY HEAD
COMMUNITY ASSOCIATION, INC.; TOWN OF AQUINNAH, MA,

Plaintiffs, Appellees,

v.

THE WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH);
THE WAMPANOAG TRIBAL COUNCIL OF GAY HEAD, INC.;
THE AQUINNAH WAMPANOAG GAMING CORPORATION,

Defendants, Appellants,

CHARLES D. BAKER, in his official capacity as Governor
of the Commonwealth of Massachusetts; MAURA T. HEALEY,
in her capacity as Attorney General of the Commonwealth
of Massachusetts; STEPHEN P. CROSBY, in his capacity as
Chairman of the Massachusetts Gaming Commission,

Third-Party Defendants.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

———————————

Before

Howard, Chief Judge,
Torruella and Kayatta, Circuit Judges.

———————————

Scott D. Crowell, with whom Crowell Law Offices-Tribal
Advocacy Group, Lael Echo-Hawk and Hobbs Straus Dean & Walker, LLP
were on brief, for appellants.
Judy B. Harvey, Attorney, Environment and Natural Resources
Division, U.S. Department of Justice, with whom John C. Cruden,

Assistant Attorney General, <u>Sam Hirsch</u>, Principal Deputy Assistant Attorney General, <u>Mary Gabrielle Sprague</u> and <u>Amber Blaha</u>, Attorneys, Environment and Natural Resources Division, <u>Dan Lewerenz</u>, Office of the Solicitor, Department of the Interior, and <u>Maria Getoff</u>, Office of the General Counsel, National Indian Gaming Commission, were on brief, for United States as amicus curiae.

    <u>Felicia H. Ellsworth</u>, with whom <u>Claire M. Specht</u>, <u>James L. Quarles, III</u>, and <u>Wilmer Cutler Pickering Hale and Dorr LLP</u> were on brief, for appellee Aquinnah/Gay Head Community Association, Inc.

    <u>Ronald H. Rappaport</u>, with whom <u>Michael A. Goldsmith</u> and <u>Reynolds, Rappaport Kaplan & Hackney, LLC</u> were on brief, for appellee Town of Aquinnah.

    <u>Juliana deHaan Rice</u>, Assistant Attorney General, Government Bureau, with whom <u>Bryan F. Bertram</u>, Assistant Attorney General, and <u>Maura T. Healey</u>, Attorney General, were on brief, for appellee Commonwealth of Massachusetts and Third-Party Defendants.

---

April 10, 2017

---

-2-

TORRUELLA, **Circuit Judge**.    Appellant, the Wampanoag
Tribe of Gay Head (Aquinnah)[1] (the "Tribe"), a federally recognized
Indian tribe, seeks to have gaming pursuant to the Indian Gaming
Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721, on its trust lands
in Dukes County, Massachusetts (the "Settlement Lands").
Appellees, the Commonwealth of Massachusetts (the "Commonwealth"),
the town of Aquinnah (the "Town") and the Aquinnah/Gay Head
Community Association[2] argue that any gaming on the Settlement
Lands should be subject to state, rather than federal, laws and
regulations.    The district court, on summary judgment, found for
the Appellees.    The district court reasoned that IGRA did not
apply, because the Tribe had failed to exercise sufficient
governmental power; and that even if the Tribe had exercised
sufficient governmental power, the Wampanoag Tribal Council of Gay
Head, Inc., Indian Claims Settlement Act of 1987, Pub. L. No. 100-
95 (codified at 25 U.S.C. §§ 1771-1771i) (the "Federal Act"), which
provides that the Settlement Lands are subject to state laws and
regulations (including gaming laws and regulations), governed.
Because we find that the Tribe has exercised more than sufficient

---

[1]  The town of Gay Head was incorporated into the Commonwealth of
Massachusetts in 1870, but has since been renamed "Aquinnah."

[2]  Because the Town and the Association filed a joint brief, we
generally refer to both parties together as "the Town."

governmental power to satisfy the requirements of IGRA, and the Federal Act has been impliedly repealed by IGRA in relevant part, we reverse.

## I.  Background

### A.  Factual History

#### 1.  The Settlement Agreement and the Federal Act

The Tribe has lived on Martha's Vineyard since before the European colonization of New England, and has continued to reside there to the present day.  The Town was incorporated by the Commonwealth in 1870 as the town of Gay Head, and has since been renamed Aquinnah.  In 1974, the Tribe sued the Town in federal court, asserting title to certain lands and "seeking ejectment of record title holders."  The Commonwealth and the Association intervened.

In November 1983, these parties signed a Memorandum of Understanding (the "Settlement Agreement").  The Settlement Agreement conveyed the Settlement Lands (approximately 485 acres) to the Tribe.  In exchange, the Tribe gave up its claims to other lands and dismissed its lawsuit.  Before this Settlement Agreement could enter into force, it had to be implemented by Congress.

On August 18, 1987, Congress implemented the Settlement Agreement by passing the Federal Act.  See Wampanoag Tribal Council of Gay Head, Inc., Indian Claims Settlement Act of 1987,

-4-

Pub. L. No. 100-95 (codified at) 25 U.S.C. §§ 1771-1771i.  The Federal Act provides, inter alia, that the Settlement Lands "shall be subject to the civil and criminal laws, ordinances, and jurisdiction of the Commonwealth . . . and the [Town] . . . (including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance)."  25 U.S.C. § 1771g.

The parties all agree that "[t]he Commonwealth, the Town, and the Tribe have each exercised jurisdiction over the Settlement Lands pursuant to the provisions of the Federal Act."

### 2. Cabazon and IGRA

On February 25, 1987 -- approximately six months before Congress passed the Federal Act -- the Supreme Court decided California v. Cabazon Band of Mission Indians, 480 U.S. 202 (1987), which held that California -- which permitted certain forms of regulated gambling -- could not civilly regulate tribal bingo games because such regulation "would impermissibly infringe on tribal government."  Id. at 221-22. This decision did, however, leave space for states that criminally prohibit gaming to prohibit it on Indian lands within their jurisdictions.

In response, on October 17, 1988, Congress enacted IGRA. See, e.g., Michigan v. Bay Mills Indian Cmty., 134 S. Ct. 2024, 2034 (2014) ("Congress adopted IGRA in response to [Cabazon], which

-5-

held that States lacked any regulatory authority over gaming on Indian lands.").  IGRA provides, <u>inter alia</u>, "for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."  25 U.S.C. § 2702(1).

IGRA "sets in place a sophisticated regulatory framework" for gambling on Indian lands, dividing gaming into three classes:  Class I gaming, which includes traditional Native American gaming, is always permitted; Class II gaming, which includes bingo, is permitted so long as the state does not generally proscribe gaming of that type; and Class III gaming, which includes casino gambling, is permitted only pursuant to a compact between a tribe and the state.  <u>Id.</u> § 2710; <u>Rhode Island</u> v. <u>Narragansett Indian Tribe</u>, 19 F.3d 685, 689-90 (1st Cir. 1994). Congress established the National Indian Gaming Commission ("NIGC") to administer IGRA; its responsibilities include approving Class II gaming ordinances submitted to it by Indian tribes.  25 U.S.C. §§ 2704, 2710(b)(1)(B).

### 3.  The Tribe's Pursuit of Gaming on Settlement Lands

On November 22, 2011, Governor Deval Patrick signed "An Act Establishing Expanded Gaming in the Commonwealth" into law, which allowed gaming in establishments licensed by the Commonwealth.  On that same day, the Tribe submitted Gaming

-6-

Ordinance No. 2011-01 to the NIGC for approval, which set forth tribal rules governing gaming. On February 4, 2012, the Tribe adopted Gaming Ordinance No. 2011-01, and on February 21, 2012, the NIGC "announc[ed] the approval of Gaming Ordinance No. 2011-01 for gaming on Indian Lands as defined by IGRA." On March 5, 2012, the Tribe began corresponding with the Commonwealth to enter into negotiations for a Class III compact under the newly-enacted law, but no compact was formed.

On May 30, 2013, the Tribe submitted an amended Ordinance No. 2011-01 to the NIGC, which stated the Tribe's intention to pursue Class II gaming on the Settlement Lands. The NIGC sought an opinion from the Department of the Interior ("DOI") as to whether the Federal Act prohibited Class II gaming on the Settlement Lands; the DOI provided an opinion stating that gaming was not prohibited. On August 29, 2013, the NIGC approved the amended Ordinance No. 2011-01. On October 25, 2013, in response to a request by the Tribe, the NIGC provided an opinion that the Settlement Lands were eligible for gaming under IGRA. Consequently, the Tribe has neither applied for nor obtained a license from the Massachusetts Gaming Commission to operate a gaming establishment.

When the Tribe informed the Commonwealth that it would proceed with the establishment of a Class II gaming facility on

the Settlement Lands pursuant to IGRA, the Commonwealth responded, on December 2, 2013, by filing suit against the Tribe in state court.    The Commonwealth asserted breach of the Settlement Agreement and sought a declaratory judgment that the Settlement Agreement prohibited gaming on the Settlement Lands.    The Tribe removed the case to the district court on December 30, 2013, on grounds of federal question and supplemental jurisdiction.

After some procedural fencing not relevant here, on May 28, 2015, the parties all moved for summary judgment.    On November 13, 2015, the district court granted summary judgment for the Appellees.

The district court ruled that the Settlement Lands were not covered by IGRA, and hence were subject to the Commonwealth's gaming regulations. Massachusetts v. Wampanoag Tribe of Gay Head (AQUINNAH), 144 F. Supp. 3d 152, 177 (D. Mass. 2015).  First, it found that the Tribe, despite having jurisdiction over the Settlement Lands, failed to exercise sufficient "governmental power" over those lands, as required for IGRA to apply.  Id.  It recognized that the Tribe had asserted that it was "responsible" for many governmental services in the Settlement Lands, but found that it had not shown sufficient "actual manifestations of [the Tribe's] authority."  Id. at 169-70.  Second, it ruled that even if the Tribe did exercise sufficient governmental power, IGRA did

-8-

not work an implied repeal of the portion of the Federal Act that
subjected the Settlement Lands to the gaming laws of the
Commonwealth. Id. at 177. The district court relied heavily on
the parenthetical language in § 1771g of the Federal Act stating
that the "civil or criminal laws" included "those laws and
regulations which prohibit or regulate the conduct of bingo or any
other game of chance." 25 U.S.C. § 1771g. Id. at 170-72 (quoting
25 U.S.C. § 1771g). According to the district court, this language
"specifically prohibits gaming on the Settlement Lands." Id. at
172. Because IGRA does not permit Class II gaming if it is
"otherwise specifically prohibited on Indian lands by Federal
law," the district court ruled that IGRA did not repeal this
provision, and that the Federal Act prohibited the Tribe from
opening a gaming establishment on the Settlement Lands without the
Commonwealth's approval. Id.

On January 5, 2016, the district court entered final
judgment, declaring that the Tribe could not operate a gaming
facility on the Settlement Lands without complying with the laws
of the Commonwealth and the Town, and enjoining the Tribe from
opening any such establishment without first obtaining approval
from the Commonwealth and the Town. The Tribe filed a timely
appeal.

## II.  **Standard of Review**

A district court's grant of summary judgment is reviewed de novo.  OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Can., 684 F.3d 237, 241 (1st Cir. 2012).  Summary judgment should be granted if "there is no genuine dispute as to any material fact" and the movant "is entitled to judgment as a matter of law."  Id. (quoting Fed. R. Civ. P. 56(a)).

## III.  **Discussion**

We must resolve two issues today.  First, we must decide whether IGRA applies to the Settlement Lands.  See Narragansett, 19 F.3d at 702-03.  Second, we must decide whether IGRA effects a repeal of the Federal Act.[3]  See id. at 703-04.

## A.  **The Applicability of IGRA**

> [IGRA]'s key provisions [apply] to "[a]ny Indian tribe
> having jurisdiction over Indian lands," or, stated
> differently, to "Indian lands within such tribe's

---

[3]  The Tribe also raises a third issue, whether the district court abused its discretion by not including the NIGC as a required party.  A party is required to be joined if the absence of that party could "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations."  Fed. R. Civ. P. 19(a)(1)(B)(ii).  In determining whether there is a risk of inconsistent obligations under Rule 19(a)(1)(B)(ii), we consider whether there is a "practical" possibility of such an inconsistency, not whether it may be "theoretically possible."  Bacardí Int'l. Ltd. v. V. Suárez & Co., 719 F.3d 1, 13 (1st Cir. 2013).  Although the Tribe asserts that it may become subject to inconsistent obligations, the Tribe has failed to provide any examples of such inconsistent obligations. We thus find no error, let alone abuse of discretion, in the district court's decision to proceed without the NIGC as a party.

jurisdiction."     See     25     U.S.C.     §§ 2710(d)(3)(A),
2710(b)(1).     These     are     dual     limitations,     for     one
element     of     the     definition     of     "Indian     lands"     requires
that     an     Indian     tribe     "exercise[]     governmental     power"
over     them.     25     U.S.C.     §     2703(4).

Narragansett, 19 F.3d at 701 (third and fourth alterations in

original).

### 1. Having Jurisdiction[4]

In Narragansett, we were satisfied by the fact that Rhode

Island did not acquire "exclusive" jurisdiction, and that the

Narragansett Tribe retained "that portion of jurisdiction they

possess by virtue of their sovereign existence as a people." Id.

at 702.  In the present case, as the district court noted, the

parties stipulated that "the Commonwealth, the Town, and the Tribe

have each exercised jurisdiction over the Settlement Lands."

Although the Federal Act does contain some language limiting the

Tribe's jurisdiction, that language only confirms that the Tribe

retains the jurisdiction it has not surrendered in the Federal

Act.  25 U.S.C. § 1771e(a) (stating that the Tribe "shall not have

any jurisdiction over nontribal members and shall not exercise any

jurisdiction over any part of the [S]ettlement [L]ands in

contravention of [the Federal Act], the civil regulatory and

---

[4]  The Tribe argues that Appellees have waived arguments on this
issue.  Because we find for the Tribe on the merits, we need not
address its waiver argument.

criminal laws of [the Commonwealth and the Town], and applicable Federal Laws").[5]  "Since the Settlement Act does not unequivocally articulate an intent to deprive the Tribe of jurisdiction, we hold that its grant of jurisdiction to the state is non-exclusive.  The [Tribe], therefore, [has] made the necessary threshold showing."  Narragansett, 19 F.3d at 702.

### 2.  Exercising Governmental Power

> [A] tribe must exercise governmental power in order to trigger [IGRA].  Meeting this requirement does not depend upon the Tribe's theoretical authority, but upon the presence of concrete manifestations of that authority.  Consequently, an inquiring court must assay the jurisdictional history of the settlement lands.

Id. at 702-03.

In Narragansett, we noted that this "inquiry into governmental power need not detain us," and concluded that the Narragansett Tribe's "activities adequately evince that the Tribe exercises more than enough governmental power to satisfy the second prong of the statutory test." Id. at 703.  To wit, the Narragansett Tribe

---

5  The Town observes that in Narragansett we pointed to the Federal Act as an instance where, in contrast to Rhode Island's Settlement Act, Congress placed "stated limits on the retained jurisdiction of the affected tribes."  19 F.3d at 702.  However, we made that comment only to highlight that the Rhode Island Act's broad language did not imply exclusivity, not to suggest that the Federal Act somehow conveyed exclusive jurisdiction to the Commonwealth.

has taken many strides in the direction of self-government. It has established a housing authority, recognized as eligible to participate in the Indian programs of the federal Department of Housing and Urban Development, <u>see</u> 24 C.F.R., Part 905 (1993). It has obtained status as the functional equivalent of a state for purposes of the Clean Water Act, after having been deemed by the Environmental Protection Agency as having "a governing body carrying out substantial governmental duties and powers," 33 U.S.C. § 1377(e) (1988), and as being capable of administering an effective program of water regulation, <u>see</u> 40 C.F.R. § 130.6(d) (1993). It has taken considerable advantage of the Indian Self-Determination and Education Assistance Act (ISDA), a statute specifically designed to help build "strong and stable tribal governments." 25 U.S.C. § 450a(b) (1998). The Tribe administers health care programs under an ISDA pact with the Indian Health Service, and, under ISDA contracts with the Bureau, administers programs encompassing job training, education, community services, social services, real estate protection, conservation, public safety, and the like.

<u>Id.</u>

The Tribe in the present case has taken most of the same steps that the Narragansetts had -- and indeed several more. Therefore, like in <u>Narragansett</u>, the inquiry into governmental power "need not detain us." <u>Id.</u>

In the present case, like in <u>Narragansett</u>, the Tribe: has established a housing program that receives HUD assistance, and has built approximately 30 units of housing under that program; has entered into an intergovernmental agreement with the EPA; operates a health care clinic with the aid of the Indian Health Service; administers a program for education with scholarships

-13-

financed with Bureau of Indian Affairs funding; administers social services with a human services director responsible for child welfare work; administers conservation policy (and has two conservation rangers to enforce its conservation policy); and administers a public safety program (the same two rangers enforce tribal laws and can be cross-deputized by the Town).

In addition, the Tribe has passed numerous ordinances and employs a judge. These ordinances deal with such diverse topics as building codes, health, fire, safety, historic preservation, fish, wildlife, natural resources, housing, lead paint, elections, judiciary, criminal background checks, and the reporting of child abuse and neglect. In addition to the inter-governmental agreements already mentioned -- with the EPA and the Bureau of Indian Affairs -- the Tribe has also entered into intergovernmental agreements with the National Park Service, and indeed also with the Commonwealth and the Town. The agreements with the Commonwealth and the Town include agreements whereby the Tribe, for compensation, may rely on state and local law enforcement and firefighting services.

The Town nevertheless urges us to adopt the district court's analysis and find that the Tribe has not exercised sufficient governmental power. The Town points out that some of the Tribe's exercises of governmental power are not full-fledged,

-14-

and then proceeds to read our opinion in Narragansett as requiring full-fledged exercise of governmental power for IGRA to apply. For instance, the Town points out that while the Tribe employs a judge -- and indeed maintains a tribal court -- this judge is employed part-time, and presides via teleconference from Washington State; similarly, the Town points out that the Tribe does not have a hospital, but instead maintains a health clinic.

The Town gets it backwards. Pursuant to IGRA, "the operation of gaming by Indian tribes [is] a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702. The Town now seeks to put this logic on its head by requiring the Tribe's government to be fully developed before it can have the benefit of gaming revenue. This is not what IGRA requires, nor is it our case law. In Narragansett, we deemed the "many strides in the direction of self-government" -- that is, not the achievement of full-fledged self-governance, but merely movement in that direction -- to "evince that the Tribe exercises more than enough governmental power to satisfy the second prong of the statutory test." 19 F.3d at 703. We have no difficulty drawing the same conclusion here, especially because "[i]n determining [Congressional] intent . . . [d]oubtful expressions are to be resolved in favor of [Indians]." Id. at 691

(citations omitted) (quoting <u>Rosebud Sioux Tribe</u> v. <u>Kneip</u>, 430
U.S. 584, 586–87 (1977)).[6]

**B.   The Interface between IGRA and the Federal Act**

         Having  determined  that  IGRA  applies  to  the  Settlement
Lands,  we  must  now  determine  whether  IGRA  effected  a  partial  repeal
of  the  Federal  Act.   "The  proper  mode  of  analysis  for  cases  that
involve  a  perceived  conflict  between  two  federal  statutes  is  that
of  implied  repeal."   <u>Id.</u>  at  703  (citing  <u>United  States</u>  v.  <u>Cook</u>,  922
F.2d  1026,  1033  (2d  Cir.  1991)).   "[I]mplied  repeals  of  federal
statutes  are  disfavored.   In  the  absence  of  a  contrary  legislative
command,  when  two  acts  of  Congress  touch  upon  the  same  subject
matter  the  courts  should  give  effect  to  both,  if  that  is  feasible."
<u>Id.</u>  (citing  <u>Pipefitters  Local  562</u>  v.  <u>United  States</u>,  407  U.S.  385,
432  n.43  (1972)).  "[S]o  long  as  the  two  statutes,  fairly  construed,
are   capable   of   coexistence,   courts   should   regard   each   as
effective."   <u>Id.</u>  (citing  <u>Traynor</u>  v.  <u>Turnage</u>,  485  U.S.  535,  547–48
(1988)).   But  "'if  the  two  [acts]  are  repugnant  in  any  of  their
provisions,  the  latter  act,  without  any  repealing  clause,  operates
to  the  extent  of  the  repugnancy  as  a  repeal  of  the  first.'"   <u>Id.</u>

---

[6]  The  Tribe  also  argues  that  the  determinations  the  NIGC  and  DOI
made  concerning  the  applicability  of  IGRA  to  the  Settlement  Lands
merit  our  deference.   Because  we  find  for  the  Tribe  on  the  merits
of  its  own  legal  arguments,  we  do  not  reach  the  question  of  how
much,  if  any,  deference  the  NIGC  and  DOI  determinations  merit.

(quoting <u>United States</u> v. <u>Tynen</u>, 78 U.S. 88, 92 (1870)).  Finally, "[e]ven absent outright repugnancy, a repeal may be implied in cases where the later statute covers the entire subject 'and embraces new provisions, plainly showing that it was intended as a substitute for the first act.'"  <u>Id.</u> at 703-04 (quoting <u>Tynen</u>, 78 U.S. at 92).

"The doctrine of implied repeal operates without special embellishment in the Indian law context.  The rationale for encouraging preemption in the Indian context -- that the federal government is a more trustworthy guardian of Indian interests than the states -- has no relevance to a conflict between two federal statutes."  <u>Id.</u> at 704 (internal citations omitted).

Two precedents guide our analysis of the present issue: <u>Narragansett</u>, 19 F.3d 685 (holding that the Rhode Island Settlement Act was impliedly repealed in relevant part by IGRA, <u>id.</u> at 705), and <u>Passamaquoddy Tribe</u> v. <u>Maine</u>, 75 F.3d 784 (1st Cir. 1996) (holding that the Maine Settlement Act was not repealed by IGRA).  Because the present case is very close to <u>Narragansett</u>, and readily distinguished from <u>Passamaquoddy</u>, we find for the Tribe on this issue.

The Rhode Island Settlement Act at issue in <u>Narragansett</u> read, in relevant part, "[e]xcept as otherwise provided in this subchapter, the settlement lands shall be subject to the civil and

-17-

criminal laws and jurisdiction of the State of Rhode Island."  25
U.S.C. § 1708 (1978).  We found that this settlement act and IGRA
"are partially but not wholly repugnant."  <u>Narragansett</u>, 19 F.3d
at 704.  The two laws clashed only as to class I and class II
gaming (because IGRA permits class III gaming only if the tribe
and the state reach a compact), which "leaves largely intact the
grant of jurisdiction [to the state] -- but it demands an
adjustment of that portion of jurisdiction touching on gaming."
<u>Id.</u>  We highlighted two reasons why IGRA trumped the Rhode Island
Settlement Act:

> First, the general rule is that where two acts are in
> irreconcilable conflict, the later act prevails
> . . . .  Second, . . . courts should endeavor to read
> antagonistic statutes together in the manner that will
> minimize the aggregate disruption of congressional
> intent. Here, reading the two statutes to restrict
> state jurisdiction over gaming honors [IGRA] and, at
> the same time, leaves the heart of the [Rhode Island]
> Settlement Act untouched. Taking the opposite tack
> -- reading the two statutes in such a way to defeat
> tribal jurisdiction over gaming on the settlement
> lands -- would honor the Settlement Act, but would do
> great violence to the essential structure and purpose
> of [IGRA].

<u>Id.</u> at 704-705 (internal citations omitted).

In <u>Passamaquoddy</u>, we were presented with very different
language:

> The provisions of any Federal law enacted after
> October 10, 1980 [the effective date of the Maine
> Settlement Act], for the benefit of Indians, Indian
> nations, or tribes or bands of Indians, which would
> affect or preempt the application of the laws of the

-18-

> State of Maine . . . shall not apply within the State
> of Maine, <u>unless such provision of such subsequently
> enacted Federal law is specifically made applicable
> within the State of Maine</u>.

25 U.S.C. § 1735(b) (emphasis added).  We reasoned that the Maine
Settlement Act contained a savings clause that "acts as a warning
signal to later Congresses to stop, look, and listen before
weakening the foundation on which the settlement between Maine and
the Tribe rests," and that "signals courts that, if a later
Congress enacts a law for the benefit of Indians and intends the
law to have effect within Maine, that intent will be made
manifest." <u>Passamaquoddy</u>, 75 F.3d at 789.  Because IGRA does not
contain any indication that Congress intended it to be specifically
applicable within Maine, we concluded that -- given the presence
of the savings clause -- there was no conflict between the Maine
Settlement Act and IGRA, and IGRA therefore did not alter that
settlement act.

   The Appellees seek to distinguish the present case from
<u>Narragansett</u> because the Federal Act -- otherwise, in relevant
part, essentially identical to the Rhode Island Settlement Act[7]

---

[7]  The relevant portion of the Federal Act reads, in full:

> Except as otherwise expressly provided in this
> subchapter or in the State Implementing Act, the
> settlement lands and any other land that may now or
> hereafter be owned by or held in trust for any Indian
> tribe or entity in the town of Gay Head,
> Massachusetts, shall be subject to the civil and

-- ends in a parenthetical that reads, in full, "(including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance)."  25 U.S.C. § 1771g.  Appellees argue that this parenthetical operates as a savings clause like the one in <u>Passamaquoddy</u>.

Appellees, however, misread the parenthetical.  Unlike the savings clause in <u>Passamaquoddy</u>, the parenthetical in the Federal Act says nothing about the effect of future federal laws on the Federal Act.  Rather, the parenthetical merely clarifies that, at the time of the enactment of the Federal Act, state and local gaming law applied to the Settlement Lands.  We note that, at the time, there was a reason for adding this clarification (a reason that did not exist nine years earlier when the Rhode Island Settlement Act entered into force).  Approximately six months before Congress passed the Federal Act on August 18, 1987, the Supreme Court decided <u>Cabazon</u>, 480 U.S. 202, which created

---

criminal laws, ordinances, and jurisdiction of the Commonwealth of Massachusetts and the town of Gay Head, Massachusetts (including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance).

25 U.S.C. § 1771g.  Although the Federal Act is more detailed than the Rhode Island Settlement Act in terms of which lands it applies to and which local laws the Settlement Lands shall be subject to, Appellees do not argue, nor could they, that this added level of detail is relevant to the implied repeal analysis.

considerable uncertainty about Indian law, specifically with respect to gaming.  See, e.g., Wisconsin v. Ho-Chunk Nation, 784 F.3d 1076, 1080 (7th Cir. 2015) ("Cabazon led to a flood of activity, and states and tribes clamored for Congress to bring some order to tribal gaming."); see also supra Section I.2.  Soon after, on October 17, 1988, Congress enacted IGRA.  The Federal Act was thus passed during a period of uncertainty about the status and future of Indian gaming.  The parenthetical served to decrease that uncertainty by clarifying that, when the Federal Act was enacted, Commonwealth gaming law applied to the Settlement Lands, but -- just like the Rhode Island Settlement Act nine years before it -- it said nothing about the effect of future federal law.[8]

The fact that the savings clause in the Maine Settlement Act had already been on the books for some seven years when the Federal Act was enacted further confirms that Congress did not intend the Federal Act to contain such a savings clause -- for the Maine Settlement Act leaves no doubt that Congress knew how to

---

[8] Appellees note that Congress amended the Rhode Island Settlement Act following our decision in Narragansett to include "[f]or purposes of [IGRA], settlement lands shall not be treated as Indian lands." 25 U.S.C. § 1708(b) (1996). Appellees argue that this means that Congress also intended the Settlement Lands in Massachusetts not to be treated as Indian lands for the purposes of IGRA. Appellees ignore an obvious fact: Congress did not amend the Federal Act.

draft a savings clause, and that the parenthetical in the Federal Act is not such a savings clause.[9]

We also reject the Appellees' argument that the Federal Act and IGRA are not in conflict because the latter only allows class II gaming where it "is not otherwise specifically prohibited on Indian lands by Federal law." 25 U.S.C. § 2710(b)(1)(A). Contrary to the Appellees' contentions, the parenthetical language included in the Federal Act is neither specific nor a prohibition. The language is hardly specific, as it appears applicable to all types of gaming and references bingo only as an example. Nor does the section prohibit anything. It merely grants Massachusetts jurisdiction over gaming. And, as the Tribe points out, even Massachusetts law does not prohibit gaming altogether. Rather, it merely regulates such gaming (e.g., by requiring a license).

---

[9] The Maine Settlement Act is by no means the only example that demonstrates that Congress knows how to draft a savings clause. See Passamaquoddy, 75 F.3d at 790 ("the Court regularly has upheld and given effect to [savings clauses]" (citing Warden, Lewisburg Penit. v. Marrero, 417 U.S. 653, 659-60 n.10 (1974) (earlier statute barred repeal of certain penalties "unless the repealing Act shall so expressly provide"); Shaughnessy v. Pedreiro, 349 U.S. 48, 52 (1955) (earlier statute directed that "[n]o subsequent legislation shall . . . supersede or modify the provisions of [the earlier statute] except to the extent such legislation shall do so expressly"); Posadas v. National City Bank, 296 U.S. 497, 501 (1936) (earlier statute directed that subsequent laws "shall not apply to the Philippine Islands, except when they specifically so provide"); Great Northern Ry. Co. v. United States, 208 U.S. 452, 456 (1908) (similar); United States v. Reisinger, 128 U.S. 398, 401-02 (1888) (similar))).

Review of the legislative history confirms that this is not the type of specific prohibition that Congress had in mind.  Indeed, "[t]he phrase 'not otherwise prohibited by Federal Law'" was meant to "refer[] to gaming that utilizes mechanical devices as defined in 15 U.S.C. § 1175," which the Appellees concede is not at issue here.  S. Rep. No. 100-446, at 12 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3082.

## IV.  **Conclusion**

For the foregoing reasons, the opinion of the district court is reversed and the case is remanded to the district court for entry of judgment in favor of the Tribe.

**Reversed and Remanded.**