UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS, | **CASE NO: 1:13-cv-13286-FDS** |
| *Plaintiff,* | |
| and | [Formerly Supreme Judicial Court for Suffolk County, Massachusetts, CIVIL ACTION NO. 2013-0479 ] |
| AQUINNAH/GAY HEAD COMMUNITY ASSOCIATION, INC. (AGHCA) and TOWN OF AQUINNAH, | |
| *Intervenor-Plaintiffs/Counterclaim-Defendants,* | |
| **vs.** | |
| THE WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH), THE WAMPANOAG TRIBAL COUNCIL OF GAY HEAD, INC., and THE AQUINNAH WAMPANOAG GAMING CORPORATION, | |
| *Defendants/Counterclaim-Plaintiffs,* | |
| and | |
| CHARLIE BAKER, in his official capacity as GOVERNOR, COMMONWEALTH OF MASSACHUSETTS, et al., | |
| *Third-Party Defendants.* | |

# WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH) RESPONSE IN OPPOSITION TO THE TOWN OF AQUINNAH'S MOTION FOR ENTRY OF FINAL JUDGMENT

## TABLE OF CONTENTS

I.   OVERVIEW ........................................................................... 1

II.  ARGUMENT ........................................................................ 5

   A. PROPOSED FORM OF FINAL JUDGMENT VIOLATES
      MANDATE RULE ............................................................. 5

   B. THE TRIBE APPEALED THE LEGAL ISSUES GERMANE TO
      THE DISTRICT COURT'S PRELIMINARY INJUNCTION ....... 8

   C. ALL TOWN AND LOCAL LAWS INTEGRAL TO THE TRIBE'S
      GAMING OPERATIONS ARE PREEMPTED BY IGRA. ........ 14

   D. TECHNICAL ISSUES WITH THE LANGUAGE OF THE
      TOWN'S PROPOSED FINAL JUDGMENT .......................... 19

    SUMMARY .................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. California,*
   460 U.S. 605 (1993)...............................................................7

*Biggens v. Hazen Paper Company,*
   111 F.3d 205 (1st Cir. 1997)......................................................7

*Brehmer v. Planning Bd. of. Town of Wellfleet,*
   238 F.3d 117 (1st Cir. 2001)......................................................8

*Chemehuevi v. Newsom,*
   *F.3d_,* 2019 WL 1285060 (9th Cir. 2019) ...................................16

*Cohen v. Brown University,*
   101 F.3d 155 (1st Cir. 1996)....................................................13

*DeCotiis v. Whittemore,*
   842 F. Supp. 2d 354 (D. Maine 2012)............................................7

*EEOC v. Sears, Roebuck & Co.,*
   417 F.3d 789 (7th Cir. 2005) ....................................................8

*Engel Indus. Inc. v. Lockformer Co.,*
   166 F.3d 1379 (Fed. Cir. 1999) ..................................................5

*General Universal Systems, Inc., v. HAL, Inc.,*
   500 F.3d 444 (5th Cir. 2007) ...................................................13

*Huffman v. Saul Holdings Ltd P'ship,*
   262 F.3d 1128 (10th Cir. 2001) ..................................................6

*Hynning v. Partidge,*
   359 F.2d 271 (D.C. Cir. 1966) ...................................................6

*In re Indian Gaming Related Cases,*
   331 F.3d 1094 (9th Cir. 2003)...................................................16

*Invention Submission Corp. v. Dudas,*
   413 F.3d 411 (4th Cir. 2005) ....................................................8

*Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah),*
  853 F.3d 618 (1st. Cir. 2017)..........................................4, 5, 19, 20

*Menard v. CSX Transport. Inc.,*
  2013 WL 5726189 at *1 (D. Mass. 2013) ......................................6

*Ms. M. v. Falmouth School Dept.,*
  875 F.3d 75 (1st Cir. 2017) ......................................................7

*Negron-Almeda v. Santiago,*
  579 F.3d 45 (1st Cir. 2009) ......................................................8

*Rhode Island v. Narragansett Indian Tribe,*
  19 F.3d 685 (1st Cir. 1994) ......................................13, 14, 15, 18

*Situation Management Systems, Inc. v. Lamoco Consulting LLC,*
  2011 WL 1226114 (D. Mass. 2011)..........................................7, 8

*Sycuan Band of Mission Indians v. Roache,*
  1788 F.Supp. 1498 (S.D. Cal.  1992) ..........................................18

*United Keetoowah Band of Cherokee Indians v. Oklahoma,*
  927 F.2d 1170 (10th Cir. 1991) .................................................18

*United States v. Belculfine,*
  527 F.2d 941 (1st Cir. 1975)......................................................7

*United States v. Carta,*
  690 F.3d 1 (1st Cir. 2012) ........................................................7

*United States v. Moran,*
  393 F.3d 1 (1st Cir. 2004) ......................................................13

*United States v. Rivera-Martinez,*
  931 F.2d 148 (1st Cir. 1991)..............................................6, 7, 8

*United States v. Velez Carrero,*
  140 F.3d 327 (1st Cir. 1998)......................................................7

**Statutes**

25 U.S.C. § 2710(b)(1)(E) ......................................................... 10

25 U.S.C. § 2710(d)(3)(C) ..................................................... 16, 18

25 U.S.C. § 2710(d)(8) ............................................................ 18

Indian Gaming Regulatory Act (IGRA),
   25 U.S.C. §§ 2701 *et seq* ................................................. passim

**Other Authorities**

1B J. Moore, J. Lucas, & T. Currier, Moore's Federal Practice ¶
   0.404[1] (2d ed. 1991) .............................................................. 7

Agua Caliente Compact,
   https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc1-
   025715.pdf ......................................................................... 17

American Heritage® Dictionary of the English Language, Fifth Edition
   (2016) ............................................................................... 14

Coushatta Tribe Compact,
   https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc1-
   025952.pdf ......................................................................... 17

Department of the Interior's Office of Indian Gaming,
   www.bia.gov/as-ia/oig ........................................................... 16

Eastern Band of Cherokee Compact,
   https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc1-
   026002.pdf ......................................................................... 17

Mohegan Tribe Compact,
   https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc2-
   056439.pdf ......................................................................... 17

Oneida Compact,
   https://www.bia.gov/sites/bia.gov/files/assets/as-
   ia/oig/webteam/pdf/idc1-028231.pdf ........................................... 17

Wampanoag Mashpee Compact,
    https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc1-
    025709.pdf ........................................................................ 17

**Regulations**

25 C.F.R. § 559.4 ............................................................. 10, 15

25 C.F.R. Part 559 ................................................................ 10

Prevailing parties on appeal, Defendants[1] Counterclaimants Wampanoag Tribe of Gay Head (Aquinnah) and the Aquinnah Wampanoag Gaming Corporation ("AWGC") (collectively "Defendants" or "Tribe"), hereby respond in opposition to the Motion for Entry of Final Judgment (the "Motion") (Docs. 180-181) filed by Intervenor-Plaintiff/ Counterclaim-Defendant the Town of Aquinnah ("Town"). A supporting memorandum has been filed by Intervenor-Plaintiff/Counterclaim-Defendant, the Aquinnah/Gay Head Community Association, Inc. ("AGHCA") (Doc. 183)[2]. This Opposition pleading is also intended to be the response to such supporting memorandum.

## I.    OVERVIEW

Nearly two years after the Tribe prevailed at the First Circuit Court of Appeals, with the First Circuit issuing a simple, straightforward mandate reversing the Final Judgment issued by this Court against the Tribe, and remanding the action with simple directions to enter judgment in favor of the Tribe, and more than a year after the United States Supreme Court denied certiorari, the Town now asks this Court to enter final judgment in a manner inconsistent and in conflict with the direct mandate of the First Circuit. Despite having lost at the First Circuit, the Town, based upon its unfounded fear of an Indian tribe engaging in commercial activities to improve its economic condition and the conditions of its tribal members, now asks this Court to put the Town in a position of being able to interfere with or

---

[1] The Wampanoag Tribal Council of Gay Head, Inc., which was named as a party defendant, was an entity created under the laws of the Commonwealth of Massachusetts and no longer exists.

[2] The full caption in this matter should reflect that the name of Third Party Defendant Chairperson of the Massachusetts Gaming Commission has changed to Cathy Judd Stein. At the time of this filing, Plaintiff Commonwealth of Massachusetts and Third-Party Defendants Governor Charlie Baker, Attorney General Maura Healey, and Massachusetts Gaming Commission Chairperson Cathy Judd Stein (collectively referred to as "Commonwealth" or "State") have not submitted any pleading in support or in opposition to the Town's Motion.

prevent the Tribe from exercising its sovereign right to govern gaming activities on its Indian lands.

The Town objects to the Tribe proceeding with the construction of its gaming facility without first obtaining the Town's permission in the form of Town-issued permits. The Town also insists that the Tribe obtain permits or approvals from the Martha's Vineyard Commission (the "MVC"). The Town's Motion attempts, prior to this Court's entry of Final Judgment, to breathe new life into this Court's previous preliminary injunction, which required the Tribe to obtain Town-issued permits before the Tribe could proceed with converting its Community Center into a gaming facility. The passage of time while the litigation and appeal were proceeding required the Tribe to complete the Community Center and dedicate its use to non-gaming purposes. *See* Declaration of Tribal Chairwoman, Cheryl Andrew-Maltais filed simultaneously herewith ("Andrews-Maltais Declaration") at ¶ 6. The Tribe has since secured as a business partner Global Gaming Solutions LLC, a wholly-owned entity of the Chickasaw Nation, one of the most successful gaming entities in the country (Indian and non-Indian), which has successfully constructed and operates more than twenty gaming facilities, including WinStar World, the largest gaming facility in the United States. *Id* at ¶ 7. The Tribe has also since restructured its Tribal Gaming Commission to appoint three Commissioners who are among the most experienced regulators of gaming in this country. *Id.* at ¶¶ 10 & 11. The Tribe has also since established the infrastructure, including the retention of highly regarded and experienced building inspectors, to ensure that the gaming facility is constructed in conformance with applicable tribal and federal laws, which laws require that the facility be constructed in a manner that protects public health and safety. *Id.* at ¶¶ 15 – 17. Finally, the Tribe has now cleared a portion of its Indian lands for phase one of its planned gaming facility.

2

The Town, acting out of fear, makes bald assertions that the Tribe's action "threatens irreparable harm to the Town's residents, visitors and the natural environment" (Doc. 181 at 3), yet the Town fails to provide a scintilla of evidence to substantiate its claim. Instead, the Town speculates "For all we know. . . the Town believes. . . the ultimate facility may fall short," (Doc. 181 at 12).[3] These unsubstantiated accusations, as discussed in greater detail below, are just another example of the Town's refusal to heed the admonition of the First Circuit and recognize the Tribe as a responsible sovereign. To give the Town's assertions context, the Tribe could make the same speculative and unsubstantiated assertions against each and every proposed building project within the Town. But with respect to the gaming project envisioned by the Tribe, the critical difference is that both federal and tribal law forbid the irresponsible conduct and building practices which the Town now fears and alleges in its Motion. It is of significant note that the Town has not it raised its fears to the National Indian Gaming Commission ("NIGC") or the Tribal Gaming Commission, the two regulatory oversight entities with jurisdiction to take enforcement action to ensure that the

---

[3] The Town tries to scratch out merit by submitting a local newspaper article reporting that the Tribe allowed a live electrical wire to be exposed on the facility site. Ironically, the true facts relative to the electrical wire not only negate the Town's misdirected "live wire" fears, but further demonstrate the validity of the Tribe's concerns. As is standard practice on Martha's Vineyard, prior to demolishing a structure on the site, a licensed electrician properly disconnected the wire providing power to the structure, and reconnected the same wire to a properly installed meter socket that was intended to provide electricity during construction. *See* Declaration of Eric Robitaille filed simultaneously herewith. Unaware of the Tribe's position that Town permits are not required, the electrician, as is also standard practice on Martha's Vineyard, then requested that the Town issue a permit to proceed with power to the site. Rather than proceeding with the routine issuance of the supposedly non-discretionary permit, the Town instead contacted the power company and unilaterally directed the power company to disconnect the service, and the power company complied with the Town's directive. *Id.* To date, the Town has not acted on the permit request, and the power company has refused to reconnect electrical service without the permit. *Id.* Meanwhile, the Tribe has been deprived of electricity to continue construction, which is integral to the Tribe being able to offer gaming on its Indian lands. This "end run" on the Tribe's jurisdiction underscores the reality that the Town is not genuinely interested in providing routine non-discretionary permits, but rather, seeks to abuse any permitting authority to unjustly frustrate the Tribe's efforts to open its gaming facility, and to interfere with the Tribe's exercise of its gaming rights.

gaming project is proceeding in accordance with applicable laws and regulations. The Town's failure to take action at the NIGC or Tribal Gaming Commission level is due to the fact that the Town cannot substantiate its claims of irreparable harm, and refuses to acknowledge the legitimacy of these entities. Instead, seeing that the Tribe's gaming facility is becoming a reality, the Town is improperly asking this Court to position the Town so that it can, yet again, deprive the Tribe of the exercise of its gaming rights.

The Town attempts to capitalize on the opportunity resulting from this Court's delay in spreading the clear mandate of the First Circuit. Perhaps the Town is forum shopping because it believes that this Court is sympathetic to its position due to this Court previously siding with the Town in its dispute with the Tribe. But as set out below, the Town's Proposed Form of Judgment violates the Mandate Rule, as lower courts lack the authority to deviate from the clear mandate of the First Circuit. The Town is also wrong to assert that this Court's analysis in granting preliminary injunctive relief against the Tribe was not at issue in the contentions before the First Circuit.  This Court's analysis regarding the preliminary injunction did not survive the appeal. If there is any inclination by this Court to revive its injunction against the Tribe, the Tribe also sets forth below why this Court's initial analysis in the summer of 2015 was incorrect, and the Tribe sets forth below that the Town's proposed language in its Proposed Form of Final Judgment is problematic and errs on several material points.

This Court is better-advised to adhere to the clear direction of the First Circuit and simply spread the mandate with a Final Judgment that provides:

> For the reasons set forth in *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d 618, 629 (1st. Cir. 2017), Final Judgment is entered in favor of the Wampanoag Tribe of Gay Head (Aquinnah) and the Aquinnah Wampanoag Gaming Corporation (collectively "Tribe").  The Commonwealth of Massachusetts, the Town of Aquinnah and the Aquinnah Gay Head Community Association are permanently enjoined from asserting jurisdiction over, or interfering with, the Tribe's

rights under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 et seq.

## II.    ARGUMENT

### A.  PROPOSED FORM OF FINAL JUDGMENT VIOLATES MANDATE RULE

The Town is wrong to assert that this Court's injunction survived the unanimous reversal

by the First Circuit, as the opinion of this Court was reversed in its entirety:

> For the foregoing reasons, the opinion of the district court is reversed and the case is
> remanded to the district court for entry of judgment in favor of the Tribe.

*Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah),* 853 F.3d 618, 629 (1st. Cir.

2017). Without qualifications or conditions, the mandate directs that the opinion in its

entirety is reversed, and further directs this Court to enter judgment in favor of the Tribe.

The Town (and AGHCA) have no ability to alter that mandate and this Court lacks authority

or jurisdiction to alter that mandate. Indeed, both the Town and AGHCA

acknowledge/concede that the injunction language, which they are trying to resurrect, was

included by this Court in the final judgment that was reversed (Doc. 181 at 5; Doc. 183 at

2). The First Circuit's mandate provides no room or opportunity for further proceedings on

remand.

As the mandate's characterization suggests, it is "mandatory" that this Court follow the

First Circuit's ruling. Pursuant to the Mandate Rule, lower courts cannot take actions that

are contrary to the mandate or revisit the First Circuit's conclusions. Thus, the issues

decided by the First Circuit and within the scope of its decision are deemed incorporated

within the mandate and precluded from further adjudication unless specifically remanded to

this Court to address. *Engel Indus. Inc. v. Lockformer Co.*, 166 F.3d, 1379, 1382–84 (Fed.

Cir. 1999). The mandate is important because it affects when, and what, further action may

be taken in a case. Importantly, if the appellate relief includes proceedings on remand, the

mandate defines the scope of those proceedings. The lower court "must comply strictly with

the mandate rendered by the reviewing court" and "may not deviate" from the mandate. *United States v. Rivera-Martinez*, 931 F.2d 148, 150 (1st Cir. 1991) ("When a case is appealed and remanded, the decision of the appellate court establishes the law of the case and it must be followed by the trial court on remand"); *see also Huffman v. Saul Holdings Ltd P'ship*, 262 F.3d 1128, 1132 (10th Cir. 2001)(the trial court "may not deviate" from the mandate); *Menard v. CSX Transport. Inc.*, 2013 WL 5726189 at *1 (D. Mass. 2013)("the only logical interpretation of Menard's motion is that he is asking for relief of the mandate from the Court of Appeals to this court[4]. This court does not have the power (or the inclination) to grant such relief. . .").

Here, where the remand is simply with instructions to enter judgment in favor of the Tribe, the Mandate Rule leaves no room to divert from the clear mandate of the First Circuit. The D.C. Circuit, in a case involving a mandate similar to the one at issue here, where the losing party tried to resurrect a counterclaim on remand asserting that it was not addressed in the appellate opinion, reasoned as follows:

> While we did not discuss in our opinion the District Court's denial of the counterclaim, the judgment we entered included these words: "the judgment of the District Court appealed from is reversed, and this cause is remanded to the District Court with directions to enter judgment in favor of Partridge." As we have seen the 'judgment appealed from' was the entire judgment of the District Court. We think that when an appellate decision is without limitation as to how much of the trial court's decision is set aside, all is set aside. Moreover, the judgment we entered makes it clear that the District Court's first ruling was reversed in its entirety.

*Hynning v. Partidge*, 359 F.2d 271, 273 (D.C. Cir. 1966).

The case law regarding the scope of further proceedings on remand provides additional authority confirming that the Town's current Motion is out of order. A decision of an

---

[4] Notably, both the Town and AGHCA sought rehearing and rehearing *en banc* with the First Circuit, Document: 00117145684, which were summarily denied, Document: 00117153233. The Town and AGHCA had the opportunity at that juncture to seek limiting language with respect to the First Circuit's reversal and remand with direction to enter judgment in favor of the Tribe, but no such argument was made.

appellate tribunal on a particular issue, unless vacated or set aside, governs the issue during all subsequent stages of the litigation in the *nisi prius* court, and thereafter on any further appeal. *Arizona v. California*, 460 U.S. 605, 618 (1993); *Rivera-Martinez*, 931 F.2d at 150. When a case is appealed and remanded, the decision of the appellate court establishes the law of the case and it *must* be followed by the trial court on remand. If there is an appeal from the judgment entered after remand, the decision of the first appeal establishes the law of the case to be followed on the second. *Id.; Ms. M. v. Falmouth School Dept.*, 875 F.3d 75, 78 (1st Cir. 2017)("we did not remand the case to the district court for further proceedings"); *United States v. Carta*, 690 F.3d 1, 5 (1st Cir. 2012); *United States v. Velez Carrero,* 140 F.3d 327, 329-30 (1st Cir. 1998); *DeCotiis v. Whittemore*, 842 F. Supp. 2d 354 (D. Maine 2012)(despite merit to movant's argument, "The fact remains that the First Circuit affirmed the dismissal of Defendant Whittemore and, as a result, Defendant Whittemore is not before this Court on remand"); *Situation Management Systems, Inc. v. Lamoco Consulting LLC*, 2011 WL 1226114 at *2 (D. Mass. 2011); 1B J. Moore, J. Lucas, & T. Currier, Moore's Federal Practice ¶ 0.404[1] (2d ed. 1991). It follows, then, "when a case is decided by an appellate court and remanded, any questions that were before the appellate court and disposed of by its decree become the law of the case and bind the district court on remand." *Rivera-Martinez*, 931 F.2d at 150; *United States v. Belculfine*, 527 F.2d 941, 943 (1st Cir. 1975).

The Town cites *Biggens v. Hazen Paper Company*, 111 F.3d 205 (1st Cir. 1997), as its sole authority to proceed on remand with respect to matters not decided by the appeals court (Doc. 181 at 10). That case involved a remand with instructions for a new trial, not a remand with instructions to enter judgment in favor of the prevailing party. *Id.* at 209. Moreover, the *Biggens* court rejected the attempt to circumvent the mandate, which was to proceed to a new trial, rather than deviate to a determination on remand of whether the evidence submitted in the first trial was

sufficient to support a verdict. *Id.* at 208.   It properly applied the above-cited case law and reached the appropriate result, supporting the Tribe's position, not the Town's.

The Mandate Rule does have rare exceptions where there is a dramatic change in law, significant new evidence, or a blatant error that would result in serious injustice. *Negron-Almeda v. Santiago*, 579 F.3d 45 (1st Cir. 2009); *Invention Submission Corp. v. Dudas*, 413 F.3d 411, 414–15 (4th Cir. 2005); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 796 (7th Cir. 2005). But those circumstances are not present here. This modicum of residual flexibility does not mean that the Mandate Rule can, or should be, lightly shrugged aside:

> To the contrary, the doctrine is a salutary rule of policy and practice, grounded in important considerations related to stability in the decision-making process, predictability of results, proper working relationships between trial and appellate courts and judicial economy.

*Rivera-Martinez*, 931 F.3d at 151.   Moreover, these exceptions to the law of the case doctrine may have some permissiveness and flexibility in the context of a district court considering its own prior ruling, but not in the context of remand from a decision of an appellate court. *Situation Management Systems*, 2011 WL 1226114 at *2.

## B. THE TRIBE APPEALED THE LEGAL ISSUES GERMANE TO THE DISTRICT COURT'S PRELIMINARY INJUNCTION

The Town is wrong to assert that the issues critical to the District Court's ruling on the preliminary injunction were "undisturbed" (Doc. 181 at 5) or not within the scope of the issues raised by the Tribe to the First Circuit, and therefore, waived.[5] The Town's and

---

[5] At the time this Court entered judgment against the Tribe, the preliminary injunction was moot because the Town failed to post the bond required by this Court. Despite uncontroverted evidence that the Tribe's gaming operation will generate in excess of $10,000,000 annually in Tribal governmental revenue, this Court, in granting the Town's Motion for Preliminary Injunction, required "a relatively nominal bond of $1,000" (Doc. 142 at 43, lines 10-11). The bond was to be posted no later than August 4, 2015. (Doc. 140 at 2). No such bond was ever posted. Accordingly, the preliminary injunction issued by this Court expired as of midnight, August 4, 2015. *See Brehmer v. Planning Bd. of. Town of Wellfleet*, 238 F.3d 117 (1st Cir. 2001) ("Because plaintiffs failed to meet the $50,000 bond

AGHCA's attempts to identify the issues regarding the preliminary injunction as separate and distinct issues from the issues raised on appeal are disingenuous[6].

The Tribe appealed from the Final Judgment in its entirety (Doc. 159). The Tribe organized its Opening Brief to the First Circuit identifying three primary errors:

1.Whether the District Court erred in ruling that MILCSA[7] (Aquinnah)'s application of the Commonwealth's gaming laws remains in effect; IGRA preempts prior legislation regarding gaming on Aquinnah Indian lands;

2.Whether the District Court erred in concluding that the Tribe's struggling efforts to establish and expand its governmental presence are deficient for the Tribe's Indian lands to qualify under IGRA; Aquinnah exercises sufficient governmental power over its Indian lands; and

3. Whether the District Court erred in concluding that the Commonwealth's lawsuit could proceed without the NIGC as a party; the United States continues to assert jurisdiction over gaming activities on Aquinnah Indian lands to the exclusion of the Commonwealth.

Opening Brief, Document: 00117006636 at 13. Both issues #1 and #2 are contentions that directly address whether this Court erred in its reasoning and in issuing a preliminary injunction requiring that the Tribe comply with local permitting law.

The First Circuit found that the Indian Gaming Regulatory Act, 25 U.S.C. ¶¶ 2701 et seq. ("IGRA") preempts both State *and* local laws. *Aquinnah*, 853 F.3d at 627. Indeed, in doing so, the First Circuit expressly reasoned that the Tribe's Federal Act's express reference to local laws was irrelevant to the Court's preemption analysis:

Although the Federal Act is more detailed than the Rhode Island Settlement Act in terms of which lands it applies to and which local laws the Settlement Lands shall be subject to, Appellees do not argue, nor could they, that this added level of detail is relevant to the implied repeal analysis.

requirement imposed by the court, the TRO automatically expired").

[6] The Town suggests that the First Circuit expressly found the issues regarding the issuance of the preliminary injunction as not being relevant to the appeal (Doc. 181 at 6). That is blatantly incorrect. The "procedural wrangling" involved procedural issues of removal and intervention, not the substantive issues germane to the issuance of the preliminary injunction.

[7] MILCSA refers to the Massachusetts Indian Land Claims Settlement Act, also referenced in the briefs as the "Federal Act."

`

*Id.* at 628, n.7. Moreover, the First Circuit rejected this Court's analysis that IGRA and the Federal Act are not in a repugnant clash and can coexist. *Id.* at 627. In doing so, the First Circuit expressly noted that allowing the two acts to coexist "would do great violence to the structure and purpose of IGRA.*" Id.* Allowing the Town to now impose its local permitting laws on the Tribe would create the very violence that the First Circuit decision avoids[8]. The NIGC has express jurisdiction over the very same subject matter that the Town now wishes to exercise jurisdiction over, namely, ensuring that gaming facilities are constructed in a manner that protects public health and safety. The proposed Form of Order submitted with the Town's Motion allows the Town to interfere with the NIGC's jurisdiction, and to circumvent the NIGC's decisions regarding construction of the Tribe's gaming facility - an untenable result. IGRA mandates that the NIGC disapprove a tribal gaming ordinance unless that ordinance requires that the construction and maintenance of the gaming facility be conducted in a manner which adequately protects the environment and the public health and safety. 25 U.S.C. § 2710(b)(1)(E). The NIGC has promulgated and enforces 25 C.F.R. Part 559 to effectuate IGRA's requirements for adequate protection of the environment and the public health and safety, including specifically 25 C.F.R. § 559.4:

> A tribe shall submit to the Chair with each facility license an attestation certifying that by issuing the facility license, the tribe has determined that the construction and maintenance of the gaming facility, and the operation of that gaming, is conducted in a manner *which adequately protects the environment and the public health and safety. This means that a tribe has identified and enforces laws, resolutions, codes,*

---

[8] The violence between the Town's asserted authority and the NIGC's statutory authority is also borne out by the spurious footnote in the Town's brief, asserting that the lands on which the facility is being constructed are not eligible for gaming under IGRA (Doc. 181 at 8, n.4). The Tribe submitted to the NIGC a site-specific amendment to the Tribe's Gaming Ordinance, which submission caused the NIGC and the Department of the Interior to review the land's eligibility for gaming under IGRA. The amendment was approved. Andrews-Maltais Declaration at ¶ 13. The Town's position on this issue serves as yet another example of the Town's disregard for the NIGC's jurisdiction, and the violence that the Town's legal position does to IGRA and its regulatory scheme.

*policies, standards or procedures applicable to each gaming place, facility, or location* that protect the environment and the public health and safety, including standards under a tribal-state compact or Secretarial procedures.

(emphasis added). The Tribe's NIGC-approved Gaming Ordinance requires:

Each Gaming Facility must obtain a Facility License from the Tribal Council as required by IGRA and its implementing regulations ensuring that the construction and maintenance of the Gaming Facility and the operation of Gaming, shall be conducted in a manner which adequately protects the environment and the public health and safety and for that purpose shall comply with the requirements of all applicable health, safety and environmental standards enacted by the Tribe and any applicable federal and state laws.

(Doc. 107, Ex. X at Section 3.8). The Tribe's Gaming Commission, as a matter of both federal and tribal law, acts independently of the AWGC, and is comprised of experienced, highly qualified professionals. The Tribe's Gaming Commission provides, in accordance with tribal law, an independent level of regulatory oversight which will not allow the facility to open to the public if it is not constructed to code or otherwise poses a threat to public health and safety. *See* Andrews-Maltais Declaration at ¶ 12.

In addition to rejecting this Court's preemption analysis, the First Circuit also expressly rejected this Court's analysis that the Tribe lacks the governmental infrastructure and wherewithal to exercise its jurisdiction over its Indian lands. The Preliminary Injunction was also based in large part on this rejected analysis. This Court's rejection of tribal jurisdiction was noted in its comments in open court: "It (the Tribe) does not have a building permit. It has not applied for one." (Doc. 142 at 38, lines 11 and 12). The AWGC did apply for and receive a building permit, which was issued by the Tribal government in compliance with Tribal law.  Importantly, the Tribal law applicable to the issuance of a building permit by the Tribe includes a building code that meets or exceeds the building code set out in the Town's laws. *Id.* at ¶ 9. Moreover, the Tribal government has retained a building inspection firm comprised of inspectors properly certified to inspect the

11

construction of buildings on non-Tribal land on Martha's Vineyard[9] and elsewhere in the Commonwealth and surrounding states[10], and any construction must satisfy the inspectors in order for the Tribal Gaming Commission and the NIGC to allow the facility to open to the public. *Id*. at ¶¶ 10-12.

The Town quotes in its brief this Court's reasoning, stated in open court, which reinforces the Tribe's point on this issue: "As the Court stated, the Town should not have to sit back and allow the Tribe to construct a facility that 'ha[s] no sewage treatment of any kind, no septic or tie into a sewer and [is] discharging waste directly into . . . the bay,' or that is filled with asbestos, or that lacks sufficient fire exits, particularly where the Town has to foot the bill for fire, police, and other emergency services at the facility." (Doc. 181 at 9). First, the Town's quotation of this language underscores the fact that its position is based upon fear and arrogance, and not upon an understanding of the Tribe, its cultural concerns and obligations, and applicable law. But more importantly, IGRA and NIGC regulations establish as a matter of federal law, and require the Tribe as a matter of tribal law, to avoid and affirmatively prevent such absurd and insulting hypotheticals. Both the Town and this Court should adhere to the admonishment by the First Circuit and accept the Tribe as a responsible sovereign. The Town's reference to this Court's analysis underscores the linkage between the issues expressly raised on appeal and the basis, or lack of basis, for issuing the preliminary injunction. The Tribe and the NIGC are fully capable of protecting public

---

[9] In contrast, the Town's contracted inspector is not even available for regular hours of business. *See* Town Minutes, Exhibit A to Andrews-Maltais Declaration.

[10] Indeed, the Tribe, through the development of its infrastructure to include retention of the building inspection firm; its adoption of building codes that exceed state standards; its retention as its developer of one of the most experienced gaming companies in the nation; and oversight by the Tribal Gaming Commission and the NIGC, is far more capable than the Town (which outsources its building inspectors)  to address the Town's hypothetical concerns, and to ensure that the facility is constructed in a manner that does not threaten public health and safety.

health, safety and environmental concerns within their own governmental wherewithal, without applying for or obtaining permits issued by the Town[11].

The error in the Town's and AGHCA's argument is reinforced by the case law regarding the Mandate Rule, which forecloses a district court from re-litigating issues if the issues are either expressly *or impliedly decided or inferred* by the appellate court. *United States v. Moran*, 393 F.3d 1, 7 (1st Cir. 2004); *Cohen v. Brown University*, 101 F.3d 155, 168 (1st Cir. 1996); *General Universal Systems, Inc., v. HAL, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007). The Town and AGHCA assert that this Court's analysis regarding the application of Town permitting laws and the validity of the MVC's conditions on approval of the Tribe's Community Center was not raised by the Tribe to the First Circuit, and was not addressed by the First Circuit. The First Circuit directly rejected this Court's preemption analysis and its analysis regarding the Tribe's governmental infrastructure. The First Circuit, 853 F.3d at 627, also expressly reaffirmed the correctness of its decision in *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685 (1st Cir. 1994), which reasoned that all local laws that are "integral" to the exercise of a tribe's gaming laws are preempted by IGRA. *Id.* at 705. If the question of local permitting was not expressly decided, it was impliedly decided or inferred by the First Circuit such that paragraph 3 of the Town's Proposed Final Judgment should be rejected.

---

[11] The Town's remedy for concerns that the Tribe is constructing the gaming facility in a manner that creates a threat to public health and safety is to bring its concerns to the attention of the NIGC or the Tribal Gaming Commission. The Town has not done so. Indeed, the Town has yet to identify or articulate a science-based concern over the Tribe's construction activity, Andrews-Maltais Declaration at ¶ 19. That fact underscores the Town's motivation in seeking paragraph 3 of its Proposed Form of Judgment to be one of power and control to stop or delay the Tribe from exercising its gaming rights, and not a legitimate concern for public safety.

### C.  ALL TOWN AND LOCAL LAWS INTEGRAL TO THE TRIBE'S GAMING OPERATIONS ARE PREEMPTED BY IGRA.

This Court's analysis set forth in the context of previously granting the Town's motion for preliminary injunction in July of 2015 is wrong. Although the Tribe believes the Mandate Rule precludes the entry of judgment adverse to the Tribe in any manner, the Tribe argues in the alternative that the Court reconsider that analysis. The Town's Motion and AGHCA's brief in support are ruses, designed to enable local opposition to stop or delay the Tribe's exercise of its rights under IGRA through the denial or delay of permits. This conclusion is reinforced by the Town's and the AGHCA's failure to provide to this Court even a scintilla of evidence that the current construction and anticipated operation poses any material risk to public health and safety. However, if this Court is in any way predisposed to embrace the Town's proposed language in paragraph 3 of its Proposed Final Judgment, the Tribe urges this Court to look to the First Circuit opinion itself and reconsider the correctness of such an analysis.

As stated above, the First Circuit opinion, 853 F.3d at 627, expressly reaffirmed the correctness of its decision in *Narragansett,* which set forth the paradigm for analysis for determining which local laws are preempted by IGRA:

> Which activities are deemed regulable, therefore, will probably depend, in the first instance, on *which activities are deemed integral to gaming.* Although the core functions of class III gaming on the settlement land are beyond Rhode Island's unilateral reach, the distinction between core functions and peripheral functions is *tenebrous,* as is the question of exactly what Rhode Island may and may not do with respect to those functions that eventually are determined to be peripheral.

19 F.3d at 705-706 (emphasis added). Integral is defined as:

1. Essential or necessary for completeness; constituent:
2. Possessing everything essential; entire.

American Heritage® Dictionary of the English Language, Fifth Edition (2016). Thus, the test should be whether the Town-issued permit, or other permits the Town may require, are essential

or necessary for completeness. Using that straightforward analysis, the very fact that the Town insists that the Town-issued permits must be in place in order for the Tribe to proceed renders them to be integral and therefore preempted by IGRA.

The First Circuit anticipated that it would be difficult to determine exactly where Town jurisdiction under the Federal Act would remain in the wake of IGRA's preemption. The Tribe concedes certain issues where Town jurisdiction remains, as evidenced by the recent action by the Tribe to secure Town-issued, non-gaming related permits for completion of its Community Center (which as a result of the delay in this litigation is no longer a viable site for the Tribe's gaming facility). Andrews-Maltais Declaration at ¶ 18. Conversely, a permit to be obtained in order for construction of the gaming facility to be completed is clearly on the Tribe/federal side of the line. Where the fine line is to be drawn between the IGRA and the Federal Act was anticipated by the First Circuit to be "tenebrous," defined as dark and gloomy, *Narragansett*, 19 F.3d at 706, but that fine line drawing is not necessary here.

Reinforcement of the correctness of the Tribe's position is found both in the NIGC's authority and in the tribal/state compact provisions of IGRA. As explained above, the NIGC's oversight includes both its own regulation that will disallow a Facility License to be issued to the Tribe without ensuring that the facility is constructed and will be operated in a manner that protects public health and safety 25 C.F.R. § 559.4, and its ability to take enforcement action for non-compliance with the Tribe's Gaming Ordinance, which is expressly required to provide that construction be done in a manner that protects the public health and safety. Given that the NIGC, the federal gaming oversight entity, has such express statutory and regulatory authority, it is reasonable to conclude that such subject matter is "integral" to the  exercise of the Tribe's gaming rights.

Under IGRA, the tribal–state compacting process includes a prescribed scope of subjects that

can be properly negotiated.  Section 2710(d)(3)(C) of IGRA sets out the limited range of

subjects addressable in tribal-state compacts. In full, that section states:

> Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to—
> (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;
> (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
> (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
> (iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
> (v)   remedies for breach of contract;
> (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
> (vii) any other subjects that are directly related to the operation of gaming activities.

25 U.S.C. § 2710(d)(3)(C).  Standards for the construction of a gaming facility can be a

proper subject of compact negotiations under subsections (i), (ii), (vi) and (vii). Provisions

far more peripheral to the regulation of gaming than construction of the gaming facility have

been upheld by the courts as falling within subsection (vii); *See In re Indian Gaming*

*Related Cases*, 331 F.3d 1094, 1110-16 (9th Cir. 2003)(recognizing compact provisions

allowing workers to unionize and allowing labor unions access to gaming employees, and

compact provisions allowing a tribe to pay into a fund that is distributed amongst other

California tribes with small or no gaming facilities); *Chemehuevi v. Newsom*, __F.3d__,

2019 WL 1285060 (9th Cir. 2019) (allowing compact provision setting forth a date certain

that a tribal/state compact will expire).

These parameters on compact negotiations have resulted in a wide variety of provisions

being included in tribal-state gaming compacts. A complete library of all gaming compacts

now in effect is posted on the official website of the Department of the Interior's Office of

Indian Gaming, www.bia.gov/as-ia/oig. Compact provisions regarding the level of state

involvement range from the early Michigan compacts which merely required the tribal gaming facility to prominently post a sign noting that the state had no involvement in overseeing the gaming facility, to compact provisions reflecting very extensive state involvement, such as the compact negotiated by the Commonwealth of Massachusetts with the Wampanoag Mashpee Tribe[12]. Very common amongst all tribal-state gaming compacts are provisions regarding the construction of gaming facilities. *See* Wampanoag Mashpee Compact at §§ 5.4 and 5.5 (tribe to issue its own permits, but subject to tribal code provisions at least as stringent as the Commonwealth's; breach of compact if tribe fails to comply); Agua Caliente Compact[13] at §§ 6.42 and 11 (Tribe to issue its own permits but subject to tribal code provisions at least as stringent as the California state law and conduct environmental assessment with local government input; breach of compact if tribe fails to comply); Coushatta Tribe Compact[14] at § 10(A)(1) (all facilities shall comply with Louisiana state building codes; breach of compact if tribe fails to comply); Eastern Band of Cherokee Compact[15] at § 7 (tribe shall consult with private and North Carolina resources to conduct study and enact ordinances to preserve natural beauty of Cherokee lands – Smokey Mountains); Mohegan Tribe Compact[16] at § 14(a) (standards at least as stringent as the Connecticut state law, except to the extent that federal standards specifically applicable to Mohegan Indian lands are in place; cooperate with state agencies to ensure compliance); Oneida Compact at § 12 (standards at least as stringent as the New York state law, retaining independent inspectors, which report to tribe with copies to state. [17] IGRA requires that compacts be submitted to the Department of Interior ("DOI") and be approved, disapproved

---

[12] https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/webteam/pdf/idc1-028231.pdf
[13] https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc2-056439.pdf
[14] https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc1-025952.pdf
[15] https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc1-025709.pdf
[16] https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc1-026002.pdf
[17] https://www.bia.gov/sites/bia.gov/files/assets/as-ia/oig/oig/pdf/idc1-025715.pdf

or allowed to go into effect, 25 U.S.C. § 2710(d)(8), and that process requires DOI to ascertain whether the provisions of the compact fall within the scope of 25 U.S.C. § 2710(d)(3)(C). That DOI routinely approves tribal-state gaming compacts with provisions governing the construction of the gaming facility establishes that such provisions are "directly related" to the regulation and operation of gaming, which in turn establishes that such provisions are "integral" to a tribe's exercise of its gaming rights. If they were not integral, they could not be properly included as terms of tribal-state compacts. Under IGRA, state jurisdiction over such matters that pre-dated IGRA is preempted as a matter of federal law, and the only way to establish such state jurisdiction going forward is pursuant to the provisions of a valid tribal-state compact. *United Keetoowah Band of Cherokee Indians v. Oklahoma*, 927 F.2d 1170, 1177 (10th Cir. 1991); *Sycuan Band of Mission Indians v. Roache*, 1788 F.Supp. 1498, 1504 (S.D. Cal. 1992). In the present case, there is no such compact in effect; hence, there is no basis for the Commonwealth of Massachusetts or its political subdivisions, including the Town, to assert jurisdiction concurrent with the Tribe regarding construction permitting standards[18].

In stark contrast to the First Circuit's direction, this Court adopted the paradigm of distinguishing between laws of general applicability and gaming laws (Doc. 142 at 37, lines 10-14). The *Narragansett* court noted that a line might be drawn on the question of whether a law is of general applicability, but rejected such a paradigm, noting "that a comprehensive

---

[18] The Town's remedy or path to secure any jurisdiction over the Tribe's gaming facility, is to request and encourage the Commonwealth of Massachusetts to negotiate in good faith with the Tribe for a tribal/state compact under IGRA. The irony here is that the Tribe's formal request for the Commonwealth to engage in compact negotiations pre-dates this lawsuit, and the Commonwealth has negotiated a compact with the Wampanoag Mashpee Tribe, yet the Commonwealth refuses to negotiate with the Tribe. The Tribe remains ready, willing and able to negotiate in good faith, under IGRA, to reach a compact with the Commonwealth.

federal regulatory scheme governing a particular area typically leaves no room for additional

state burdens in that area." 19 F.3d at 705. As demonstrated above, construction standards

fall squarely within the comprehensive federal regulatory scheme under IGRA. This Court's

attempt to create a bright light distinction between laws of general applicability and gaming

laws, accordingly, was clear error.

### D. TECHNICAL ISSUES WITH THE LANGUAGE OF THE TOWN'S PROPOSED FINAL JUDGMENT

All three proposed paragraphs in the Town's Proposed Final Judgment have problematic

issues with their specific language, but most notably paragraph 3. The Tribe proposes that

the Final Judgment simply track the First Circuit's Mandate:

> For the reasons set forth in *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d 618, 629 (1st. Cir. 2017) Final Judgment is entered in favor of the Wampanoag Tribe of Gay Head (Aquinnah) and the Aquinnah Wampanoag Gaming Corporation (collectively "Tribe"). The Commonwealth of Massachusetts, the Town of Aquinnah and the Aquinnah Gay Head Community Association are permanently enjoined from asserting jurisdiction over, or interfering with, the Tribe's rights under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq*.

Such language does not share the problems of the Town's proposed language and complies

with the First Circuit's Mandate.

Even if this Court adopted paragraph 3 of the Town's Proposed Final Judgment, disputes

will likely remain over what qualifies under the undefined terms, "laws and regulations that

regulate gaming activity in connection with any Class II gaming facility" and "generally

applicable permitting requirements". Resolution of these differences is better resolved

pursuant to the paradigm set forth by the First Circuit, and not the faulty paradigm used by

this Court in 2015 at the time it considered the Town's Motion for Preliminary Injunction.

Moreover, the last sentence of paragraph 3 extending the injunction to include "all building

permit requirements of the Town of Aquinnah" is blatantly overreaching,[19] and would allow the Town to impose restrictions on gaming in the context of requirements on building permits.  For these reasons and the reasons stated above, paragraph 3 of the Town's Proposed Final Judgment should be struck in its entirety.

Paragraph 2, in addition to having the problematic undefined language of "laws and regulations that regulate gaming activity in connection with any Class II gaming facility", ignores that the First Circuit's decision and analysis applies with equal force to both Class II and Class III gaming. Only if the Commonwealth negotiated a provision in a tribal/state gaming compact with the Tribe that allowed for the exercise of Town authority would the Town be able to assert authority over Class III gaming on the Tribe's Indian lands.

The Town's proposed paragraph 1, in addition to having the problematic language limiting it to Class II gaming, has unnecessary limiting language regarding what lands may qualify for gaming. The First Circuit's decision and analysis applies with equal force to any of the Tribe's Indian lands that are eligible for gaming under IGRA.

**SUMMARY**

For the reasons set forth above, the Town's Motion should be denied and Final Judgment should be entered as proposed by the Tribe:

> For the reasons set forth in *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah),* 853 F.3d 618, 629 (1st. Cir. 2017) Final Judgment is entered in favor of the Wampanoag Tribe of Gay Head (Aquinnah) and the Aquinnah Wampanoag Gaming Corporation (collectively "Tribe").  The Commonwealth of Massachusetts, the Town of Aquinnah and the Aquinnah Gay Head Community Association are permanently enjoined from asserting jurisdiction over, or interfering with, the Tribe's rights under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq.*

---

[19] Such overreaching underscores that the Town's motive is to stop or delay the Tribe from offering gaming on its Indian lands, and that the Town's motive is not to protect public health and safety.

Dated: April 18, 2019                         Respectfully Submitted,


                                              s/ Scott Crowell
                                              SCOTT CROWELL (*pro hac vice*)
                                              CROWELL LAW OFFICE TRIBAL
                                              ADVOCACY GROUP LLP
                                              Sedona, Arizona, 86336
                                              Telephone: (425) 802-5369
                                              Fax: (509) 235-5017
                                              scottcrowell@clotag.net

                                              BRUCE SINGAL (BBO #464420)
                                              ELIZABETH MCEVOY (BB) # 683191)
                                              DONOGHUE, BARRETT & SINGAL
                                              One Beacon Street, Suite 1320
                                              Boston, MA 02108-3106
                                              Telephone: (617) 720-5090
                                              Fax: (617) 720-5092

                                              LAEL R. ECHO-HAWK (*pro hac vice*)
                                              MThirtySix, PLLC
                                              The Yard
                                              700 Pennsylvania Avenue, Second Floor
                                              Washington, D.C. 20003
                                              Telephone: (206) 271-0106
                                              lael@mthirtysixpllc.com

                                              *Attorneys for Defendants/Counterclaim-
                                              Plaintiffs*

21

**CERTIFICATE OF SERVICE**

I, Scott Crowell, hereby certify that I filed through the ECF System and therefore copies of the RESPONSE TO MOTION TO ENTER FINAL JUDGMENT will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). All non-registered CM/ECF participants will receive a copy of this filing via USPS.

Dated: April 18, 2019

                                             *s/ Scott Crowell*
                                             SCOTT CROWELL