UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS,<br><br>    Plaintiff, and<br><br>AQUINNAH/GAY HEAD COMMUNITY ASSOCIATION, INC. (AGHCA) and TOWN OF AQUINNAH,<br><br>    Plaintiff-Intervenors,<br><br>    v.<br><br>THE WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH), THE WAMPANOAG TRIBAL COUNCIL OF GAY HEAD, INC., and THE AQUINNAH WAMPANOAG GAMING CORPORATION,<br><br>    Defendants/Counterclaim-Plaintiffs, and<br><br>CHARLES D. BAKER, in his official capacity as Governor of the Commonwealth of Massachusetts, MAURA T. HEALEY, in her official capacity as Attorney General of the Commonwealth of Massachusetts, and CATHY JUDD-STEIN, in her official capacity as Chair of the Massachusetts Gaming Commission,<br><br>    Third Party Defendants. | No. 1:13-CV-13286-FDS<br><br>Leave to file granted on May 6, 2019 |

**THE TOWN OF AQUINNAH'S AND AQUINNAH/GAY HEAD COMMUNITY
ASSOCIATION, INC.'S REPLY MEMORANDUM
IN SUPPORT OF MOTION FOR ENTRY OF JUDGMENT**

# INTRODUCTION

In its Opposition ("Opp."), ECF #185, the Wampanoag Tribe of Gay Head (Aquinnah) (the "Tribe") argues that: (i) the First Circuit's mandate encompasses matters that were not part of the appeal; (ii) this Court's earlier decision on the non-gaming permitting issue, which was not challenged on appeal, was wrong; and (iii) the Court should enter a broad judgment authorizing not just Class II gaming on the "Settlement Lands" as authorized by the First Circuit's decision in this case, but Class III gaming—*i.e.*, a full-fledged casino—on any Indian lands the Tribe might control, including lands that are not "Settlement Lands" within the meaning of the First Circuit's opinion. The first argument is incorrect as a matter of well-settled law. *See, e.g.*, *United States v. Matthews*, 643 F.3d 9, 12 (1st Cir. 2011); *see also* Town of Aquinnah ("Town") Opening Memorandum ("Town Mem.") (ECF #181), at 8-9. The second argument is a transparent attempt to resuscitate a forfeited issue and get a second bite at the apple (and, in any event, is not substantively meritorious). Finally, the third argument seeks to broaden the scope of this case beyond its established parameters. All three arguments, and the sweeping proposed judgment that flows from them, should be rejected. This Court should enter the judgment proposed by the Town. The Town's proposed judgment adheres to the First Circuit's mandate as well as the earlier ruling of this Court on the permitting issue, which the Tribe did not raise on appeal.

# ARGUMENT

**I.     THE FIRST CIRCUIT DID NOT REVERSE THE PORTION OF THIS COURT'S FINAL JUDGMENT RELATED TO STATE AND LOCAL PERMITS, WHICH IS LAW OF THE CASE.**

As the Town and the Aquinnah/Gay Head Community Association, Inc. ("AGHCA") explained in their opening memoranda, this Court made clear in ruling on the preliminary injunction motion and in its entry of final judgment (Dkt #158) that the permitting issue is

1

separate and independent from the gaming issue. *See* Town Mem. at 3, 6-10; AGHCA Mem. (Dkt # 183) at 1-2. Because the Tribe did not raise this Court's ruling on the permitting issue on appeal, the Tribe has forfeited all objections to the portion of the Court's final judgment on that issue, which is now law of the case. *See Matthews*, 643 F.3d at 12; *see also* Town Mem. at 8-9.

In response, the Tribe insists that the First Circuit's mandate encompasses not just issues raised on appeal, but also issues neither raised by the Tribe nor addressed by the First Circuit. Ignoring settled law to the contrary, the Tribe latches onto the First Circuit's statement that "the opinion of the district court is reversed," *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d 618, 629 (1st Cir. 2017), and maintains that the reversal necessarily covers not just the portion of the prior judgment from which the Tribe appealed, but also the portion that was never appealed. *See* Opp. at 5-8. In the Tribe's view, a party may lose on two independent issues, appeal only one, and win a backdoor reversal on the other so long as an appeals court uses language like "reverse" with reference to a lower court's order. This is contrary to First Circuit precedent. *See, e.g.*, *Biggins v. Hazen Paper Co.*, 111 F.3d 205, 209 (1st Cir. 1997).

In support, the Tribe (Opp. at 6) cites only a 1966 case from the D.C. Circuit, *Hynning v. Partridge*, 359 F.2d 271 (D.C. Cir. 1966). But *Hynning* provides the Tribe no help. As the D.C. Circuit observed in *Hynning*, "an opinion and judgment [must] be read together." *Id.* at 272-73. Thus, even under the out-of-circuit precedent relied upon by the Tribe, an appellate court's judgment is limited by the matters addressed in that court's opinion. Here, the First Circuit's opinion unequivocally addresses the gaming issue only, and concludes that "the *opinion* of the district court"—*i.e.*, the opinion granting summary judgment to the Commonwealth, Town, and

AGHCA on the gaming issue—"is reversed." *Wampanoag Tribe*, 853 F.3d at 629 (emphasis added).  This confirms that the First Circuit's decision was limited to the gaming issue.[1]

The Tribe recognizes, as it must, that it did not expressly raise the permitting issue on appeal, and that the First Circuit did not expressly address it.  Opp. at 13.  Nevertheless, the Tribe maintains that the issue was somehow "impliedly" raised or "inferred" and resolved.  *Id*. at 9-13.  Specifically, the Tribe argues that it "organized its Opening Brief to the First Circuit identifying three primary errors," and that "issues #1 and #2 are contentions that directly address" the permitting issue.  *Id*. at 9.  That is not an accurate portrayal of the briefing.  The first issue asked "[w]hether the District Court erred in ruling that [the Federal Act]'s application of the Commonwealth's gaming laws remains in effect; IGRA preempts prior legislation regarding gaming on Aquinnah Indian lands."  *Id*.[2]  This language refers only to "the Commonwealth's *gaming* laws"—not generally applicable local and State permitting requirements.  There is nothing in the issue as presented to the First Circuit from which one could reasonably infer that the Tribe was calling into question this Court's ruling on the permitting issue, and, of course, the First Circuit did not interpret the issue otherwise.  The second issue asked whether the Tribe's "governmental presence" on the "Settlement Lands" was sufficient for the Indian Gaming Regulatory Act ("IGRA") to apply.  *Id.*  As with the first issue, it is not reasonable to infer that

---

[1] Because the Tribe forfeited the permitting issue by failing to raise it on appeal, all of the cases cited by the Tribe (Opp. at 6-7) discussing the binding effect of appellate decisions (none of which is disputed by the Town) are irrelevant.  But even if somehow it were determined that the Tribe had not forfeited its arguments on the permitting issue, this Court would still retain discretion to resolve the issue in the Town's favor.  *See Biggins* , 111 F.3d at 209.  The Tribe attempts to distinguish *Biggins* by asserting that it involved "a remand with instructions for a new trial," Opp. at 7, but the Tribe's argument misses the mark.  The question in *Biggins* was whether the Supreme Court's mandate prevented the First Circuit, on remand, from considering whether the defendant was entitled to a new trial.  The First Circuit held that it had discretion to order a new trial because the new-trial issue "had not been addressed in the Supreme Court's opinion."  *Id.* at 208-09.  Likewise, here, if the permitting issue were not forfeited, this Court would retain discretion to enter the Town's proposed judgment since the permitting issue was not addressed in the First Circuit's opinion.

[2] As explained in the Town's opening memorandum, the "Federal Act" codified the 1983 settlement agreement as a matter of federal law.  Town Mem. at 2.

3

this second issue encompassed the permitting issue, and the First Circuit did not suggest otherwise. The First Circuit ultimately decided the two issues the Tribe raised in the Tribe's favor, but that decision has no bearing on the separate and independent permitting issue that the Tribe never raised.

The Tribe maintains that the First Circuit held that IGRA preempts *all* State and local regulation on all lands owned by the Tribe—not restricted to the "Settlement Lands," and not restricted to gaming. Opp. at 9-13, 19-20. But this argument ignores the plain language of the First Circuit's opinion. First, the First Circuit made clear that its decision applied only to the Settlement Lands. *Wampanoag Tribe*, 853 F.3d at 626-27 (concluding "that IGRA applies to the Settlement Lands"). Second, the First Circuit stated that IGRA effected a "partial repeal of the Federal Act," repealing only those provisions of the Federal Act that had authorized the application of State and local gaming regulations to the Settlement Lands—not all State and Town laws and regulations writ large. *Wampanoag Tribe*, 853 F.3d at 626-27; *see also id.* at 624-29 (quoting *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 705 (1st Cir. 1994), for the proposition that IGRA left "largely intact the grant of jurisdiction [to the state]" pursuant to a settlement agreement materially identical to the Federal Act, "but [IGRA] demands an adjustment of that portion of jurisdiction touching on gaming").

Notwithstanding the plain language of the First Circuit's opinion, the Tribe purports to find support for its argument in the First Circuit's citation to *Narragansett*. Opp. at 14 (citing *Wampanoag Tribe*, 853 F.3d 627). In *Narragansett*, the First Circuit rejected the position that IGRA displaces all State and local regulations, and held that IGRA displaces only state and local regulation of "activities deemed integral to gaming." *Narragansett*, 19 F.3d at 704-05. Seizing upon *Narragansett*'s use of the word "integral," the Tribe argues that any State and local

regulations, including permitting requirements, that bear in any way on the potential opening of a gaming facility are "integral" to gaming. Opp. at 14-15. Under the Tribe's argument, all State and local regulations, no matter how attenuated they may be from actual gaming activities, are "integral" to gaming. This argument is flawed in many respects, as this Court recognized when it rejected the argument when the Tribe first advanced it during preliminary injunction briefing in 2015. *See* ECF #136 at 14-16; ECF #142 at 37. Furthermore, the argument is undermined by *Narragansett* itself, where the First Circuit explained that "integral" is used to distinguish between "core" and "peripheral" gaming "functions." 19 F.3d at 705. Providing some examples, the *Narragansett* court stated that "zoning, traffic control, advertising, [and] lodging" would likely fall within the "peripheral" category and "remain subject to state [and local] control." *Id.* Similarly, building regulations, and other regulations designed to protect health, safety, and the natural environment, are necessarily "peripheral" to gaming, as they do not go to "core" gaming functions. *See id.*[3]

## II.     THE TRIBE'S PERMITTING ARGUMENTS ARE MERITLESS.

The Tribe's forfeiture of the permitting issue leaves nothing more for this Court to decide beyond reaffirming the permitting portion of its prior order as proposed by the Town in its proposed final judgment.[4] Nevertheless, the Tribe argues "in the alternative" (Opp. at 14) that this Court should reconsider its prior ruling on the permitting issue. But the time is long past for reconsideration, and in any event the Tribe does not meet the established standard for reconsideration. "'Motions for reconsideration are appropriate only in a limited number of circumstances: if the moving party presents newly discovered evidence, if there has been an

---

[3] Even if such regulations could somehow be construed as "integral" to gaming, that is an argument that the Tribe could have, but did not, make on appeal. Accordingly, the argument is forfeited.

[4] The Tribe suggests in a footnote (Opp. at 8 n.5) that the Town waived the permitting issue by supposedly failing to post bond, as required by the Court's preliminary injunction order. But the Town posted the required bond. *See* Dkt # 141.

intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust.'" *Pinero v. Pino*, No. 11-40080-FDS, 2012 WL 1132145, at *2 (D. Mass. Apr. 3, 2012) (quoting *United States v. Allen*, 573 F.3d 42, 53 (1st Cir. 2009)).  The Tribe has identified no intervening change in law, previously unavailable evidence, or manifest error of law in the Court's earlier decision—the Tribe just wants a different outcome.  The Tribe is "not entitled to another bite at the apple simply because the Court did not rule in his favor" the first time around.  *Antony v. Duty Free Americas, Inc.*, 705 F. Supp. 2d 112, 115 (D. Mass. 2010); *see also Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir. 2003) ("Litigation is not a game of hopscotch.  It is generally accepted that a party may not, on a motion for reconsideration, advance a new argument that could (and should) have been presented prior to the district court's original ruling.").

      The Tribe's arguments—both legal and factual—provide this Court no basis, at this late date, to reconsider its decision on the permitting issue.  Legally, the Tribe argues that the National Indian Gaming Commission ("NIGC") has exclusive jurisdiction over "ensuring that gaming facilities are constructed in a manner that protects public health and safety."  Opp. at 10.  The Tribe raised the same argument at the preliminary injunction stage (*see* ECF #142 at 25-26), and the Court rejected it. The argument therefore does not present a proper basis for a motion for reconsideration.  *See, e.g., Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (a motion for reconsideration "does not allow the losing party to repeat old arguments previously considered and rejected").

      In any event, the argument fails on the merits.  Although the NIGC has authority to enforce health and safety standards for tribal gaming facilities, its authority is not exclusive, and it does not displace State and local regulation, particularly where, as here, there is a settlement

6

agreement (codified in the Federal Act) specifically authorizing such regulation. *See Narragansett*, 19 F.3d at 704-705 ("[IGRA] leaves largely intact the grant of jurisdiction [to Rhode Island]—but it demands an adjustment of that portion of jurisdiction touching on gaming. . . . [T]he withdrawal of jurisdiction over gaming cannot be interpreted to signify a withdrawal of *all* residual jurisdiction." (emphasis in original)); *supra* at 4 (noting that the First Circuit's decision in this case found the Federal Act preempted only gaming regulations, not other forms of State and local regulations on the Settlement Lands); *see also, e.g.*, *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001), *aff'd sub nom.* 538 U.S. 644 (2003) ("Where coordinated state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal preemption becomes a less persuasive one."). State and local governments have a substantial interest in ensuring that all buildings within their jurisdictions comply with health, safety, and environmental standards. *See* ECF #142 at 24-28 (this Court recognizing this state and local interest). Here, notwithstanding the Tribe's contention to the contrary, there is no guarantee that NIGC could or would protect health, safety and the natural environment in the same manner and to the same extent as the Town or the Martha's Vineyard Commission. The Town is unaware (*see* Ex. A to Town Mem. at ¶ 10) of any ongoing federal oversight of the Tribe's construction project, and the Tribe has presented no evidence of any such oversight. Regardless, as a matter of law, even if NIGC were providing some oversight, the Town's concurrent jurisdiction would not be supplanted. *Nevada v. Hicks*, 533 U.S. 353, 394 (2001) (O'Connor, J., concurring) (collecting cases discussing concurrent jurisdiction over Indian lands).

For the same reason, the Tribe's lengthy argument (Opp. at 15-18) about tribal-state gaming compacts—which was also raised and rejected at the preliminary injunction stage (ECF

#142 at 26)—misses the point. The fact that states may exercise authority over tribal gaming facilities pursuant to such compacts does not displace other sources of state and local regulatory authority, such as the Federal Act here. *See supra* at 4-5.

Factually, the Tribe argues that it is fully capable of protecting health and safety on its own and that it has already established adequate safeguards. Opp. at 10-12. Again, the Tribe previously raised these arguments in its preliminary injunction briefing, and the Court rejected them, so they provide no proper basis for reconsideration. *E.g.*, ECF # 136 at 5-7, 17; ECF #142 at 38-39. Regardless, even if the Tribe were correct, the Town would retain the right and obligation to ensure for itself that the Tribe's plans and building methods pose no undue risk to public health, safety, and the natural environment. No legitimate municipality, and the Town is no exception, would defer to a land-owner's[5] representations regarding compliance with generally applicable building rules.[6] Even accepting that the Tribe's building inspector is highly qualified or even superior to the Town's building inspector, the Tribe must still allow the *Town's* independent building inspector to confirm that the Tribe has complied with all pertinent rules. Even though an entity could hire a private security force with superior training to a local police force, doing so would not authorize the entity and its private security force to act in place of the police or as a branch of law enforcement.

---

[5] Although the Tribe suggests that it is no mere land-owner, but rather a separate "sovereign," it is important to note that the Tribe has not sought to invoke sovereign immunity against the Town in this case, and for good reason: the Tribe waived its sovereign immunity in the 1983 settlement agreement. *See Bldg. Inspector & Zoning Officer of Aquinnah v. Wampanoag Aquinnah Shellfish Hatchery Corp.*, 443 Mass. 1, 12-13 (2004) (the "*Shellfish Hatchery* case"); ECF #95 at 7-16 (holding that the sovereign immunity ruling in the *Shellfish Hatchery* case has claim-preclusive effect here).

[6] Massachusetts carefully regulates the appointment of building inspectors to ensure effective enforcement of local and state building codes. *See* M.G.L. c. 143. The Tribe's building inspector has not been appointed pursuant to these requirements, so there is no way to know whether the Tribe's inspector is actually qualified to do the job. The Tribe simply asserts that he is. But, again, whether he is or is not qualified is irrelevant. The Tribe has no right, on its own, to displace the Town's authority with regard to health, safety, and environmental regulations that are peripheral to gaming. *See Narragansett*, 19 F.3d at 705.

Whether or not the Tribe is right or wrong in its contentions that its construction methods and building plans pose no risk is irrelevant. The Town has an independent obligation to protect the public health and safety by enforcing generally applicable building requirements. Indeed, if the Tribe's preexisting safeguards are as strong as advertised, the Tribe should have no trouble acquiring all necessary permits. Although the Tribe (*e.g.*, Opp. at 4) expresses fear that the Town might withhold permits because of the nature of the Tribe's proposed facility, the Town has not done so,[7] and does not intend to act in anything other than good faith.[8] And, of course, if the Town acts otherwise and "impose[s] restrictions on gaming in the context of requirements on building permits," Opp. at 20, the Tribe would have recourse in the courts. Unless that happens, however, the Tribe has no basis to reject the Town's efforts to protect the interests of its residents, and to protect visitors and the natural environment.

### III. THE TRIBE'S PROPOSED JUDGMENT GOES FAR BEYOND THE FIRST CIRCUIT'S MANDATE, AND DISREGARDS THE PERMITTING PORTION OF THIS COURT'S PRIOR JUDGMENT, WHICH WAS NEVER APPEALED.

The Tribe's proposed judgment goes far beyond anything that any court has ever arguably held in this case. As reflected in its proposed judgment, in the Tribe's view the First Circuit's decision authorizes not just Class II gaming on the Settlement Lands, but also "Class III gaming on the Tribe's Indian lands" more generally. Opp. at 20. According to the Tribe, the First Circuit has given the Tribe a green light to construct a full-fledged casino, not just a bingo parlor. *See, e.g.*, *Seminole Tribe v. Florida*, 517 U.S. 44, 48 & n.1 (1996) (distinguishing

---

[7] The Declaration of Eric Robataille attached to the Tribe's Opposition asserts that the Town improperly "ordered" the electric company (Eversource) to disconnect a power line at the Tribe's construction site. The Town did no such thing: Eversource disconnected the power line on its own because it believed the Tribe's use of the line to be improper. *See* Town Mem., Ex. B.

[8] The Town and the Tribe have historically enjoyed good relations under the settlement agreement, and the Tribe has obtained multiple Town permits on a variety of projects without difficulty. The only disputes that the Town and the Tribe have had on permitting issues are: (i) whether the Tribe needed to obtain Town building and related permits for a shellfish facility in a marine commercial and coastal district (which was resolved in the Town's favor by the Massachusetts Supreme Judicial Court, *see Shellfish Hatchery*, 443 Mass. at 17); and (ii) this gaming dispute, which was initiated by the Commonwealth.

between Class II and Class III gaming, and explaining that Class III gaming "includes such things as slot machines, casino games, banking card games, dog racing, and lotteries"). Furthermore, as the Tribe would have it, it may construct its gaming facility on any land the Tribe might control, not just the Settlement Lands. *See* Town Mem. at 7 n.4 (noting that the current location of the Tribe's proposed facility appears to fall outside the Settlement Lands and, thus, outside of IGRA's protection). The First Circuit's decision does not reach nearly so far— the First Circuit addressed only the Tribe's right to establish "a Class II gaming facility on the Settlement Lands pursuant to IGRA." *Wampanoag Tribe*, 853 F.3d at 623. The Court should not award the Tribe relief that it neither sought nor received on the gaming issue from the First Circuit. And the Court must not allow the Tribe to do an end-run around the very real issue of whether the current site of the Tribe's proposed gaming facility is subject to IGRA.

The overbreadth of the Tribe's proposed final judgment is further underscored by its extensive and imprecise request for injunctive relief. Opp. at 20. Specifically, the Tribe requests that the Court enter a final judgment that provides: "The Commonwealth of Massachusetts, the Town of Aquinnah, and the Aquinnah Gay Head Community Association are permanently enjoined from asserting jurisdiction over, or interfering with, the Tribe's rights under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq.*" *Id.* In essence, the Tribe seeks to restrict the Commonwealth's, the Town's, and the AGHCA's right to seek judicial intervention and to challenge the Tribe's actions as to any gaming facility, on any land, in perpetuity. The Tribe's argument runs counter to First Circuit precedent and the plain language of IGRA itself.

In *Narragansett*, the First Circuit made clear that its resolution of whether IGRA applied to the settlement lands at issue in that case, and whether IGRA effected a partial implied repeal of the settlement agreement at issue there—the two questions the First Circuit addressed as to the

10

Tribe's proposed Class II gaming facility on the Settlement Lands—did not resolve all potential IGRA issues related to gaming. *Narragansett*, 19 F.3d at 705 ("Despite this holding—a holding that resolves the case before us—it would be disingenuous to pretend that all the relevant questions have been answered."). Indeed, the *Narragansett* court expressly acknowledged that further litigation related to the contours of the gaming facility at issue there would be permissible. *Id.* at 706 (noting that "the jurisdictional issues remain *subject to further judicial intervention* . . . in a more fact-specific context" (emphasis added)).

Moreover, the Tribe's position is inconsistent with IGRA, which ties any tribe's ability to engage in gaming to specific parcels of lands. *E.g.*, 25 U.S.C. § 2703(4) (defining "Indian lands" as including "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power"); *id.* § 2719 ("gaming [under IGRA] shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988," subject to a few, limited exceptions). The Tribe's proposed judgment, which seeks to prevent any challenge to the propriety of the Tribe's gaming activities on unnamed parcels in the future runs directly counter to the site-specific nature of IGRA. Indeed, the proposed judgment appears to be an improper attempt to preempt any challenge to construction of its gaming facility on the site that the Tribe now intends to use, which was acquired by the Tribe after October 17, 1988 and does not appear to fall within any of the limited statutory exceptions that would permit gaming.

As for the permitting issue, the Tribe's proposed judgment ignores it. Instead, the Tribe accuses the Town of "overreaching" because its proposed judgment seeks to impose restrictions on gaming in the context of building permit requirements. Opp. at 20. But this is simply another

11

way of asking the Court to vacate its prior preliminary injunction ruling, as incorporated in the Court's earlier final judgment, which was never challenged on appeal. That ruling, along with First Circuit's mandate relating to Class II gaming on the Settlement Lands (and only the Settlement Lands) should be reflected in this Court's final judgment. The Town's proposed final judgment accomplishes both goals. The Tribe's proposed judgment accomplishes neither.

## **CONCLUSION**

For the foregoing reasons, as well as those outlined in their opening memoranda, the Town and the AGHCA respectfully request that this Court enter the Town's proposed final judgment as soon as possible.

| | |
|---|---|
| Dated: May 6, 2019 | Respectfully submitted, |
| AQUINNAH/GAY HEAD COMMUNITY ASSOCIATION, INC. (AGHCA) | TOWN OF AQUINNAH |
| By its attorneys, | By its attorneys, |
| /s/ *Felicia H. Ellsworth* | /s/ *Ronald H. Rappaport* |
| Felicia H. Ellsworth (BBO No. 665232)<br>Claire M. Specht (BBO No. 687952)<br>WILMER CUTLER PICKERING<br>    HALE AND DORR LLP<br>60 State Street<br>Boston, Massachusetts 02109<br>(617) 526-6000<br>Felicia.Ellsworth@wilmerhale.com<br>Claire.Specht@wilmerhale.com | Ronald H. Rappaport (BBO No. 412260)<br>Michael A. Goldsmith (BBO No. 558971)<br>REYNOLDS, RAPPAPORT, KAPLAN &<br>    HACKNEY, LLC<br>106 Cooke Street, P.O. Box 2540<br>Edgartown, MA 02539<br>Tel.: +1 508 627-3711<br>rrappaport@rrklaw.net<br>mgoldsmith@rrklaw.net<br><br>Douglas J. Kline (BBO No. 556680)<br>Joshua J. Bone (BBO No. 687722)<br>GOODWIN PROCTER LLP<br>100 Northern Avenue<br>Boston, Massachusetts 02210<br>Tel.: +1 617 570 1000<br>Fax.: +1 617 523 1231<br>dkline@goodwinlaw.com<br>jbone@goodwinlaw.com<br><br>William M. Jay (*pro hac vice* pending)<br>GOODWIN PROCTER LLP<br>901 New York Ave. NW<br>Washington, DC 20001<br>Tel.: +1 202 346 4000<br>wjay@goodwinlaw.com |

**CERTIFICATE OF SERVICE**

      I, Douglas J. Kline, certify that this document filed through the ECF system has been sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 6, 2019.

      /s/ *Douglas J. Kline*
      Douglas J. Kline