UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS, | **CASE NO: 1:13-cv-13286-FDS** |
| *Plaintiff,* | |
| and | [Formerly Supreme Judicial Court for Suffolk County, Massachusetts, CIVIL ACTION NO. 2013-0479 ] |
| AQUINNAH/GAY HEAD COMMUNITY ASSOCIATION, INC. (AGHCA) and TOWN OF AQUINNAH, | |
| *Intervenor-Plaintiffs,* | |
| **vs.** | |
| THE WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH), THE WAMPANOAG TRIBAL COUNCIL OF GAY HEAD, INC., and THE AQUINNAH WAMPANOAG GAMING CORPORATION, | |
| *Defendants,* | |
| and | |
| CHARLES BAKER, in his official capacity as GOVERNOR, COMMONWEALTH OF MASSACHUSETTS, et al., | |
| *Third-Party Defendants.* | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TRIBE'S MOTION TO STAY THE JUDGMENT AND THE INJUNCTION STATED THEREIN PENDING APPEAL**

**EXPEDITED REVIEW REQUESTED**

# TABLE OF CONTENTS

I.      OVERVIEW ................................................................................................................. 1

II.     APPLICABLE STANDARDS FOR DELIBERATION OF MOTIONS FOR STAY PENDING
APPEAL .................................................................................................................... 2

III.   JURISDICTION ......................................................................................................... 4

IV.   ARGUMENT ............................................................................................................. 4

    A.  Element 1: There is a substantial likelihood that the Tribe will prevail on the merits; the merits
are serious, substantial and difficult. ............................................................................... 4

        1.     This Court's Amended Final Judgment and Opinion and Order of June 19, 2019 erred
on the critical substantive legal issues. ........................................................................ 5

        2.     This Court's Amended Final Judgment and Opinion and Order of June 19, 2019 erred
on the critical procedural legal issues. ...................................................................... 12

    B. Element 2: The Tribe will suffer irreparable harm if the stay is not granted. ................................ 16

    C. Element 3: In sharp contrast, the Town and Commonwealth will not be irreparably harmed in any
material manner if the Tribe's Motion is granted. ........................................................... 17

    D. Element 4: Granting the Motion Advances the Public Interest. ..................................................... 19

V. CONCLUSION ................................................................................................................ 19

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Acevedo-Garcia v. Vera-Monroig*,
  296 F.3d 13 (1st Cir. 2002) ............................................................................. 2, 3

*Aftermarket Auto Parts Alliance, Inc. v. Bumper2Bumper, Inc.*,
  2012 WL 12996020 (D. Maine 2012) ..................................................................... 2

*Ainsworth Aristocrat Intern. Pty. Ltd. v. Tourism Co. of Com. of Puerto Rico*,
  818 F.2d 1034 (1st Cir. 1987) ............................................................................. 2

*Biggens v. Hazen Paper Company*,
  111 F.3d 205 (1st Cir. 1997) ............................................................................ 14

*Cabazon Band of Mission Indians et. al. v. California*,
  480 U.S. 202 (1987) ......................................................................................... 5

*United Steelworkers of America v. Textron, Inc.*,
  836 F.2d 6 (1st Cir. 1987) ................................................................................ 3

*City of Chanute v. Kansas Gas and Elec. Co.*,
  754 F.2d 310 (10th Cir. 1985) ........................................................................... 3

*Coastal Counties Workforce, Inc. v. LePage*,
  2018 WL 545712 (D. Maine 2018) .................................................................... 3, 4

*Hilton v. Braunskill*,
  481 U.S. 770 (1987) ...................................................................................... 2, 3

*Hynning v. Partridge*,
  359 F.2d 271 (D.C. Cir. 1966) .......................................................................... 13

*Martinez Rodriguez v. Jimenez*,
  537 F.2d 1 (1st Cir. 1976) ................................................................................. 2

*Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*,
  853 F.3d 618 (1st Cir. 2017) ..................................................................... 1, 7, 12

*Montana v. Blackfeet Tribe*,
  471 U.S. 759 (1985) ......................................................................................... 9

*OfficeMax Inc. v. County Qwick Print, Inc.*,
  751 F. Supp. 2d 221 (D. Maine 2011) .................................................................. 4

*P.R. Hosp. Supply, Inc. v. Boston Scientific Corp.*,
  426 F.3d 503 (1st Cir. 2005) ...................................................................3

*Penobscot Indian Nation v. Key Bank*,
  112 F.3d 538 (1st Cir. 1997) ...................................................................9

*Providence Journal Co. v. Federal Bureau of Investigation*,
  595 F.2d 889 (1st Cir. 1990) ...................................................................3

*Rhode Island v. Narragansett Indian Tribe*,
  19 F.3d 685 (1st Cir. 1994) ..........................................................*passim*

*Rolland v. Patrick*,
  2007 WL 9752013 (D. Mass 2007) .........................................................3

*Seminole Tribe v. Florida*,
  517 U.S. 44 (1996) ...............................................................................10

*Sycuan Band of Mission Indians v. Roache*,
  788 F.Supp. 1498 (S.D. Cal. 1992) .......................................................10

*United H.E.R.E. Local 217 v. Sage Hospitality Resources*,
  722 F. Supp. 2d 169 (D. R.I. 2010) .........................................................2

*United Keetoowah Band of Cherokee Indians v. Oklahoma*,
  927 F.2d 1170 (10th Cir. 1991) .............................................................10

*United States v. 1020 Electronic Gambling Machines*,
  38 F. Supp. 2d 1219 (E.D. Wash. 1999) ..................................................5

*Weaver v. Henderson*,
  984 F.2d 11 (1st Cir. 1993) ......................................................................3

## Statutes

25 C.F.R. § 559.4...............................................................................9, 17

25 U.S.C. § 2702(1)......................................................................2,16, 19

25 U.S.C. § 2710(b)(1)(E)................................................................9, 17

25 U.S.C. § 2710(b)(2)(B)....................................................................16

25 U.S.C. § 2710(d)(7)(B).....................................................................10

28 U.S.C. §1295(a)(1) ........................................................................................................4

## Rules

Fed.R.App.P. 8(a)(1) .....................................................................................................2, 4

Fed.R.App.P. 8(a)(1)(A)……………………………………………………………………..1

Fed.R.App.P. 8(a)(1)(C)……………………………………………………………….1, 4

Fed.R.Civ.P 62(b) ...........................................................................................................4

Fed.R.Civ.P. 58(c)(2)(B) ...............................................................................................13

Fed.R.Civ.P. 62(c) .......................................................................................................1, 4

## Other Authorities

Commonwealth General Law, MGL c. 111 s. 31 ..........................................................18

Commonwealth Wetland Protections Act, 310 CMR 10, MGL c. 131 s. 40 ................18

Massachusetts Expanded Gaming Act, MGL c. 23K…………………………………..10, 18

State Environmental Code, 30 CMR 15, 15 MGL c. 21A s. 13 ....................................18

Prevailing parties on appeal, Defendants[1] Counterclaimants Wampanoag Tribe of Gay Head (Aquinnah) and the Aquinnah Wampanoag Gaming Corporation ("AWGC") (collectively "Tribe") submit this Memorandum of Points and Authorities in support of the Tribe's Motion (the "Motion"), pursuant to Fed.R.Civ.P. 62(c) and in compliance with Fed.R.App.P. 8(a)(1)(A) and (C), for an order staying the Order and Amended Final Judgment of this Court entered on June 19, 2019 (ECF Nos. 200-201), pending appeal to the United States Court of Appeals for the First Circuit (the "Appeals Court"). In the alternative, the Tribe seeks a temporary stay to allow sufficient time for the Appeals Court to consider and rule upon a motion from the Tribe pursuant to Fed.R.App.P. 8(a)(1)(A) and (C).

## I.     OVERVIEW

The Appeals Court vacated this Court's original Final Judgment (the "Original Final Judgment") in this matter, reasoning that the Indian Gaming Regulatory Act's ("IGRA") comprehensive and sophisticated regulatory scheme, rather than the laws of the Commonwealth of Massachusetts (the "Commonwealth") and local laws, governed gaming activities on the Tribe's Indian lands. *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d 618 (1st Cir. 2017).  Reaffirming *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685 (1st Cir. 1994), the Appeals Court reasoned that this Court misapprehended *Narragansett's* federal preemption analysis in ruling against the Tribe, and issued a mandate to this Court to enter judgment in favor of the Tribe.  *Aquinnah*, 853 F.3d at 627-29. Rather than simply implement the Appeals Court's mandate, this Court entertained an untimely motion by Plaintiff Counterclaim Defendant Town of Aquinnah (the "Town") to issue, on remand, a final judgment adverse to the Tribe.  The Amended Final Judgment subjects the Tribe to the jurisdiction of all Commonwealth and local laws and regulations regarding the construction, occupancy and operation of the Tribe's gaming facility on its Indian lands. The Amended Final Judgment, if allowed to stand, will devastate the Tribe's ability to generate governmental

---

[1] The Wampanoag Tribal Council of Gay Head, Inc., which was named as a party defendant, was an entity created under the laws of the Commonwealth prior to Federal Recognition and no longer exists.

revenue from gaming, which funds are desperately needed for the Tribe to fulfill Congress' intended goals of promoting tribal economic development, self-sufficiency, and strong tribal governments. 25 U.S.C. § 2702(1).

Accordingly, the Tribe seeks a stay of the Amended Final Judgment pending appeal to the extent it subjects the Tribe to laws and regulations of the Commonwealth and Town regarding the construction, occupancy and operation of gaming facilities on the Tribe's Indian lands. The Tribe will be irreparably harmed if the stay is denied, with the effect of ripping from the Tribe the governmental revenues it needs to provide essential governmental services to its members. Conversely, the Town and Commonwealth will suffer no harm whatsoever if the stay is granted, as federal and tribal law more than adequately protects public health and safety, and the environment, with respect to the Tribe's gaming facilities and operations. Applying the First Circuit's standards for the deliberation of motions to stay pending appeal, the balance of hardships weighs sharply in favor of the Tribe, as the Tribe's appeal raises serious issues upon which the Tribe is likely to prevail, and at the same time, the public interest is advanced, such that a stay is appropriate.

## II.   APPLICABLE STANDARDS FOR DELIBERATION OF MOTIONS FOR STAY PENDING APPEAL

Fed.R.App.P. 8(a)(1) requires the Tribe to move first in this Court for a stay of the Amended Final Judgment pending appeal, or for an order suspending, modifying, restoring, or granting an injunction while the Tribe's appeal is pending. Stays of injunctive orders "... are evaluated under the traditional four-part standard applied to injunctions." *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 16 (1st Cir. 2002). The considerations are: (1) whether the applicant has made a strong showing of success on the merits; (2) whether the applicant will be irreparably harmed absent injunctive relief; (3) whether issuance of the stay will injure other parties; and (4) where the public interest lies." *Id.* at 16 and n.3 (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *Ainsworth Aristocrat Intern. Pty. Ltd. v. Tourism Co. of Com. of Puerto Rico*, 818 F.2d 1034, 1039 (1st Cir. 1987); *Martinez Rodriguez v. Jimenez*, 537 F.2d 1, 2 (1st Cir. 1976); *Aftermarket Auto Parts Alliance, Inc. v. Bumper2Bumper, Inc.*, 2012 WL 12996020 (D. Maine 2012); *United H.E.R.E. Local 217 v. Sage Hospitality Resources*, 722 F. Supp. 2d 169, 172

(D. R.I. 2010); *Rolland v. Patrick*, 2007 WL 9752013 at *1 (D. Mass 2007).

The *sine qua non* of the stay pending appeal standard is whether the movant is likely to succeed on the merits. *Acevedo-Garcia*, 296 F.3d at 16-17 (citing *Weaver v. Henderson*, 984, F.2d 11, 12 (1st Cir. 1993)). In essence, the issuance of a stay depends on whether the harm caused to the movant without the stay, in light of the movant's likelihood of eventual success on the merits, outweighs the harm that the stay will cause the non-moving party. *Acevedo-Garcia*, 296 F.3d at 17 (citing *United Steelworkers of America v. Textron, Inc.*, 836 F.2d 6, 7 (1st Cir. 1987)). Where the denial of a stay could cause relatively slight harm to the appellee while causing irreparable harm to the appellant, the appellant need not show an absolute probability of success in order to be entitled to a stay. *Providence Journal Co. v. Federal Bureau of Investigation*, 595 F.2d 889, 890 (1st Cir. 1990). Other Circuits which have addressed the issue conclude that where a party can meet the other requirements for a stay pending appeal, it may be deemed to have satisfied the "likelihood of success on appeal" element if it shows "questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation." *See, e.g.*, *City of Chanute v. Kansas Gas and Elec. Co.*, 754 F.2d 310, 314 (10th Cir. 1985).

The First Circuit cautions that "[w]hat matters ... is not the raw amount of irreparable harm [a] party might conceivably suffer, but rather the risk of such harm in light of the party's chance of success on the merits." *P.R. Hosp. Supply, Inc. v. Boston Scientific Corp.*, 426 F.3d 503 (1st Cir. 2005); *Coastal Counties Workforce, Inc. v. LePage*, 2018 WL 545712 at *4 (D. Maine 2018). Because traditional stay factors contemplate individualized judgments in each case, the formula cannot be reduced to a set of rigid rules. *Hilton*, 481 U.S. at 776-77. Individualized consideration and assessment is required in each case. *Id.*

As set forth below, all four considerations outlined above weigh in favor of granting the Tribe's Motion for a stay pending appeal in this matter.

## III.   JURISDICTION

The Tribe has timely filed on June 28, 2019 its Notice of Appeal (ECF No. 202) of this Court's Memorandum Opinion and Order (ECF No. 200) and the Amended Final Judgment (ECF No. 201), both dated June 19, 2019. The Appeals Court has jurisdiction pursuant to 28 U.S.C. §1295(a)(1) (appeal from Final Judgment). This Court has jurisdiction to hear the Tribe's Motion pursuant to Fed.R.App.P. 8(a)(1) requiring parties requesting a stay of order and restoration of injunction to first file a motion in district court, and Fed.R.Civ.P 62(b) and (c), which permits a court to stay a final judgment and restore a preliminary injunction pending appeal. *OfficeMax Inc. v. County Qwick Print, Inc.*, 751 F. Supp. 2d 221, 253 (D. Maine 2011), reversed on other grounds, 658 F.3d 94 (1st Cir. 2011).

## IV.   ARGUMENT

The four elements required to issue a stay pending appeal are established in the instant circumstance. The Tribe will refrain from repeating the arguments presented in its Response and Sur-Reply in Opposition to the Town's Motion for Entry of Final Judgment (ECF Nos. 185 and 196), which pleadings and arguments are incorporated by reference, and will instead focus on identifying the errors in this Court's analysis and the framing of the Amended Final Judgment.

### A.   Element 1: There is a substantial likelihood that the Tribe will prevail on the merits; the merits are serious, substantial and difficult.

It is difficult for a losing party to successfully make a "strong showing" to the trial court that there is a likelihood of success on appeal, because if the court had concluded it was likely making the wrong decision, it would have made the right one. *Coastal Counties Workforce*, 2018 WL 545712 at *3. In granting the Town's motion regarding the form of final judgment to be issued in this case, this Court, rather than reviewing the correctness of its analysis regarding local permitting in light of the Appeals Court opinion in this matter, doubled down on granting the Town jurisdiction over the Tribe's gaming facility on the Tribe's Indian lands. Hence, the requirement that the Tribe first seek a stay before this Court is likely a mere procedural formality so that the Tribe may comply with Fed.R.App.P. 8(a)(1)(C) and seek a stay from the Appeals Court. However, the Tribe implores this Court to consider

4

that its analysis may be incorrect on the issues at hand, and further implores this Court take the procedural steps necessary to prevent further deprivation of the Tribe's rights under *Cabazon Band of Mission Indians et. al. v. California*, 480 U.S. 202 (1987) and IGRA.  In a similar circumstance, where two Indian tribes in Washington State operated slot machines over the objection of the state, the federal district court ruled unambiguously that the tribes lost on the merits, but granted a stay pending appeal, reasoning:

> The Tribes use the proceeds from gambling devices to fund a number of useful programs. If the gambling devices are forfeited, the Tribes will be forced to terminate those programs. That fact is sufficient to create a risk of irreparable harm. . . . Since the balance of hardships tips sharply in their favor, a stay is appropriate.

*United States v. 1020 Electronic Gambling Machines*, 38 F. Supp. 2d 1219, 1225 (E.D. Wash. 1999).

The dispositive legal issue on appeal is whether this Court properly concluded that the construction, occupancy and operation of the Tribe's gaming facility are subject to "General Regulatory Laws," including "permitting requirements."  This Court made three fatal procedural errors as subterfuge to its error on the dispositive legal issue, and this Court was wrong to even address the legal issue.  Even if those procedural issues are resolved against the Tribe, however, this Court's Amended Final Judgment and its June 19, 2019 Memorandum and Order serve as a denial of the Tribe's request, ECF Nos. 185 at 14-20 and 196, at 6-8, that this Court reconsider its analysis regarding the injunction in light of the Appeals Court's opinion in this matter.

### 1. This Court's Amended Final Judgment and Opinion and Order of June 19, 2019 erred on the critical substantive legal issues.

Rather than recognize and embrace the Appeals Court's conclusion that IGRA is a comprehensive and sophisticated regulatory scheme preempting state and local law that infringes on that regulatory scheme, and applying the traditional canons of construction regarding statutes intended for the benefit of Indian tribes to particularized circumstances, this Court draws a bright line between "the gaming laws" and "the General Regulatory Laws." This Court very narrowly defines "the gaming laws" to mean:

> the laws, regulations and ordinances of the Commonwealth of Massachusetts and the

Town of Aquinnah that prohibit or regulate the conduct of bingo or any other game of chance.

ECF No. 201 at 2-3, and very broadly defines "the General Regulatory Laws" to mean:

the laws, regulations, and ordinances of the Commonwealth of Massachusetts, the Town of Aquinnah, and other state and local governmental authorities other than the Gaming Laws, including but not limited to any state and local permitting requirements.

ECF No. 201 at 3. This Court then concludes that the Tribe must comply with all General Regulatory Laws of the Commonwealth "in connection with the construction, occupancy, and operation of a gaming facility on the Settlement Lands." ECF No. 201 at 3. In other words, the Town, with its longstanding vehement opposition to the Tribe's gaming efforts, and motivated to interfere in any way possible with the Tribe's exercise of its rights under IGRA, may indeed interfere, so as long as the interference occurs in the context of the construction, occupancy or operation of the Tribe's gaming facility. Perhaps this Court intended only that the Tribe be required to obtain routine permits for electrical outlets and other similar science and code-based permits, but instead, it has given the Town a road map and the tools to stop or unduly interfere with the Tribe's gaming facility by merely framing the Town's ordinances and regulations, and its permitting decisions, as restricting construction, occupancy and operation, rather than as illegally restricting the Tribe's right to conduct gaming operations. The absurd reality of how this can come to pass was demonstrated by the Town in its own pleadings in support of the initial preliminary injunction when confronted with the fact that Town law is silent on the legality of bingo despite the Town's repeated representations to this Court to the contrary. The Town reasoned that its laws "prohibit" a casino because its laws prohibit all commercial uses except for businesses on certain parcels owned by Town and small home-based business uses (ECF No. 138 at 2, and ECF No. 138-2 at 3). The Town notes that it may in its unbridled discretion issue a special permit (ECF No. 138-2). In other words, the Town has never looked to its "gaming laws" to stop the Tribe; rather, the Town has always looked to "General Regulatory Laws" with restrictions on the construction, occupancy and operation of the gaming facility.

Fortunately, this Court's bright line between "the gaming laws" and "General Regulatory

Laws" is not the law of the First Circuit.  In its opinion vacating this Court's Original Final Judgment,

the Appeals Court reaffirmed its decision in *Narragansett*.  *Aquinnah*, 853 F.3d at 625, n.5, 627-629.

This Court's bright line between "gaming laws" and "General Regulatory Laws" runs counter to the

Appeals Court's explicit guidance on the issue. Despite the Tribe repeatedly citing to the *Narragansett*

opinion, and despite the Appeals Court reaffirming the *Narragansett* opinion in vacating this Court's

Original Final Judgment, this Court has yet to acknowledge the direction of the *Narragansett* opinion,

much less explain how this Court's gaming laws/General Regulatory Laws paradigm complies with

the Appeals Court's direction on the issue. The relevant passage in *Narragansett*, at issue, is as follows

in its entirety:

### C. Some Unanswered Questions.

Despite this holding—a holding that resolves the case before us—it would be disingenuous to pretend that all the relevant questions have been answered. While the Tribe retains all aspects of its retained sovereignty, as that term is commonly comprehended in our jurisprudence, Congress, after having granted to the state non-exclusive jurisdiction over the settlement lands via the Settlement Act, impliedly withdrew from that grant, via the Gaming Act, the state's jurisdiction over gaming.  Yet, the withdrawal of jurisdiction over gaming cannot be interpreted to signify a withdrawal of all residual jurisdiction.

This means that the state continues to possess a quantum of regulatory authority. Of course, any effort by the state to exercise this residual authority is hedged in by barriers on both sides: on one side, by the Tribe's retained rights of sovereignty; on the other side, by the Tribe's congressionally approved authority over a specific subject matter, namely, gaming. Testing the sturdiness of one or the other of these barriers in a given case will require "a particularized inquiry into the nature of the state, federal, and tribal interests at stake." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145 (1980). We cannot undertake such an inquiry in the abstract, and, thus, the jurisdictional status of the settlement lands remains ill-defined in certain respects. But that is the nature of litigation; Article III of the Constitution forbids courts from issuing advisory opinions or answering hypothetical questions. See, e.g., *International Longshoremens' Union v. Boyd*, 347 U.S. 222, 224 (1954); *United Public Workers v. Mitchell*, 330 U.S. 75, 89 (1947). Having exhausted the limits of the case in controversy, we must depart the stage, leaving it set for the possibility of future litigation.

In parting, we offer a few words of guidance. The crucial questions which must yet be answered principally deal with the nature of the regulable activities which may—or may not—be subject to state control, e.g., zoning, traffic control, advertising, lodging. It is true that nondiscriminatory burdens imposed on the activities of non-Indians on Indian lands are generally upheld. See, e.g., *Washington v. Confederated Tribes of Colville Reservation*, 447 U.S. 134, 151 (1980) (discussing tax burdens). But it is also true that a comprehensive federal regulatory scheme governing a particular area typically leaves no room for additional state burdens in that area. See, *White Mountain Apache Tribe*, 448 U.S. at 148 (finding state timber regulation to be preempted). Which activities are deemed regulable, therefore, will probably depend, in the first instance, on

which activities are deemed integral to gaming. Although the core functions of class III gaming on the settlement land are beyond Rhode Island's unilateral reach, the distinction between core functions and peripheral functions is tenebrous, as is the question of exactly what Rhode Island may and may not do with respect to those functions that eventually are determined to be peripheral.

If these criss-crossing lines prove agonizingly difficult to decipher, let alone to administer, they "are no more or less so than many of the classifications that pervade the law of Indian jurisdiction." *Washington v. Yakima Nation*, 439 U.S. 463 (1979). And in all events, the jurisdictional issues remain subject to further judicial intervention, pursuant to the Gaming Act, in a more fact-specific context, if the parties' compact negotiations collapse.

We can go no further at this time. We add, however, that although our opinion today answers some questions and raises others, we do not mean to encourage the protagonists to litigate *ad infinitum*. The parties' baseline power need not be defined with exactitude by judicial decree where, as here, they are compelled to enter negotiations out of which will emerge a new balance of power. The next step in the allocation of jurisdiction over gaming is in the hands of the parties, through negotiations designed to produce a tribal-state

compact as contemplated by the Gaming Act, see 25 U.S.C. § 2710(d). If cool heads and fair-minded thinking prevail, that step may be the last.

*Narragansett*, 19 F.3d at 705-706. This Court's Amended Final Judgment contravenes the First Circuit's guidance in numerous respects.

First, the bright line between "gaming laws" and "General Regulatory laws" now imposed by this Court is certainly not "a particularized inquiry into the nature of the state, federal, and tribal interests at stake." Rather, this Court undertook the inquiry in the "abstract" and issued an arbitrary, sweeping grant of jurisdiction to both the Town and the Commonwealth, to the exclusion of the Tribe's retained jurisdiction.

Second, this Court requires the construction, occupation and operation of the gaming facility to comply with all "General Regulatory Laws" of the Commonwealth and Town. While the *Narragansett* court noted that such a bright line might be drawn ("It is true that nondiscriminatory burdens imposed on the activities of non-Indians on Indian lands are generally upheld") 19, F.3d at 705, it also summarily rejected that paradigm noting "[b]ut it is also true that a comprehensive federal regulatory scheme governing a particular area typically leaves no room for additional state burdens in that area." *Id.* IGRA is precisely such a comprehensive regulatory scheme. It does not merely provide that tribes may offer certain games of chance, but instead sets forth a far reaching and intricate regulatory

framework, including *inter alia*, requiring tribes to adopt, implement and enforce their own building codes, with regulatory oversight and enforcement vested in the National Indian Gaming Commission ("NIGC"). 25 U.S.C. § 2710(b)(1)(E); 25 C.F.R. § 559.4. In fact, IGRA does contemplate tribes working with state and local jurisdictions, but *only* in the confines of a negotiated Class III gaming compact.  There is no such authorization for Class II gaming – the type of gaming to be offered by the Tribe and contemplated here.  This Court's conclusion that the Appeals Court's decision did not include a preemption of the Town's permitting authority is illogical based on the carefully-crafted regulatory scheme laid out in IGRA.  IGRA is clear.  If, as the Appeals Court held, IGRA preempts the gaming components of the Settlement Act, then Class III gaming is subject to a negotiated compact with the Commonwealth, and Class II gaming is exempt from Commonwealth and local oversight, including any oversight by the Town.

Third, the *Narragansett* court noted that there are likely circumstances where state and local "zoning, traffic control, advertising, [and] lodging" laws and regulations will apply, and other circumstances where they will not, depending on the particularized circumstances. 19 F.3d at 705-706. Under this Court's Amended Final Judgment, state and local zoning, traffic control, advertising, and lodging laws and regulations will apply in all circumstances. Never mind that IGRA is a federal statute intended for the benefit of Indian tribes, which requires federal courts to interpret any ambiguities in IGRA in favor of the tribes, *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985); *Penobscot Indian Nation v. Key Bank*, 112 F.3d 538, 547 (1st Cir. 1997), the Amended Final Judgment imposes state and local law (other than state statutes that "prohibit or regulate games of chance") on the Tribe regardless of the circumstances and class of gaming.

Fourth, the Amended Final Judgment's gaming law/General Regulatory Law paradigm eviscerates the *Narragansett* court's paradigm which requires an assessment of whether the state or town law, regulation or permit at issue is "integral" to the Tribe's ability to proceed with the exercise of its rights under IGRA. Such a paradigm requires the tenebrous analysis of distinguishing between core functions and peripheral functions of gaming on settlement lands in the particularized

circumstances at issue. 19 F.3d at 705-706. The two paradigms cannot co-exist. This Court's gaming law/General Regulatory Law paradigm allows for the imposition of state and local laws regarding the construction, occupancy and operation of the gaming facility without regard to whether the regulation or permit at issue is integral to the exercise of the Tribe's rights under IGRA.   Notably, the Massachusetts Expanded Gaming Act, MGL c. 23K, identifies building codes as one integral subject which must be addressed in the context of commercial gaming in the Commonwealth. MGL c. 23K s, 15(12) (an applicant must comply with state and local building codes and ordinances and bylaws). Similarly, the compact negotiated by the Commonwealth with the Mashpee Wampanoag Tribe requires the Mashpee Tribe to adopt codes at least as restrictive as the Commonwealth's but leaves it to the Mashpee Tribe to apply and enforce their codes (ECF No. 185 at 23 and n.12). Such identification of the issue makes it, by the Commonwealth's own actions, integral to the conduct of gaming. This Court has yet to acknowledge the guidance of the *Narragansett* court, much less explain its rejection of the Tribe's well-reasoned analysis set forth in its pleadings in opposition to the Town's Motion for Entry of Final Judgment (ECF No. 185 at 14-19, and ECF No. 196 at 6-8).

Fifth, the *Narragansett* court noted that the proper forum for resolution of such issues is in the context of negotiating a compact for Class III gaming (casino gaming, or gaming beyond bingo and non-banked card games). *Id.* at 705-706. *See also United Keetoowah Band of Cherokee Indians v. Oklahoma*, 927 F.2d 1170, 1177 (10th Cir. 1991); *Sycuan Band of Mission Indians v. Roache*, 788 F.Supp. 1498, 1504 (S.D. Cal. 1992). The Amended Final Judgment devastates the Tribe's right to a compact negotiated in good faith under IGRA by eliminating the Commonwealth's incentive to negotiate in good faith with the Tribe. Why negotiate with the Tribe when the Commonwealth and Town can already impose their will through the passage and enforcement of their own laws and regulations? This devastation is even more heinous when considered in the wake of *Seminole Tribe v. Florida*, 517 U.S. 44 (1996*)*, which ruled that Congress' intended remedy for tribes against recalcitrant states (a court-appointed mediator that chooses between last best offers, 25 U.S.C. § 2710(d)(7)(B)), is unavailable because Congress wrongly abrogated the states' Eleventh Amendment immunity. 517

U.S. at 76. The Tribe has already demonstrated to this Court the Commonwealth's recalcitrance prior to the Appeals Court's opinion in this litigation, which has unfolded as an absurd situation where the Commonwealth has a useless gaming compact with the only other federally recognized tribe in the Commonwealth, which tribe is unable to secure lands eligible for gaming under IGRA. The Amended Final Judgment allows the Commonwealth to further its recalcitrance against the Tribe, as evidenced by the Massachusetts Gaming Commission's recent decision to move forward with the consideration of the establishment of a billion-dollar non-Indian casino in the heart of the Wampanoag's aboriginal lands. *See* Andrews-Maltais Declaration at 10, ¶ 27, and Exhibit "D".

The Amended Final Judgment wrongfully asserts that the Tribe contends "the First Circuit implicitly decided that all state and local permitting authority was preempted by the IGRA," ECF No. 200 at 8, and rejects the Tribe's Proposed Form of Final Judgment, ECF No. 185-4, as overreaching, resulting in no residual Commonwealth and local jurisdiction:

> The Court will not read into the (First Circuit's) silence a ruling that would essentially overrule *Narragansett*, void significant portions of the Settlement Act, and divest the Town of regulatory jurisdiction of any kind. The Tribe's interpretation would destroy-not "leave. . . . intact"-the jurisdiction over the Settlement Lands granted to the Commonwealth and the Town by the Settlement Act.

ECF No. 200 at 9. That conclusion is blatantly wrong. The Tribe's Proposed Form of Final Judgment does no such thing. Rather, it requires the Tribe to proceed in a manner consistent with the Appeals Court's opinion in this case, which opinion embraces and reaffirms *Narragansett*, placing the Commonwealth and the Tribe in the exact same position as Rhode Island and the Narragansett Tribe. If the Commonwealth is truly interested in negotiating these issues with the Tribe, then it should begin pursuing a compact with the Tribe to resolve these issues. Similarly, as a mere political subdivision of the Commonwealth, if the Town is truly interested in these issues, it should be urging the Commonwealth to negotiate a compact with the Tribe. If a compact cannot be reached, the Commonwealth or Town may seek recourse if there is a particularized circumstance where they believe the Tribe's actions infringe upon the Commonwealth's and/or Town's residual jurisdiction. Notwithstanding this Court's opinion to the contrary, all parties acknowledge that the Appeals Court

held that IGRA and the Settlement Act are repugnant, and therefore, the Settlement Act *was* preempted and thus significant provisions of the Settlement Act *were* voided, and the Commonwealth and Town *have been* divested of regulatory jurisdiction over matters integral to gaming on the Tribe's Indian lands. *Aquinnah*, 853 F.3d at 627-629. This Court's Order and Amended Final Judgment fail to address the repugnancy of allowing the Settlement Act to create conflicting results regarding the construction, occupancy and operation of the Tribe's gaming facility. *See* Tribe's Sur-Reply in Opposition, ECF No. 196 at 6-7. The Tribe, in its pleadings, acknowledges [2] that there are circumstances of residual jurisdiction, such as the completion of the Community Center, which is no longer a practical location for the Tribe's gaming facility. *See* Andrews-Maltais Declaration at 2-3, ¶ 5. Where federal law in the form of IGRA and NIGC regulations, and tribal law, set forth the applicable standards for construction, occupancy and operation of the gaming facility, the jurisdiction of the Commonwealth or Town otherwise provided in the Settlement Act is preempted. The lengthy passage in *Narragansett* cited above was the applicable law governing the substantive issue in the appeal at the time this Court erred in ruling against the Tribe, and remains the law. This Court's interpretation, not the Tribe's interpretation, "would essentially overrule *Narragansett*."

## 2. This Court's Amended Final Judgment and Opinion and Order of June 19, 2019 erred on the critical procedural legal issues.

This Court erred in three critical respects regarding the procedural context of the Town's Motion for Entry of Final Judgment. All three errors exacerbate this Court's failure to follow the law articulated by the Appeals Court in its reaffirmation of *Narragansett*. All three procedural errors support an Amended Final Judgment that allows the Town and the Commonwealth to interfere with

---

[2] Not at issue in this Motion for Stay, the Tribe maintains that the Settlement Agreement is no longer valid because it violates 25 U.S.C. §§ 476 (f) and (g) (amendments to the Indian Reorganization Act), see *Akiachack Native Community v. United States*, 935 F. Supp. 2d 195 (D.C. Dist. 2013), appeal dismissed for want of jurisdiction, 827 F.3d. 100, Dkt. (D.C. Cir. 2016), and because conditions precedent in the 1983 Settlement Agreement have never been met. Nothing herein is intended to negate that position. Additionally, the 1983 Settlement Agreement, at ¶ 16 requires the Tribe's consent to changes to zoning laws that change the Land Use Plan then in effect. The Tribe reserves the right to challenge the Town's attempts to base any decision regarding the construction, occupancy and operation of the gaming facility on changes to its zoning laws subsequent to 1983.

the Tribe's rights under IGRA by framing their interference as restrictions on the construction, occupation and operation of the gaming facility, rather than framing their interference as restrictions on games of chance. First, this Court erred by finding jurisdiction to hear the Town's motion despite the fact that the Appeals Court's mandate that judgment be entered in favor of the Tribe became effective by operation of law after the passage of 150 days from this Court's docketing of the mandate it received from the Appeals Court. Second, this Court violated the mandate rule. Third, this Court erred in finding that the Tribe has waived its arguments regarding the applicability of General Regulatory Laws – the Tribe did not waive the arguments.

This Court was divested of jurisdiction as of October 6, 2018; accordingly, it lacked the capacity to hear the Town's motion. Fed.R.Civ.P. 58(c)(2)(B) provides that if a court fails to enter a separate document setting forth final judgment within 150 days from entry in the civil docket, judgment is deemed to have been issued and in effect. This Court lodged the mandate issued by the Appeals Court, directing this Court to enter judgment in favor of the Tribe, on May 9, 2018. ECF. No. 176. Accordingly, judgment was entered in favor of the Tribe, and against the Town, the Commonwealth and the Aquinnah Gay Head Community Association (the "AGHCA") on October 6, 2018. The Town's motion was moot and untimely because final judgment, as directed by the mandate, was already entered as of October 6, 2018.

The same misapprehension by this Court of IGRA and the Appeals Court opinion in this matter, failing to grasp that IGRA is a comprehensive regulatory scheme entailing far more than merely whether a particular state law prohibiting a game of chance applies to a tribe, also leads to error by this Court on the remaining two of the three key procedural errors.

This Court erred in reasoning that the mandate issued by the Appeals Court provided latitude to this Court to enter judgment in favor of the Town, the Commonwealth and the AGHCA. This Court recognized that *Hynning v. Partridge*, 359 F.2d 271, 273 (D.C. Cir. 1966), supports the Tribe's position, but attempted to distinguish it by noting that opinions and judgments should be read together "and there is nothing inconsistent or irrational in denying the Tribe's claims as to the application of

permitting regulations." ECF No. 200 at 10. The Tribe agrees that the mandate and opinion should be read together, but to read them in a manner that disrupts *Narragansett* in the many ways identified above is both inconsistent and irrational. This Court never addresses the argument that IGRA's comprehensive regulatory scheme which governs the construction, occupancy and operation of gaming facilities on Indian lands is repugnant to local or Commonwealth jurisdiction over the precise same subject matter.

This Court compounds its error by citing *Biggens v. Hazen Paper Company*, 111 F.3d 205 (1st Cir. 1997), for the general proposition that, on remand, a court is free to use its own judgment on all matters not addressed by the appellate decision. *Biggens*, however, remanded with instructions to proceed with the case, not with instructions to enter judgment, *id.* at 209, and as discussed above, the Appeals Court did decide that IGRA's comprehensive scheme preempts Commonwealth and local jurisdiction. This Court's suggestion that the Tribe's proposed form of judgment "eviscerates" *Narragansett* is just wrong. Going forward, if the Town or the Commonwealth believes in a particularized circumstance that the Tribe is proceeding in a manner that encroaches on the Commonwealth's or Town's residual jurisdiction, it may take the necessary steps to resolve the matter. In such context, the Appeals Court opinion and its reaffirmation of *Narragansett* would provide guidance to the appropriate answer for the particularized circumstance. In contrast, the Amended Final Judgment subjects the Tribe to every Commonwealth and local law and regulation, other than those prohibiting specific games of chance, without regard to the disruption to IGRA's comprehensive regulatory scheme. Even if *Biggens* applies to mandates with specific instructions to enter judgment in favor of the appellant, which it does not, this Court is not free to issue a decision inconsistent with *Narragansett,* which it has done.

Even if this Court were correct that the Tribe waived the issue on appeal, which it did not, the Tribe asked this Court to reconsider its injunction against the Tribe in light of the Appeals Court's analysis, ECF Nos. 185 at 14-20 and 196, at 6-8. If this Court has jurisdiction to amend final judgment, it has jurisdiction to entertain the Tribe's request for reconsideration in light of the Appeals Court

opinion.

This Court's failure to acknowledge that IGRA is a comprehensive regulatory scheme entailing far more than merely whether a particular state law prohibiting a game of chance applies to a tribe, also leads to its error in concluding that the Tribe failed to appeal the issue of whether local building permits are required. This Court concedes that the Tribe appealed whether IGRA preempts the Settlement Act regarding gaming, and whether IGRA applies to the Tribe's Indian lands. ECF No. 200 at 6. This Court creates (for the first time in its Amended Final Judgment) a contrived definition of "gaming laws" as merely the Commonwealth's or Town's prohibition or regulation of specific games of chance, when the terms are contextual regarding IGRA's comprehensive and sophisticated regulatory scheme, which scheme includes the construction, occupancy and operation of tribal gaming facilities. This Court characterizes the Appeals Court opinion as "focused entirely on the parenthetical in the statute, which directly addressed state and local regulation," ECF No. 200 at 8. It would be far more appropriate to characterize the decision as focused on the correctness of the Appeals Court's decision in *Narragansett*, and this Court's error in failing to follow *Narragansett.* The Tribe clearly appealed this Court's errant preemption analysis, which analysis includes this Court's decision in the Original Final Judgment that the Tribe must comply with local permitting laws, and which analysis certainly included this Court's broad definition of General Regulatory Laws embedded in its Amended Final Judgment. That this Court believes there is no dispute that the Tribe failed to appeal the issue underscores its misapprehension of Congress' repeal of the Settlement Act when IGRA became law.

For these reasons, both substantive and procedural, and for the reasons set forth in the Tribe's response and sur-reply in opposition to the Town's Motion for Entry of Final Judgment, there is a substantial likelihood that the Tribe will prevail on appeal. Even if this Court believes it ruled correctly, this Court's own acknowledgment that the issues are tenebrous is an acknowledgment that the appeal raises questions that are "serious, substantial and difficult," such that a stay is appropriate.

**B.  Element 2: The Tribe will suffer irreparable harm if the stay is not granted.**

The Amended Final Judgment has resulted in the Tribe halting the construction of its initial gaming facility, which construction would otherwise have resulted in the continuance of approximately 100 temporary jobs involved in the construction and pre-opening phase of the gaming facility, and the creation of 100 permanent jobs upon completion of the gaming facility. Andrews-Maltais Declaration at 6-7, ¶¶ 19-20. Relying upon the clear and unambiguous language in the First Circuit's order to this Court to reverse its opinion and to enter a final judgment in favor of the Tribe, the Tribe proceeded to resume its pursuit of its gaming facility. *Id.* at 6-7, ¶ 20. The Tribe is being deprived of the critical revenue stream, estimated to range from three million to five million dollars per year from the initial phases of operation. *Id.* The Tribe deliberately set a course to develop a modest initial facility to enable it to better assess the market and the revenue stream before developing the second phase, which will result in even more jobs and the generation of more governmental revenue. *Id.* at 6, ¶ 18. It is important to note that this is not lost profit to a private venture; this is lost governmental revenue. The Tribe by its own laws and by IGRA is mandated to use the revenue for essential governmental services, 25 U.S.C. § 2710(b)(2)(B), all of which are currently desperately underfunded. Every day of delay is a delay in funding essential health services, education, housing, social services, cultural protection, police and fire protection, EMT services, judiciary, infrastructure development, and a multitude of other governmental services, ECF Nos. 136-1 at 6, ¶ 21; 127, at 29-30. These revenues will provide the means for tribal members who were forced to leave their homeland in pursuit of viable employment and affordable housing to come home and improve access to services for members living off-Island. Every day of delay is also lost governmental revenue that will never be recovered. Additionally the Tribe, relying upon its affirmed rights, has already invested millions of dollars in contractual agreements, under which additional delays exponentially increase the Tribe's indebtedness. Andrews-Maltais Declaration at 6-7, ¶ 20. Moreover, subjecting the Tribe to jurisdiction where there is none is itself irreparable harm, thwarting Congress' intended result of promoting tribal economic development, self-sufficiency, and strong tribal governments. 25 U.S.C. § 2702(1).

This irreparable harm is exacerbated by this Court's Amended Final Judgment vesting jurisdiction in the Town, which has a long-standing hostility to the Tribe's gaming project, wherein key players have made statements to the local press and in open meetings that demonstrate an intent to stop the Tribe despite its victory in the First Circuit and the Supreme Court's denial of certiorari. Examples include a Town Selectman stating she would use her personal vehicle to stop construction, Andrews-Maltais Declaration at 7, ¶ 21, and Exhibit "B", the head of the AGHCA stating the organization (representing the non-Indian homeowners that control the Town) will continue to do all it can to stop the project, *Id.* at 9, ¶ 25 and Exhibit "C", and the Town refusing to process a permit from an electric utility that inadvertently sought a permit for the gaming site. ECF Nos. 185 at 3, n.3 and 185-4. A review of the videos of Town meetings demonstrates a pattern of hostile statements and wild unsubstantiated accusations made by Town officials. Andrews-Maltais Declaration at 7-10, ¶¶ 21-26[3].  Enabling the Town to impose undue restrictions on the construction, occupancy and operation of the gaming facility will be devastating to the Tribe's gaming efforts. Rhetoric that the Town no longer opposes the Tribe's gaming facility is empty; there is no evidence that the Town will exercise the jurisdiction this Court granted in any manner other than to delay and/or stop the gaming facility from ever being completed and opened.

C.      **Element 3: In sharp contrast, the Town and Commonwealth will not be irreparably harmed in any material manner if the Tribe's Motion is granted.**

Permeating this Motion is this Court's failure to acknowledge that IGRA's comprehensive and sophisticated regulatory scheme, which preempts the Settlement Act, includes provisions that ensure that the construction, occupancy and operation of the gaming facility are done in a manner that protects public health and safety and the environment. 25 U.S.C. § 2710(b)(1)(E); 25 C.F.R. § 559.4; and ECF No. 107, Ex. X at Section 3.8. Those protections, as manifested by the Tribe and the NIGC, protect the Town and Commonwealth from suffering any irreparable harm if the stay is granted.

---

[3] Video recordings of open meetings of the Town Selectmen are available on the MVTV's public access television's official web page, mvtv.vod.castus.tv.

In the wake of the favorable decision from the Appeals Court, the Community Center that the Tribe had intended to convert into the first phase of its gaming facility was no longer an option as the Community Center has since been completed and its use restricted. Andrews-Maltais Declaration at 2-3, ¶ 5. The Tribe, accordingly, set out to manifest its secured rights by engaging one of the most successful and reputable tribal gaming companies in the world, Global Gaming Solutions, LLC, owned by the Chickasaw Nation, which has constructed, occupied and operated twenty-two gaming facilities including the Winstar World Casino Resort, the largest gaming facility in North America, *id.* At 3 ¶ 7, all under tribal law with oversight by the NIGC, and all without a single material problem that threatens public health and safety or threatens the environment. *Id.* at 3-4, ¶ 9.

In preparation for building the gaming facility, the Tribe updated and revised its Land Use Ordinance adopting and incorporating by reference the family of codes issued by the International Code Council as adopted and as amended from time to time by the Commonwealth; the regulations under the Commonwealth Wetland Protections Act, 310 CMR 10, MGL c. 131 s. 40, as they may be amended from time to time; the regulations under the State Environmental Code, 30 CMR 15, 15 MGL c. 21A s. 13, as they may be amended from time to time; and the health code regulations adopted by the Commonwealth General Law, MGL c. 111 s. 31 as they may be amended from time to time. Andrews-Maltais Declaration at 4, ¶ 10 and Exhibit "A". Further, the Tribe created a building department and contracted the services of a reputable building inspection company, Municipal Code Consulting, LLC ("MCC") to act as Permit Administrator, to review the Tribe's codes, to review the gaming facility's plans, to issue permits and to conduct inspections. *Id.* at 4-6,¶¶ 12-14 and 17; ECF No. 185-2 at ¶¶ 10-12; Declaration of Felix Zemel at 2-3, ¶¶ 2, 4 and 5.

While the creation of the Building Department and the contract with MCC were done as an exercise of tribal sovereignty, they were also for a very practical purpose – to the Tribe's knowledge, the Town has no full-time building inspector. The last project which the Tribe undertook – the completion of the Community Center at issue in the injunction proceedings – took much longer to complete due to the

18

utter failing by the Town to perform its duty as the permitting municipality to provide timely and expert inspections as work was completed. In fact, the building inspector could "only" do building inspection on Fridays and then only if his schedule permitted. Andrews-Maltais Declaration at 5-6, ¶ 16.  Instead, the Tribe, even after finding another building inspector to fill in when the Town's building inspector was unavailable, was forced to wait until the Town's inspector was again available again before it could proceed. *Id*. Anticipating the same level of governmental incompetence and resulting irreparable harm, the Tribe took matters into its own hands and hired competent and readily available building inspectors to ensure the construction of its gaming facility would be completed in a timely manner while protecting the environment and public health and safety as required by both tribal and federal law. *Id*. at 4-5, ¶¶ 12-15. Tribal permits have been and will continue to be issued, and inspections have been and will continue to be conducted in the same timely and science-based manner as such permits and inspections should/would otherwise be issued and conducted by the Town, or any other government or governmental instrumentality, in the ordinary course of business. *See* Zemel Declaration at 3, ¶ 6.

### D.  Element 4: Granting the Motion Advances the Public Interest.

Congress identified the public interest that should be advanced in this litigation. In Congress' "Declaration of Policy" it states that the purpose of IGRA is:

> to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.

25 U.S.C. § 2702(1). That policy is only advanced by granting the Tribe's Motion.

## V. CONCLUSION

For the reasons set forth herein, and in its Response and Sur-Reply in Opposition to the Town's Motion for Entry of Final Judgment (ECF Nos. 185 and 196), the Tribe's Motion  for Stay Pending Appeal should be granted.

Dated: July 11, 2019.

Respectfully submitted,

/s/ *Scott Crowell*
SCOTT CROWELL (pro hac vice)
CROWELL LAW OFFICE-TRIBAL
ADVOCACY GROUP LLP
Sedona, Arizona, 86336
Telephone: 425-802-5369
Fax: 509-235-5017
Email: scottcrowell@clotag.net

BRUCE SINGAL (BBO #464420)
ELIZABETH MCEVOY (BB) # 683191)
DONOGHUE, BARRETT & SINGAL
One Beacon Street, Suite 1320
Boston, MA 02108-3106
Telephone: 617-720-5090
Fax: 617-720-5092

LAEL R. ECHO-HAWK (pro hac vice)
MThirtySix, PLLC
The Yard
700 Pennsylvania Avenue, Second Floor
Washington, D.C. 20003
Telephone: (206) 271-0106
Email: lael@mthirtysixpllc.com

*Attorneys for Defendants/Counterclaim-Plaintiffs*

## CERTIFICATE OF SERVICE

I, Scott Crowell, hereby certify that I filed through the ECF System and therefore copies of the

Memorandum in Support of the Motion to Stay will be sent electronically to the registered

participants as identified on the Notice of Electronic Filing (NEF); paper copies will be sent, via

first-class mail, to those indicated as non-registered participants.

Dated: July 11, 2019.

/s/ *Scott Crowell*
SCOTT CROWELL